No. 21-1292

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

MANI BATCHU,
PETITIONER-APPELLANT

v.

UNITED STATES OF AMERICA,
RESPONDENT-APPELLEE

ON APPEAL FROM AN ORDER DENYING A MOTION TO VACATE,
SET ASIDE, OR CORRECT A SENTENCE UNDER 28 U.S.C. §2255,
ENTERED IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

GOVERNMENT'S SUPPLEMENTAL APPENDIX

RACHAEL S. ROLLINS
UNITED STATES ATTORNEY

MARK T. QUINLIVAN
ASSISTANT U.S. ATTORNEY
JOHN JOSEPH MOAKLEY U.S. COURTHOUSE
1 COURTHOUSE WAY
SUITE 9200
BOSTON, MASSACHUSETTS 02210
(617) 748-3606

No. 21-1292

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

### MANI BATCHU,
### PETITIONER-APPELLANT

v.

### UNITED STATES OF AMERICA,
### RESPONDENT-APPELLEE

### ON APPEAL FROM AN ORDER DENYING A MOTION TO VACATE, SET ASIDE, OR CORRECT A SENTENCE UNDER 28 U.S.C. §2255, ENTERED IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

### GOVERNMENT'S SUPPLEMENTAL APPENDIX

## Table of Contents

1.  Docket Sheet ........................................................................G.App.1

2.  Indictment (Docket No. 22) ...............................................G.App.31

3.  Plea Agreement (Docket No. 79) ......................................G.App.45

4.  Transcript of Plea Hearing.................................................G.App.75

5.  Motion to Continue (Docket No. 84) ...............................G.App.139

6.    Motion to Reconsider (Docket Entry No. 86) ................................G.App.141

7.    Sentencing Memorandum (Docket Entry No. 89) .........................G.App.145

8.    Transcript of Sentencing Hearing....................................................G.App.149

9.    Judgment in a Criminal Case (excluding Statement of Reasons) (Docket Entry No. 91) ......................................................................G.App.251

10.    Motion Under 28 U.S.C. §2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Docket No. 126) ..........G.App.259

11.    Petitioner's Supplemental Petition for Relief Under 28 U.S.C. §2255 (Docket No. 132) ..................................................G.App.281

12.    Verified Affidavit of Richard N. Foley (Docket No. 133)..............G.App.327

13.    Transcript of Evidentiary Hearing..................................................G.App.393

14.    Request for Amended or Additional Findings Under Fed. R. Civ. P. 52 (Docket No. 285) ...............................................G.App.465

15.    Motion for Certificate of Appealability (Docket No. 286) .............G.App.471

16.    Motion for Reconsideration (Docket No. 287)................................G.App.477

17.    Notice of Appeal (Docket No. 290).................................................G.App.481

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Crim. No. 10-300⟨⟩-MAP |
| | ) | |
| v. | ) | **VIOLATIONS** |
| | ) | |
| MANI M. BATCHU, | ) | 18 U.S.C. § 2423(a) - Transportation Of A |
| also known as "Mark Taylor," | ) | Minor To Engage In Criminal Sexual Activity |
| | ) | (Count One) |
| | ) | |
| | ) | 18 U.S.C. § 2423(b) - Interstate Travel For |
| | ) | The Purpose Of Engaging In Illicit Sexual |
| | ) | Conduct With A Minor |
| | ) | (Counts Two Through Four) |
| | ) | |
| | ) | 18 U.S.C. § 2422(b) - Use of Facility Of |
| | ) | Interstate Commerce To Entice Minor To |
| | ) | Engage In Criminal Sexual Activity |
| | ) | (Count Five) |
| | ) | |
| | ) | 18 U.S.C. § 2251(a) - Sexual Exploitation Of |
| | ) | A Minor |
| | ) | (Counts Six and Seven) |
| | ) | |
| | ) | 18 U.S.C. § 2252(a)(4)(B) - Possession Of |
| | ) | Material Involving The Sexual Exploitation Of |
| | ) | A Minor |
| | ) | (Count Eight) |
| | ) | |
| | ) | 18 U.S.C.  § 2253 - Asset Forfeiture |
| Defendant. | ) | Allegations |

## INDICTMENT

The Grand Jury charges:

### COUNT ONE:  18 U.S.C. § 2423(a) - Transportation Of A Minor To Engage In Criminal Sexual Activity

1.     On or about May 1, 2009, within the District of Massachusetts and elsewhere,

**MANI M. BATCHU,
also known as "Mark Taylor,"**

defendant herein, did knowingly transport Minor A, an individual who had not attained the age of

18 years, in interstate commerce, with the intent that such individual engage in any sexual activity for which any person can be charged with a criminal offense.

All in violation of Title 18, United States Code, Section 2423(a).

2

**G.App.2**

The Grand Jury further charges:

**COUNT TWO:**     **18 U.S.C. § 2423(b) - Interstate Travel For The Purpose Of Engaging In Illicit Sexual Conduct With A Minor**

2.     On or about May 1, 2009, within the District of Massachusetts and elsewhere,

**MANI M. BATCHU,**
**also known as "Mark Taylor,"**

defendant herein, did knowingly travel in interstate commerce for the purpose of engaging in illicit

sexual conduct with another person, to wit, engaging in a sexual act (as defined in Title 18, United

States Code, Section 2246) with Minor A, who was a person under 18 years of age, that would be

in violation of chapter 109A if the sexual act occurred in the special maritime and territorial

jurisdiction of the United States.

All in violation of Title 18, United States Code, Section 2423(b).

3

**G.App.3**

The Grand Jury further charges:

**COUNT THREE:**   **18 U.S.C. § 2423(b) - Interstate Travel For The Purpose Of Engaging In Illicit Sexual Conduct With A Minor**

3.      On or about May 23, 2009, within the District of Massachusetts and elsewhere,

**MANI M. BATCHU,**
**also known as "Mark Taylor,"**

defendant herein, did knowingly travel in interstate commerce for the purpose of engaging in illicit

sexual conduct with another person, to wit, engaging in a sexual act (as defined in Title 18, United

States Code, Section 2246) with Minor A, who was a person under 18 years of age, that would be

in violation of chapter 109A if the sexual act occurred in the special maritime and territorial

jurisdiction of the United States.

All in violation of Title 18, United States Code, Section 2423(b).

4

**G.App.4**

The Grand Jury further charges:

**COUNT FOUR:**    **18 U.S.C. § 2423(b) - Interstate Travel For The Purpose Of Engaging In Illicit Sexual Conduct With A Minor**

4.    On or about August 3, 2009, within the District of Massachusetts and elsewhere,

**MANI M. BATCHU,**
**also known as "Mark Taylor,"**

defendant herein, did knowingly travel in interstate commerce for the purpose of engaging in illicit sexual conduct with another person, to wit, engaging in a sexual act (as defined in Title 18, United States Code, Section 2246) with Minor A, who was a person under 18 years of age, that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States.

All in violation of Title 18, United States Code, Section 2423(b).

**G.App.5**

The Grand Jury further charges:

**COUNT FIVE:**     **18 U.S.C. § 2422(b) - Use Of Facility Of Interstate Commerce To Entice Minor To Engage In Criminal Sexual Activity**

5.     Between on or about October 1, 2008 and on or about August 3, 2009, within the

District of Massachusetts and elsewhere,

**MANI M. BATCHU,**
**also known as "Mark Taylor,"**

defendant herein, using the mail and a facility and means of interstate and foreign commerce, did

knowingly persuade, induce, entice, and coerce Minor A, an individual who had not attained the age

of 18 years, to engage in any sexual activity for which any person can be charged with a criminal

offense.

All in violation of Title 18, United States Code, Section 2422(b).

6

**G.App.6**

The Grand Jury further charges:

**COUNT SIX:**    **18 U.S.C. § 2251(a) - Sexual Exploitation Of A Minor**

6.    Between on or about October 1, 2008 and on or about June 9, 2009, within the District of Massachusetts and elsewhere,

**MANI M. BATCHU,**
**also known as "Mark Taylor,"**

defendant herein, did employ, use, persuade, induce, entice, and coerce any minor to engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct and for the purpose of transmitting a live visual depiction of such conduct, and the defendant knew and had reason to know that such visual depiction would be transported and transmitted using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce and mailed, and that such visual depiction was produced and transmitted using materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer, and that such visual depiction was actually transported and transmitted using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce and mailed.

All in violation of Title 18, United States Code, Section 2251(a).

7

**G.App.7**

The Grand Jury further charges:

## COUNT SEVEN:    18 U.S.C. § 2251(a) - Sexual Exploitation Of A Minor

7.    On or about July 18, 2009, within the District of Massachusetts and elsewhere,

### MANI M. BATCHU,
**also known as "Mark Taylor,"**

defendant herein, did employ, use, persuade, induce, entice, and coerce any minor to engage in any

sexually explicit conduct for the purpose of producing any visual depiction of such conduct and for

the purpose of transmitting a live visual depiction of such conduct, and the defendant knew and had

reason to know that such visual depiction would be transported and transmitted using any means and

facility of interstate and foreign commerce and in and affecting interstate and foreign commerce and

mailed,  and that such visual depiction was produced and transmitted using materials that had been

mailed, shipped, and transported in and affecting interstate and foreign commerce by any means,

including by computer, and that such visual depiction was actually transported and transmitted using

any means and facility of interstate and foreign commerce and in and affecting interstate and foreign

commerce and mailed.

All in violation of Title 18, United States Code, Section 2251(a).

8

**G.App.8**

The Grand Jury further charges:

**COUNT EIGHT:**    **18 U.S.C. § 2252(a)(4)(B) - Possession Of Material Involving The Sexual Exploitation Of A Minor**

8.    On or about August 3, 2009, within the District of Massachusetts and elsewhere,

**MANI M. BATCHU,**
**also known as "Mark Taylor,"**

defendant herein, knowingly possessed, and knowingly accessed with intent to view, one or more books, magazines, periodicals, films, video tapes, and other matter which contained any visual depiction that had been mailed, and had been shipped and transported using any means and facility of interstate and foreign commerce and in or affecting interstate and foreign commerce, and which was produced using materials which have been mailed and so shipped and transported, by any means including by computer, the producing of such visual depiction involving the use of a minor engaging in sexually explicit conduct and such visual depiction being of such conduct; that is: MANI M. BATCHU knowingly possessed and knowingly accessed with intent to view a computer and computer media, to wit, a black SanDisk Cruzer Micro 2.0 GB flash USB memory drive bearing number BE06063BB, which contained visual depictions of minors engaging in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2), such as: xxx824 Video on 2009-07-18 at 18.09.mpg and xxx824 Video on 2009-07-18 at 16.21.mpg.

All in violation of Title 18, United States Code, Section 2252(a)(4)(B).

9

The Grand Jury further charges:

## ASSET FORFEITURE ALLEGATIONS
### (18 U.S.C. §§ 2253 and 2428, 28 U.S.C. § 2461(c))

1.      The allegations of Counts One through Seven of this Indictment are hereby re-alleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. §§ 2253 and 2428 and 28 U.S.C. § 2461(c).

2.      Upon conviction of any offenses alleged in Counts One, Two, and Four of this Indictment, in violation of 18 U.S.C. § 2423,

### MANI M. BATCHU,
### also known as "Mark Taylor,"

defendant herein, shall forfeit to the United States, pursuant to 18 U.S.C. § 2428, any property, real or personal, that was used or intended to be used to commit or to facilitate the commission of the offenses, and any property, real or personal, constituting or derived from any proceeds that the defendant obtained, directly or indirectly, as a result of the offenses.

3.      Upon conviction of the offense alleged in Count Three of this Indictment, in violation of 18 U.S.C. § 2423,

### MANI M. BATCHU,
### also known as "Mark Taylor,"

defendant herein, shall forfeit to the United States, pursuant to 18 U.S.C. § 2428, any property, real or personal, that was used or intended to be used to commit or to facilitate the commission of the offenses, and any property, real or personal, constituting or derived from any proceeds that the defendant obtained, directly or indirectly, as a result of the offenses. The property to be forfeited includes, but is not limited to, one silver 2002 Lexus IS 300, bearing Vehicle Identification Number JTHBD192820035037 and Illinois Registration Number VBATCHU.

10

**G.App.10**

4. Upon conviction of the offense alleged in Count Five of this Indictment, in violation of 18 U.S.C. § 2422(b),

**MANI M. BATCHU,**

**also known as "Mark Taylor,"**

defendant herein, shall forfeit to the United States, pursuant to 18 U.S.C. § 2428, any property, real or personal, that was used or intended to be used to commit or to facilitate the commission of the offense, and any property, real or personal, constituting or derived from any proceeds that the defendant obtained, directly or indirectly, as a result of the said violation. The property to be forfeited includes, but is not limited to:

        (1)     one Apple MacBook Pro bearing serial number W8734MNOZ5W; and

        (2)     one Apple MacBook Pro bearing serial number W8928JY566D.

5. If any of the property described in paragraphs 2 through 4, above, as a result of any act or omission of the defendant,

        (a)     cannot be located upon the exercise of due diligence;

        (b)     has been transferred or sold to, or deposited with, a third party;

        (c)     has been placed beyond the jurisdiction of the Court;

        (d)     has been substantially diminished in value; or

        (e)     has been commingled with other property which cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to 28 U.S.C. § 2461(c), incorporating 21 U.S.C. § 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in subparagraphs (a) through (e) of this paragraph.

6. Upon conviction of the offense alleged in Count Six of this Indictment, in violation

11

**G.App.11**

of 18 U.S.C. § 2251(a),

**MANI M. BATCHU,**
**also known as "Mark Taylor,"**

defendant herein, shall forfeit to the United States, pursuant to 18 U.S.C. § 2253, any matter which contains visual depictions produced, transported, mailed, shipped, or received in violation of 18 U.S.C. § 2251; any property, real or personal, constituting or traceable to gross profits or other proceeds the defendant obtained as a result of the said violations; and any property, real or personal, used or intended to be used to commit or to promote the commission of the violations or any property traceable to such property.    The property to be forfeited includes, but is not limited to one Apple MacBook Pro bearing serial number W8734MNOZ5W.

7.    Upon conviction of any offenses alleged in Counts Seven and Eight of this Indictment, in violation of 18 U.S.C. § 2251(a),

**MANI M. BATCHU,**
**also known as "Mark Taylor,"**

defendant herein, shall forfeit to the United States, pursuant to 18 U.S.C. § 2253, any matter which contains visual depictions produced, transported, mailed, shipped, or received in violation of 18 U.S.C. § 2251; any property, real or personal, constituting or traceable to gross profits or other proceeds the defendant obtained as a result of the said violations; and any property, real or personal, used or intended to be used to commit or to promote the commission of the violations or any property traceable to such property.    The property to be forfeited includes, but is not limited to one black SanDisk Cruzer Micro 2.0 GB flash USB memory drive bearing number BE06063BB.

8.    If any of the property described in paragraphs 6 and 7, above, as a result of any act or omission of the defendant,

12

**G.App.12**

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the Court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to 18 U.S.C. § 2253(b), incorporating 21 U.S.C. § 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in subparagraphs (a) through (e) of this paragraph.

All pursuant to Title 18, United States Code, Sections 2253 and 2428, and Title 28, United States Code, Section 2428(c).

A TRUE BILL

FOREPERSON OF THE GRAND JURY

STEVEN H. BRESLOW
ASSISTANT U.S. ATTORNEY

DISTRICT OF MASSACHUSETTS:

Returned into the District Court by the Grand
Jurors and filed on April 1st, 2010.

DEPUTY CLERK OF COURT

14

G.App.14

APPEAL,CUSTODY,VICTIM

# United States District Court
## District of Massachusetts (Springfield)
## CRIMINAL DOCKET FOR CASE #: 3:10–cr–30008–MGM–1

Case title: USA v. Batchu

Related Case: 3:14–cv–30203–MGM
Magistrate judge case number: 3:09–mj–00711–KPN

Date Filed: 04/05/2010

Date Terminated: 11/30/2011

Assigned to: Judge Mark G.
Mastroianni

Appeals court case numbers:
11–2414 First Circuit, 13–6914
Supreme Court of the United
States, 21–1292 USCA – First
Circuit

**Defendant (1)**

| | | |
|---|---|---|
| **Mani Batchu**<br>*TERMINATED: 11/30/2011* | represented by | **Mani Batchu**<br>Reg. No. 91057–038<br>Inmate Mail, FCI Beaumont Low<br>P.O. Box 26020<br>Beaumont, TX 77720<br>PRO SE |

**Francis T. O'Brien , Jr.**
O'Brien Law Boston, PC
10 Tremont Street
Suite 602
Boston, MA 02108
617–512–0939
Fax: 781–740–7207
Email: fob@obrienlawboston.com
*TERMINATED: 06/09/2010*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Kevin L. Barron**
Kevin L. Barron
Attorney at Law
50 Congress Street, 6th Flr.
Boston, MA 02109
617–407–6837
Email: kevinbarronesq@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Richard N. Foley**
55 Market Street 2B
Portsmouth, NH 03801
603–433–1303
Fax: 603–433–1214
Email: rfoley@lawofficesofrichardfoley.com

**G.App.15**

*TERMINATED: 01/12/2017*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Pending Counts**

TRANSPORTATION OF A
MINOR TO ENGAGE IN
CRIMINAL SEXUAL
ACTIVITY, 18:2423.F
(1)

**Disposition**

365 months imprisonment to run concurrently. 360 months supervised release. 1. The defendant is prohibited from possessing a firearm, destructive device, or other dangerous weapon. 2. The defendant is prohibited from incurring new credit charges or opening additional lines of credit without the approval of the Probation Office while any financial obligations remain outstanding. 3. The defendant is to provide the Probation Office access to any requested financial information, which may be shared with the Financial Litigation Unit of the U.S. Attorneys Office. 4. The defendant is to participate in a sex offender specific treatment program which may include sex offender specific testing at the direction of the Probation Office. The defendant shall be required to contribute to the costs of services for such treatment based on the ability to pay or availability of third–party payment. 5. The defendant shall be required to submit to periodic polygraph testing as a means to insure that he is in compliance with the requirements of the therapeutic program. No violation proceedings will arise based solely on a defendants failure to pass the polygraph. Such an event could, however, generate a separate investigation. When submitting to a polygraph exam, the defendant does not waive his Fifth Amendment rights, and the defendants exercise of his Fifth Amendment rights will not give rise to violation proceedings. The defendant shall be required to contribute to the costs of testing based on the ability to pay or availability of third–party payment. 6. The defendant is prohibited from engaging in an occupation, business, or profession that would require or enable him to have direct or indirect supervision of children under the age of 18 and is not to have unsupervised contact with anyone under the age of 18. 7. The defendant is prohibited from possessing a computer and/or related materials except as deemed necessary for work purposes. 8. The defendant shall allow the U.S. Probation Office to install software (IPPC) designed to monitor computer activities on any computer the defendant is authorized to use. This may include, but is not limited to, software that may record any and all activity on the computers the defendant may use, including the capture of keystrokes, application information, internet use history, email correspondence, and chat conversations. The defendant will pay any costs related to the monitoring of his computer usage. 9. The defendant shall have no use of the Internet at his home, work, or elsewhere. 10. The defendant is prohibited from viewing or possessing any kind of pornography or sexually explicit materials, adult or otherwise. 11. The defendant shall report his address, and any subsequent address changes, to the Probation Office. 12.The defendant shall register as a sex offender as required in any state where he resides, is employed, carries on a vocation, or is a student. 13.The

**G.App.16**

defendant shall use his true name and is prohibited from the use of any false identifying information which includes, but is not limited to, any aliases, false dates of birth, false social security numbers, and incorrect places of birth. 14. Defendant shall not contact, directly or indirectly, any victim, including Minor A, or family member of any victim, of the charged offenses. 15. Defendant shall promptly notify the Probation Department of any contact, direct or indirect, by any victim, including Minor A and Minor C, or family member of any victim, of the charged offenses. 16. Defendant shall \"submit his person, and any property, house, residence, vehicle, papers, computer, other electronic communications, or data storage devices or media, and effects to search at any time, with or without a warrant, by any law enforcement or probation officer with reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct by the person, and by any probation officer in the lawful discharge of the officer's supervision functions,\" pursuant to 18 U.S.C. 3583(d). Special assessment fee of $500 to be paid immediately. Restitution in the amount of $2,500,000. Forfeiture of the following: (1) one Apple MacBook Pro with serial number W8734MNOZ5W; (2) one Apple MacBook Pro bearing serial number W8928JY566D; (3) one black SanDisk Cruzer Micro 2.0 GB flash USB memory drive bearing number BE06063BB; (4) one silver Casio Exilim 3.2 MP digital camera bearing serial number 1280444A; and (5) one silver 2002 Lexus IS 300, bearing Vehicle Identification Number JTHBD192820035037 and Illinois Registration Number VBATCHU.

INTERSTATE TRAVEL FOR THE PURPOSE OF ENGAGING IN ILLICIT SEXUAL CONDUCT WITH A MINOR, 18:2423.F
(2–4)

365 months imprisonment to run concurrently. 360 months supervised release. 1. The defendant is prohibited from possessing a firearm, destructive device, or other dangerous weapon. 2. The defendant is prohibited from incurring new credit charges or opening additional lines of credit without the approval of the Probation Office while any financial obligations remain outstanding. 3. The defendant is to provide the Probation Office access to any requested financial information, which may be shared with the Financial Litigation Unit of the U.S. Attorneys Office. 4. The defendant is to participate in a sex offender specific treatment program which may include sex offender specific testing at the direction of the Probation Office. The defendant shall be required to contribute to the costs of services for such treatment based on the ability to pay or availability of third–party payment. 5. The defendant shall be required to submit to periodic polygraph testing as a means to insure that he is in compliance with the requirements of the therapeutic program. No violation proceedings will arise based solely on a defendants failure to pass the polygraph. Such an event could, however, generate a separate investigation. When submitting to a polygraph exam, the defendant does not waive his Fifth Amendment rights, and the defendants exercise of his Fifth Amendment rights will not give rise to violation proceedings. The defendant shall be required to contribute to the costs of testing based on the ability

to pay or availability of third–party payment. 6. The defendant is prohibited from engaging in an occupation, business, or profession that would require or enable him to have direct or indirect supervision of children under the age of 18 and is not to have unsupervised contact with anyone under the age of 18. 7. The defendant is prohibited from possessing a computer and/or related materials except as deemed necessary for work purposes. 8. The defendant shall allow the U.S. Probation Office to install software (IPPC) designed to monitor computer activities on any computer the defendant is authorized to use. This may include, but is not limited to, software that may record any and all activity on the computers the defendant may use, including the capture of keystrokes, application information, internet use history, email correspondence, and chat conversations. The defendant will pay any costs related to the monitoring of his computer usage. 9. The defendant shall have no use of the Internet at his home, work, or elsewhere. 10. The defendant is prohibited from viewing or possessing any kind of pornography or sexually explicit materials, adult or otherwise. 11. The defendant shall report his address, and any subsequent address changes, to the Probation Office. 12.The defendant shall register as a sex offender as required in any state where he resides, is employed, carries on a vocation, or is a student. 13.The defendant shall use his true name and is prohibited from the use of any false identifying information which includes, but is not limited to, any aliases, false dates of birth, false social security numbers, and incorrect places of birth. 14. Defendant shall not contact, directly or indirectly, any victim, including Minor A, or family member of any victim, of the charged offenses. 15. Defendant shall promptly notify the Probation Department of any contact, direct or indirect, by any victim, including Minor A and Minor C, or family member of any victim, of the charged offenses. 16. Defendant shall \"submit his person, and any property, house, residence, vehicle, papers, computer, other electronic communications, or data storage devices or media, and effects to search at any time, with or without a warrant, by any law enforcement or probation officer with reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct by the person, and by any probation officer in the lawful discharge of the officer's supervision functions,\" pursuant to 18 U.S.C. 3583(d). Special assessment fee of $500 to be paid immediately. Restitution in the amount of $2,500,000. Forfeiture of the following: (1) one Apple MacBook Pro with serial number W8734MNOZ5W; (2) one Apple MacBook Pro bearing serial number W8928JY566D; (3) one black SanDisk Cruzer Micro 2.0 GB flash USB memory drive bearing number BE06063BB; (4) one silver Casio Exilim 3.2 MP digital camera bearing serial number 1280444A; and (5) one silver 2002 Lexus IS 300, bearing Vehicle Identification Number JTHBD192820035037 and Illinois Registration Number VBATCHU.

USE OF A FACILITY OF INTERSTATE COMMERCE TO ENTICE MINOR TO ENGAGE IN CRIMINAL SEXUAL ACTIVITY, 18:2422.F (5)

365 months imprisonment to run concurrently. 360 months supervised release. 1. The defendant is prohibited from possessing a firearm, destructive device, or other dangerous weapon. 2. The defendant is prohibited from incurring new credit charges or opening additional lines of credit without the approval of the Probation Office while any financial obligations remain outstanding. 3. The defendant is to provide the Probation Office access to any requested financial information, which may be shared with the Financial Litigation Unit of the U.S. Attorneys Office. 4. The defendant is to participate in a sex offender specific treatment program which may include sex offender specific testing at the direction of the Probation Office. The defendant shall be required to contribute to the costs of services for such treatment based on the ability to pay or availability of third–party payment. 5. The defendant shall be required to submit to periodic polygraph testing as a means to insure that he is in compliance with the requirements of the therapeutic program. No violation proceedings will arise based solely on a defendants failure to pass the polygraph. Such an event could, however, generate a separate investigation. When submitting to a polygraph exam, the defendant does not waive his Fifth Amendment rights, and the defendants exercise of his Fifth Amendment rights will not give rise to violation proceedings. The defendant shall be required to contribute to the costs of testing based on the ability to pay or availability of third–party payment. 6. The defendant is prohibited from engaging in an occupation, business, or profession that would require or enable him to have direct or indirect supervision of children under the age of 18 and is not to have unsupervised contact with anyone under the age of 18. 7. The defendant is prohibited from possessing a computer and/or related materials except as deemed necessary for work purposes. 8. The defendant shall allow the U.S. Probation Office to install software (IPPC) designed to monitor computer activities on any computer the defendant is authorized to use. This may include, but is not limited to, software that may record any and all activity on the computers the defendant may use, including the capture of keystrokes, application information, internet use history, email correspondence, and chat conversations. The defendant will pay any costs related to the monitoring of his computer usage. 9. The defendant shall have no use of the Internet at his home, work, or elsewhere. 10. The defendant is prohibited from viewing or possessing any kind of pornography or sexually explicit materials, adult or otherwise. 11. The defendant shall report his address, and any subsequent address changes, to the Probation Office. 12.The defendant shall register as a sex offender as required in any state where he resides, is employed, carries on a vocation, or is a student. 13.The defendant shall use his true name and is prohibited from the use of any false identifying information which includes, but is not limited to, any aliases, false dates of birth, false social security numbers, and incorrect places of birth. 14. Defendant shall not contact, directly or indirectly, any victim, including

Minor A, or family member of any victim, of the charged offenses. 15. Defendant shall promptly notify the Probation Department of any contact, direct or indirect, by any victim, including Minor A and Minor C, or family member of any victim, of the charged offenses. 16. Defendant shall \"submit his person, and any property, house, residence, vehicle, papers, computer, other electronic communications, or data storage devices or media, and effects to search at any time, with or without a warrant, by any law enforcement or probation officer with reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct by the person, and by any probation officer in the lawful discharge of the officer's supervision functions,\" pursuant to 18 U.S.C. 3583(d). Special assessment fee of $500 to be paid immediately. Restitution in the amount of $2,500,000. Forfeiture of the following: (1) one Apple MacBook Pro with serial number W8734MNOZ5W; (2) one Apple MacBook Pro bearing serial number W8928JY566D; (3) one black SanDisk Cruzer Micro 2.0 GB flash USB memory drive bearing number BE06063BB; (4) one silver Casio Exilim 3.2 MP digital camera bearing serial number 1280444A; and (5) one silver 2002 Lexus IS 300, bearing Vehicle Identification Number JTHBD192820035037 and Illinois Registration Number VBATCHU.

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| SEXUAL EXPLOITATION OF A MINOR, 18:2251.F (6) | Dismissed by government motion |
| SEXUAL EXPLOITATION OF A MINOR, 18:2251.F (7) | Dismissed by government motion |
| POSSESSION OF MATERIAL INVOLVING THE SEXUAL EXPLOITATION OF A MINOR, 18:2252A.F (8) | Dismissed by government motion |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
| --- | --- |
| 18:2423.F TRANSPORTATION OF A MINOR WITH INTENT TO ENGAGE IN CRIMINAL SEXUAL ACTIVITY | |

**Plaintiff**

**USA**                                            represented by    **Alex J. Grant**
United States Attorney's Office
United States Courthouse
300 State Street
Suite 230
Springfield, MA 01105−2926
413−785−0395
Fax: 413−785−0394
Email: Alex.Grant@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Alexandra R. Gelber**
U.S. Department of Justice
1400 New York Avenue NW
Suite 600
Washington, DC 20530
202−307−1316
Fax: 202−514−1793
Email: alexandra.gelber@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Anitha S. Ibrahim**
U.S. Department of Justice Criminal
Division
1400 New York Avenue., NW, 6th Flr.
Washington, DC 20005
202−616−3181
Email: anitha.ibrahim@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Steven H. Breslow**
United States Attorney's Office
300 State Street
Springfield, MA 01105−2926
413−785−0330
Fax: 413−785−0394
Email: steve.breslow@usdoj.gov
*TERMINATED: 12/29/2016*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/17/2009 | | Arrest of Mani Batchu (Healy, Bethaney) [3:09−mj−00711−KPN] (Entered: 09/18/2009) |
| 09/17/2009 | 1 | COMPLAINT as to Mani Batchu. (Healy, Bethaney) (Additional attachment(s) added on 9/18/2009: # 1 js45) (Healy, Bethaney). (Additional attachment(s) added on 9/23/2009: # 2 redacted complaint) (Healy, Bethaney). [3:09−mj−00711−KPN] (Entered: 09/18/2009) |
| 09/17/2009 | 2 | MOTION for Detention as to Mani Batchuby USA. (Healy, Bethaney) [3:09−mj−00711−KPN] (Entered: 09/18/2009) |
| 09/17/2009 | | Electronic Clerk Notes for proceedings held before Judge Michael A Ponsor: Initial Appearance as to Mani Batchu held on 9/17/2009. Counsel and Defendant appear for initial appearance. Defendant advised of rights. Defendant retains private counsel. Government seeking detention. Court orders Defendant detained pending hearing on 9/18/09 at 11:30 a.m. before Magistrate Judge Neiman. Court requests USMS transport Deft to courthouse early to allow for PTS interview. (Court Reporter Alice Moran.)(Attorneys present: O'Regan, O'Brien) (Healy, Bethaney) |

**G.App.21**

| | | |
|---|---|---|
| | | [3:09–mj–00711–KPN] (Entered: 09/18/2009) |
| 09/17/2009 | 3 | Judge Michael A Ponsor: ORDER OF TEMPORARY DETENTION as to Mani Batchu ENTERED, cc:cl. Detention Hearing set for 9/18/2009 11:30 AM in Hampshire Courtroom before Magistrate Judge Kenneth P. Neiman. (Healy, Bethaney) [3:09–mj–00711–KPN] (Entered: 09/18/2009) |
| 09/18/2009 | | Attorney update in case as to Mani Batchu. Attorney Kevin O'Regan terminated (Attorney O'Regan appeared on behalf of Attorney Breslow for the initial appearance). (Healy, Bethaney) [3:09–mj–00711–KPN] (Entered: 09/18/2009) |
| 09/18/2009 | | Electronic Clerk Notes for proceedings held before Magistrate Judge Kenneth P. Neiman: Counsel and Defendant appear for Detention Hearing as to Mani Batchu held on 9/18/2009, Preliminary Examination as to Mani Batchu held on 9/18/2009. Defendant waives preliminary examination. Government is moving for detention. Government indicates that it will seek an extension of the time to return an indictment. Colloquy re: circumstances of arrest. Defendant requests the detention issue be continued to 9/23/09. Court allows request and continues hearing to 9/23/09 at 11:00 a.m. (Court Reporter FTR (11:30 a.m.).)(Attorneys present: Breslow,O'Brien) (Healy, Bethaney) [3:09–mj–00711–KPN] (Entered: 09/18/2009) |
| 09/18/2009 | 4 | WAIVER of Preliminary Examination or Hearing by Mani Batchu (Healy, Bethaney) [3:09–mj–00711–KPN] (Entered: 09/18/2009) |
| 09/21/2009 | 5 | Joint MOTION for Excludable Delay from 10/16/2009 to 12/15/2009 as to Mani Batchuby USA. (Breslow, Steven) [3:09–mj–00711–KPN] (Entered: 09/21/2009) |
| 09/23/2009 | 6 | MEMORANDUM in Support by USA as to Mani Batchu re 2 MOTION for Detention (Attachments: # 1 Exhibit Compact Disc Filed Under Seal, # 2 Exhibit Service Of Restraining Order.05–24–09, # 3 Exhibit Service of Restraining Order.05–29–09, # 4 Exhibit Docket Sheet and Release Conditions.Massachusetts District Court, # 5 Exhibit Docket and Release Conditions.Connecticut Superior Court)(Breslow, Steven) (Additional attachment(s) added on 9/23/2009: # 6 redacted Exhibit B, # 7 Redacted Exhibit C, # 8 Redacted Exhibit D, # 9 Redacted Exhibit E) (Healy, Bethaney). [3:09–mj–00711–KPN] (Entered: 09/23/2009) |
| 09/23/2009 | | Judge Michael A Ponsor: Electronic ORDER entered granting 5 Motion to Exclude as to Mani Batchu (1). THE INTEREST OF JUSTICE IN THIS CIRCUMSTANCE OUTWEIGH THE USUAL INTEREST OF A SPEEDY TRIAL (Pelegano, Theresa) [3:09–mj–00711–KPN] (Entered: 09/23/2009) |
| 09/23/2009 | 7 | Judge Michael A Ponsor: ElectronicORDER entered. ORDER ON EXCLUDABLE DELAY as to Mani Batchu Time excluded from 10/16/2009 until 12/15/2009. (Pelegano, Theresa) [3:09–mj–00711–KPN] (Entered: 09/23/2009) |
| 09/23/2009 | | Magistrate Judge Kenneth P. Neiman: Electronic ORDER entered granting 2 Government's Motion for Detention for the reasons stated and within the parameters set forth in court this day. So ordered. (Neiman, Kenneth) [3:09–mj–00711–KPN] (Entered: 09/23/2009) |
| 09/23/2009 | | Electronic Clerk Notes for proceedings held before Magistrate Judge Kenneth P. Neiman: Detention Hearing as to Mani Batchu held on 9/23/2009. Arguments heard. Court hears from victim's mother. Defendant ordered detained. (Court Reporter FTR.)(Attorneys present: Breslow, O'Brien) (Healy, Bethaney) [3:09–mj–00711–KPN] (Entered: 10/04/2009) |
| 09/25/2009 | 8 | Assented to MOTION to redact court filings filed under seal as to Mani Batchu by USA. (Attachments: # 1 Proposed Redacted Filing (1of2), # 2 Proposed Redacted Filing (2of2))(Lindsay, Maurice) [3:09–mj–00711–KPN] (Entered: 09/25/2009) |
| 09/25/2009 | | Magistrate Judge Kenneth P. Neiman: Electronic ORDER entered with regard to 8 Government's Motion to Redact references to the alleged victim's initials in court filings. Although the court doubts the efficacy of the redactions at this time, it will, with the assent of Defendant, allow the motion. So ordered.(Neiman, Kenneth) [3:09–mj–00711–KPN] (Entered: 09/25/2009) |
| 11/24/2009 | 9 | Joint MOTION for Excludable Delay from 12/15/2009 to 01/29/2010 as to Mani Batchuby USA. (Breslow, Steven) [3:09–mj–00711–KPN] (Entered: 11/24/2009) |

**G.App.22**

| 11/25/2009 | | Judge Michael A Ponsor: Electronic ORDER entered granting 9 Motion to Exclude as to Mani Batchu (1). The interest of justice in this circumstance outweigh the usual interest in a speedy trial. (Pelegano, Theresa) [3:09−mj−00711−KPN] (Entered: 11/25/2009) |
| 11/25/2009 | 10 | Judge Michael A Ponsor: ElectronicORDER entered. ORDER ON EXCLUDABLE DELAY as to Mani Batchu Time excluded from 12/15/09 until 1/29/10. (Pelegano, Theresa) [3:09−mj−00711−KPN] (Entered: 11/25/2009) |
| 11/30/2009 | 11 | MOTION for Reconsideration re 2 MOTION for Detention filed by USA as to Mani Batchu. (O'Brien, Francis) [3:09−mj−00711−KPN] (Entered: 11/30/2009) |
| 12/11/2009 | 12 | Govt's SEALED MOTION to submit redacted memorandum in opp. to Deft's motion to reconsider order of pretrial detentionas to Mani Batchuby USA filed. (Finn, Mary) [3:09−mj−00711−KPN] (Entered: 12/14/2009) |
| 12/11/2009 | 13 | REDACTED MEMORANDUM in Opposition by USA as to Mani Batchu re 11 MOTION for Reconsideration re 2 MOTION for Detention filed by USA. (Attachments: # 1 Exhibit)(Finn, Mary) [3:09−mj−00711−KPN] (Entered: 12/14/2009) |
| 12/11/2009 | 14 | Sealed Document by United States of America filed. (Attachments: # 1 Exhibit)(Finn, Mary) [3:09−mj−00711−KPN] (Entered: 12/14/2009) |
| 12/15/2009 | | Magistrate Judge Kenneth P. Neiman: Electronic ORDER entered granting 12 Government's Motion to Submit Redacted Memorandum in Opposition, provided that an unredacted copy be provided to Defendant. So ordered. (Neiman, Kenneth) [3:09−mj−00711−KPN] (Entered: 12/15/2009) |
| 12/22/2009 | | Magistrate Judge Kenneth P. Neiman: Electronic ORDER entered granting 11 Defendant's Motion for Reconsideration but, after such reconsideration, denying his request for release on conditions. In essence, Defendant had not rebutted the presumption that he should be detained. First, in the court's estimation, the proposed conditions of release, namely, the posting of property and electronic monitoring, are not sufficient to assure against the risk of flight or the safety of the community. Second, Defendant has repeatedly shown his inability to abide by conditions previously set by other courts. Third, the fact that he has remained incarcerated for some time now is related, in large part, to his agreement to extend the deadline for an indictment to issue. Finally, formal charges have since been filed against him in Florida as well, for which a warrant has issued; there is no assurance that the court there would permit his release even if this court were inclined to do so. So ordered. (Neiman, Kenneth) [3:09−mj−00711−KPN] (Entered: 12/22/2009) |
| 01/13/2010 | 15 | Joint MOTION for Excludable Delay from 01/29/2010 to 03/26/2010 *(and from 09/17/09 to 10/16/09)* as to Mani Batchuby USA. (Breslow, Steven) [3:09−mj−00711−KPN] (Entered: 01/13/2010) |
| 01/15/2010 | | Judge Michael A Ponsor: Electronic ORDER entered granting 15 Motion to Exclude as to Mani Batchu (1). The government will file its indictment on or before MArch 26, 2010. The intervening time is hereby excluded in the interest of justice. (Pelegano, Theresa) Modified on 1/15/2010 to add text(Pelegano, Theresa). [3:09−mj−00711−KPN] (Entered: 01/15/2010) |
| 01/15/2010 | 16 | Judge Michael A Ponsor: ElectronicORDER entered. ORDER ON EXCLUDABLE DELAY as to Mani Batchu Time excluded from 12/15/09 until 3/26/10. (Pelegano, Theresa) [3:09−mj−00711−KPN] (Entered: 01/15/2010) |
| 01/19/2010 | | Judge Michael A Ponsor: ElectronicORDER entered. as to Mani Batchu re 15 Joint MOTION for Excludable Delay from 01/29/2010 to 03/26/2010 *(and from 09/17/09 to 10/16/09)* filed by USA −Addendum: with regard to footnote 1, the period from 9/17/09 to 10/16/09 is also excluded in the interest of justice. (Pelegano, Theresa) [3:09−mj−00711−KPN] (Entered: 01/19/2010) |
| 01/19/2010 | 17 | Judge Michael A Ponsor: ElectronicORDER entered. ORDER ON EXCLUDABLE DELAY as to Mani Batchu Time excluded from 9/17/09 until 10/16/09. (Pelegano, Theresa) [3:09−mj−00711−KPN] (Entered: 01/19/2010) |
| 02/11/2010 | 18 | MOTION to Withdraw as Attorney by Francis T. O'Brien, Jr. and MOTION to Appoint New Counsel ( Responses due by 2/25/2010) as to Mani Batchu filed. (Finn, |

**G.App.23**

| | | |
|---|---|---|
| | | Mary) [3:09–mj–00711–KPN] (Entered: 02/11/2010) |
| 02/11/2010 | | Notice of correction to docket made by Court staff. Correction: Document 18 – Deft's motion to withdraw as counsel. corrected because: Motion deleted and re–docketed due to the motion contains two relief – Motion to withdraw as counsel and motion to appoint new counsel. When motion originally docketed it only contained one relief – Motion to withdraw as counsel as to Mani Batchu. (Finn, Mary) [3:09–mj–00711–KPN] (Entered: 02/11/2010) |
| 02/11/2010 | | Magistrate Judge Kenneth P. Neiman: ELECTRONIC ORDER entered as to Mani Batchu re 18 MOTION to Withdraw as Attorney by Francis T. O'Brien, Jr. and for Appointment of Counsel, cc:cl. In order for the court to consider the appointment of counsel, Defendant must submit under seal a completed financial affidavit (Form CJA–23), and shall do so by no later than February 25, 2010. (Healy, Bethaney) [3:09–mj–00711–KPN] (Entered: 02/11/2010) |
| 03/01/2010 | | Magistrate Judge Kenneth P. Neiman: Electronic ORDER entered denying without prejudice 18 Defendant's counsel's Motion to Withdraw and to Appoint Substitute Counsel, Defendant and Defendant's counsel having failed to submit under seal a completed financial affidavit by February 25, 2010, as ordered on February 11, 2010. So ordered. (Neiman, Kenneth) [3:09–mj–00711–KPN] (Entered: 03/01/2010) |
| 03/24/2010 | 20 | Assented to MOTION to Continue to 04/01/2010 to Indict Case, Assented to MOTION for Excludable Delay from 03/26/2010 to 04/23/2010 ( Responses due by 4/7/2010) as to Mani Batchuby USA. (Breslow, Steven) [3:09–mj–00711–KPN] (Entered: 03/24/2010) |
| 03/25/2010 | | Judge Michael A Ponsor: ORDER entered granting 20 Motion to Continue Time to Indict to 4/1/10 as to Mani Batchu (1); granting 20 Motion to Exclude Time from 3/26/10 – 4/23/10 in interests of justice as to Mani Batchu (1) (Stuckenbruck, John) [3:09–mj–00711–KPN] (Entered: 03/25/2010) |
| 03/25/2010 | 21 | Judge Michael A Ponsor: ORDER entered. ORDER ON EXCLUDABLE DELAY as to Mani Batchu Time excluded from 3/26/10 until 4/23/10. Reason for entry of order on excludable delay: 18 USC 3161(h)(8)(B)(i) Interests of justice. (Pelegano, Theresa) [3:09–mj–00711–KPN] (Entered: 03/25/2010) |
| 04/01/2010 | 22 | INDICTMENT as to Mani Batchu (1) count(s) 1, 2–4, 5, 6–7, 8. (Attachments: # 1 JS45)(Healy, Bethaney) (Entered: 04/06/2010) |
| 04/06/2010 | | Attorney update in case as to Mani Batchu. Attorney Steven Breslow added. (Healy, Bethaney) (Entered: 04/06/2010) |
| 04/08/2010 | | ELECTRONIC NOTICE OF HEARING as to Mani Batchu ISSUED, cc:cl. Arraignment set for 4/22/2010 at 2:30 PM in Hampshire Courtroom before Magistrate Judge Kenneth P. Neiman. (Healy, Bethaney) (Entered: 04/08/2010) |
| 04/09/2010 | 23 | BILL OF PARTICULARS as to Mani Batchu (Lei, Veronica) (Entered: 04/09/2010) |
| 04/22/2010 | | District Judge Michael A. Ponsor: ELECTRONIC ORDER entered Referring Case to Magistrate Judge Kenneth P. Neiman. Reason for referral: full pretrial management, excluding dispositive motions. (Healy, Bethaney) (Entered: 04/22/2010) |
| 04/22/2010 | 27 | NOTICE OF ATTORNEY APPEARANCE: Richard N. Foley appearing for Mani Batchu. Type of Appearance: Retained. (Healy, Bethaney) (Entered: 04/23/2010) |
| 04/22/2010 | | ELECTRONIC Clerk's Notes for proceedings held before Magistrate Judge Kenneth P. Neiman: Counsel appear for Arraignment on 4/22/2010. Court informs counsel that, due to an unforeseen conflict in the USMS schedule, Defendant has not been brought to court for arraignment. Arraignment is rescheduled to 5/3/10 at 2:00 p.m. Colloquy re: status of counsel. Court accepts Attorney Foley's appearance for Defendant and allows Attorney O'Brien's renewed motion to withdraw appearance, successor counsel having now filed his appearance. (Attorneys present: Breslow, O'Brien, Foley. )Court Reporter Name and Contact or digital recording information: Digital Recording. (Healy, Bethaney) (Entered: 04/23/2010) |
| 05/03/2010 | | ELECTRONIC Clerk's Notes for proceedings held before Magistrate Judge Kenneth P. Neiman: Counsel and Defendant appear for Arraignment as to Mani Batchu (1) |

| | | |
|---|---|---|
| | | Count 1,2–4,5,6–7,8 held on 5/3/2010. Defendant pleads not guilty to charges. Schedule established with order to issue. (Attorneys present: Breslow, Foley. )Court Reporter Name and Contact or digital recording information: Digital Recording. (Healy, Bethaney) (Entered: 05/04/2010) |
| 05/04/2010 | 29 | Magistrate Judge Kenneth P. Neiman: SCHEDULING ORDER as to Mani Batchu ENTERED, cc:cl. Status Conference set for 6/9/2010 at 2:00 PM in Hampshire Courtroom before Magistrate Judge Kenneth P. Neiman. See order for further details. (Healy, Bethaney) (Entered: 05/04/2010) |
| 06/07/2010 | 30 | NOTICE re automatic disclosure pursuant to Local Rule 116.1 (dated 5/3/10) as to Mani Batchu. (Healy, Bethaney) (Entered: 06/07/2010) |
| 06/08/2010 | 31 | STATUS REPORT *(Joint)* by USA as to Mani Batchu (Breslow, Steven) (Entered: 06/08/2010) |
| 06/09/2010 | | Attorney update in case as to Mani Batchu. Attorney Francis T. O'Brien, Jr terminated. (Healy, Bethaney) (Entered: 06/10/2010) |
| 06/09/2010 | | ELECTRONIC Clerk's Notes for proceedings held before Magistrate Judge Kenneth P. Neiman: Counsel appear for Initial Status Conference as to Mani Batchu held on 6/9/2010. Colloquy re: status of case. Scheduling Order and Status Report to issue. Parties assert – and the court agrees – that, as of 7/9/10, no time will have run on the speedy trial clock. A separate order shall issue. (Attorneys present: Breslow, Foley. )Court Reporter Name and Contact or digital recording information: Digital Recording. (Healy, Bethaney) (Entered: 06/10/2010) |
| 06/09/2010 | 32 | Magistrate Judge Kenneth P. Neiman: SCHEDULING ORDER as to Mani Batchu ENTERED, cc:cl. Final Status Conference set for 7/9/2010 at 2:00 PM in Hampshire Courtroom before Magistrate Judge Kenneth P. Neiman; joint memo by 7/8/10. (Healy, Bethaney) (Entered: 06/10/2010) |
| 06/10/2010 | 33 | Magistrate Judge Kenneth P. Neiman: STATUS REPORT as to Mani Batchu ISSUED, cc:cl. (Healy, Bethaney) (Entered: 06/10/2010) |
| 06/10/2010 | 34 | Magistrate Judge Kenneth P. Neiman: ORDER ON EXCLUDABLE DELAY as to Mani Batchu ENTERED, cc:cl. Time excluded from May 3, 2010 until July 9, 2010. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (Healy, Bethaney) (Entered: 06/10/2010) |
| 06/10/2010 | | ELECTRONIC NOTICE OF RESCHEDULING as to Mani Batchu ISSUED, cc:cl. Status Conference moved to 7/9/2010 at 2:30 PM in Hampshire Courtroom before Magistrate Judge Kenneth P. Neiman. Please note change in time only.(Healy, Bethaney) (Entered: 06/10/2010) |
| 06/10/2010 | 35 | STATUS REPORT *(Joint)* by USA as to Mani Batchu (Breslow, Steven) (Entered: 06/10/2010) |
| 06/23/2010 | | Magistrate Judge Kenneth P. Neiman: ELECTRONIC ORDER entered granting 36 Government's Motion to Seal Document. So ordered. (Neiman, Kenneth) (Entered: 06/23/2010) |
| 07/09/2010 | 38 | STATUS REPORT *(Joint)* by USA as to Mani Batchu (Breslow, Steven) (Entered: 07/09/2010) |
| 07/09/2010 | | ELECTRONIC Clerk's Notes for proceedings held before Magistrate Judge Kenneth P. Neiman: Counsel appear for Status Conference as to Mani Batchu held on 7/9/2010. Parties requesting a further conference be set for September, 2010. Matter set for further status conference on 9/15/10 at 2:00 p.m., with joint memorandum due by 9/14/10. Parties assert that time should be excluded through the next conference. The court agrees and excludes time from Speedy Trial calculation from 7/9/10–9/15/10. Orders and status report to issue. (Attorneys present: Breslow, Foley. )Court Reporter Name and Contact or digital recording information: Digital Recording. (Healy, Bethaney) (Entered: 07/09/2010) |
| 07/09/2010 | 39 | Magistrate Judge Kenneth P. Neiman: SCHEDULING ORDER as to Mani Batchu ENTERED, cc:cl. Status Conference set for 9/15/2010 at 2:00 PM in Hampshire Courtroom before Magistrate Judge Kenneth P. Neiman; joint memorandum set for |

| | | 9/14/10. (Healy, Bethaney) (Entered: 07/09/2010) |
|---|---|---|
| 07/09/2010 | 40 | Magistrate Judge Kenneth P. Neiman: INTERIM STATUS REPORT as to Mani Batchu, cc:cl. (Healy, Bethaney) (Entered: 07/09/2010) |
| 07/09/2010 | 41 | Magistrate Judge Kenneth P. Neiman: ORDER ON EXCLUDABLE DELAY as to Mani Batchu ENTERED, cc:cl. Time excluded from July 9, 2010 until September 15, 2010. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (Healy, Bethaney) (Entered: 07/09/2010) |
| 07/14/2010 | 42 | MOTION for Excludable Delay from 07/09/10 to 09/15/10 *(Joint)* as to Mani Batchu by USA. (Breslow, Steven) (Entered: 07/14/2010) |
| 07/15/2010 | | Magistrate Judge Kenneth P. Neiman: ELECTRONIC ORDER entered granting 42 Motion for Excludable Delay as to Mani Batchu (1), cc:cl. Allowed. The court has excluded the time as requested (See Order on Excludable Delay dated 07/09/10, Doc. No. 41). (Healy, Bethaney) (Entered: 07/15/2010) |
| 08/19/2010 | | ELECTRONIC NOTICE OF RESCHEDULING as to Mani Batchu ISSUED, cc:cl. Status Conference moved to 9/15/2010 at 3:30 PM in Hampshire Courtroom before Magistrate Judge Kenneth P. Neiman. Please note change in time only. (Healy, Bethaney) (Entered: 08/19/2010) |
| 09/14/2010 | | ELECTRONIC NOTICE OF RESCHEDULING as to Mani Batchu ISSUED, cc:cl. Status Conference moved to 9/14/2010 at 4:00 PM in Hampshire Courtroom before Magistrate Judge Kenneth P. Neiman. PLEASE NOTE CHANGE IN TIME ONLY.(Healy, Bethaney) (Entered: 09/14/2010) |
| 09/14/2010 | 43 | STATUS REPORT by USA as to Mani Batchu (Breslow, Steven) (Entered: 09/14/2010) |
| 09/15/2010 | | ELECTRONIC Clerk's Notes for proceedings held before Magistrate Judge Kenneth P. Neiman: Counsel appear for Interim Status Conference as to Mani Batchu held on 9/15/2010. Colloquy re: status of case. Order and Status Report to issue. (Attorneys present: Breslow, Foley. )Court Reporter Name and Contact or digital recording information: Digital Recording. (Healy, Bethaney) (Entered: 09/17/2010) |
| 09/17/2010 | 44 | Joint MOTION for Excludable Delay from 09/15/10 to 10/15/10 as to Mani Batchu by USA. (Attachments: # 1 Text of Proposed Order Proposed Order of Excludable Delay)(Breslow, Steven) (Entered: 09/17/2010) |
| 09/17/2010 | | Magistrate Judge Kenneth P. Neiman: ELECTRONIC ORDER entered granting 44 Motion for Excludable Delay from 09/15/10 to 10/15/10 as to Mani Batchu (1), cc:cl. The court finds that the ends of justice outweigh the usual interest in a speedy trial and orders time excluded from 9/15/10 through 10/15/10. A separate order shall issue. (Healy, Bethaney) (Entered: 09/17/2010) |
| 09/17/2010 | 45 | Magistrate Judge Kenneth P. Neiman: ORDER ON EXCLUDABLE DELAY as to Mani Batchu, ENTERED, cc:cl. Time excluded from September 15, 2010 until October 15, 2010. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (Healy, Bethaney) (Entered: 09/17/2010) |
| 09/20/2010 | 46 | Magistrate Judge Kenneth P. Neiman: STATUS REPORT as to Mani Batchu ISSUED, cc:cl. (Healy, Bethaney) (Entered: 09/20/2010) |
| 09/20/2010 | 47 | Magistrate Judge Kenneth P. Neiman: SCHEDULING ORDER as to Mani Batchu ENTERED, cc:cl. Status Conference set for 10/15/2010 at 2:30 PM in Hampshire Courtroom before Magistrate Judge Kenneth P. Neiman; joint memo by 10/14/10. (Healy, Bethaney) (Entered: 09/20/2010) |
| 10/14/2010 | 48 | STATUS REPORT *(Joint and Final)* by USA as to Mani Batchu (Breslow, Steven) (Entered: 10/14/2010) |
| 10/15/2010 | | ELECTRONIC Clerk's Notes for proceedings held before Magistrate Judge Kenneth P. Neiman: Final Status Conference as to Mani Batchu held on 10/15/2010. Colloquy re: status of case. Final Status Report to issue. Pretrial conference set before District Judge Michael A. Ponsor on 12/8/10. See status report for further information and schedule. (Attorneys present: Breslow, Foley. )Court Reporter Name and Contact or digital recording information: Digital Recording. (Healy, Bethaney) (Entered: |

| | | 10/15/2010) |
|---|---|---|
| 10/27/2010 | 49 | Joint MOTION for Excludable Delay from 10/15/2010 to 12/08/2010 as to Mani Batchu by USA. (Attachments: # 1 Exhibit Proposed Order of Excludable Delay)(Breslow, Steven) (Entered: 10/27/2010) |
| 10/28/2010 | | Magistrate Judge Kenneth P. Neiman: ELECTRONIC ORDER entered granting 49 Joint Motion for Excludable Delay. Order to issue. (Neiman, Kenneth) (Entered: 10/28/2010) |
| 10/28/2010 | 50 | Magistrate Judge Kenneth P. Neiman: FINAL STATUS REPORT as to Mani Batchu ISSUED, cc:cl. D's motions to suppress due by 11/5/10, with G's response by 11/24/10; Pretrial Conference set for 12/8/2010 at 3:30 PM in Hampden Courtroom before Judge Michael A Ponsor. (Healy, Bethaney) (Entered: 10/28/2010) |
| 10/28/2010 | | Set/Reset Deadlines as to Mani Batchu: D's Motions to Suppress due by 11/5/2010; G's Responses due by 11/24/2010. (Healy, Bethaney) (Entered: 10/28/2010) |
| 10/28/2010 | 51 | Magistrate Judge Kenneth P. Neiman: ORDER ON EXCLUDABLE DELAY as to Mani Batchu, ENTERED, cc:cl. Time excluded from October 15, 2010 until December 8, 2010. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice and 3161(h)(7)(B)(iv). (Healy, Bethaney) (Entered: 10/28/2010) |
| 11/23/2010 | 52 | Assented to MOTION to permit paper filing of motions as to Mani Batchu. (Lindsay, Maurice) (Entered: 11/24/2010) |
| 11/23/2010 | 53 | Assented to MOTION for Extension of Time to 11/23/10 to File Motions to Suppress as to Mani Batchu. (Attachments: # 1 Motion to Suppress, # 2 Memo in Support, # 3 Affidavit, # 4 Motion to Suppress II, # 5 Memo in Support II)(Lindsay, Maurice) (Entered: 11/24/2010) |
| 11/23/2010 | 54 | MOTION to Suppress as to Mani Batchu. (Lindsay, Maurice) (Entered: 11/24/2010) |
| 11/23/2010 | 55 | MEMORANDUM in Support of 54 MOTION to Suppress by Mani Batchu (Attachments: # 1 Affidavit in Support)(Lindsay, Maurice) (Entered: 11/24/2010) |
| 11/23/2010 | 56 | MOTION to Suppress II as to Mani Batchu. (Lindsay, Maurice) (Entered: 11/24/2010) |
| 11/23/2010 | 57 | MEMORANDUM in Support of 56 MOTION to Suppress II by Mani Batchu (Lindsay, Maurice) (Entered: 11/24/2010) |
| 11/24/2010 | | Judge update in case as to Mani Batchu. Magistrate Judge Kenneth P. Neiman no longer referred on case. (Pelegano, Theresa) (Entered: 11/24/2010) |
| 11/29/2010 | | Judge Michael A Ponsor: ELECTRONIC ORDER entered granting 52 Motion Permit Paper Filing Of Motions as to Mani Batchu (1). As to these motions only, Counsel must in future use the court's ECF system. (Pelegano, Theresa) (Entered: 11/29/2010) |
| 11/29/2010 | | Magistrate Judge Kenneth P. Neiman: ELECTRONIC ORDER entered granting 53 Defendant's assented–to Motion for Extension of Time to November 23, 2010, to File Motions to Suppress. The Government shall have until December 13, 2010, to respond. So ordered. (Neiman, Kenneth) (Entered: 11/29/2010) |
| 12/13/2010 | 58 | Judge Michael A Ponsor: ORDER entered as to Mani Batchu. See attached. (Pelegano, Theresa) (Entered: 12/13/2010) |
| 12/13/2010 | 59 | MOTION for Leave to File Excess Pages as to Mani Batchu by USA. (Breslow, Steven) (Stuckenbruck, John). (Entered: 12/13/2010) |
| 12/13/2010 | 60 | MEMORANDUM in Opposition by USA as to Mani Batchu re 56 MOTION to Suppress, 54 MOTION to Suppress (Breslow, Steven) (Stuckenbruck, John). (Stuckenbruck, John). (Entered: 12/13/2010) |
| 12/13/2010 | | Judge Michael A Ponsor: ELECTRONIC ORDER entered granting 59 Motion for Leave to File Excess Pages ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. as to Mani Batchu (1) (Pelegano, |

| | | |
|---|---|---|
| | | Theresa) (Entered: 12/14/2010) |
| 12/22/2010 | 61 | AFFIDAVIT of Richard N. Foley by Mani Batchu (Foley, Richard) (Entered: 12/22/2010) |
| 12/29/2010 | | ELECTRONIC NOTICE OF HEARING ON MOTION as to Mani Batchu 54 MOTION to Suppress, 56 MOTION to Suppress :(oral argument only) and status conference Motion Hearing set for 1/31/2011 10:00 AM in Hampden Courtroom before Judge Michael A Ponsor. (Pelegano, Theresa) (Entered: 12/29/2010) |
| 01/26/2011 | 62 | Supplemental Verified AFFIDAVIT of Mani Batchu, by Mani Batchu (Lindsay, Maurice) Modified on 1/26/2011 (Stuckenbruck, John). Document sealed by court due to victim information in affidavit. (Entered: 01/26/2011) |
| 01/30/2011 | 64 | REDACTION byMani Batchu (Foley, Richard) (Entered: 01/30/2011) |
| 01/31/2011 | 65 | EXHIBIT/WITNESS LIST by USA as to Mani Batchu (Breslow, Steven) (Entered: 01/31/2011) |
| 01/31/2011 | | ELECTRONIC Clerk's Notes for proceedings held before Judge Michael A Ponsor: Status Conference as to Mani Batchu held on 1/31/2011, ( Jury Trial set for 4/4/2011 09:00 AM in Hampden Courtroom before Judge Michael A Ponsor., Hearing set for Motion to Supress 2/24/2011 and 2/25/11 09:30 AM in Hampden Courtroom before Judge Michael A Ponsor.) (Attorneys present: Foley, Breslow. )Court Reporter: Alice Moran at 413–731–0086. (Pelegano, Theresa) (Entered: 01/31/2011) |
| 02/07/2011 | 66 | NOTICE OF ATTORNEY APPEARANCE Alexandra R. Gelber appearing for USA. (Gelber, Alexandra) (Entered: 02/07/2011) |
| 02/23/2011 | 67 | MOTION to Dismiss *Counts Seven And Eight* as to Mani Batchu by USA. (Breslow, Steven) (Entered: 02/23/2011) |
| 02/24/2011 | | ELECTRONIC Clerk's Notes for proceedings held before Judge Michael A. Ponsor:Motion Hearing as to Mani Batchu held on 2/24/2011 re 56 MOTION to Suppress filed by Mani Batchu, 54 MOTION to Suppress filed by Mani Batchu. Testimony of Chicago PD officers O'Leary and Burke completed. Hearing to resume on 2/25/11 at 9:30 a.m. (Attorneys present: Breslow, Foley. )Court Reporter : Sarah Mubarek (Pelegano, Theresa) (Entered: 02/24/2011) |
| 02/25/2011 | | ELECTRONIC Clerk's Notes for proceedings held before Judge Michael A. Ponsor:Motion Hearing as to Mani Batchu held on 2/25/2011 re: 56 MOTION to Suppress filed by Mani Batchu, 54 MOTION to Suppress filed by Mani Batchu. Govt.'s evidence continues. Andrew Litowitz(witness) Govt. rests. Deft. rests. Arguments of counsel. Further memorandums due by 3/25/2011. Court will then take motions under advisement.(Attorneys present: Breslow, Foley. )Court Reporter Name and Contact information: (Sara Mubarek, Philbin & Associates, 413–733–4078) (Stuckenbruck, John) Modified on 2/25/2011 to add court reporter information(Stuckenbruck, John) (Entered: 02/25/2011) |
| 03/09/2011 | 69 | Transcript of Motion Hearing as to Mani Batchu held on February 24, 2011, before Judge Michael A. Ponsor. Court Reporter Name and Contact Information: Sarah Mubarek. The Transcript may be purchased through Sarah Mubarek at sarahmubarek@comcast.net, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 3/30/2011. Redacted Transcript Deadline set for 4/11/2011. Release of Transcript Restriction set for 6/7/2011. (Scalfani, Deborah) Modified on 3/9/2011 (Scalfani, Deborah). (Entered: 03/09/2011) |
| 03/09/2011 | 70 | Transcript of Motion Hearing as to Mani Batchu held on February 25, 2011, before Judge Michael A. Ponsor. Court Reporter Name and Contact Information: Sarah Mubarek. The Transcript may be purchased through Sarah Mubarek at sarahmubarek@comcast.net, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 3/30/2011. Redacted Transcript Deadline set for 4/11/2011. Release of Transcript Restriction set for 6/7/2011. (Scalfani, Deborah) Modified on 3/9/2011 (Scalfani, Deborah). (Entered: 03/09/2011) |
| 03/09/2011 | 71 | NOTICE is hereby given that an official transcript of a proceeding as to Mani Batchu has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, a copy of which is attached to this |

**G.App.28**

| | | |
|---|---|---|
| | | entry. (Scalfani, Deborah) (Entered: 03/09/2011) |
| 03/25/2011 | 72 | Supplemental MEMORANDUM in Opposition by USA as to Mani Batchu re 54 MOTION to Suppress (Breslow, Steven) (Main Document 72 replaced on 3/28/2011) (Pelegano, Theresa) (Entered: 03/25/2011) |
| 03/27/2011 | 73 | PRETRIAL MEMORANDUM by USA as to Mani Batchu (Attachments: # 1 Exhibit (Article, Probation Officers Debrief Jurors After Child Pornography Trials)(Breslow, Steven) (Entered: 03/27/2011) |
| 03/27/2011 | 74 | MOTION in Limine *To Bar Evidence of Victim's Consent* as to Mani Batchu by USA. (Breslow, Steven) (Entered: 03/27/2011) |
| 03/27/2011 | 75 | MOTION in Limine *To Bar Evidence of Victim's Past Sexual Conduct* as to Mani Batchu by USA. (Breslow, Steven) (Entered: 03/27/2011) |
| 03/27/2011 | 76 | MOTION in Limine *To Admit Summary Charts* as to Mani Batchu by USA. (Breslow, Steven) (Entered: 03/27/2011) |
| 03/28/2011 | 77 | Joint MOTION Hold A Status Conference on April 4, 2011 and Continue The Trial Until May 2, 2011 as to Mani Batchu by USA. (Breslow, Steven) (Entered: 03/28/2011) |
| 03/30/2011 | | ELECTRONIC NOTICE OF HEARING as to Mani Batchu Status Conference set for 4/4/2011 02:00 PM in Hampden Courtroom before Judge Michael A. Ponsor. (Pelegano, Theresa) (Entered: 03/30/2011) |
| 03/31/2011 | | Judge Michael A. Ponsor: ELECTRONIC ORDER entered denying without prejudice, 54 Motion to Suppress as to Mani Batchu (1), in light of the defendant's intention to plead guilty. (Pelegano, Theresa) (Entered: 03/31/2011) |
| 03/31/2011 | | Judge Michael A. Ponsor: ELECTRONIC ORDER entered granting 63 Motion to Seal as to Mani Batchu (1); granting 67 Motion to Dismiss counts 7 and 8 as to Mani Batchu (1); denying as moot 74 Motion in Limine as to Mani Batchu (1); denying as moot 75 Motion in Limine as to Mani Batchu (1); denying as moot 76 Motion in Limine as to Mani Batchu (1); granting 77 Motion for Status conference as to Mani Batchu (1). The status conference has been set for 4/4/11 at 2 p.m. (Pelegano, Theresa) (Entered: 03/31/2011) |
| 04/04/2011 | | Terminate Deadlines and Hearings as to Mani Batchu: Jury trial date (Pelegano, Theresa) (Entered: 04/04/2011) |
| 04/04/2011 | 78 | NOTICE OF ATTORNEY APPEARANCE Anitha S. Ibrahim appearing for USA. (Ibrahim, Anitha) (Entered: 04/04/2011) |
| 04/04/2011 | | ELECTRONIC Clerk's Notes for proceedings held before Judge Michael A. Ponsor: Status Conference as to Mani Batchu held on 4/4/2011, ( Rule 11 Hearing set for 5/9/2011 02:00 PM in Hampden Courtroom before Judge Michael A. Ponsor.) (Attorneys present: Breslow, Foley. )Court Reporter : Alice Moran at 413–731–0086. (Pelegano, Theresa) (Entered: 04/04/2011) |
| 05/07/2011 | 79 | PLEA AGREEMENT as to Mani Batchu (Breslow, Steven) (Entered: 05/07/2011) |
| 05/07/2011 | 80 | Joint MOTION for Excludable Delay from 03/28/11 to 05/09/11 as to Mani Batchu by USA. (Attachments: # 1 Text of Proposed Order Proposed Order Of Excludable Delay)(Breslow, Steven) (Entered: 05/07/2011) |
| 05/09/2011 | | Judge Michael A. Ponsor: ELECTRONIC ORDER entered denying 56 Motion to Suppress as to Mani Batchu (1). Granting 80 Motion to Exclude as to Mani Batchu (1). Order to issue as to motion to exclude. (Pelegano, Theresa) (Entered: 05/09/2011) |
| 05/09/2011 | | ELECTRONIC Clerk's Notes for proceedings held before Judge Michael A. Ponsor:Rule 11 Hearing as to Mani Batchu held on 5/9/2011, Plea entered by Mani Batchu (1) Guilty Count 1,2–4,5. Sentencing set for 10/5/2011 at 2:00 p.m. (Attorneys present: Brelow, Foley. )Court Reporter Name and Contact or digital recording information: Sarah Mubarek (Pelegano, Theresa) (Entered: 05/09/2011) |
| 05/09/2011 | 81 | Judge Michael A. Ponsor: ORDER entered. PROCEDURAL ORDER re sentencing hearing as to Mani Batchu Sentencing set for 10/5/2011 02:00 PM in Hampden |

**G.App.29**

| | | Courtroom before Judge Michael A. Ponsor. (Pelegano, Theresa) (Entered: 05/09/2011) |
|---|---|---|
| 05/09/2011 | 82 | Judge Michael A. Ponsor: ORDER entered. ORDER ON EXCLUDABLE DELAY as to Mani Batchu. Time excluded from 3/28/2011 until 5/9/2011. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (Pelegano, Theresa) (Entered: 05/10/2011) |
| 09/02/2011 | 83 | Assented to MOTION to Continue to 11/18/11 to Hold Sentencing as to Mani Batchu by USA. (Breslow, Steven) (Entered: 09/02/2011) |
| 09/07/2011 | | Judge Michael A. Ponsor: ELECTRONIC ORDER entered granting 83 Motion to Continue as to Mani Batchu (1) Sentencing set for 11/28/2011 02:00 PM in Hampden Courtroom before Judge Michael A. Ponsor. ( The hearing for 10/5/11 has been rescheduled) (Pelegano, Theresa) (Entered: 09/07/2011) |
| 09/07/2011 | | ELECTRONIC NOTICE OF RESCHEDULING as to Mani Batchu Sentencing set for 11/18/2011 11:00 AM in Hampden Courtroom before Judge Michael A. Ponsor. (Pelegano, Theresa) (Entered: 09/07/2011) |
| 11/01/2011 | 84 | MOTION to Continue as to Mani Batchu. (Foley, Richard) (Entered: 11/01/2011) |
| 11/07/2011 | | Judge Michael A. Ponsor: ELECTRONIC ORDER entered denying 84 Motion to Continue as to Mani Batchu (1). Defendant has waited too long to arrange for the evaluation. (Pelegano, Theresa) (Entered: 11/07/2011) |
| 11/08/2011 | 85 | MOTION for Forfeiture of Property as to Mani Batchu by USA. (Attachments: # 1 Preliminary Order of Forfeiture)(Lei, Veronica) (Entered: 11/08/2011) |
| 11/13/2011 | 86 | MOTION for Reconsideration as to Mani Batchu. (Foley, Richard) (Entered: 11/13/2011) |
| 11/14/2011 | | Judge Michael A. Ponsor: ELECTRONIC ORDER entered denying 86 Motion for Reconsideration re 84 MOTION to Continue filed by Mani Batchu as to Mani Batchu (1), for the reason previously stated. Defendant may of course submit copies of existing medical records as part of his sentencing memorandum. (Pelegano, Theresa) (Entered: 11/14/2011) |
| 11/17/2011 | | ELECTRONIC NOTICE OF RESCHEDULING (TIME CHANGE) as to Mani Batchu Sentencing set for 11/18/2011 12:00 PM in Hampden Courtroom before Judge Michael A. Ponsor. (Pelegano, Theresa) (Entered: 11/17/2011) |
| 11/17/2011 | 87 | SENTENCING MEMORANDUM by USA as to Mani Batchu (Breslow, Steven) (Entered: 11/17/2011) |
| 11/17/2011 | | Judge Michael A. Ponsor: ELECTRONIC ORDER entered granting 85 Motion for Forfeiture of Property as to Mani Batchu (1) (Pelegano, Theresa) (Entered: 11/17/2011) |
| 11/17/2011 | 88 | Judge Michael A. Ponsor: ORDER entered. as to Mani Batchu re Order on Motion for Forfeiture of Property (Pelegano, Theresa) (Entered: 11/17/2011) |
| 11/18/2011 | 89 | SENTENCING MEMORANDUM by Mani Batchu filed. (Finn, Mary) (Entered: 11/18/2011) |
| 11/18/2011 | 90 | CORRECTED SENTENCING MEMORANDUM by USA as to Mani Batchu. (Stuckenbruck, John) (Entered: 11/18/2011) |
| 11/18/2011 | | ELECTRONIC Clerk's Notes for proceedings held before Judge Michael A. Ponsor:Sentencing held on 11/18/2011 as to Mani Batchu counts 1,2–4, and 5, 365 months imprisonment to run concurrently. 360 months supervised release.Special assessment fee of $500 to be paid immediately. Restitution in the amount of $2,500,000. Forfeiture of the following: (1) one Apple MacBook Pro with serial number W8734MNOZ5W; (2) one Apple MacBook Pro bearing serial number W8928JY566D; (3) one black SanDisk Cruzer Micro 2.0 GB flash USB memorydrive bearing number BE06063BB; (4) one silver Casio Exilim 3.2 MP digital camera bearing serial number 1280444A; and(5) one silver 2002 Lexus IS 300, bearing Vehicle Identification Number JTHBD192820035037 and Illinois RegistrationNumber VBATCHU. Count(s) 6, 7, 8, Dismissed by government motion. See written Judgment |

**G.App.30**

| | | |
|---|---|---|
| | | to be issued for further conditions. (Attorneys present: Breslow, Foley. )Court Reporter Name and Contact or digital recording information: Alice Moran at 413–731–0086. (Pelegano, Theresa) (Entered: 11/30/2011) |
| 11/30/2011 | 91 | Judge Michael A. Ponsor: ORDER entered. JUDGMENT as to Mani Batchu (1), Count(s) 1, 2–4 and 5, 365 months imprisonment to run concurrently. 360 months supervised release. Special assessment fee of $500 to be paid immediately. Restitution in the amount of $2,500,000. Forfeiture of the following: (1) one Apple MacBook Pro with serial number W8734MNOZ5W; (2) one Apple MacBook Pro bearing serial number W8928JY566D; (3) one black SanDisk Cruzer Micro 2.0 GB flash USB memory drive bearing number BE06063BB; (4) one silver Casio Exilim 3.2 MP digital camera bearing serial number 1280444A; and (5) one silver 2002 Lexus IS 300, bearing Vehicle Identification Number JTHBD192820035037 and Illinois Registration Number VBATCHU.; Count(s) 6, 7, 8, Dismissed by government motion (Pelegano, Theresa) (Entered: 11/30/2011) |
| 11/30/2011 | 92 | NOTICE OF APPEAL by Mani Batchu re 91 Judgment,,, NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/efiling.htm.** US District Court Clerk to deliver official record to Court of Appeals by 12/20/2011. (Finn, Mary) (Entered: 11/30/2011) |
| 11/30/2011 | 93 | Certified and Transmitted Abbreviated Electronic Record on Appeal as to Mani Batchu to US Court of Appeals re 92 Notice of Appeal – Final Judgment, (Ramos, Jeanette) (Entered: 11/30/2011) |
| 11/30/2011 | | USCA Case Number as to Mani Batchu 11–2414 for 92 Notice of Appeal – Final Judgment,. (Ramos, Jeanette) (Entered: 11/30/2011) |
| 12/01/2011 | 94 | Transmitted Supplemental Record on Appeal as to Mani Batchu re 92 Notice of Appeal – Final Judgment,,, Documents included: 12, 14, 24, 25, 26, 28, 36, 37, 63, 68 and endos. 4/22 & 6/28 2010 (Finn, Mary) (Entered: 12/01/2011) |
| 12/20/2011 | 97 | US Marshal Process Receipt and Return for Preliminary Order of Forfeiture. Richard N. Foley,, Esquire, 55 Market Street, Portsmouth, NH 03801 served. Delivered on 12/9/2011. (Finn, Mary) Modified on 12/20/2011 to correct the text to reflect the document that is being filed. (Finn, Mary). (Entered: 12/20/2011) |
| 12/27/2011 | 98 | US Marshal Process Receipt and Return for Preliminary Order of Forfeiture. Francis T. O'Brien, Jr., Esquire, 169 State Street, 8th Floor, Boston, mA 02109. served, delivered on Returned unexecuted – 12/20/2011. (Finn, Mary) (Entered: 12/27/2011) |
| 12/28/2011 | 99 | Transcript of Sentencing as to Mani Batchu held on 11/18/11, before Judge Michael A. Ponsor. COA Case No. 11–2414. Court Reporter Name and Contact Information: Alice Moran at 413–731–0086 The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 1/18/2012. Redacted Transcript Deadline set for 1/30/2012. Release of Transcript Restriction set for 3/27/2012. (Folan, Karen) (Entered: 12/28/2011) |
| 12/28/2011 | | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Folan, Karen) (Entered: 12/28/2011) |
| 01/04/2012 | 100 | MOTION for Leave to Proceed In Forma Pauperis as to Mani Batchu. (Attachments: # 1 Affidavit of support)(Lindsay, Maurice) (Entered: 01/05/2012) |
| 01/05/2012 | 0 | Judge Michael A. Ponsor: ENDORSED ORDER entered granting 100 Motion to Proceed In Forma Pauperis as to Mani Batchu (1). ALLOWED. (Lindsay, Maurice) Modified on 1/6/2012 (Stuckenbruck, John). (Entered: 01/05/2012) |

| 02/13/2012 | <u>101</u> | USM Marshals Service Process Receipt and Return for Preliminary Order of Forfeiture. One Apple MacBook Pro latop computer, serial number W8734MNQZ5W, One Apple Macbook Pro latop computer, bearing serial number W8928JY566D, One SanDisk Cruzer Micro 2.0GB flash USB memory drive, bearing serial number BE06063BB and one silver Casio Exilim 3.2MP digital camera, bearing serial number 1280444A served. Delivered on 2/10/2012. Not in USMS custody. (Finn, Mary) Modified on 2/13/2012 to correct the text and to add not in USMS custody to the text. (Finn, Mary). (Entered: 02/13/2012) |
|---|---|---|
| 04/02/2012 | <u>102</u> | US Marshal Process Receipt and Return for Preliminary Order of Forfeiture. Mani Batchu served, delivered on 2/24/12. (Lindsay, Maurice) (Entered: 04/02/2012) |
| 05/01/2012 | <u>103</u> | Transcript of Plea Hearing as to Mani Batchu held on May 9, 2011, before Judge Michael A. Ponsor. COA Case No. 11–2414. Court Reporter Name and Contact Information: Sarah Mubarek at sarahmubarek@comcast.net. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 5/22/2012. Redacted Transcript Deadline set for 6/1/2012. Release of Transcript Restriction set for 7/30/2012. (Scalfani, Deborah) (Entered: 05/01/2012) |
| 05/01/2012 | | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 05/01/2012) |
| 05/07/2012 | <u>104</u> | Service by Publication as to Mani Batchu. (Lei, Veronica) (Entered: 05/07/2012) |
| 08/16/2012 | <u>105</u> | MOTION for Forfeiture of Property as to Mani Batchu by USA. (Attachments: # <u>1</u> Final Order of Forfeiture)(Lei, Veronica) (Entered: 08/16/2012) |
| 09/10/2012 | 106 | Judge Michael A. Ponsor: ELECTRONIC ORDER entered granting <u>105</u> Motion for Forfeiture of Property as to Mani Batchu (1) (Pelegano, Theresa) (Entered: 09/10/2012) |
| 09/10/2012 | 107 | Judge Michael A. Ponsor: ORDER entered as to Mani Batchu re <u>105</u> MOTION for Forfeiture of Property filed by USA (Pelegano, Theresa) (Entered: 09/10/2012) |
| 09/13/2012 | 108 | MOTION to Unseal Document as to Mani Batchu by USA. (Breslow, Steven) (Entered: 09/13/2012) |
| 09/14/2012 | 109 | Judge Michael A. Ponsor: ENDORSED ORDER entered granting <u>108</u> Motion to Unseal Document Sentencing Letter as to Mani Batchu (1). (Finn, Mary) (Entered: 09/14/2012) |
| 11/08/2012 | <u>111</u> | Assented to MOTION to Seal Document *(3 CDs containing child pornography)* as to Mani Batchu by USA. (Breslow, Steven) (Entered: 11/08/2012) |
| 11/26/2012 | <u>113</u> | Transmitted Supplemental Record on Appeal as to Mani Batchu re <u>92</u> Notice of Appeal – Final Judgment,,, Documents included: 8, 12. 14, 19, 24–26, 28, 36, 37, 62, 63, 68, 95, 96, 100, 110 & 112. (Finn, Mary) (Entered: 11/26/2012) |
| 12/05/2012 | <u>115</u> | Transmitted Supplemental Record on Appeal as to Mani Batchu re <u>92</u> Notice of Appeal – Final Judgment. Documents included: #114 and three sealed discs. (Finn, Mary) (Entered: 12/05/2012) |
| 12/18/2012 | <u>116</u> | US Marshal Process Receipt and Return for Final Order of Forfeiture. one Apple MacBook Pro laptop computer bearing serial number W8928JY566D and others (see attached for details) served, delivered on 11/20/12. (Lindsay, Maurice) (Entered: 12/18/2012) |
| 07/18/2013 | <u>118</u> | OPINION of USCA as to Mani Batchu re <u>92</u> Notice of Appeal – Final Judgment. AFFIRMED... (Paine, Matthew) (Entered: 07/19/2013) |
| 07/18/2013 | <u>119</u> | JUDGMENT of USCA (certified copy) as to Mani Batchu re <u>92</u> Notice of Appeal – Final Judgment. The judgment of the district court is affirmed. (Paine, Matthew) (Entered: 07/19/2013) |

**G.App.32**

| 08/09/2013 | 120 | MANDATE of USCA (certified copy) as to Mani Batchu re Appeal number 92 . Appeal number 92 Terminated (Paine, Matthew) (Entered: 08/12/2013) |
| 10/16/2013 | 121 | Case Appealed to Supreme Court of the United States, Case Number 13−6914 as to Mani Batchu. (Paine, Matthew) (Entered: 10/21/2013) |
| 11/18/2013 | 122 | Order entered from the U.S. Supreme Court. The Petition for a Writ of Certiorari is Denied as to Mani Batchu. (Paine, Matthew) (Entered: 12/03/2013) |
| 08/18/2014 | 125 | US Marshal Process Receipt and Return for Final Order of Forfeiture. One Apple MacBook Pro laptop computer served, delivered on 8/12/14. (Lindsay, Maurice) (Entered: 08/18/2014) |
| 11/21/2014 | 126 | MOTION to Vacate under 28 U.S.C. 2255 as to Mani Batchu. (Attachments: # 1 Exhibit A − C)(Finn, Mary) Civil case 3:14−cv−30203 opened. (Entered: 11/21/2014) |
| 11/21/2014 | 127 | Blank cover and category sheets forwarded to Mani Batchu to be completed and returned. (Finn, Mary) (Entered: 11/21/2014) |
| 11/21/2014 | 128 | Judge Michael A. Ponsor: ORDER entered. SERVICE ORDER re 2255 Motion. Order entered pursuant to R.4 of the Rules governing Section 2255 cases for service on respondents. Answer/responsive pleading due w/in 21 days of receipt of this order; cc/Deft. (Finn, Mary) (Entered: 11/21/2014) |
| 12/17/2014 | 129 | Opposition by USA as to Mani Batchu re 126 MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Text of Proposed Order)(Breslow, Steven) (Entered: 12/17/2014) |
| 02/03/2015 | 130 | MOTION for Extension of Time to 2/26/15 to File his Supplement to his 2255 Motion as to Mani Batchu. (Lindsay, Maurice) (Entered: 02/03/2015) |
| 02/04/2015 | 131 | Judge Michael A. Ponsor: ELECTRONIC ORDER entered granting 130 Motion for Extension of Time until February 26, 2015 for Petitioner to file supplement to his 2255 Petition as to Mani Batchu (1). (Healy, Bethaney) (Entered: 02/04/2015) |
| 03/06/2015 | 132 | SUPPLEMENTAL PETITION For Relief Under 28 U.S.C 2255 by Mani Batchu re his 126 MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Exhibits, # 2 Cover Letter)(Lindsay, Maurice) (Entered: 03/06/2015) |
| 05/06/2015 | 133 | AFFIDAVIT of Richard N. Foley by Mani Batchu (Foley, Richard) (Entered: 05/06/2015) |
| 05/11/2015 | 134 | EXHIBITS A − H in support of 133 Affidavit filed by Mani Batchu by Mani Batchu (Attachments: # 1 Exhibit B, # 2 Exhibit C, # 3 Exhibit D, # 4 Exhibit E, # 5 Exhibit F, # 6 Exhibit G, # 7 Exhibit H) (Finn, Mary) (Entered: 05/11/2015) |
| 05/28/2015 | 135 | Judge Michael A. Ponsor: ORDER re: Further Scheduling as to 132 Petitioner's Supplemental Petition filed by Mani Batchu, ENTERED. Government's response due by 6/26/15. (Healy, Bethaney) (Entered: 05/28/2015) |
| 06/05/2015 | 136 | Copy re 135 Scheduling Order, mailed to Mani Batchu on 6/5/15. (Lindsay, Maurice) (Entered: 06/05/2015) |
| 07/08/2015 | 137 | MOTION to Continue to September 18, 2015 to Oppose Defendant's Section 2255 Motion as to Mani Batchu by USA. (Breslow, Steven) (Entered: 07/08/2015) |
| 07/23/2015 | 138 | Judge Michael A. Ponsor: ELECTRONIC ORDER entered granting 137 Motion to Continue deadline to oppose section 2255 motion until 9/18/15 as to Mani Batchu (1). ALLOWED without opposition. (Lindsay, Maurice) (Entered: 07/23/2015) |
| 08/14/2015 | 139 | Set/Reset Deadlines re 126 MOTION to Vacate under 28 U.S.C. 2255 in case as to Mani Batchu. Responses due by 9/18/2015. (Healy, Bethaney) (Entered: 08/14/2015) |
| 09/18/2015 | 140 | MOTION to Continue *the Government's deadline to respond to the defendant's Section 2255 Motion until December 18, 2015* as to Mani Batchu by USA. (Breslow, Steven) (Entered: 09/18/2015) |
| 09/23/2015 | 141 | Judge Michael A. Ponsor: ELECTRONIC ORDER entered granting 140 Motion to Continue Deadline to Oppose Section 2255 Motion as to Mani Batchu (1). |

**G.App.33**

| | | |
|---|---|---|
| | | ALLOWED. No further extensions will be permitted. (Healy, Bethaney) (Entered: 09/23/2015) |
| 12/09/2015 | 142 | Set/Reset Deadlines re Motion or Report and Recommendation in case as to Mani Batchu 126 MOTION to Vacate under 28 U.S.C. 2255. Government's Response due by 12/18/2015. (Healy, Bethaney) (Entered: 12/09/2015) |
| 12/18/2015 | 143 | Opposition by USA as to Mani Batchu re 126 MOTION to Vacate under 28 U.S.C. 2255 (Breslow, Steven) (Entered: 12/18/2015) |
| 01/11/2016 | 144 | MOTION for Extension of Time to 3/18/16 to File Reply to Govt's 143 Opposition to Motion as to Mani Batchu. (Lindsay, Maurice) (Entered: 01/11/2016) |
| 01/11/2016 | 145 | Judge Michael A. Ponsor: ELECTRONIC ORDER entered granting 144 Petitioner's Motion for Extension of Time until March 18, 2016 to File Reply as to Mani Batchu (1). (Healy, Bethaney) (Entered: 01/11/2016) |
| 01/11/2016 | 146 | Set/Reset Deadlines re Motion in case as to Mani Batchu 126 MOTION to Vacate under 28 U.S.C. 2255: Petitioner's Reply due by 3/18/2016. (Healy, Bethaney) (Entered: 01/11/2016) |
| 03/15/2016 | 147 | MOTION to Continue Deadline to 6/17/16 to Submit A Reply to Govt's 143 Opposition to his 126 Motion under 2255 as to Mani Batchu. (Lindsay, Maurice) (Entered: 03/15/2016) |
| 03/16/2016 | 148 | Judge Michael A. Ponsor: ENDORSED ORDER entered granting 147 Motion to Continue Deadline to Submit Reply. ALLOWED. Extension to June 17, 2016 as to Mani Batchu (1) (Lindsay, Maurice) (Entered: 03/16/2016) |
| 03/16/2016 | 149 | Copy re 148 Order on Motion to Continue mailed to Mani Batchu on 3/16/16. (Lindsay, Maurice) (Entered: 04/04/2016) |
| 04/04/2016 | 150 | Letter (non−motion) regarding Communications as to Mani Batchu (Lindsay, Maurice) (Entered: 04/04/2016) |
| 06/13/2016 | 151 | MOTION to Continue to 9/9/16 to File Reply to Govt's Opposition as to Mani Batchu(Lindsay, Maurice) (Entered: 06/13/2016) |
| 06/14/2016 | 152 | Judge Michael A. Ponsor: ENDORSED ORDER entered granting 151 Motion to Continue Deadline to Submit a Reply to Govt's Opposition as to Mani Batchu (1). ALLOWED. Extension to Sept. 9, 2016. (Lindsay, Maurice) (Entered: 06/14/2016) |
| 06/14/2016 | 153 | Copy re 152 Order on Motion to Continue mailed to Mani Batchu on 6/14/16. (Lindsay, Maurice) (Entered: 06/14/2016) |
| 06/20/2016 | 154 | Letter (non−motion) regarding Requesting an update on his docket as to Mani Batchu. − Updated docket sheet forwarded to the Deft. (Finn, Mary) (Entered: 06/20/2016) |
| 08/29/2016 | 155 | MOTION for Extension of Time to 9/30/16 to File Reply to Govt's 143 Opposition to his 126 Motion to vacate as to Mani Batchu. (Attachments: # 1 Cover Letter)(Lindsay, Maurice) (Entered: 08/29/2016) |
| 08/30/2016 | 156 | Judge Michael A. Ponsor: ELECTRONIC ORDER entered granting 155 Motion for Extension of Time to 9/30/16 to File Reply to Govt's 143 Opposition to his 126 Motion to vacate. ALLOWED. as to Mani Batchu (1) (Lindsay, Maurice) (Entered: 08/30/2016) |
| 09/12/2016 | 157 | REPLY TO RESPONSE to Motion by Mani Batchu re 126 MOTION to Vacate under 28 U.S.C. 2255 and a Copy of his Motion to Ext. time to 9/30/2016 as part of it. (Finn, Mary) Modified on 9/12/2016 to add that his motion to ext. time is a part of the reply. (Finn, Mary). (Entered: 09/12/2016) |
| 10/04/2016 | 158 | REPLY to Govt's 143 and 129 Oppositions to his 126 MOTION to Vacate under 28 U.S.C. 2255 by Mani Batchu. (Attachments: # 1 Exhibits, # 2 Cover Letter)(Lindsay, Maurice) (Entered: 10/04/2016) |
| 11/22/2016 | 162 | Letter MOTION for Extension of Time to file remaining materials by Christmas Day as to Mani Batchu. (Lindsay, Maurice) (Entered: 11/22/2016) |

**G.App.34**

| 11/23/2016 | 163 | Judge Michael A. Ponsor: ELECTRONIC ORDER entered granting 162 Motion for Extension of Time to file remaining materials by Christmas Day 12/25/16 as to Mani Batchu (1) ALLOWED. (Lindsay, Maurice) (Entered: 11/23/2016) |
| --- | --- | --- |
| 11/23/2016 | 164 | Copy re 163 Order on Motion for Extension of Time to File Response/Reply mailed to Mani Batchu on 11/23/16. (Lindsay, Maurice) (Entered: 11/23/2016) |
| 12/27/2016 | 165 | Defendant's Omnibus MOTION to Appoint Counsel and for Evidentiary Hearing as to Mani Batchu. (Attachments: # 1 Cover Letter)(Lindsay, Maurice) (Entered: 12/27/2016) |
| 12/28/2016 | 166 | Judge Michael A. Ponsor: MEMORANDUM AND ORDER entered. As follows: For the reasons stated. The Motion for Appointment of Counsel is hereby ALLOWED,and the Motion for an Evidentiary Hearing is DENIED, without prejudice. Once counsel is on board, the court may reconsider the possibility of an evidentiary hearing. The clerk is directed to appoint counsel to represent Defendant. Once counsel is appointed, the court will set a date for a status conference to determine how counsel intends to proceed. It is So Ordered. See the attached memo and order for complete details. (Lindsay, Maurice) (Entered: 12/28/2016) |
| 12/29/2016 | 167 | NOTICE of ATTORNEY APPEARANCE Alex J. Grant appearing for USA. (Grant, Alex) (Entered: 12/29/2016) |
| 12/29/2016 | 168 | NOTICE of Withdrawal of Appearance by Government Attorney AUSA STEVEN H. BRESLOW as to Mani Batchu (Breslow, Steven) (Entered: 12/29/2016) |
| 12/29/2016 | | Attorney update in case as to Mani Batchu. Attorney Steven H. Breslow terminated. (Lindsay, Maurice) (Entered: 12/29/2016) |
| 01/12/2017 | | Attorney update in case as to Mani Batchu. Attorney Kevin Barron added. (Healy, Bethaney) (Entered: 01/12/2017) |
| 01/18/2017 | 169 | REPLY BRIEF as to Mani Batchu: Re: 126 MOTION to Vacate under 28 U.S.C. 2255 filed by Mani Batchu. (Lindsay, Maurice) (Entered: 01/18/2017) |
| 01/18/2017 | 170 | ELECTRONIC NOTICE OF HEARING as to Mani Batchu ISSUED. Status Conference set for 2/14/2017 at 2:30 PM in Hampden Courtroom before Judge Michael A. Ponsor. (Healy, Bethaney) (Entered: 01/18/2017) |
| 02/02/2017 | 171 | Defendant's First couple of pages of the remaining Portion of his 2255 Reply Brief by Mani Batchu (Lindsay, Maurice) (Entered: 02/02/2017) |
| 02/10/2017 | 172 | Assented to MOTION to Continue *Status Conference* as to Mani Batchu. (Barron, Kevin) (Entered: 02/10/2017) |
| 02/10/2017 | 173 | Letter (non−motion) regarding remaining sections of his reply brief and supplemental materials as to Mani Batchu (Lindsay, Maurice) (Entered: 02/10/2017) |
| 02/11/2017 | 174 | Judge Michael A. Ponsor: ELECTRONIC ORDER entered granting 172 Motion to Continue the February 14, 2017 Status as to Mani Batchu (1). Allowed. The clerk shall reschedule the conference to a date mutually agreeable to the parties. (Healy, Bethaney) (Entered: 02/11/2017) |
| 02/14/2017 | 175 | ELECTRONIC NOTICE OF RESCHEDULING as to Mani Batchu ISSUED. Status Conference moved to 3/14/2017 at 11:00 AM in Hampden Courtroom before Judge Michael A. Ponsor. (Healy, Bethaney) (Entered: 02/14/2017) |
| 02/23/2017 | 176 | Letter (non−motion) regarding delay of additional information as to Mani Batchu (Lindsay, Maurice) (Entered: 02/23/2017) |
| 03/09/2017 | 177 | Assented to MOTION to Continue *Status Conference* to Week of March 27 as to Mani Batchu. (Barron, Kevin) (Entered: 03/09/2017) |
| 03/12/2017 | 178 | Judge Michael A. Ponsor: ELECTRONIC ORDER entered granting 177 Motion to Continue 3/14/17 Status Conference as to Mani Batchu (1). Allowed. The Status Conference is continued to 3/28/2017 at 11:00 AM in Hampden Courtroom before Judge Michael A. Ponsor. (Healy, Bethaney) (Entered: 03/12/2017) |
| 03/28/2017 | 179 | Electronic Clerk's Notes for proceedings held before Judge Michael A. Ponsor: Counsel appear for Status Conference as to Mani Batchu held on 3/28/2017. Colloquy |

**G.App.35**

| | | |
|---|---|---|
| | | re: status of matter. Defendant's status report due by 5/30/17. (Attorneys present: Grant, Barron. )Court Reporter Name and Contact or digital recording information: Sarah Mubarek, Philbin & Associates, 413–788–4078. (Healy, Bethaney) (Entered: 03/28/2017) |
| 04/13/2017 | 181 | Judge Michael A. Ponsor: ENDORSED ORDER entered granting 180 Motion to Allow Attorney Barron Access to His Sealed Documents as to Mani Batchu (1). Construed as a Motion to allow Defendants Counsel access to sealed documents, this is ALLOWED. (Lindsay, Maurice) (Entered: 04/14/2017) |
| 05/30/2017 | 182 | STATUS REPORT by Mani Batchu (Barron, Kevin) (Entered: 05/30/2017) |
| 05/31/2017 | 183 | Judge Michael A. Ponsor: ORDER entered. re 182 Status Report. APPROVED. Further status report on or before June 30, 2017. So Ordered., as to Mani Batchu. (Lindsay, Maurice) (Entered: 05/31/2017) |
| 06/30/2017 | 184 | STATUS REPORT by Mani Batchu (Barron, Kevin) (Entered: 06/30/2017) |
| 10/10/2017 | 189 | Letter (non−motion) from Defendant, requesting copy of docket sheet as to Mani Batchu. (Healy, Bethaney) (Entered: 10/11/2017) |
| 03/27/2018 | 196 | MOTION to Produce as to Mani Batchu. (Barron, Kevin) (Entered: 03/27/2018) |
| 04/11/2018 | 197 | Opposition by USA as to Mani Batchu re 196 MOTION to Produce (Grant, Alex) (Entered: 04/11/2018) |
| 05/02/2018 | 198 | Judge Michael A. Ponsor: ELECTRONIC ORDER entered. Defendant's Motion to Produce (Dkt. No. 196) is DENIED, without prejudice to a more detailed offering. The requested material is potentially sensitive, and the motion does not allow the court to discern, or even conceive, of its relevance to the petition. So ordered. (Kaplan, Jennifer) (Entered: 05/02/2018) |
| 05/18/2018 | 199 | MOTION to Seal Document as to Mani Batchu. (Barron, Kevin) (Entered: 05/18/2018) |
| 06/06/2018 | 200 | Judge Michael A. Ponsor: ELECTRONIC ORDER entered. Petitioner's Motion to Seal Document as to Mani Batchu (Dkt. No. 199) is hereby ALLOWED, without opposition. Defendant may file a sealed declaration on or before June 15, 2018. So ordered. (Kaplan, Jennifer) (Entered: 06/06/2018) |
| 07/19/2018 | 202 | Notice of Reassignment as to Mani Batchu. Judge Mark G. Mastroianni added. Judge Michael A. Ponsor no longer assigned to case. (Healy, Bethaney) (Entered: 07/19/2018) |
| 10/04/2018 | 203 | Judge Mark G. Mastroianni: ELECTRONIC ORDER entered granting 196 Defendants Motion to Produce on reconsideration in light of supplemental submission subject to the following protective order. Review of the requested material is limited to counsel of record and the expert identified in the supplemental submission. The material requested may not be shared, copied, or used in any way beyond the purpose detailed in the supplemental submission 201 . (Lindsay, Maurice) (Entered: 10/04/2018) |
| 10/30/2018 | 204 | Judge Mark G. Mastroianni: ELECTRONIC ORDER entered as to Mani Batchu. Defendant's counsel is directed to file a status report with the court on or before November 16, 2018. (Status Report due by 11/16/2018) (Bartlett, Timothy) (Entered: 10/30/2018) |
| 11/06/2018 | 206 | MOTION to Seal Document *(Supplement to Status Report)* as to Mani Batchu. (Barron, Kevin) (Entered: 11/06/2018) |
| 11/07/2018 | 207 | Judge Mark G. Mastroianni: ELECTRONIC ORDER entered granting 206 Motion to Seal Document as to Mani Batchu (1). ALLOWED. (Lindsay, Maurice) (Entered: 11/07/2018) |
| 11/13/2018 | 208 | MOTION for Discovery as to Mani Batchu. (Attachments: # 1 Exhibit A (Subpoenas), # 2 Exhibit B (Letter to Trial Counsel))(Barron, Kevin) (Entered: 11/13/2018) |
| 11/14/2018 | 209 | STATUS REPORT by Mani Batchu (Barron, Kevin) (Entered: 11/14/2018) |

| | | |
|---|---|---|
| 11/26/2018 | 212 | Opposition by USA as to Mani Batchu re 208 MOTION for Discovery (Grant, Alex) (Entered: 11/26/2018) |
| 01/02/2019 | 215 | Judge Mark G. Mastroianni: ELECTRONIC ORDER entered granting 208 Motion for Discovery. Good cause exists to explore and develop further the attorney conflict issue and ineffective claim. Though the timeline of events and substantial facts are already establishedas noted by the government in its oppositionDefendant has demonstrated a good cause basis to seek this narrowly defined discovery. (Lindsay, Maurice) (Entered: 01/02/2019) |
| 01/09/2019 | 216 | Judge Mark G. Mastroianni: ORDER entered as to Mani Batchu re restitution. (Bartlett, Timothy) (Entered: 01/15/2019) |
| 05/09/2019 | 217 | Judge Mark G. Mastroianni: ELECTRONIC ORDER entered as to Mani Batchu; Defendants counsel is directed to file a status report with the court and proposed timeline for the next phase of this case on or before June 7, 2019. (Rivera, Christina) (Entered: 05/09/2019) |
| 06/06/2019 | 218 | STATUS REPORT *WITH PROPOSED TIMELINE* by Mani Batchu (Barron, Kevin) (Entered: 06/06/2019) |
| 06/11/2019 | 219 | Judge Mark G. Mastroianni: ELECTRONIC ORDER entered as to Mani Batchu re 218 Status Report filed by Mani Batchu. The court adopts the timeline proposed, and directs a further status report be filed on or before December 2, 2019. (Bartlett, Timothy) (Entered: 06/11/2019) |
| 10/02/2019 | 222 | US Marshal Process Receipt and Return for Subpoena to Testify at Deposition and Subpoena to Produce Documents. Richard N. Foley, Esquire, 414 State Street, #2, Portsmouth NH 03801 served, delivered on 9/24/2019 at 12:30. (Finn, Mary) (Entered: 10/02/2019) |
| 10/02/2019 | 223 | US Marshal Process Receipt and Return for Supoenas to testify at deposition and to produce documents. Richard N. Foley, Esquire, 414 State Street,, #2, Portsmouth, NH 03801 served, delivered on 9/24/2019 at 12:30. (Finn, Mary) (Entered: 10/02/2019) |
| 10/02/2019 | 224 | Documents [222 and 223 are docketed in the correct case – due to 14–30203–MGM is a 2255 Habeas Petition) – as to Mani Batchu: (Finn, Mary) (Entered: 10/02/2019) |
| 10/03/2019 | 225 | Assented to MOTION for Extension of Time to File *(For Extension of Discovery Schedule and to Serve New Subpoenas)* as to Mani Batchu. (Barron, Kevin) (Entered: 10/03/2019) |
| 10/04/2019 | 226 | Judge Mark G. Mastroianni: ELECTRONIC ORDER entered granting 225 Assented to Motion for Extension of Time to File. The deposition of trial counsel shall be completed by November 15, 2019 and hearing briefs and opposing papers shall be submitted within 60 days, in keeping with the timeline originally proposed by Defendant. (Rivera, Christina) (Entered: 10/04/2019) |
| 11/06/2019 | 227 | Emergency MOTION to Compel *Compliance with Subpoenas (with No Objection from Government)* as to Mani Batchu. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Barron, Kevin) (Main Document 227 unsigned original motion replaced with a signed copy on 11/7/2019) (Lindsay, Maurice). (Entered: 11/06/2019) |
| 11/07/2019 | 228 | Judge Mark G. Mastroianni: ELECTRONIC ORDER entered granting 227 Emergency Motion to Compel Compliance with Subpoenas to Produce Documents by November 13 and to Appeal for November 15 Deposition. A copy of this order and the motion (including attachments) 227 shall be mailed to Attorney Foley at Law Offices of Richard N. Foley, PO Box 868, Portsmouth, New Hampshire, 03802. (Lindsay, Maurice) (Entered: 11/07/2019) |
| 11/07/2019 | 229 | Copy re 228 Order on Motion to Compel, 227 Emergency MOTION to Compel *Compliance with Subpoenas (with No Objection from Government)* mailed to Attorney Richard Foley, Portsmouth, New Hampshire 03802. on 11/7/19. (Lindsay, Maurice) (Entered: 11/07/2019) |
| 11/14/2019 | 230 | US Marshal Process Receipt and Return for Subpoenas. Richard N. Foley, 135 Lafayette Road, North Hampton, NH 03863 served, delivered on 11/12/2019. (Finn, Mary) (Entered: 11/14/2019) |

**G.App.37**

| | | |
|---|---|---|
| 11/14/2019 | <u>231</u> | US Marshal Process Receipt and Return for Subpoena to Testify. Richard N. Foley, 135 Lafayette Road, North Hampton, NH 03863 served, delivered on 11/15/2019.. (Finn, Mary) (Entered: 11/14/2019) |
| 11/25/2019 | <u>232</u> | US Marshal Process Receipt and Return for Subpoenas. Richard N. Foley, Esquire, 135 Lafayette Road, North Hampton, NH 03863 or 20 Rudulf Aven7e, Kittery, ME 03904–1537 served, delivered on Service was attempted at 1245 hrs on 11/4/2019. Spoke to a David Adkis who has resided at the residence since 2017, Subject above unable to be located.. (Finn, Mary) (Entered: 11/25/2019) |
| 12/09/2019 | <u>233</u> | MOTION for Extension of Time to File *Status Report and Status Report* as to Mani Batchu. (Barron, Kevin) (Entered: 12/09/2019) |
| 12/30/2019 | <u>234</u> | Assented to MOTION for Extension of Time to File *Petitioner's Brief* as to Mani Batchu. (Barron, Kevin) (Entered: 12/30/2019) |
| 12/31/2019 | 235 | Judge Mark G. Mastroianni: ELECTRONIC ORDER entered granting <u>233</u> Petitioners motion for an extension of time to file his status report and <u>234</u> Assented to Motion for Extension of Time to File Petitioners Hearing Brief. Counsel for Petitioner shall file the hearing brief by **2/15/2020**. (Rivera, Christina) (Entered: 12/31/2019) |
| 02/12/2020 | <u>236</u> | Assented to MOTION for Extension of Time to File *Petitioner's Hearing Brief* as to Mani Batchu. (Barron, Kevin) (Entered: 02/12/2020) |
| 02/13/2020 | 237 | Judge Mark G. Mastroianni: ELECTRONIC ORDER entered granting <u>236</u> Defendant–petitioners Further Assented–to Motion for Extension of Time. Defendant–petitioners hearing brief shall be filed on or before February 19, 2020. (Lindsay, Maurice) (Entered: 02/13/2020) |
| 02/18/2020 | <u>238</u> | Assented to MOTION to Seal Document as to Mani Batchu. (Barron, Kevin) (Entered: 02/18/2020) |
| 02/19/2020 | <u>239</u> | Assented to MOTION for Leave to File Excess Pages *of Petitioner's Hearing Brief* as to Mani Batchu. (Attachments: # <u>1</u> Appendix Petitioner's Hearing Brief, # <u>2</u> Exhibit A – Evaluation, # <u>3</u> Appendix Deposition Transcript, # <u>4</u> Exhibit Deposition Exhibit G, # <u>5</u> Exhibit Deposition Exhibit H, # <u>6</u> Exhibit Deposition Exhibit O, p. 7)(Barron, Kevin) (Entered: 02/19/2020) |
| 02/21/2020 | 240 | Judge Mark G. Mastroianni: ELECTRONIC ORDER entered granting <u>238</u> Assented–to Motion to Seal Exhibit and <u>239</u> Assented–to Motion for Leave to File Excess Pages. (Lindsay, Maurice) (Entered: 02/21/2020) |
| 03/10/2020 | <u>242</u> | Memorandum regarding Petitioner's Hearing Brief as to Mani Batchu (Attachments: # <u>1</u> Exhibit A, Evaluation, # <u>2</u> Exhibit Deposition Transcript, # <u>3</u> Exhibit Deposition Exhibit G, # <u>4</u> Exhibit Deposition Exhibit H, # <u>5</u> Exhibit Deposition Exhibit O, # <u>6</u> Supplement Table of Contents)(Barron, Kevin) (Entered: 03/10/2020) |
| 03/16/2020 | <u>243</u> | Assented to MOTION for Leave to File *Oversized Brief* as to Mani Batchu by USA. (Attachments: # <u>1</u> Exhibit Government Response to Hearing Brief, # <u>2</u> Exhibit Attachment A)(Grant, Alex) (Entered: 03/16/2020) |
| 03/17/2020 | 244 | Judge Mark G. Mastroianni: ELECTRONIC ORDER entered granting <u>243</u> Assented–to Motion to File Oversized Brief. (Lindsay, Maurice) (Entered: 03/17/2020) |
| 03/17/2020 | <u>245</u> | MEMORANDUM in Opposition by USA as to Mani Batchu re <u>126</u> MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # <u>1</u> Exhibit Attachment A)(Grant, Alex) (Entered: 03/17/2020) |
| 03/17/2020 | <u>246</u> | MOTION for Discovery *(for Issuance to Two Further Subpoenas for Law Firm Records)* as to Mani Batchu. (Attachments: # <u>1</u> Appendix Proposed Subpoena, # <u>2</u> Appendix Proposed Subpoena)(Barron, Kevin) (Entered: 03/17/2020) |
| 04/06/2020 | <u>247</u> | Opposition by USA as to Mani Batchu re <u>246</u> MOTION for Discovery *(for Issuance to Two Further Subpoenas for Law Firm Records)* (Grant, Alex) (Entered: 04/06/2020) |
| 04/06/2020 | <u>248</u> | MOTION for Leave to File *Reply* as to Mani Batchu. (Attachments: # <u>1</u> Appendix Proposed Reply)(Barron, Kevin) (Entered: 04/06/2020) |

**G.App.38**

| | | |
|---|---|---|
| 04/08/2020 | 249 | Judge Mark G. Mastroianni: ELECTRONIC ORDER entered granting 248 Defendants Motion For Leave to File Reply and 246 Defendants Motion for Discovery. Though Defendant has not explained his delay in making this request and it is hard to justify the delay, under the circumstances of this case, the court finds the interest of fully exploring the issues related to trial counsels possible pecuniary conflict outweigh the arguments for denying the discovery due to delay. To prevent further delay, the court will move forward with consideration of the substantial briefing already filed by the parties. In a subsequent order, the court will set a date in July for a hearing on that briefing. Should the requested subpoenas yield materials Defendant believes relevant to this court, he may file a supplemental brief not to exceed five pages within 14 days of receiving the material and, within 14 days of that filing, the government may file a response also not to exceed five pages. (Lindsay, Maurice) (Entered: 04/08/2020) |
| 04/09/2020 | 250 | ELECTRONIC NOTICE OF HEARING ON MOTION as to Mani Batchu 126 MOTION to Vacate under 28 U.S.C. 2255 ISSUED. Motion Hearing set for 7/16/2020 at 2:00 PM in Hampden Courtroom before Judge Mark G. Mastroianni. (Healy, Bethaney) (Entered: 04/09/2020) |
| 04/16/2020 | 251 | Documents Received for filing from the Defendant included two copies of completed Subpoena's and a highlighted copy of the court's docket sheet as to Mani Batchu: (Lindsay, Maurice) (Entered: 04/16/2020) |
| 06/16/2020 | 253 | US Marshal Process Receipt and Return for Subpoena for Documents. Francis T O'Brien, O'Brian Law Boston, PC, 50 Congress Steet, Ste. 525, Boston, mA 020109 served, delivered on Attempete service 5/20. 5/521 and service made 5/21/2020.. (Finn, Mary) (Entered: 06/16/2020) |
| 06/18/2020 | 255 | MOTION for Clarification as to Mani Batchu. (Barron, Kevin) (Entered: 06/18/2020) |
| 06/20/2020 | 256 | AFFIDAVIT of CJA Appellate Counsel, Claudia Leis Bolgen, by Mani Batchu 126 MOTION to Vacate under 28 U.S.C. 2255 filed by Mani Batchu (Barron, Kevin) (Entered: 06/20/2020) |
| 06/22/2020 | 257 | ELECTRONIC NOTICE OF HEARING ON MOTION as to Mani Batchu 255 MOTION for Clarification : Motion Hearing set for **6/25/2020 at 9:30 AM** before Judge Mark G. Mastroianni. Court to provide parties with call–in information. (Rivera, Christina) (Entered: 06/22/2020) |
| 06/22/2020 | 258 | ELECTRONIC NOTICE as to Mani Batchu, Resetting Hearing on Motion 255 MOTION for Clarification : The hearing previously scheduled for 6/25/2020 at 9:30 AM has been canceled and rescheduled. Motion Hearing set for **6/30/2020 at 10:30 AM** before Judge Mark G. Mastroianni. (Rivera, Christina) (Entered: 06/22/2020) |
| 06/22/2020 | 259 | MOTION to Continue *or Reschedule June 25 Hearing* as to Mani Batchu. (Barron, Kevin) (Entered: 06/22/2020) |
| 06/23/2020 | 260 | MOTION to Withdraw Document 259 MOTION to Continue *or Reschedule June 25 Hearing* as to Mani Batchu. (Barron, Kevin) (Entered: 06/23/2020) |
| 06/24/2020 | 261 | Judge Mark G. Mastroianni: ELECTRONIC ORDER entered granting 260 Motion to Withdraw 259 Motion to Continue. as to Mani Batchu (1) (Lindsay, Maurice) (Entered: 06/24/2020) |
| 06/30/2020 | 263 | Remark: Telephone Conference information sent to all parties via email. (Rivera, Christina) (Entered: 06/30/2020) |
| 06/30/2020 | 264 | Electronic Clerk's Notes for proceedings held before Judge Mark G. Mastroianni: Motion Hearing as to Mani Batchu held on 6/30/2020. Present via Telephone: Alex J. Grant for USA, Kevin L. Baron for Defendant. Colloquy re: Status and facts of case. Parties discuss potential witnesses. Defense is to file Motions discussed at hearing on or before the next Status Conference set for 8/19/2020 at 11:00 AM. Court to provided parties with telephone call–in information.<br><br>Court Reporter Name and Contact or digital recording information: Alice Moran at alice.moran@verizon.net. (Rivera, Christina). (Entered: 07/01/2020) |
| 07/01/2020 | 265 | ELECTRONIC NOTICE CANCELING HEARING as to Mani Batchu. Motion Hearing scheduled for 7/16/2020 is now vacated and replaced with a Status |

| | | |
|---|---|---|
| | | Conference on 8/19/2020 at 11:00 AM. (Rivera, Christina) (Entered: 07/01/2020) |
| 07/01/2020 | 266 | ELECTRONIC NOTICE OF HEARING as to Mani Batchu: Status Conference set for **8/19/2020 at 11:00 AM** before Judge Mark G. Mastroianni. Clerk to provide parties with call–in information. (Rivera, Christina) (Entered: 07/01/2020) |
| 07/31/2020 | 267 | STATUS REPORT by Mani Batchu (Barron, Kevin) (Entered: 07/31/2020) |
| 08/12/2020 | 268 | MOTION for Hearing *(Evidentiary)* as to Mani Batchu. (Attachments: # 1 Exhibit A)(Barron, Kevin) (Entered: 08/12/2020) |
| 08/19/2020 | 269 | Remark: Telephone Conference call–in information provided to all parties via email. (Rivera, Christina) (Entered: 08/19/2020) |
| 08/19/2020 | 270 | Electronic Clerk's Notes for proceedings held before Judge Mark G. Mastroianni: Status Conference as to Mani Batchu held on 8/19/2020. Present via Telephone: Alex J. Grant for USA, Kevin L. Barron for Deft. Colloquy re: Status of case. Court gives parties opportunity to Argue Defendant's Motion for an Evidentiary Hearing. Court hears arguments. Defense to file electronically supplemental documents discussed during hearing within one week of today. Court will have a ruling on 268 Motion for Hearing (evidentiary) after receipt of those documents. Next Status Conference set for 9/8/2020 at 9:30 AM. Notice to follow. Court Reporter Name and Contact or digital recording information: Alice Moran at alice.moran@verizon.net. (Rivera, Christina) . (Entered: 08/20/2020) |
| 08/20/2020 | 271 | Memorandum regarding Documents Provided in Response to Subpoenas as to Mani Batchu (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Barron, Kevin) (Entered: 08/20/2020) |
| 08/28/2020 | 272 | RESPONSE to Motion by USA as to Mani Batchu re 268 MOTION for Hearing *(Evidentiary)* (Grant, Alex) (Entered: 08/28/2020) |
| 08/31/2020 | 273 | Judge Mark G. Mastroianni: ELECTRONIC ORDER entered granting 268 Motion for Evidentiary Hearing with respect to Richard Foley. Having reviewed the document and arguments advanced by the parties, the court finds Petitioner has identified factual issues in dispute regarding Foleys actions and motivations that warrant a limited evidentiary hearing. U.S. v. McGill, 11 F.3d 223, 225 (1st Cir. 1993). While the government has made some compelling arguments about the timing of various events, the court understands Defendant to have made a broader argument about Foleys ineffectiveness that is not necessarily inconsistent with the timeline laid out by the government. As to the other potential witnesses identified by Petitioner, the motion is denied without prejudice. At this time, the court concludes Petitioner has not made a sufficient showing that testimony from those witnesses would assist the court in resolving the factual issues in dispute. Id. (Lindsay, Maurice) (Entered: 08/31/2020) |
| 12/14/2020 | 274 | ELECTRONIC NOTICE OF HEARING as to Mani Batchu

This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.

Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.

For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.

Status Conference set for 12/18/2020 10:00 AM in Remote Proceeding : Springfield before Judge Mark G. Mastroianni. (Healy, Bethaney) (Entered: 12/14/2020) |
| 12/18/2020 | 275 | Electronic Clerk's Notes for proceedings held before Judge Mark G. Mastroianni: Status Conference as to Mani Batchu held on 12/18/2020. (Attorneys present via Telephone: Alex J. Grant for USA, Kevin L. Barron for Defendant. ) Colloquy re: Status on setting an Evidentiary hearing. Hearing set for January 5, 2021 at 10:00 AM. |

**G.App.40**

| | | |
|---|---|---|
| | | Court Orders Attorney Richard Foley to appear for said hearing via ZOOM Video. A separate Order shall be mailed to Attorney Foley. Court will contact facility where Defendant is housed to attempt to have Defendant present at said hearing. Court Reporter Name and Contact or digital recording information: Alice Moran at alice.moran@verizon.net. (Rivera, Christina) (Entered: 12/18/2020) |
| 12/18/2020 | 276 | Judge Mark G. Mastroianni: ELECTRONIC ORDER entered setting evidentiary hearing for 1/5/2021 at 10:00 am. Attorney Richard Foley is ordered to appear for the hearing, which will be conducted remotely via Zoom due to the ongoing pandemic. A copy of this notice and instructions regarding use of Zoom to access court proceedings shall be mailed to Attorney Richard Foley, at the address associated with his active membership in the Massachusetts bar.<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>Evidentiary Hearing set for **1/5/2021 at 10:00 AM** in Remote Proceeding : Springfield before Judge Mark G. Mastroianni.) (Rivera, Christina) (Entered: 12/18/2020) |
| 12/18/2020 | 277 | Copy re: Notice of 275 Status Conference and 276 Order mailed to Attorney Richard N. Foley on 12/18/2020 at: P.O. Box 868, Portsmouth, New Hampshire, 03802. (Rivera, Christina) (Entered: 12/18/2020) |
| 12/30/2020 | 278 | APPENDIX/EXHIBIT by Mani Batchu (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q)(Barron, Kevin) (Entered: 12/30/2020) |
| 01/03/2021 | 279 | APPENDIX/EXHIBIT by Mani Batchu (Barron, Kevin) (Entered: 01/03/2021) |
| 01/05/2021 | 280 | Electronic Clerk's Notes for proceedings held before Judge Mark G. Mastroianni: Evidentiary Hearing as to Mani Batchu held on 1/5/2021. (Attorneys present via ZOOM Video: AUSA Grant, Atty Barron for Deft. Atty Foley, Witness) Colloquy re: Court discusses evidentiary hearing. Court decides that hearing cannot go forward as the Defendant is not present. Court staff as well as Defense Counsel has reached out various times to the facility where Defendant is being held and has been unsuccessful in arranging the appearance of the Defendant. Clerk and Defense Counsel will continue attempting reaching someone to arrange the appearance of the Deft. Evidentiary Hearing Continued to February 24, 2021 at 11:00 AM via Zoom video. Court Reporter Name and Contact or digital recording information: Alice Moran at alice.moran@verizon.net. (Rivera, Christina) (Entered: 01/15/2021) |
| 01/15/2021 | 281 | Set Hearings as to Mani Batchu:<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact |

| | | media@mad.uscourts.gov. |
| | | Evidentiary Hearing set for **2/24/2021 at 11:00 AM** in Remote Proceeding : Springfield before Judge Mark G. Mastroianni. (Rivera, Christina) (Entered: 01/15/2021) |
| 02/24/2021 | 282 | Electronic Clerk's Notes for proceedings held before Judge Mark G. Mastroianni: Evidentiary Hearing as to Mani Batchu held on 2/24/2021. (Present via ZOOM Video: AUSA Grant, Atty Barron for Defendabt, Deft(UC) via telephone) Colloquy re: Court hears Defendant's arguments. Defense calls Witness Mr. Foley. Witness Mr. Foley placed under Oath. Court hears testimony from Mr. Foley. Defense moves for evidence to be admitted; Court allows over the Objection of the Government on letter from Mr. O'Brien. Government cross examines Defense Witness Mr. Foley. Government moves for admission of exhibits into evidence; Court allows all exhibits from both parties to be admitted into evidence. Court takes matter under advisement. A separate Order shall issue. Court Reporter Name and Contact or digital recording information: Kathleen Silva at kathysilva@verizon.net. (Rivera, Christina) (Entered: 02/25/2021) |
| 03/01/2021 | <u>283</u> | Judge Mark G. Mastroianni: MEMORANDUM AND ORDER entered as follows: For the reasons stated, Defendant–Petitioners 2255 petition and motion to vacate (Dkt.No. <u>126</u> ) is denied. It is So Ordered. See the attached memo and order for complete details. (Lindsay, Maurice)<br>Civil Case 3:14–cv–30203–MGM closed. (Entered: 03/01/2021) |
| 03/01/2021 | 284 | Judge Mark G. Mastroianni: ELECTRONIC ORDER entered finding moot <u>255</u> Motion for Clarification as this motion was superseded by <u>268</u> Defendant–Petitioner's Motion for Evidentiary Hearing, which the court granted on 8/31/2020 273 . (Lindsay, Maurice) (Entered: 03/02/2021) |
| 03/27/2021 | <u>285</u> | MOTION REQUEST FOR AMENDED OR ADDITIONAL FINDINGS UNDER F.R.Civ.P. Rule 52 re <u>283</u> Order on Motion to Vacate (2255), as to Mani Batchu. (Barron, Kevin) (Entered: 03/27/2021) |
| 03/29/2021 | <u>286</u> | MOTION for Certificate of Appealability as to Mani Batchu. (Barron, Kevin) (Entered: 03/29/2021) |
| 03/30/2021 | <u>287</u> | MOTION for Reconsideration re <u>283</u> Order on Motion to Vacate (2255), as to Mani Batchu. (Barron, Kevin) (Entered: 03/30/2021) |
| 04/01/2021 | 288 | Judge Mark G. Mastroianni: ELECTRONIC ORDER denying <u>285</u> Motion Request for Amended or Additional Findings and <u>287</u> Motion for Reconsideration. The court grants <u>286</u> Motion for Certificate of Appealability. With respect to the Motion Request for Amended or Additional Findings, the interrogatory style of the filing goes beyond the scope of Fed. R. Civ. P. 52 and the court's ruling provides sufficient findings. The court, therefore, both denies the request for relief pursuant to Rule 52, but liberally construes the filing as a memorandum in support of the Motion for Reconsideration <u>287</u> .<br>The court considered the documents in the record, heard Foley testify, and concluded the facts regarding any future appeal were too uncertain to create an actual financial conflict of interest in the months leading up to sentencing. The court also considered the facts of the underlying offense, the explanations provided by the sentencing judge at sentencing, and the recent evaluation of Defendant–Petitioner before determining that there was no reasonable probability that submission of a psychological evaluation would have shortened Petitioners sentence. The courts ruling <u>283</u> addressed its disagreement with theories urged by Defendant–Petitioner, including, issues related to the failure to obtain an evaluation, Attorney Foleys inability, under circumstances as they existed, to stop defendants elocution at sentencing, and the existence of a financial conflict. The presence of an appellate waiver in the plea agreement was only one consideration among several that supported the courts conclusion that Foley did not have an actual financial conflict in the months leading up to the sentencing. Contrary to Defendant–Petitioner's argument, the court did not find that the plea agreement waiver section "foreclosed" an appeal, and thereby eradicated any expectation of an appellate fee, but rather, as the court explained, it was "unclear whether Defendant–Petitioner would be able to file an appeal, let alone that he would retain Attorney Foley for such an appeal." (Dkt. No. 283, 6.) The lack of definitive |

|            |          |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                             |
|------------|----------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|            |          | clarity about whether there will be grounds for an appeal and the impact of an appeal waiver, as noted by the court, is consistent with the Supreme Courts language in *Garza v. Idaho*, 139 S.Ct. 738, 744 (2019). In *Garza*, the Court explained that no waiver of appellate rights is absolute and that the filing of a notice of appeal is usually a ministerial act, often undertaken before a substantive assessment of available grounds for appeal. That a legally thorough analysis by Foley after sentencing would cast hope on survivable appellate options, including enforceability and validity or scope of the waiver, but also ineffective assistance, a ground that could hardly be pursued by him, is not evidence that he was counting on being retained to conduct the appeal. Having heard directly from Attorney Foley, the court was not persuaded that Attorney Foley engaged in such detailed analysis as part of a ploy to get an appellate fee. Petitioner has been given significant leeway, in terms of opportunity, time and resources, to develop his arguments. Though counsel has presented the arguments thoroughly, the court was not persuaded that a financial conflict existed or that any other basis for habeas relief is applicable in this case. Defendant–Petitioner's most recent arguments add nothing new that would cause the court to revisit its ruling. However, as it is possible that other reasonable jurists may view the facts differently, Petitioner's Motion for Certificate of Appealability 286 is allowed. (Zamorski, Michael) (Entered: 04/01/2021) |
| 04/13/2021 | 289      | NOTICE of change of address or firm. Change of address for Mani Batchu, Reg. No. 91057–038, Inmate Mail, FCI Beaumont Low, P.O. Box 26020, Beaumont, TX 77720 as to Mani Batchu. (Finn, Mary) (Entered: 04/13/2021)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                           |
| 04/13/2021 | 290      | NOTICE OF APPEAL by Mani Batchu re 283 Order on Motion to Vacate (2255), 288 Order on Motion for Certificate of Appealability, Order on Motion for Reconsideration,, Order on Motion for Miscellaneous Relief,.. NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** **US District Court Clerk to deliver official record to Court of Appeals by 5/3/2021. (Finn, Mary) (Entered: 04/13/2021)**                                                                                                                                                                       |
| 04/13/2021 | 291      | Certified and Transmitted Abbreviated Electronic Record on Appeal as to Mani Batchu to US Court of Appeals re 290 Notice of Appeal. (Paine, Matthew) (Entered: 04/13/2021)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                     |
| 04/14/2021 | 292      | USCA Case Number as to Mani Batchu 21–1292 for 290 Notice of Appeal, filed by Mani Batchu. (Paine, Matthew) (Entered: 04/14/2021)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                             |
| 04/23/2021 | 293      | MOTION for Leave to Appeal In Forma Pauperis as to Mani Batchu.. (Attachments: # 1 Mani Batchu Letter)(Finn, Mary) (Entered: 04/23/2021)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                      |
| 04/23/2021 | 294      | Copy re 290 Notice of Appeal mailed to Mani Batchu, Reg. No. 91–57–038, Inmate Mail, FCI Beaumont–Low, P.O. Box 26020, Beaumont, TX 77720. on 4/23/2021. (Finn, Mary) (Entered: 04/23/2021)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                   |
| 04/26/2021 | 295      | Judge Mark G. Mastroianni: ELECTRONIC ORDER granting 293 Defendant's Motion for Leave to Appeal In Forma Pauperis. A copy of this order shall be mailed to Defendant. (Zamorski, Michael) (Entered: 04/26/2021)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                |
| 04/26/2021 | 296      | Transmitted Supplemental Record on Appeal as to Mani Batchu re 290 Notice of Appeal, Documents included: ECF Nos. 293 and 295 (Paine, Matthew) (Entered: 04/26/2021)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                          |
| 04/29/2021 | 297      | Copy re 295 Order on Motion for Leave to Appeal In Forma Pauperis mailed to Defendant on 4/29/2021. (Zamorski, Michael) (Entered: 04/29/2021)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                 |
| 06/03/2021 | 298      | MOTION for transcripts at government expense as to Mani Batchu. (Zamorski, Michael) (Entered: 06/03/2021)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                     |
| 06/04/2021 | 299      | TRANSCRIPT ORDER FORM by Mani Batchu for proceedings held on 2/24/21 before Judge Mark G. Mastroianni. (Attachments: # 1 Cover Letter)(Lindsay, Maurice) (Entered: 06/08/2021)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                |

| 06/09/2021 | 300 | Judge Mark G. Mastroianni: ELECTRONIC ORDER entered granting <u>298</u> Motion for Transcripts at Government as to the evidentiary hearing held on 2/24/2021. (Lindsay, Maurice) (Entered: 06/09/2021) |
| --- | --- | --- |
| 06/09/2021 | 301 | Copy re 300 Order on Motion for Transcript at Government Expense mailed to Mani Batchu on 6/9/21. (Lindsay, Maurice) (Entered: 06/09/2021) |
| 08/20/2021 | <u>302</u> | NOTICE TRANSCRIPT ORDER ACKNOWLEDGMENT FORM received from USCA and addressed to Kathleen Silva as to Mani Batchu' Transcript order form filed in USCA on 7/26/21. Transcript due by 10/19/2021. (Lindsay, Maurice) (Additional attachment(s) added on 8/20/2021: # <u>1</u> Cover Letter) (Lindsay, Maurice). (Entered: 08/20/2021) |
| 08/24/2021 | <u>303</u> | Transcript of Evidentiary Hearing as to Mani Batchu held on February 24, 2021, before Judge Mark G. Mastroianni. COA Case No. 21–1292. Court Reporter Name and Contact Information: Kathleen Silva at kathysilva@verizon.net The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 9/14/2021. Redacted Transcript Deadline set for 9/24/2021. Release of Transcript Restriction set for 11/22/2021. (Coppola, Katelyn) (Entered: 08/26/2021) |
| 08/24/2021 | 304 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Coppola, Katelyn) (Entered: 08/26/2021) |



**U.S. Department of Justice**

*Carmen M. Ortiz*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

April 4, 2011

BY MAIL

Richard N. Foley, Esq.
55 Market Street
Portsmouth, NH 03801

      Re:    <u>United States v. Mani M. Batchu</u>
            Criminal No. 10-30008-MAP

Dear Counsel:

    This letter sets forth the Agreement between the United States Attorney for the District of Massachusetts ("the U.S. Attorney") and your client, Mani M. Batchu ("Defendant"), in the above-referenced case. The Agreement is as follows:

    1.    <u>Change of Plea</u>

    At the earliest practicable date but in no event later than May 9, 2011, Defendant shall plead guilty to the following counts of the above-referenced Indictment:

          a.     Transportation Of A Minor To Engage In Criminal Sexual Activity, in violation of 18 U.S.C. §2423(a) (Count One);

          b.     Interstate Travel For The Purpose Of Engaging In Illicit Sexual Conduct With A Minor, in violation of 18 U.S.C. §2423(b) (Counts Two Through Four); and

          c.     Use Of Facility Of Interstate Commerce To Entice A Minor To Engage In Criminal Sexual Activity, in violation of 18 U.S.C. §2422(b) (Count Five).

    The U.S. Attorney agrees to dismiss Count Six of the Indictment (Sexual Exploitation Of A Minor, in violation of 18 U.S.C. §2251(a)) following the imposition of sentence at the sentencing hearing.

*2.23.11*

**G.App.45**

2.    Penalties

Defendant faces the following minimum mandatory and maximum penalties:

a.    Transportation Of A Minor To Engage In Criminal Sexual Activity, in violation of 18 U.S.C. §2423(a) (Count One):  a mandatory minimum sentence of ten years in prison and a maximum sentence of life in prison, a mandatory minimum of five years and a maximum lifetime of supervised release pursuant to 18 U.S.C. §3583(k), mandatory restitution as ordered by the Court, forfeiture to the extent charged in the Indictment, a fine of $250,000.00, and a $100 special assessment;

b.    Interstate Travel For The Purpose Of Engaging In Illicit Sexual Conduct With A Minor, in violation of 18 U.S.C. §2423(b) (Counts Two Through Four): a maximum sentence of thirty years in prison, a mandatory minimum of five years and a maximum lifetime of supervised release pursuant to 18 U.S.C. §3583(k), mandatory restitution as ordered by the Court, forfeiture to the extent charged in the Indictment, a fine of $250,000.00, and a $100 special assessment; and

c.    Use Of Facility Of Interstate Commerce To Entice A Minor To Engage In Criminal Sexual Activity, in violation of 18 U.S.C. §2422(b) (Count Five):  a mandatory minimum sentence of ten years in prison and a maximum sentence of life in prison, a mandatory minimum of five years and a maximum lifetime of supervised release pursuant to 18 U.S.C. §3583(k), mandatory restitution as ordered by the Court, forfeiture to the extent charged in the Indictment, a fine of $250,000.00, and a $100 special assessment.

Defendant also recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States.  Under federal law, a broad range of crimes are removable offenses, including the offense(s) to which Defendant is pleading guilty. Removal and other immigration consequences are the subject of a separate proceeding, however, and Defendant understands that no one, including defense counsel and the District Court, can predict to a certainty the effect of this conviction on Defendant's immigration status.  Defendant nevertheless affirms his decision to plead guilty regardless of any immigration consequences that this plea may entail, even if the consequence is Defendant's automatic removal from the United States.

3.    Sentencing Guidelines

The sentence to be imposed upon Defendant is within the discretion of the District Court ("Court"), subject to the statutory mandatory minimum and maximum penalties set forth above, and the provisions of the Sentencing Reform Act, and the United States Sentencing Guidelines promulgated thereunder.  The Sentencing Guidelines are advisory, not mandatory and, as a result,

**G.App.46**

the Court may impose a sentence up to and including the statutory maximum term of imprisonment and statutory maximum fine. In imposing the sentence, the Court must consult and take into account the Sentencing Guidelines, along with the other factors set forth in 18 U.S.C. §3553(a).

The U.S. Attorney agrees with respect to the application of the United States Sentencing Guidelines that:

a.  the Guidelines effective November 1, 2010 apply;

b.  in accordance with USSG §2G1.3(c)(1) and§2G2.1(a), Defendant's base offense level is 32, because defendant's offense involved causing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct;

c.  in accordance with USSG §2G2.1(b)(1)(B), Defendant's offense level is increased by 2 levels, because Defendant's offense involved a minor who had attained the age of twelve years but not attained the age of sixteen years;

d.  in accordance with USSG §2G2.1(b)(2)(A), Defendant's offense level is increased by 2 levels, because Defendant's offense involved the commission of a sexual act or sexual contact;

e.  in accordance with USSG §2G2.1(b)(6), Defendant's offense level is increased by 2 levels, because for the purpose of producing sexually explicit material or for the purpose of transmitting such material live, Defendant's offense involved (A) the knowing misrepresentation of a participant's identity to induce, entice, coerce, or facilitate the travel of, a minor to engage in sexually explicit conduct; or (B) the use of a computer or an interactive computer service to (i) persuade, induce, entice, coerce, or facilitate the travel of, a minor to engage in sexually explicit conduct, or to otherwise solicit participation by a minor in such conduct; or (ii) solicit participation with a minor in such conduct;

f.  in accordance with USSG §3C1.1, Defendant's offense level is increased by 2 levels because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction and the obstructive conduct related to the defendant's offense of conviction;

g.  in accordance with USSG §3D1.2, Counts One through Five form one group with a total offense level of 40 (Group One);

h.  in accordance with USSG §2G2.1(d)(1) and §3D1.2, two additional groups

3

2.28.11

**G.App.47**

Case 3:10-cr-30008-MAP    Document 79    Filed 05/07/11    Page 4 of 30

(Groups Two and Three) are formed, each with a total offense level of 38, because Defendant's offense involved the exploitation of two additional minors.

    i.    in accordance with USSG §3D1.3 and §3D1.4(a), the combined offense level is 43, based upon the offense level applicable to Group One (40) plus three units.

Defendant agrees that the foregoing application of the Sentencing Guidelines is correct, except that Defendant contests the addition of two additional groups in subsection (h) and three additional levels in subsection (i) on the basis that Defendant contests that the individuals are minors.

The U.S. Attorney and Defendant agree that there is no basis for a departure from the Sentencing Guidelines or for a sentence outside the Guidelines under the factors set forth in 18 U.S.C. §3553(a), except as explicitly reserved below. Accordingly, neither the U.S. Attorney nor Defendant will seek a departure from the Sentencing Guidelines or a sentence outside the Guidelines, except under the conditions explicitly set forth below.

The U.S. Attorney expressly reserves the right to seek an upward departure pursuant to USSG §4A1.3 should any of Defendant's prior state convictions be vacated or Defendant's Criminal History Category otherwise changes after his indictment in this case. Thus, for example, the U.S. Attorney may contend that an upward departure under §4A1.3 is appropriate if a state-court conviction that existed at the time of Defendant's indictment is vacated and that vacation alters Defendant's Criminal History Category.

Defendant reserves the right to contend that there is a basis for departure from, or a sentence outside, the otherwise applicable Sentencing Guideline range based on his cultural background and on his medical, mental and/or emotional condition. In the event Defendant contends that there is a basis for departure from, or a sentence outside, the otherwise applicable Sentencing Guideline range based on his medical, mental and/or emotional condition, or otherwise intends to rely on any such condition at sentencing, Defendant will, forthwith upon request, execute all releases and other documentation necessary to permit the U.S. Attorney and her experts (including medical personnel of the Bureau of Prisons) to obtain access to Defendant's medical, psychiatric, and psychotherapeutic records and will also provide to the U.S. Attorney forthwith copies of any such records already in his possession. In addition, Defendant will authorize his care providers to discuss his condition with the U.S. Attorney and her agents (including medical personnel of the Bureau of Prisons), as well as experts retained by the U.S. Attorney. Defendant also agrees to submit to examinations and interviews with experts retained by and chosen by the U.S. Attorney (including medical personnel of the Bureau of Prisons).

The U.S. Attorney will oppose any argument for a departure or sentence outside the Guidelines under the factors set forth in 18 U.S.C. §3553(a) .

Based on Defendant's acceptance of personal responsibility for the offense(s) of conviction

2.23.11

in this case, and information known to the U.S. Attorney at this time, the U.S. Attorney agrees to recommend that the Court reduce by two levels Defendant's Adjusted Offense Level under USSG §3E1.1.

The U.S. Attorney specifically reserves the right not to recommend a reduction under USSG §3E1.1 if, at any time between Defendant's execution of this Agreement and sentencing Defendant:

    (a)    Fails to admit a complete factual basis for the plea;

    (b)    Fails to truthfully admit his conduct in the offenses of conviction;

    (c)    Falsely denies, or frivolously contests, relevant conduct for which Defendant is accountable under USSG §1B1.3;

    (d)    Fails to provide truthful information about his financial status;

    (e)    Gives false or misleading testimony in any proceeding relating to the criminal conduct charged in this case and any relevant conduct for which Defendant is accountable under USSG §1B1.3;

    (f)    Engages in acts which form a basis for finding that Defendant has obstructed or impeded the administration of justice under USSG §3C1.1;

    (g)    Intentionally fails to appear in Court or violates any condition of release;

    (h)    Commits a crime;

    (i)    Transfers any asset protected under any provision of this Agreement; or

    (j)    Attempts to withdraw his guilty plea.

Defendant expressly understands that he may not withdraw his plea of guilty if, for any of the reasons listed above, the U.S. Attorney does not recommend that he receive a reduction in Offense Level for acceptance of responsibility.

Defendant expressly understands that, in addition to declining to recommend an acceptance-of-responsibility adjustment, the U.S. Attorney may seek an upward adjustment pursuant to USSG §3C1.1 if Defendant obstructs justice after date of this Agreement.

4.    <u>Sentence Recommendation</u>

The U.S. Attorney agrees to recommend the following sentence before the Court:

    (a)    incarceration within the Sentencing Guideline range as calculated by the U.S.

2.23.11

Attorney in Paragraph 3;

(b)     a fine within the Sentencing Guideline range as calculated by the U.S. Attorney in Paragraph 3;

(c)     365 months of supervised release with the following special conditions:

   i.     Defendant shall not contact, directly or indirectly, any victim, including Minor A, or family member of any victim, of the charged offenses;

   ii.    Defendant shall promptly notify the Probation Department of any contact, direct or indirect, by any victim, including Minor A, or family member of any victim, of the charged offenses;

   iii.   Defendant shall "submit his person, and any property, house, residence, vehicle, papers, computer, other electronic communications, or data storage devices or media, and effects to search at any time, with or without a warrant, by any law enforcement or probation officer with reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct by the person, and by any probation officer in the lawful discharge of the officer's supervision functions," pursuant to 18 U.S.C. § 3583(d);

   iv.    Defendant shall participate in a sex offender specific treatment program, and shall be required to submit to periodic polygraph testing as a means to ensure that he is in compliance with the requirements of this therapeutic program;

   v.     Defendant shall not engage in any occupation, business, or profession that would require him to have direct or indirect supervision of any person under the age of 18, and Defendant shall not have unsupervised contact with any person under the age of 18;

   vi.    Defendant shall not possess a computer and/or related materials except as deemed necessary by the Court or the Probation Department for work purposes;

   vii.   Defendant shall allow the U.S. Probation Office to install software designed to monitor computer activities on any computer Defendant is authorized to use;

   viii.  Defendant shall have no use of the Internet at his home, work, or elsewhere, unless the United States Probation Office determines

2.23.11

otherwise;

ix.    Defendant shall be prohibited from viewing or possessing any kind of pornography or sexually explicit materials;

x.    Defendant shall report his address, and any subsequent address changes, to the Probation Office;

xi.    Defendant shall register as a sex offender as required under federal and state law in any state where he resides, is employed, carries on a vocation, or is a student; and

xii.    Defendant shall use his true name and is prohibited from the use of any false identifying information, which includes, but is not limited to, any aliases, false dates of birth, false social security numbers, and false places of birth.

(d)    mandatory special assessment in the amount of $500;

(e)    restitution as determined by the Court; and

(f)    forfeiture as set forth in Paragraph 11.

Defendant agrees that the imposition of any supervised release term should be no less than 15 years and in any event should include all of the special conditions specified above.

Defendant agrees that he will provide to the U.S. Attorney expert reports, motions, memoranda of law and documentation of any kind on which he intends to rely at sentencing not later than twenty-one days before sentencing. Any basis for sentencing with respect to which all expert reports, motions, memoranda of law and documentation have not been provided to the U.S. Attorney at least twenty-one days before sentencing shall be deemed waived.

5.    Payment of Mandatory Special Assessment

Defendant agrees to pay the mandatory special assessment to the Clerk of the Court on or before the date of sentencing, unless Defendant establishes to the satisfaction of the Court that Defendant is financially unable to do so.

6.    Protection of Assets for Payment of Restitution, Forfeiture and Fine

Defendant agrees not to transfer, or authorize the transfer of, any asset which has been restrained by Order of the Court in this case or any asset, whether or not restrained, which Defendant has agreed to forfeit pursuant to this Agreement.

7

2.23.11

Defendant agrees not to transfer, or authorize the transfer of any other asset in which he has an interest without prior express written consent of the U.S. Attorney, except for:

    (a)    Assets subject to superior, secured interests of innocent third parties, in which Defendant has an equity interest of less than $4,000;

    (b)    Ordinary living expenses necessary to house, clothe, transport and feed Defendant and those to whom he owes a legal duty of support, so long as such assets do not exceed $4,000 per month; and

    (c)    Attorney's fees incurred in connection with this criminal case.

This prohibition shall be effective as of the date of Defendant's execution of this Agreement and continue until the fine, forfeiture and restitution ordered by the Court at sentencing are satisfied in full.

Defendant further agrees that, prior to sentencing, he will truthfully and accurately complete the sworn financial statement enclosed with this Agreement.

    7.    <u>Waiver of Rights to Appeal and to Bring Collateral Challenge</u>.

    (a)    Defendant has conferred with his attorney and understands that he has the right to challenge both his conviction and his sentence (including any orders relating to supervised release, fines, forfeiture, and restitution) on direct appeal. Defendant also understands that he may, in some circumstances, be able to argue in a future (collateral) challenge, such as pursuant to a motion under 28 U.S.C. §2255, 28 U.S.C. §2241 or 18 U.S.C. §3582(c), that his conviction should be set aside or his sentence (including any orders relating to supervised release, fines, forfeiture, and restitution) set aside or reduced.

    (b)    Defendant waives any right he has to challenge his conviction on direct appeal or in a collateral challenge.

    (c)    In exchange for the U.S. Attorney's agreement to dismiss Count Six from the Indictment, Defendant agrees that he will not file a direct appeal nor collaterally challenge any sentence of imprisonment of 293 months or less or any orders relating to supervised release, fines, forfeiture and restitution. This provision is binding even if the Court employs a Guidelines analysis different from that set forth in this Agreement.

    (d)    The U.S. Attorney likewise agrees that, regardless of the analysis employed by the Court, the U.S. Attorney will not appeal any imprisonment sentence of 324 months or more.

2.23.11

**G.App.52**

(e)     Notwithstanding the previous subparagraphs, Defendant reserves the right to claim that Defendant's lawyer was ineffective in connection with the negotiation of this plea agreement or the entry of the guilty plea.

8.     <u>Other Post-sentence Events</u>

(a)     In the event that, notwithstanding the waiver provision of Paragraph 7(c), Defendant appeals or collaterally challenges his sentence, the U.S. Attorney reserves the right to argue the correctness of the sentence imposed by the Court (in addition to arguing that any appeal or collateral challenge is waived as a result of the waiver in Paragraph 7).

(b)     If notwithstanding the waiver provision of Paragraph 7(c), Defendant seeks re-sentencing, he agrees that he will not seek to be re-sentenced with the benefit of any change to the criminal history category that the Court calculated at the time of Defendant's original sentencing, except to the extent that he has been found actually factually innocent of a prior crime. Thus, for example, Defendant will not seek to be re-sentenced based on the set aside of a prior state-court conviction that occurs after sentencing unless he has been found actually factually innocent of that prior crime.

(c)     In the event of a re-sentencing following an appeal from or collateral challenge to Defendant's sentence, the U.S. Attorney reserves the right to seek a departure from the Sentencing Guidelines and a sentence outside the Sentencing Guidelines if, and to the extent, necessary to reinstate the sentence advocated by the U.S. Attorney at Defendant's initial sentencing pursuant to this Agreement.

9.     <u>Waiver of Hyde Amendment Claim</u>

Defendant is aware that 111 Stat. 2440, 2520 (1997), the so-called "Hyde Amendment," authorizes courts in criminal cases to award to certain prevailing defendants attorneys' fees and other litigation expenses. In exchange for concessions made by the U.S. Attorney in this Agreement, Defendant voluntarily and knowingly waives any claim that he might assert under this statute based in whole or in part on the U.S. Attorney's agreement in Paragraph 1 to dismiss Count Six.

10.     <u>Court Not Bound by Agreement</u>

The sentencing recommendations made by the parties and their respective calculations under the Sentencing Guidelines are not binding upon the U.S. Probation Office or the Court. Within the maximum sentence which Defendant faces under the applicable law, the sentence to be imposed is within the sole discretion of the Court. Defendant's plea will be tendered pursuant to Fed. R. Crim. P. 11(c)(1)(B). Defendant may not withdraw his plea of guilty regardless of what sentence is imposed. Nor may Defendant withdraw his plea because the U.S. Probation Office or the Court

9

2.23.11

declines to follow the Sentencing Guidelines calculations or recommendations of the parties. In the event that the Court declines to follow the Sentencing Guidelines calculations or recommendations of the U.S. Attorney, the U.S. Attorney reserves the right to defend the Court's calculations and sentence in any subsequent appeal or collateral challenge.

11.   Forfeiture

Defendant understands that the Court will, upon acceptance of his guilty plea, enter an order of forfeiture as part of his sentence, and that the order of forfeiture may include assets directly traceable to his offense, assets used to facilitate his offense, substitute assets and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense.

The assets to be forfeited specifically include, without limitation, the following:

(1)   one Apple MacBook with serial number W8734MNOZ5W;

(2)   one Apple MacBook Pro bearing serial number W8928JY566D;

(3)   one black SanDisk Cruzer Micro 2.0 GB flash USB memory drive bearing number BE06063BB;

(4)   one silver Casio Exilim 3.2 MP digital camera bearing serial number 1280444A; and

(5)   one silver 2002 Lexus IS 300, bearing Vehicle Identification Number JTHBD192820035037 and Illinois Registration Number VBATCHU.

Defendant admits that these assets are subject to forfeiture on the grounds that they constitute property, real or personal, used or intended to be used to commit, or to promote the commission of the offenses in Counts One through Five of the Indictment. Defendant agrees to consent to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Defendant understands and agrees that forfeiture shall not satisfy or affect any fine, lien, penalty, restitution, cost of imprisonment, tax liability or any other debt owed to the United States.

Defendant agrees to assist fully in the forfeiture of the foregoing assets. Defendant agrees to promptly take all steps necessary to pass clear title to the forfeited assets to the United States, including but not limited to executing any and all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are not sold, disbursed, wasted, hidden or otherwise made unavailable for forfeiture. Defendant further agrees that he will not assist any third party in asserting a claim to the forfeited assets in an ancillary

2.23.11

proceeding and that he will testify truthfully in any such proceeding. In order to assist the United States in locating and forfeiting assets, Defendant shall deliver to the U.S. Attorney within thirty days after signing this Agreement a sworn financial statement disclosing all assets in which Defendant currently has any interest, and all assets over which Defendant has exercised control, or has had any legal or beneficial interest, at any time from October 1, 2008 to the present. At the request of the U.S. Attorney, Defendant further agrees to be deposed with respect to Defendant's assets.

Defendant further agrees to waive all constitutional, legal and equitable challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Agreement. Defendant agrees not to challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with regard to such challenge or review.

Defendant hereby waives and releases any claims he may have to any vehicles, currency, or other personal property seized by the United States, or seized by any state or local law enforcement agency and turned over to the United States, during the investigation and prosecution of this case, and consents to the forfeiture of all such assets.

Defendant agrees to consent to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Defendant acknowledges that he understands that the forfeiture of assets is part of the sentence that may be imposed in this case and waives any failure by the court to advise him of this, pursuant to Rule 11(b)(1)(J), at the time his guilty plea is accepted.

12.    Restitution

Pursuant to 18 U.S.C. § 3663, Defendant agrees to the entry of a Restitution Order for the full amount of the victims' losses. Defendant acknowledges that pursuant to this plea agreement, he agrees to pay restitution for the full amount of the victims' compensable losses as may be proved by the United States or stipulated to by the parties. Defendant acknowledges that the Court may not decline to award restitution because of Defendant's economic circumstances or the fact that the victims have, or are entitled to, receive(d) compensation for their injuries from the proceeds of insurance or any other source. 18 U.S.C. 3664(f).

Defendant further agrees to make full and accurate disclosure of his financial affairs to the United States. Specifically, Defendant agrees that, before sentencing, Defendant shall complete and provide to the United States, under penalty of perjury, the attached personal financial statement. Defendant shall also identify all assets valued at more than $5,000 which have been transferred to third parties since May 2, 2009, including the location of the assets and the identity of the third parties.

The parties will jointly recommend that as a condition of probation or supervised release,

2.23.11

Defendant will notify the Financial Litigation Unit, United States Attorney's Office, of any interest in property obtained, directly or indirectly, including any interest obtained under any other name, or entity, including a trust, partnership or corporation after the execution of this agreement until the fine or restitution is paid in full. See 18 U.S.C. § 3664(k), (n).

The parties will also jointly recommend that as a condition of probation or supervised release, Defendant will notify the Financial Litigation Unit, United States Attorney's Office, before Defendant transfers any interest in property owned directly or indirectly by Defendant, including any interest held or owned under any other name or entity, including trusts, partnership and/or corporations. See 18 U.S.C. § 3664(k), (n).

Defendant further agrees that whatever monetary penalties are imposed by the Court will be due immediately and subject to immediate enforcement by the United States as provided for in 18 U.S.C. § 3613. If the Court imposes a schedule of payments, Defendant understands that the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment. If Defendant is incarcerated, Defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the Court specifically directs participation or imposes a schedule of payments.

13.   Information For Presentence Report

Defendant agrees to provide all information requested by the U.S. Probation Office concerning Defendant's assets.

14.   Civil Liability

By entering into this Agreement, the U.S. Attorney does not compromise any civil liability, including but not limited to any tax liability, which Defendant may have incurred or may incur as a result of his conduct and his plea of guilty to the charges specified in Paragraph 1 of this Agreement.

15.   Rejection of Plea by Court

Should Defendant's guilty plea not be accepted by the Court for whatever reason, or later be withdrawn on motion of Defendant, this Agreement shall be null and void at the option of the U.S. Attorney.

16.   Breach of Agreement

If the U.S. Attorney determines that Defendant has failed to comply with any provision of this Agreement, has violated any condition of his pretrial release, or has committed any crime following his execution of this Agreement, the U.S. Attorney may, at her sole option, be released from her commitments under this Agreement in their entirety by notifying Defendant, through

2.23.11

counsel or otherwise, in writing. The U.S. Attorney may also pursue all remedies available to her under the law, irrespective of whether she elects to be released from her commitments under this Agreement. Further, the U.S. Attorney may pursue any and all charges which have been, or are to be, dismissed pursuant to this Agreement. Defendant recognizes that no such breach by him of an obligation under this Agreement shall give rise to grounds for withdrawal of his guilty plea. Defendant understands that, should he breach any provision of this Agreement, the U.S. Attorney will have the right to use against Defendant before any grand jury, at any trial or hearing, or for sentencing purposes, any statements which may be made by Defendant, and any information, materials, documents or objects which may be provided by Defendant to the government subsequent to this Agreement without any limitation. In this regard, Defendant hereby waives any defense to any charges which Defendant might otherwise have based upon any statute of limitations, the constitutional protection against pre-indictment delay, or the Speedy Trial Act.

17.   Sex Offender Registration Notification Act

Defendant acknowledges that he has been advised, and understands, that under the Sex Offender Registration and Notification Act and any applicable state law, he must register as a sex offender and keep the registration current in each of the following jurisdictions: (a) where he resides; (b) where he is an employee; (c) and where he is a student. Defendant understands that he will be required to provide his name, his residence address, and the names and addresses of any places where he is or will be an employee or a student, in addition to any other information required by state or federal law. Defendant further understands that the requirement to keep the registration current includes informing at least one jurisdiction in which he resides, is an employee, or is a student not later than three business days after any change of his name, residence, employment, or student status. Defendant has been advised, and understands, that failure to comply with these obligations may subject him to prosecution and imprisonment for failure to register under state or federal law.

18.   Victim Matters

Defendant agrees never to seek to profit financially, in any way, either directly or indirectly, from the crimes he committed in the instant case. Defendant agrees to submit to any medical tests for HIV or other sexually transmitted diseases, and have the test results released to the Court, United States Attorney's Office, United States Probation Office, the minor victims, and the victims' families. Defendant agrees to have no contact or communication with the minor victims and the victims' families without explicit written permission from the Court or the United States Probation Office for a period of 365 months following his release from imprisonment for the instant case, regardless of the term of supervised release ordered by the Court. Defendant agrees never to identify, in any manner, the minor victims and the victims' families.

19.   Who Is Bound By Agreement

This Agreement is limited to the U.S. Attorney for the District of Massachusetts, and cannot and does not bind the Attorney General of the United States or any other federal, state or local prosecutive authorities.

13

2.23.11

**G.App.57**

## ACKNOWLEDGMENT OF PLEA AGREEMENT

I have read this letter in its entirety and discussed it with my attorney. I hereby acknowledge that it fully sets forth my agreement with the United States Attorney's Office for the District of Massachusetts. I further state that no additional promises or representations have been made to me by any official of the United States in connection with this matter. I understand the crimes to which I have agreed to plead guilty, the maximum penalties for those offenses and Sentencing Guideline penalties potentially applicable to them. I am satisfied with the legal representation provided to me by my attorney. We have had sufficient time to meet and discuss my case. We have discussed the charges against me, possible defenses I might have, the terms of this Plea Agreement and whether I should go to trial. I am entering into this Agreement freely, voluntarily, and knowingly because I am guilty of the offenses to which I am pleading guilty and I believe this Agreement is in my best interest.

Mani M. Batchu
Defendant

Date: 3/25/11

I certify that Mani M. Batchu has read this Agreement and that we have discussed its meaning. I believe he understands the Agreement and is entering into the Agreement freely, voluntarily and knowingly.

Richard Foley
Attorney for Defendant

Date: 3/30/11

15

**G.App.58**

20.    <u>Complete Agreement</u>

This letter contains the complete and only agreement between the parties relating to the disposition of this case. No promises, representations or agreements have been made other than those set forth in this letter. This Agreement supersedes prior understandings, if any, of the parties, whether written or oral. This Agreement can be modified or supplemented only in a written memorandum signed by the parties or on the record in court.

If this letter accurately reflects the agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Agreement below. Please also sign below as Witness. Return the original of this letter to Assistant U.S. Attorney Steven H. Breslow.

Very truly yours,

CARMEN M. ORTIZ
United States Attorney

By: 

JOHN T. McNEIL
Deputy Chief, Criminal Division

14

# UNITED STATES DEPARTMENT OF JUSTICE
# FINANCIAL STATEMENT

Authority for the solicitation of the requested information is one or more of the following: 5 U.S.C. 301, 901 (see Note, Executive Order 6166, June 10, 1933); 28 U.S.C. 501, et seq.; 28 U.S.C. § 3001 et seq.; 31 U.S.C. 951, et seq.; 44 CFR 101 0.160, 0.171 and Appendix to subpart Y.

The principal purpose for gathering this information is to evaluate your capacity to pay any Government claim or judgment against you. Routine uses of the information are established in the following U.S. Department of Justice Case File Systems published in Vol. 42 of the Federal Register: Justice/CIV-001 at page 53321; Justice/TAX-001 at page 15347; Justice/USA-00 at pages 53408-53410, Justice/CRIM-016 at page 12774. If the requested information is not furnished, the U.S. Department of Justice has the right to such disclosure of the information by legal methods.

**INSTRUCTIONS: Please fill out all responses completely. Do not leave blanks. For example, if the response is "none" write in "none". Use additional sheets or continue on reverse side of form if additional space is needed.**

1.   NAME: _____

2.   OTHER NAMES USED: _____

3.   BIRTH DATE: _____

4.   (a) HOME ADDRESS: _____

    CITY: _____ STATE: _____ ZIP: _____

    (b) IDENTIFY ALL INDIVIDUALS WHO RESIDE AT THIS LOCATION AND THEIR RELATIONSHIP TO YOU _____

    (c) DO YOU PLAN TO MOVE FROM YOUR CURRENT RESIDENCE? ( ) YES ( ) NO IF YES, DATE YOU PLAN TO MOVE: _____
    NEW ADDRESS: _____

5.   (a) YOUR SOCIAL SECURITY NO._____-_____-_____

    (b) IDENTIFY ANY OTHER SOCIAL SECURITY NUMBERS YOU HAVE EVER USED
    _____

(Financial Statement 3/98)

**G.App.60**

6.  LIST ALL PHONE NUMBERS AT YOUR PLACE OF RESIDENCE, CELLULAR AND/OR BEEPER NUMBERS:_____
    IF NONE, GIVE NAME AND PHONE NUMBER OF NEAREST RELATIVE OR NEIGHBOR:_____

7.  MARITAL STATUS: (  ) MARRIED (  ) DIVORCED (GIVE DATE AND STATE OF DIVORCE_____) (  ) SEPARATED (  ) SINGLE

8.  NAME OF SPOUSE (GIVE ADDRESS AND PHONE NUMBER IF DIFFERENT FROM YOURS): _____
    _____

    DATE OF SPOUSE'S BIRTH: _____

9.  NUMBER OF DEPENDENTS: _____

    NAME                          RELATIONSHIP              DATE OF BIRTH

    _____
    _____
    _____
    _____
    _____

10. FATHER'S NAME: _____
    ADDRESS: _____
    PLACE OF EMPLOYMENT: _____
    ADDRESS: _____

11. MOTHER'S NAME: _____
    ADDRESS: _____
    PLACE OF EMPLOYMENT: _____
    ADDRESS: _____

12. ARE YOU CURRENTLY AN ACTIVE MEMBER OF THE ARMED FORCES (INCLUDING NATIONAL GUARD AND RESERVES)? (  ) YES  (  ) NO.
    IF YES, GIVE NAME, ADDRESS AND TELEPHONE NUMBER OF YOUR UNIT AND HOW MANY YEARS REMAINING IN YOUR ENLISTMENT_____
    _____

(Financial Statement 3/98)                    2

**G.App.61**

13.   ARE YOU CURRENTLY WORKING? (   ) YES    (   ) NO.  IF YES, GIVE NAME OF EMPLOYER, ADDRESS AND TELEPHONE: _____

_____

14.   (a)  HOW OFTEN ARE YOU PAID? ( ) WEEKLY (   ) BI-WEEKLY ( ) MONTHLY
      (   ) OTHER  _____

      (b) HOW MUCH ARE YOU PAID PER PERIOD:
          (Attach a copy of the most recent three months of  payroll statements)
          Gross Pay                                    _____
          Commissions/bonuses                          _____
          Taxes (State, Federal, FICA, etc.)           _____
          Retirement                                   _____
          Insurance                                    _____
                Life                                   _____
                Health                                 _____
                Other                                  _____
          Bonds, Savings, Union Dues (Specify)         _____
          Other Deductions (Specify)

          _____
          _____
          NET TAKE HOME PAY                            _____

15.   ON WHAT DAYS OF THE MONTH OR WEEK ARE YOU PAID?  _____

16.   ARE YOU A MEMBER OF A UNION: (   ) YES (   ) NO.  IF YES, GIVE  UNION NAME, ADDRESS AND TELEPHONE NUMBER:

_____
_____

17.   LIST ALL OTHER EMPLOYMENT WITHIN THE LAST SIX YEARS:
      EMPLOYER NAME          ADDRESS          PHONE      DATES      SALARY

_____
_____
_____
_____

      (a)   HAVE YOU EVER APPLIED FOR OR RECEIVED UNEMPLOYMENT OR DISABILITY PAYMENTS WITHIN THE LAST SIX YEARS?  IF SO, STATE THE PERIOD AND AMOUNT RECEIVED.

_____

      (b)   DO YOU RECEIVE UNEMPLOYMENT BENEFITS NOW? (   ) YES (   ) NO.

IF YES, STATE HOW MANY WEEKS OF ELIGIBILITY YOU HAVE LEFT:

_____

IF NO, HAVE YOU APPLIED FOR THEM?  IF YOU APPLIED FOR SUCH BENEFITS AND WERE DENIED, STATE THE REASON FOR THE DENIAL

_____

.

18.    ASIDE FROM ANY BENEFITS IDENTIFIED IN YOUR RESPONSE TO QUESTION 19(a), HAVE YOU RECEIVED FINANCIAL SUPPORT FROM ANY SOURCE OR PERSON WITHIN THE LAST SIX YEARS?  IF SO, STATE THE AMOUNT, DATES RECEIVED, AND IDENTIFY THE SOURCE WITH NAME, ADDRESS AND TELEPHONE NUMBER.

_____
_____
_____
_____

19.    DO YOU EXPECT TO BE WORKING IN THE NEXT 12 MONTHS?  ( ) YES ( ) NO.
(a) IF YES, GIVE THE EMPLOYER'S NAME, ADDRESS AND TELEPHONE NUMBER:

_____
_____
_____

(b)  IF NOT, STATE THE REASONS WHY NOT:

_____
_____
_____

20.    HAS YOUR SPOUSE WORKED IN THE LAST SIX YEARS? ( ) YES ( ) NO.  IF SO, GIVE THE EMPLOYER'S NAME, ADDRESS AND TELEPHONE NUMBER?

_____
_____
_____

21.    HOW MUCH DOES HE/SHE MAKE? $_____ PER  ( ) WEEK ( ) MONTH
(  ) YEAR.  WHAT IS THE TAKE HOME PER PAY PERIOD?

_____

22. HAVE YOU, YOUR SPOUSE OR DEPENDENTS HAD A CHECKING ACCOUNT IN THE PAST SIX YEARS? ( ) YES ( ) NO. IF SO, LIST ALL SUCH ACCOUNTS, WITH BANK NAME, ACCOUNT HOLDER AND ACCOUNT NUMBER.

| BANK | ACCOUNT NUMBER | ACCOUNT HOLDER | CURRENT BALANCE OR DATE CLOSED |
|------|----------------|----------------|--------------------------------|
| | | | |
| | | | |
| | | | |
| | | | |

23. HAVE YOU, YOUR SPOUSE OR DEPENDENTS HAD A SAVINGS ACCOUNT IN THE PAST SIX YEARS?        ( ) YES ( ) NO.
IF SO, GIVE NAMES AND ADDRESSES OF ALL BANKS AND ALL ACCOUNT NUMBERS.

| BANK | ACCOUNT NUMBER | ACCOUNT HOLDER | CURRENT BALANCE OR DATE CLOSED |
|------|----------------|----------------|--------------------------------|
| | | | |
| | | | |
| | | | |

24. DO YOU OR YOUR SPOUSE HAVE AN INDIVIDUAL RETIREMENT ACCOUNT (IRA) KEOUGH ACCOUNT; PENSION PLAN ACCOUNT; 401(k) ACCOUNT; 404(b) ACCOUNT; OR ANY OTHER RETIREMENT SAVINGS PLAN? ( ) YES ( ) NO. IF YES, GIVE NAME OF FINANCIAL INSTITUTION(S), ADDRESS, ACCOUNT TYPE AND ACCOUNT NUMBERS, AMOUNT AND FREQUENCY OF CONTRIBUTIONS AND BALANCE OF EACH ACCOUNT:

| BANK | ACCOUNT NUMBER | ACCOUNT HOLDER | CURRENT BALANCE OR DATE CLOSED |
|------|----------------|----------------|--------------------------------|
| | | | |
| | | | |
| | | | |
| | | | |

25. DO YOU, YOUR SPOUSE OR DEPENDENTS HAVE ANY SECURITY DEPOSITS? IF SO, IDENTIFY THE AMOUNT, ENTITY OR INDIVIDUAL WHO CONTROLS THE SECURITY DEPOSIT AND LOCATION.

_____

_____

_____

26.     DO YOU, YOUR SPOUSE OR DEPENDENTS HAVE ANY CASH OVER $5,000?  IF SO, IDENTIFY THE AMOUNT AND LOCATION:

_____
_____
_____

27.     HAVE YOU, YOUR SPOUSE OR DEPENDENTS USED ANY SAFE DEPOSIT BOXES WITHIN THE PAST SIX YEARS?  IF SO, IDENTIFY THE HOLDER OF SUCH SAFE DEPOSIT BOX, THE CONTENTS, AMOUNT AND LOCATION.

_____
_____
_____

28.     HAVE YOU, YOUR SPOUSE OR DEPENDENTS HAD ANY MONEY MARKET, BROKERAGE OR OTHER ACCOUNTS IN THE PAST SIX YEARS?  IF SO, IDENTIFY THE FINANCIAL INSTITUTION AND CURRENT OR CLOSING BALANCE OF EACH ACCOUNT.

| BANK | ACCOUNT NUMBER | ACCOUNT HOLDER | CURRENT BALANCE OR DATE CLOSED |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

29.     HAVE YOU, YOUR SPOUSE OR DEPENDENTS HAD ANY FOREIGN BANK ACCOUNTS IN THE PAST SIX YEARS?   IF SO, IDENTIFY THE FINANCIAL INSTITUTION WHERE LOCATED, AND CURRENT OR CLOSING BALANCE OF EACH ACCOUNT.

| BANK | ACCOUNT NUMBER | ACCOUNT HOLDER | CURRENT BALANCE OR DATE CLOSED |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

30.     HAVE YOU, YOUR SPOUSE OR DEPENDENTS HAD ANY CERTIFICATES OF DEPOSIT, TREASURY NOTES WITHIN THE PAST SIX YEARS? IF SO, IDENTIFY THE AMOUNT AND WHERE MAINTAINED.

_____
_____
_____

**G.App.65**

31.    DO YOU, YOUR SPOUSE OR DEPENDENTS HAVE ANY TRAVELERS CHECKS?  IF SO, IDENTIFY THE AMOUNT AND WHERE MAINTAINED.

_____
_____
_____

32.    HAVE YOU, YOUR SPOUSE OR DEPENDENTS HAD ANY SECURITIES (BONDS, STOCKS, NOTES, MORTGAGES OR REAL ESTATE INVESTMENT TRUSTS) WITHIN THE PAST SIX YEARS? IF SO, IDENTIFY THE AMOUNT AND WHERE MAINTAINED.

_____
_____
_____

33.    HAVE YOU, YOUR SPOUSE OR DEPENDENTS HAD ANY TAX EXEMPT FUNDS, MUNICIPAL BONDS WITHIN THE PAST SIX YEARS? IF SO, IDENTIFY THE AMOUNT AND WHERE MAINTAINED.

_____
_____
_____

34.    HAVE YOU, YOUR SPOUSE OR DEPENDENTS HAD ANY EQUITY SECURITIES, COMMODITY CONTRACTS WITHIN THE PAST SIX YEARS?  IF SO, IDENTIFY THE NATURE AND VALUE AND WHERE MAINTAINED.

_____
_____
_____

35.    HAVE YOU, YOUR SPOUSE OR DEPENDENTS HAD ANY MUTUAL FUNDS WITHIN THE PAST SIX YEARS?  IF SO, IDENTIFY THE VALUE AND WHERE MAINTAINED.

_____
_____
_____

36.    HAVE YOU, YOUR SPOUSE OR DEPENDENTS HAD ANY BROKERAGE ACCOUNTS OR BROKERS' MARGIN ACCOUNTS WITHIN THE PAST SIX YEARS?  IF SO, IDENTIFY THE INSTITUTION.

| BANK | ACCOUNT NUMBER | ACCOUNT HOLDER | CURRENT BALANCE OR DATE CLOSED |
|------|----------------|----------------|-------------------------------|
| | | | |
| | | | |
| | | | |

**G.App.66**

37. DO YOU, YOUR SPOUSE OR DEPENDENTS HAVE ANY ACCOUNTS RECEIVABLE (INCLUDING PRINCIPAL AMOUNT, MATURITY DATE, MARKET VALUE)?  IF SO, IDENTIFY THE AMOUNTS THAT ARE OWED AND FROM WHOM.

_____
_____
_____

38. DO YOU, YOUR SPOUSE OR DEPENDENTS HAVE ANY ANNUITY CONTRACTS?  IF SO, GIVE COMPLETE DETAILS.

_____
_____
_____

39. ARE YOU, YOUR SPOUSE OR DEPENDENTS ENTITLED TO RECEIVE ANY ALIMONY OR CHILD SUPPORT PAYMENTS?  IF SO, GIVE COMPLETE DETAILS.

_____
_____
_____

40. HAVE YOU, YOUR SPOUSE OR DEPENDENTS HELD ANY PROMISSORY NOTES OR MADE ANY LOANS TO ANY PERSON OR ENTITY THAT ARE STILL OUTSTANDING? IF SO, GIVE COMPLETE DETAILS.

_____
_____
_____

41. HAVE YOU, YOUR SPOUSE OR DEPENDENTS HAD ANY BUSINESS INTERESTS (INCLUDING SOLE PROPRIETORSHIPS, PARTNERSHIPS, CORPORATIONS) WITHIN THE PAST SIX YEARS?  IF SO, GIVE COMPLETE DETAILS.

_____
_____
_____

42. DO YOU, YOUR SPOUSE OWN OR LEASE ANY VEHICLES? IF SO, IDENTIFY MAKE, MODEL, DATE OF PURCHASE, OR LOAN AGREEMENT.

_____
_____
_____

G.App.67

43.    DO YOU DRIVE A MOTOR VEHICLE OWNED OR LEASED BY SOMEONE ELSE? IDENTIFY THE MAKE, MODEL, YEAR AND OWNER AND/OR LESSEE OF VEHICLE.

_____
_____
_____

44.    DO YOU OR YOUR SPOUSE HAVE ANY LIFE INSURANCE POLICIES?
( ) YES ( ) NO.  IF YES, STATE:

(a)    COMPANY NAME, ADDRESS, PHONE NUMBER:

_____
_____

(b)    TYPE OF INSURANCE (TERM, WHOLE LIFE, ETC.)

_____
_____

(c)    POLICY NUMBER:

_____
_____

(d)    FACE VALUE AMOUNT:

_____
_____

(e)    CASH SURRENDER VALUE:

_____
_____

(f)    OUTSTANDING LOANS ON POLICY:

_____
_____

45.    DO YOU OR ANYONE IN YOUR HOUSEHOLD HAVE ANY HOMEOWNER'S OR RENTER'S INSURANCE POLICIES?  ( ) YES ( ) NO
IF YES, IDENTIFY THE FOLLOWING:

(a) COMPANY NAME, ADDRESS AND PHONE NUMBER

_____
_____

(b) TYPE OF INSURANCE: _____

(c) POLICY NUMBER(S):_____

(Financial Statement 3/98)         9

**G.App.68**

(d) VALUE OF INSURANCE:_____

(e) DOES THIS INSURANCE POLICY OR ANY OTHER POLICY COVER ANY PERSONAL PROPERTY SUCH AS JEWELRY, ARTWORK, FURS, SILVERWARE, RARE COINS, ETC., THAT ARE SPECIFICALLY LISTED AS COVERED UNDER SUCH POLICY? ( ) YES ( ) NO
IF YES, ATTACH ALL SCHEDULES, LISTS OR RIDERS OF POLICY LISTING SUCH INSURED ITEMS, INCLUDING AMOUNT OF INSURANCE COVERAGE.

46. DO YOU, YOUR SPOUSE OR DEPENDENTS OWN ANY REAL ESTATE OR HAVE ANY OWNERSHIP INTEREST IN ANY REAL ESTATE OR REAL ESTATE INVESTMENT ENTITIES OR TRUSTS? ( ) YES ( ) NO.
IF YES, IDENTIFY LOCATION, TITLE OWNERS, INTEREST OWNED.
_____
_____

47. ARE YOU PLANNING TO PURCHASE OR SELL ANY REAL ESTATE UNDER CONTRACT? ( ) YES ( ) NO. IF YES, STATE:

(a) PROPERTY ADDRESS:
_____
_____

(b) NAME AND ADDRESS OF BUYER/SELLER:
_____
_____

(c) PROPERTY'S APPRAISED VALUE: _____

(d) CONTRACT PRICE: _____

(e) PRINCIPAL STILL OWED: _____

(f) NEXT PAYMENT DATE:_____

(g) AMOUNT OF NEXT PAYMENT:_____

48. DO YOU HAVE ANY INCOME PROTECTION INSURANCE, e.g., ACCIDENT INSURANCE? ( ) YES ( ) NO. IF YES, STATE COMPANY NAME, ADDRESS, PHONE NUMBER:
_____
_____

49. LIST ALL PERSONAL PROPERTY OWNED BY YOU, YOUR SPOUSE OR DEPENDENTS:

| PROPERTY ITEM | DESCRIPTION | LOCATION | OWNED BY | YEAR PURCHASED & PRICE |
|---|---|---|---|---|
| Furniture | | | | |

**G.App.69**

Microwave

Refrigerator

Stove/Oven

Dishwasher

Washer/Dryer

Other Appliances

TV (state how many)

VCR

Video Camera/Recorder

Stereo/CD Player

Cameras

Guns

Jewelry

Antiques

Collectibles, e.g.,.stamps, artwork, etc.

Computers, printers, scanners

Telefax Machine, answering machine

Tools

Aircraft

Boats or other water craft

Vehicles of any kind   (including cars, trucks, campers, motorcycles, snowmobiles, etc.

Lawn Mower

Satellite TV System

Other

Professional & Business Licenses

(Financial Statement 3/98)

11

**G.App.70**

50.    DATE LAST FEDERAL INCOME TAX RETURN WAS FILED:

_____

AMOUNT OF GROSS INCOME REPORTED:

_____

51.    ARE YOU, YOUR SPOUSE OR DEPENDENTS CLAIMING ANY TAX REFUNDS? IF SO,
IDENTIFY THE AMOUNT CLAIMED AND FROM WHOM.

_____
_____

52.    LIST ALL TRANSFERS OF PROPERTY INCLUDING CASH (BY LOANS, GIFT, SALE,
ETC.) THAT YOU HAVE MADE WITHIN THE LAST SIX (6) YEARS (ITEMS OF $1,000
OR MORE IN VALUE) USE ADDITIONAL SHEETS IF NECESSARY:

DATE                    AMOUNT               PROPERTY TRANSFERRED TO WHOM
_____
_____
_____

53.    ARE YOU A TRUSTEE, EXECUTOR, BENEFICIARY OR ADMINISTRATOR UNDER
ANY WILL OR TESTAMENT, INSURANCE POLICY OR TRUST AGREEMENT?
(  ) YES  (  ) NO.  IF YES, GIVE DETAILS:

_____
_____

54.    (a) IS THERE ANY LIKELIHOOD YOU, YOUR SPOUSE OR DEPENDENT WILL
RECEIVE ANY INHERITANCE?  (  ) YES ( ) NO.

IF YES, FROM WHOM?  (name, address and phone number)
_____
_____

(b) HAVE YOU RENOUNCED ANY INHERITANCE RIGHTS WITHIN THE LAST THREE
YEARS?  IF SO, PROVIDE THE DETAILS OF WHOSE ESTATE, AND PROVIDE ALL
DOCUMENTS EXECUTED BY YOU IN CONNECTION WITH THIS.

_____
_____

**G.App.71**

55.     DO YOU RECEIVE OR, UNDER ANY CIRCUMSTANCES, EXPECT TO RECEIVE BENEFITS FROM ANY ESTABLISHED TRUST, FROM A CLAIM FOR COMPENSATION OR DAMAGES, OR FROM A CONTINGENT OR FUTURE INTEREST IN PROPERTY OR ANY KIND?   (   ) YES (   ) NO.  IF YES, GIVE DETAILS:

_____
_____

56.     DO YOU HAVE ANY OUTSTANDING LOANS PAYABLE TO BANKS, FINANCE COMPANIES, ETC.?  (   ) YES (   ) NO.  IF YES, GIVE DETAILS:

| Owed To | Purpose | Amount | Payment | Balance |
|---------|---------|--------|---------|---------|
|         |         |        |         |         |
|         |         |        |         |         |
|         |         |        |         |         |
|         |         |        |         |         |

57.     ARE YOU SELF-EMPLOYED OR DO YOU OWN ALL OR PART OF A BUSINESS AS SOLE OWNER, PARTNER, STOCKHOLDER, OR OTHER OTHERWISE?
( ) YES  ( ) NO.  IF YES, STATE THE NAME AND ADDRESS OF THE BUSINESS:

_____
_____

STATE THE NATURE AND VALUE OF YOUR INTEREST:

_____
_____

HOW AND WHEN DO YOU DRAW MONEY FROM IT?

_____
_____

58.     GIVE AN ACCURATE ACCOUNT OF THE FINANCIAL CONDITION OF THIS BUSINESS FOR THE LAST SIX YEARS.  ATTACH COPIES OF THE MOST RECENT THREE RETURNS AND A STATEMENT OF ASSETS, INVENTORIES, LIABILITIES, GROSS AND NET INCOME, AND THE AMOUNT OF ANY UNDISTRIBUTED PROFITS IN THE BUSINESS:

_____
_____

**G.App.72**

59.    LIST CREDITORS TO WHOM YOU OWE MONEY (INCLUDING JUDGMENTS, CREDIT CARD DEBTS, LOANS, DOCTOR BILLS, ETC.: (Even if disclosed above)

| Creditor | Monthly Payment | Balance Owing |
|----------|-----------------|---------------|
|          |                 |               |
|          |                 |               |
|          |                 |               |
|          |                 |               |

60.    MONTHLY INCOME AND EXPENSES OF SELF, SPOUSE AND DEPENDENTS.

| LIST ALL MONTHLY INCOME (even if disclosed above) | | LIST ALL MONTHLY EXPENSES (even if disclosed above) | |
|---|---|---|---|
| Take home pay  (self) | $ | Rent/mortgage | $ |
| "      (spouse) | $ | Real estate taxes | $ |
| "      (dependents) | $ | Food (home, work, school) | $ |
| Overtime (est. if necessary) | $ | Heat (gas, oil, wood) | $ |
| Interest/Dividends | $ | Electricity | $ |
| Support/Alimony | $ | Telephone | $ |
| Pension/Social Security | $ | Cable TV | $ |
| Social Services | $ | Other utilities | $ |
| Food Stamps | $ | Insurance | $ |
| Rent Income | $ | Medical | $ |
| Benefits from the U.S. | $ | Transportation | $ |
| Disability compensation | $ | Clothing | $ |
| Retirement pay | $ | Childcare | $ |
| Military pay (active) | $ | Tuition | $ |
| Commissions | $ | Child support/alimony | $ |
| Other (list specifically) | $ | Entertainment | $ |
|  | $ | Personal care | $ |
|  | $ | Drycleaning/laundry | $ |
|  | $ | Gifts | $ |
|  | $ | Newspapers/Magazines | $ |
|  | $ | Church/charities | $ |
|  | $ | Tobacco | $ |

(Financial Statement 3/98)                              14

**G.App.73**

Case 3:10-cr-30008-MAP  Document 79   Filed 05/07/11   Page 30 of 30

| | $ | Other Miscellaneous | $ |
|---|---|---|---|
| | | | |
| **TOTAL INCOME** | $ | **TOTAL EXPENSES** | $ |

Attach copies of all documents related to monthly income and expenses over $200.

WITH KNOWLEDGE OF THE PENALTIES FOR FALSE STATEMENTS PROVIDED BY TITLE 18, UNITED STATES CODE, SECTION 1001 ($250,000 FINE AND/OR FIVE YEARS IMPRISONMENT) AND WITH KNOWLEDGE THAT THIS FINANCIAL STATEMENT IS SUBMITTED BY ME TO AFFECT ACTION BY THE UNITED STATES DEPARTMENT OF JUSTICE, I HEREBY CERTIFY THAT THE ABOVE STATEMENT IS TRUE AND THAT IT IS A COMPLETE STATEMENT OF ALL MY INCOME AND ASSETS, REAL AND PERSONAL, WHETHER HELD IN MY NAME OR BY ANY OTHER.

_____
Date

_____
Signature

_____
Print name

(Financial Statement 3/98)

15

**G.App.74**

1

```
 1                  UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
 2                        WESTERN SECTION

 3

 4      UNITED STATES        *       Docket No. 10-30008-MAP

 5
        VS.                  *       Springfield, MA
 6

 7      MANI BATCHU          *       May 9, 2011

 8      *    *    *    *     *       2:15 p.m.

 9

10

                  TRANSCRIPT OF THE HEARING HELD BEFORE
11                 THE HONORABLE MICHAEL A. PONSOR,
                   UNITED STATES DISTRICT COURT JUDGE.

12

13

14

15
        APPEARANCES:
16      For the Plaintiff:  STEVEN H. BRESLOW, Assistant
            U.S. Attorney, 300 State Street, Springfield,
17          Massachusetts 01105.

18      For the Defendant:  RICHARD N. FOLEY, ESQUIRE,
            55 Market Street, Suite 2B, Portsmouth,
19          New Hampshire 03801.

20

21

22

23

24                          Sarah L. Mubarek
                      Registered Professional Reporter
25
```

```
 1                    (Court came in at 2:15 p.m.)

 2                    THE COURT:  Good afternoon.  Please be

 3        seated.

 4                    THE CLERK:  Your Honor, this is the

 5        matter of United States v. Mani Batchu, criminal

 6        matter 10-30008-MAP.

 7                    THE COURT:  We're here, as I

 8        understand it, to take the pleas of the defendant,

 9        Mani Batchu, for a number of the counts in the

10        indictment.  Before I begin to speak to the

11        defendant, I had a question.  I may be missing

12        something.

13              The plea agreement speaks of the change of

14        plea on page one, and contemplates Mr. Batchu

15        pleading guilty to Counts One through Five, and

16        indicates that the U.S. Attorney is agreeing to

17        dismiss Count Six.  Unless there was a superseding

18        indictment, there are eight counts in the indictment

19        that I see, and I don't know what's going on with

20        Counts Seven and Eight.

21                    MR. BRESLOW:  Your Honor may recall

22        that shortly before the suppression hearing in

23        February of this year, we moved voluntary in the

24        interest of justice to dismiss Counts Seven and Eight

25        due to information that we developed in the course of
```

```
 1    the investigation in preparation for the suppression
 2    hearing.
 3              THE COURT:  So Counts Seven and Eight
 4    were previously dismissed.
 5              MR. BRESLOW:  I'm not sure if your
 6    Honor has ruled in a written motion, but your Honor
 7    did indicate that those counts would be dismissed.
 8              THE COURT:  Okay.  So Counts One
 9    through Five will be the subject of the pleas, and
10    Six will be dismissed following imposition of the
11    sentence, and Seven and Eight are already subject to
12    a motion to dismiss.
13              Mr. Batchu, let me say a few -- you can be
14    seated.  That's all right.  Ordinarily it is true
15    that the defendant stands when he's addressed by the
16    court, but it's fine for you to remain seated.  I
17    just want to say a few things before we get started.
18              My job whenever I take anyone's plea is to
19    make sure that if they plead guilty, they do it
20    knowingly, intelligently and voluntarily, meaning
21    that they offer their pleas with their eyes open.
22    I'm going to be asking you a series of questions, I'm
23    going to be giving you some information, and I'm
24    going to be giving you some warnings that are all
25    part of my normal plea proceeding.  I want you to
```

1    know, Mr. Batchu, that if I don't speak up loudly
2    enough, or there's some noise in the courtroom that
3    distracts you, or I don't explain myself clearly, you
4    can let me know and I'd be happy to repeat myself or
5    explain anything.
6              Also, I recognize that you're here with
7    Mr. Foley, your attorney, and you have the right to
8    consult with him at any time.  If you have a brief
9    question for him, we can arrange for you to have a
10   confidential conversation with him right here in the
11   courtroom, but if you need to speak to him at greater
12   length, we'll suspend this plea proceeding and give
13   you a conference room, and you can sit down with your
14   attorney and get all your questions answered.
15             Let me tell you how I go about taking a
16   plea.  In a moment or two I'm going to be asking you
17   to come around to the far side of this witness box.
18   You'll step up, raise your right hand, and
19   Ms. Pelegano will place you under oath.  Once we've
20   done that, I'll have a series of questions for you,
21   information and warnings to give you.  Then I'll have
22   a few questions for your attorney, Mr. Foley, and
23   then I'll have some questions for Assistant U.S.
24   Attorney Breslow, who is here representing the
25   government.

1               At the end of that time, once I've gone

2       through those questions, if I think it's appropriate,

3       we will be setting this case down for sentencing,

4       which will take place in some weeks to permit us to

5       prepare the Presentence Report.  It normally takes me

6       in the neighborhood of half an hour to take a plea,

7       but I'm prepared to take as long as is necessary to

8       go through this step by step and make sure that you

9       know exactly what you're doing.

10              All right, sir.  That's my preliminary

11      comments.  If you'd come around to this side of the

12      witness box, we'll get started.  Just come around on

13      this side and give the door -- oops, you're going too

14      far.  Just give the door a tug there.  There you go.

15      Very good.  If you'd raise your right hand, please.

16              The defendant, MANI BATCHU, having been

17      duly sworn, testifies as follows:

18                    THE COURT:  Please have a seat.  My

19      first question, Mr. Batchu, is that you have just

20      sworn to tell the truth.  I want to make sure you

21      understand that if you deliberately and intentionally

22      tell a lie in response to one of my questions, you

23      can be prosecuted for perjury.  Do you understand

24      that?

25                    THE DEFENDANT:  I do.

```
 1                    THE COURT:  Next, I want to make sure
 2      that you understand the rights that you will be
 3      giving up if you choose to plead guilty in this case.
 4      You've previously pled not guilty to these charges.
 5      You have a right to stick with that not guilty plea,
 6      and to have a trial to test whether the government is
 7      able to prove you guilty beyond a reasonable doubt.
 8                    That trial would take place right in this
 9      courtroom where we're seated right now.  The jury
10      would sit over here to my right in the jury box.  The
11      witnesses would sit in the witness box where you're
12      seated right now.  You would have the right to be
13      present throughout your trial.  You'd have the right
14      to the assistance of your attorney during your trial.
15      You'd have the right to see and hear all the
16      witnesses against you, and to have your attorney
17      question those witnesses.  You'd have the right to
18      bring in your own witnesses if you wished to, and if
19      they would not come in voluntarily, I would issue an
20      order requiring them to come in.
21                    At this trial you would have the right to
22      make your own decision about whether you wished to
23      testify.  If you did wish to testify, you could take
24      the witness stand where you're seated right now and
25      tell your side of the story to the jury.  If you did
```

 1    not wish to testify, however, our constitution gives
 2    every defendant the right to remain silent.  You
 3    would not have to say anything during your trial.
 4    Moreover, if you chose to remain silent, I would
 5    instruct the jurors that they could not consider that
 6    or think about it in any way in determining whether
 7    the government had proved its case against you beyond
 8    a reasonable doubt.
 9          At your trial you would not be required to
10    prove that you were innocent.  Rather, the
11    government, as I've mentioned, would have to prove
12    you guilty beyond a reasonable doubt.  That means
13    that they would have to convince twelve jurors
14    unanimously, beyond a reasonable doubt, that you were
15    in fact guilty of the charges against you, and you
16    could not be found guilty of anything unless twelve
17    jurors were so convinced.
18          Do you understand, Mr. Batchu, that if I
19    permit you to plead guilty here, you're going to be
20    giving up all the rights that I just described?  Do
21    you understand that?
22          THE DEFENDANT:  I do understand.
23          THE COURT:  Do you understand that if
24    you plead guilty, there's not going to be any trial,
25    there will not be any witnesses, and there will not

1     be any burden on the government?

2               THE DEFENDANT:  I understand.

3               THE COURT:  Have you told your

4     attorney, Mr. Foley, the whole story behind these

5     charges without concealing anything from him?

6               THE DEFENDANT:  I have.

7               THE COURT:  You've spoken openly to

8     your attorney?

9               THE DEFENDANT:  Right, correct.

10              THE COURT:  And spoken in detail about

11    everything related to these charges with him?

12              THE DEFENDANT:  Correct.

13              THE COURT:  All right.  Has Mr. Foley

14    advised you of the nature of these charges and any

15    possible defenses you might have to these charges?

16              THE DEFENDANT:  He has.

17              THE COURT:  And has Mr. Foley

18    described the elements of these offenses, meaning the

19    things that the government would have to prove beyond

20    a reasonable doubt before you could be found guilty

21    of anything?

22              THE DEFENDANT:  He has.

23              THE COURT:  And have you been advised

24    of the maximum penalty provided by law for the

25    offenses to which you intend now to plead guilty?

1                    THE DEFENDANT:  Yes, I have.

2                    THE COURT:  These are fairly

3      considerable potential penalties, and some of them

4      are mandatory, so I want to go through exactly what

5      these possible penalties are.  As I understand it,

6      you are contemplating pleas of guilty to Counts One

7      through Five.

8                    Count One charges you with transportation

9      of a minor to engage in criminal sexual activity,

10     which is a violation of a federal statute known as

11     18 U.S. Code §2423(a).  That's the first count.

12     Counts Two, Three and Four charge you with traveling,

13     yourself, for purposes of engaging in illicit sexual

14     conduct with a minor, and that's in violation of

15     18 U.S. Code §2423(b).  So those are the Counts Two,

16     Three and Four.  Count Five charges you with using a

17     facility of interstate commerce to entice a minor to

18     engage in criminal sexual activity, which is a

19     violation of 18 U.S. Code §2422(b).

20                    As we mentioned at the beginning here, the

21     government will be dismissing Count Six of the

22     indictment.  Count Seven and Eight have already been

23     the subject of a motion to dismiss, although it may

24     not have yet been allowed.

25                    Here are the possible penalties for the

1     three offenses that you propose to plead guilty to.

2     First, transportation of a minor to engage in

3     criminal sexual activity carries with it a mandatory

4     minimum prison sentence of ten years.  That means

5     that regardless of what my own personal opinion might

6     be, Congress has set this down and has eliminated any

7     discretion on my part or on the part of any judge.

8     If you plead guilty to this count, you will have to

9     spend ten years in prison.  Do you understand that?

10                    THE DEFENDANT:  I do.

11                    THE COURT:  That constitutes the floor

12    of the sentence that you're looking at.  Now, the

13    ceiling goes all the way up to life.  I'm going to

14    have to compose a sentence of at least ten years, but

15    I could impose a ceiling all the way up to life

16    imprisonment as a potential prison term in your case.

17    Do you understand that?

18                    THE DEFENDANT:  Yes, I do.

19                    THE COURT:  And with regard to what we

20    call supervised release, there is also a minimum and

21    a maximum term.  Supervised release begins once a

22    defendant has completed his term of imprisonment.  He

23    or she is released, they're free, they're in the

24    community, but they're on supervised release which

25    means that you have to follow certain rules and

 1    report to a probation officer.  So the United States

 2    or the government still has a hold on you to some

 3    extent even though you're no longer confined.

 4          Here your term of supervised release would

 5    be at least five years.  You'll be under supervised

 6    release terms, and you could receive a period of

 7    supervised release of up to life, for the rest of

 8    your life.  You also could be looking at a fine of up

 9    to $250,000, and a special assessment of $100.  Do

10    you understand that, Mr. Batchu?

11          THE DEFENDANT:  I do.

12          THE COURT:  There is also in some

13    cases a provision that requires a defendant to pay

14    restitution as ordered by the court.  That

15    restitution may include your paying costs associated

16    with the victim, counselling support and other types

17    of support she may need as a result of the crime.  Do

18    you understand that?

19          THE DEFENDANT:  Yes.

20          THE COURT:  And also there is a

21    provision in the indictment which contemplates your

22    forfeiture of certain property.  That includes

23    certain hardware and software which the government

24    charges were used in connection with this criminal

25    behavior, and also the forfeiture of I believe a 2002

1    Lexus automobile which would be permanently turned
2    over to the possession of the government as a result
3    of your pleading guilty.  Do you understand that?
4              THE DEFENDANT:  I do understand.
5              THE COURT:  All right.  So that's the
6    first of the five counts that you propose to plead
7    guilty to.
8              The second, third and fourth counts charge
9    you with traveling for purposes of engaging in
10   illicit sexual conduct with a minor.  Those three
11   counts each carry a maximum sentence of 30 years in
12   prison, plus a mandatory minimum of five years.  So
13   here again, the sentence has a floor and a ceiling.
14   The floor this time is not ten years, as with the
15   first charge, it's five years.  You must receive five
16   years in prison, and the ceiling is not life, but is
17   30 years in prison.  Yes, Mr. Breslow.
18             MR. BRESLOW:  Yes, your Honor.  Just
19   so the record is clear, Counts Two through Four
20   charge a statutory -- there is no statutory mandatory
21   minimum.  There's just a maximum sentence of 30 years
22   in prison, and then a mandatory minimum of five
23   years, and a maximum lifetime on supervised release.
24             THE COURT:  Thank you, Mr. Breslow.  I
25   misspoke.  I want to correct what I said.  There is

**G.App.86**

```
 1    no floor to the sentence with regard to Counts Two,
 2    Three and Four.  There's a maximum sentence of 30
 3    years in prison.
 4            Your supervised release term carries a
 5    minimum mandatory five-year term.  So with regard to
 6    each of those charges, once you're released from
 7    prison, you will have to go onto supervised release
 8    for at least five years.  In that sense it's similar
 9    to the previous charge.  You could be on supervised
10    release for as long as the rest of your life.  There
11    is also the restitution and forfeiture that I
12    mentioned before, and fines of $250,000 and a $100
13    special assessment.
14            With regard to Two, Three and Four, I could
15    hypothetically stack each one of those sentences on
16    top of each other.  I could run them consecutively if
17    I felt it was appropriate rather than concurrently.
18    So your sentence would be added for each one of these
19    counts, and it is also possible that the sentences on
20    Counts Two, Three and Four could be added to the
21    sentence on Count One and stacked on top of each
22    other as well.  Do you understand that?
23            THE DEFENDANT:  Yes.
24            THE COURT:  Finally, you're charged in
25    Count Five with using a facility of interstate
```

1    commerce to entice a minor to engage in criminal

2    sexual activity.  That count carries with it a

3    mandatory minimum prison sentence of ten years, so in

4    that sense it's similar to Count One, and a maximum

5    sentence of life, a mandatory minimum of five years

6    and a maximum of life on supervised release,

7    mandatory restitution again, forfeiture as I've

8    already described it, $250,000 fine and a $100

9    special assessment.

10        Do you understand that those are the

11    penalties you could be looking at for Count Five

12    here, Mr. Batchu?

13        THE DEFENDANT:  Yes, I do.

14        THE COURT:  Now, the two ten-year

15    sentences do not have to be consecutive, is that

16    correct?  So we're not talking about a minimum

17    mandatory twenty-year sentence, we're talking about a

18    minimum mandatory ten-year sentence?

19        MR. BRESLOW:  They're not required to

20    be consecutive.

21        THE COURT:  Right.  They could be, but

22    they're not required to be.  So Count One and Count

23    Five each carry a mandatory minimum ten-year

24    sentence.  Despite that, the mandatory minimum for

25    both would be ten years.  In other words, I would not

**G.App.88**

```
 1    be required to stack the mandatory minimums on top of

 2    each other, although I could.  Do you understand

 3    that?

 4              THE DEFENDANT:  Yeah.

 5              THE COURT:  All right.  Mr. Batchu,

 6    has anyone threatened you or threatened any member of

 7    your family to try to force you to plead guilty here

 8    this afternoon?

 9              THE DEFENDANT:  No, they have not.

10              THE COURT:  Has anybody made any

11    promises to you that you would get special treatment

12    or some kind of particularly lenient sentence as a

13    reward for your pleading guilty here this afternoon?

14              THE DEFENDANT:  No, they have not.

15              THE COURT:  Now, I understand that

16    your attorney, Mr. Foley, has negotiated a plea

17    agreement with the government on your behalf.  I want

18    to make sure that you have had an opportunity to read

19    over that plea agreement.  Have you read over the

20    plea agreement with your attorney?

21              THE DEFENDANT:  I have.

22              THE COURT:  And are you satisfied that

23    you understand that plea agreement?

24              THE DEFENDANT:  Yeah.  Is it possible

25    to speak with my counsel?
```

```
1                      THE COURT:  Yes, you may.

2                      THE DEFENDANT:  Just a brief question.

3                      (Pause.)

4                      THE COURT:  Have you had an

5       opportunity to talk to your attorney?

6                      THE DEFENDANT:  Yes, I have.

7                      THE COURT:  So I was asking you

8       whether you had a chance to read over the plea

9       agreement with your lawyer?

10                     THE DEFENDANT:  Yes.

11                     THE COURT:  And are you satisfied that

12      you understand the plea agreement?

13                     THE DEFENDANT:  Yes, I do.

14                     THE COURT:  Now, it is my

15      understanding that part, perhaps not all, but part of

16      the reason that you have agreed to plead guilty here

17      this afternoon is the agreement that you have,

18      through your attorney, entered into with the

19      government as part of this plea process.  Am I

20      correct in that?

21                     THE DEFENDANT:  That is correct.

22                     THE COURT:  My job ultimately will be

23      to determine what your sentence should be in this

24      case.  I will tell you that I have not decided what

25      sentence I'm going to be imposing in this case for
```

```
1    reasons that I will get to in a moment, but I want to
2    make sure that you have not been told by anyone what
3    sentence I'm going to impose.  Has anyone tried to
4    tell you what I'm going to be doing?
5                    THE DEFENDANT:  I have not been told.
6                    THE COURT:  Mr. Batchu, is your plea
7    of guilty entirely free and voluntary?
8                    THE DEFENDANT:  It is entirely free
9    and voluntary.
10                   THE COURT:  Now I'm going to go over
11   the charges that you have indicated that you intend
12   to plead guilty to.  I'm going to go through them,
13   and then I'm going to be asking you whether you did
14   in fact commit the crimes that are described in the
15   indictment here.  I do this in every case because I
16   would not want someone to plead guilty to a crime
17   they did not commit.
18                   So let's look at Count One.  As I mentioned
19   before, Count One charges you with transportation of
20   a minor to engage in criminal sexual activity.  In
21   connection with that charge, the government alleges
22   that on or about May 1, 2009, you did knowingly
23   transport a particular minor, who's only identified
24   as Minor A, an individual who had not attained the
25   age of 18 years, in interstate commerce with the
```

1    intent that that individual engage in any sexual

2    activity for which any person can be charged with a

3    criminal offense.

4              That is the specific charge that has been

5    offered against you.  Are you pleading guilty,

6    Mr. Batchu, because you did in fact commit that

7    crime?

8                    THE DEFENDANT:  Yes.

9                    THE COURT:  All right.  Now, in Count

10    Two, the government charges you with the crime of

11    interstate travel for the purpose of engaging in

12    illicit sexual conduct with a minor.

13              Specifically, the government charges that

14    on or about May 1, 2009, just a little over two years

15    ago, within the district of Massachusetts and

16    elsewhere, you did knowingly travel in interstate

17    commerce for the purpose of engaging in illicit

18    sexual conduct with another person, to wit, engaging

19    in a sexual act with the particular minor identified

20    as Minor A, who was a person under 18 years of age,

21    in violation of a particular statute, Chapter 109A,

22    if the sexual act occurred in the special maritime

23    and territory jurisdiction of the United States.

24              Are you pleading guilty, Mr. Batchu,

25    because you did in fact commit that crime?

    1                 THE DEFENDANT:  Yes.

    2                 THE COURT:  In Count Three the

    3     government charges that about three weeks later, on

    4     May 23, 2009, you did knowingly travel in interstate

    5     commerce, again for the purpose of engaging in

    6     illicit sexual conduct with another person,

    7     specifically engaging in a sexual act with Minor A,

    8     who was a person under 18 years of age, that would

    9     have been in violation of Chapter 109A if the sexual

   10     act occurred in the special maritime and territory

   11     jurisdiction of the United States.

   12                 Are you pleading guilty, Mr. Batchu,

   13     because you did in fact commit that crime?

   14                 THE DEFENDANT:  Yes.

   15                 THE COURT:  In Count Four the

   16     government charges that on or about August 3, 2009,

   17     so now it's somewhat less than two years ago, about

   18     21 months ago, you did, within the district of

   19     Massachusetts and elsewhere, knowingly travel in

   20     interstate commerce for the purpose of engaging in

   21     illicit sexual conduct with another person, to wit,

   22     engaging in a sexual act with Minor A, who was a

   23     person under 18 years of age, and would be a

   24     violation of Chapter 109A if the sexual act occurred

   25     in the special maritime and territory jurisdiction of

**G.App.93**

Case: 21-1292    Case: 1:10-cr-30008-MBM    Document: 903    Document 103    Filed: 05/01/12    Filed 05/12/15    Page 20 of 63    Entry ID: 6507951

20

```
 1    the United States.

 2                    Are you pleading guilty, Mr. Batchu,

 3    because you did in fact commit that crime?

 4                    THE DEFENDANT:  Yes.

 5                    THE COURT:  Finally, the government

 6    charges in Count Five that you used a facility of

 7    interstate commerce to entice a particular minor to

 8    engage in criminal sexual activity.  Specifically,

 9    the government charges that on or about October 1,

10    2008, and on or about August 3, 2008, within the

11    district of Massachusetts and elsewhere --

12                    MR. BRESLOW:  That's 2009, your Honor.

13                    THE COURT:  Beg your pardon.  Thank

14    you.  August 3, 2009, within the district of

15    Massachusetts and elsewhere, the defendant, using the

16    mail and a facility and means of interstate and

17    foreign commerce, did knowingly persuade, induce,

18    entice and coerce Minor A, an individual who had not

19    attained the age of 18 years, to engage in sexual

20    activity for which any person could be charged with a

21    criminal offense.

22                    Are you pleading guilty, Mr. Batchu,

23    because you did in fact commit that crime?

24                    THE DEFENDANT:  Yes.

25                    THE COURT:  I want to ask you some
```

```
1    questions about your health.  Have you currently been

2    seeing a doctor to look after you for any physical

3    problems you may be having, Mr. Batchu?

4                    THE DEFENDANT:  No, I have not.

5                    THE COURT:  And have you been taking

6    any medications, pills or drugs regularly for any

7    physical problems?

8                    THE DEFENDANT:  No, I have not.

9                    THE COURT:  Have you been seeing a

10   psychiatrist or counselor of any kind?

11                   THE DEFENDANT:  No, I have not.

12                   THE COURT:  Have you been taking any

13   medication, pills or drugs for any emotional or

14   mental problems you're having?

15                   THE DEFENDANT:  No.

16                   THE COURT:  Do you understand,

17   Mr. Batchu, that if I permit you to plead guilty, all

18   that will be left in your case will be the imposition

19   of a sentence, and that sentence will almost

20   certainly involve a lengthy period of imprisonment?

21   Do you understand that?

22                   THE DEFENDANT:  I do.

23                   THE COURT:  Do you feel you've had

24   sufficient time to discuss this matter fully with

25   Mr. Foley before offering your pleas of guilty here
```

1    today?

2              THE DEFENDANT: I do.

3              THE COURT: And are you satisfied with

4    the representation that he has given you?

5              THE DEFENDANT: Yes, I am.

6              THE COURT: Let me tell you a little

7    bit about how I'm going to go about deciding what

8    your sentence should be here. After today I'm going

9    to be referring you and your attorney to our

10    probation office. Our probation office is

11    represented today by Mr. McCarthy, but I believe it

12    will probably be a different probation officer who

13    will be putting together the Presentence Report.

14              MR. McCARTHY: That's correct, your

15    Honor.

16              THE COURT: Okay. So Mr. McCarthy is

17    here representing the probation office, but it will

18    either be Ms. Rochelle Lee or Mr. Rinaldi who will be

19    putting together your Presentence Report.

20          What will happen is you and your attorney

21    will sit down and talk to the probation officer. The

22    probation officer will be asking questions and

23    getting information from you. He or she will also

24    get information from Mr. Breslow and possibly from

25    other sources. They'll pull that information

 1    together and put it into something we call a

 2    Presentence Report, meaning a report that will

 3    describe your background, the background of this

 4    offense or these offenses, and various other details

 5    that I will need to have in mind when I approach my

 6    responsibility to sentence you.

 7              The report is generally quite lengthy.  It

 8    can be 40, 50, 60 pages long.  Before I ever see it,

 9    it will come to you and to the government, and both

10    sides will have a chance to read it over.  If it

11    contains any mistakes or if there's anything

12    important that's been left out, you can correct the

13    mistakes and fill in the omissions.  The probation

14    officer will then make a final version of the

15    Presentence Report.  It will come to me, I will read

16    it, and it will help me decide what sentence to

17    impose in your case.

18              I'm telling you this, Mr. Batchu, because I

19    want to make sure you understand that as I sit here

20    right now, as I said a few minutes ago, I do not know

21    what sentence I'm going to impose on you.  I know

22    what the mandatory minimum is, I know what the

23    maximum is, but I really don't know the sentence that

24    I'm going to impose because I'm going to want to see

25    that Presentence Report before I make my final

1    decision.  Do you understand that?

2                    THE DEFENDANT:  I do understand.

3                    THE COURT:  Now, part of the

4    Presentence Report will address and will analyze what

5    we call the Sentencing Guidelines.  The Sentencing

6    Guidelines are rules that I have to take into careful

7    consideration every time I sentence someone.  Have

8    you and your attorney had a chance to talk over the

9    Sentencing Guidelines and how they might work out in

10   your case?

11                   THE DEFENDANT:  We've talked over it

12   for a bit, yeah.

13                   THE COURT:  So you understand

14   basically the Sentencing Guidelines are drawn from a

15   grid which has someone's criminal history across the

16   top, that is whether they have any prior convictions,

17   and then down the side there's what we call the

18   Offense Level, and the severity of the offense

19   increases as the criminal conduct gets to be more

20   serious.

21                   I determine what the appropriate Offense

22   Level is, what the appropriate Criminal History

23   Category is.  I bring them together, and it produces

24   a Sentencing Guideline range with a low end and a

25   high end expressed in months.  Are you generally

```
1    familiar with that process?

2                    THE DEFENDANT:  Generally.

3                    THE COURT:  So I want to make sure you

4    understand that whenever I sentence someone, I have

5    to take into careful consideration what the

6    Sentencing Guidelines are, and it's very possible

7    that I'm going to be imposing a sentence that's

8    within that guideline range.  Do you understand that?

9                    THE DEFENDANT:  I understand that.

10                   THE COURT:  Do you also understand

11   that I have the discretion in certain circumstances,

12   when I think the law requires it, to impose a

13   sentence which is above the guideline range, harsher

14   than what the guidelines might call for, or a

15   sentence that's below the guideline range, more

16   lenient than what the guidelines call for?  Did you

17   understand that?

18                   THE DEFENDANT:  I do understand that.

19                   THE COURT:  Do you understand that in

20   our federal system, we have no parole anymore?  There

21   was a time, it's getting to be quite a while back

22   now, when somebody might receive a sentence let's say

23   of six years, but they might get out in only two or

24   three years and put on parole.  We don't have that

25   system anymore.
```

```
 1              We have something called Truth in
 2      Sentencing, and what that means is that the sentence
 3      that I impose on you at the time of sentencing is
 4      essentially the sentence that you'll have to serve.
 5      You may get modest time off, I think it's about 50
 6      days a year, for good institutional behavior while
 7      you're in prison, but apart from what's called good
 8      time, you basically will have to serve the sentence
 9      that I impose on you.  Do you understand?
10              THE DEFENDANT:  I do understand.
11              THE COURT:  I'm required to ask
12      everyone who comes before me to offer a plea of
13      guilty whether they are a citizen of the United
14      States, and so I ask you, are you a citizen of the
15      United States?
16              THE DEFENDANT:  I am a citizen.
17              THE COURT:  Finally, I mentioned
18      something called supervised release.  The way that
19      works is an individual serves a prison sentence,
20      they're released, they're placed on supervised
21      release, which means they have to follow certain
22      rules and report to a probation officer.  If the
23      individual breaks those rules, he or she can be sent
24      back to prison.  Do you understand that?
25              THE DEFENDANT:  Yes, I do.
```

**G.App.100**

```
 1                 THE COURT:  Mr. Foley, a few questions

 2     for you.  Have you advised the defendant concerning

 3     the admissibility of any evidence the government has

 4     against him?

 5                 MR. FOLEY:  I have.

 6                 THE COURT:  And in this case I

 7     understand that you filed a motion to suppress, which

 8     I believe I denied.  Apart from that particular

 9     motion, are you concerned that your client may be

10     pleading guilty because of any illegally obtained

11     evidence in the possession of government?

12                 MR. FOLEY:  I am not.

13                 THE COURT:  And has --

14                 MR. BRESLOW:  Your Honor, forgive me,

15     but the motion to suppress was filed.  I don't think

16     your Honor had ruled on it.  I think your Honor

17     actually, if my recollection of the docket is right,

18     your Honor dismissed without prejudice the motion as

19     moot because of the defendant's guilty plea.

20                 THE COURT:  I see.  All right.  Thank

21     you.  There was a motion to suppress that was filed.

22     I know we had a hearing on the motion to suppress.

23     Do you agree with Mr. Breslow that my ruling on that

24     motion was still pending at the time that we got word

25     that Mr. Batchu was pleading guilty?
```

    1                    MR. FOLEY:  Yes, that's correct.
    2                    THE COURT:  You filed a motion to
    3        suppress, and you contended there was certain
    4        information that the government had that was
    5        illegally obtained.  So I'm going to ask you again,
    6        Mr. Foley, are you concerned that the defendant may
    7        be pleading guilty now because of any illegally
    8        obtained evidence in the possession of the
    9        government?
   10                    MR. FOLEY:  No, your Honor, not within
   11        the context of the agreement.
   12                    THE COURT:  All right.  Has Mr. Batchu
   13        told you anything about any physical or emotional
   14        situation or about any medication, drugs or any other
   15        factors which might in any way compromise his
   16        judgment here today?
   17                    MR. FOLEY:  He has not.
   18                    THE COURT:  Have you ever had any
   19        problem communicating with Mr. Batchu?
   20                    MR. FOLEY:  None.
   21                    THE COURT:  And have you made, apart
   22        from going over the guidelines with your client and
   23        the minimum mandatories, have you made any specific
   24        promise of a particular sentence in return for his
   25        plea of guilty?

**G.App.102**

```
 1                    MR. FOLEY:  I have not.

 2                    THE COURT:  And have you run over the

 3       elements of each of those offenses with your client?

 4                    MR. FOLEY:  I have.

 5                    THE COURT:  And do you know of any

 6       reason why I should not accept Mr. Batchu's plea of

 7       guilty here this afternoon?

 8                    MR. FOLEY:  I do not.

 9                    THE COURT:  All right.  Mr. Breslow,

10       would you kindly summarize the evidence the

11       government would have offered if this case had gone

12       to trial, and take an overview of the plea agreement,

13       and give me an idea of what at least the government's

14       assessment of the Sentencing Guidelines is.  Then

15       we'll move on from there to the next stage.

16                    MR. BRESLOW:  Yes, your Honor.  Before

17       I do, I'd like to underscore to the Court that

18       Minor A and virtually all of her immediate family are

19       here in the courtroom today.

20                    THE COURT:  You're very welcome.

21                    MR. BRESLOW:  Your Honor, in

22       approximately August of 2008, this defendant met

23       Minor A through an internet application called Speed

24       Date.  He used an alias, actually several, the first

25       being Doc Hollywood, and the name of Mark Taylor,
```

```
 1    both of which were false, and a false age and a false

 2    photograph.  With these facilities and a computer, he

 3    groomed Minor A for sexual exploitation through a

 4    lengthy series of emails, instant messages, text

 5    messages, phone calls, and gifts and cards that he

 6    sent through the mail.

 7          Then having successfully groomed Minor A,

 8    he proceeded to commit the following series of

 9    statutory rapes of Minor A.  The first occurred on

10    May 1st to 2nd, 2009, in Hartford, Connecticut, in

11    which he traveled across states lines from Chicago to

12    Connecticut, and then drove north to a town in

13    western Massachusetts where Minor A lived, and then

14    transported Minor A by a rental car back to an

15    airport hotel in Hartford, Connecticut, or nearby

16    Bradley International Airport, and then proceeded to

17    engage in sexually explicit conduct with her.

18          The second incident occurred on May 23,

19    2009.

20                THE COURT:  I'm going to stop you.  So

21    the incident that you have just summarized forms the

22    basis for the counts in Count One and Two of the

23    indictment?

24                MR. BRESLOW:  Yes, and this is just an

25    overview.
```

**G.App.104**

```
1              THE COURT:  Yes.
2              MR. BRESLOW:  The second incident
3    occurred on May 23, 2009, in which the defendant
4    drove from his home town of Chicago all the way
5    across the country to meet Minor A near her home in
6    Massachusetts to engage in further sexual conduct
7    with her.  This episode occurred after the defendant
8    had been warned that Minor A's family had reported
9    the earlier episode to the police.
10             The third episode occurred on or about
11   July 22nd to July 25th, 2009, in Florida.  That
12   occurred not only after the defendant was served with
13   not one, but two Massachusetts restraining orders
14   prohibiting any contact with Minor A, but also after
15   he was arrested and arraigned in two state statutory
16   rape cases in Massachusetts and Connecticut based on
17   the two episodes that I just discussed with you, and
18   released on the condition that he not contact
19   Minor A.
20             The last episode, which forms the basis of
21   Count Four, concerned the defendant's travel into a
22   town in Massachusetts, Hadley in particular, to
23   engage in sexual conduct with Minor A, and notably
24   that occurred the day before the defendant was
25   scheduled to appear in court in the Connecticut
```

**G.App.105**

1    statutory rape case.

2          Now, in addition to all of these contact

3    offenses, the defendant recorded his cyber sex

4    sessions with Minor A and at least two other minor

5    females, and either had access or possessed hundreds

6    of videos and images of child pornography.  At the

7    time of all of these offenses, your Honor, the

8    defendant was an approximately 29-year-old man who

9    was a second year medical resident in psychiatry at

10   the University of Illinois in Chicago, with an

11   interest in adolescent psychiatry.

12         Referring to the defendant's online

13   courtship and grooming of Minor A, this pertains

14   broadly, your Honor, to Count Five, which is use of a

15   facility of interstate commerce to entice a minor to

16   engage in criminal sexual activity.  That charge

17   covers virtually the entire range of the defendant's

18   contact from when he first met Minor A online until

19   on or about August 3, 2009, when he was arrested

20   after his final visit to Minor A.

21         He used a false name, Mark Taylor, to meet

22   a girl who was only 15 years old, at the time using

23   an online computer service.  According to Minor A, he

24   initially claimed to be 17 years old, but then he

25   later claimed falsely to be 21 years old.  He used a

**G.App.106**

1     computer application to send an online profile of

2     himself that depicted him falsely as a white

3     19-year-old male with a tag name of Doc Hollywood.

4     Although Minor A initially claimed to be 18 years

5     old, falsely, she did inform the defendant fairly

6     soon into the relationship that her real age was 15

7     years old, and the defendant responded that he did

8     not care about her real age.

9           During his online courtship and after he

10    became sexually active with Minor A, the defendant

11    repeatedly contacted Minor A through something called

12    AOL Instant Messenger, through cell phones, emails,

13    YouTube video clips, and text messages, many of which

14    were of a sexual nature.  By 2009, particularly by

15    the spring of 2009, the defendant and Minor A were

16    engaging in literally hundreds of minutes of

17    telephone calls and text messages.  The defendant

18    told Minor A as part of his grooming of her that he

19    was in love with her and he wanted to marry her.

20          He sent her by mail a series of romantic

21    cards and gifts such as flowers, jewelry and perfume.

22    In particular, on March 27, 2009, the defendant sent

23    via the internet a purchase from 1-800-Flowers, one

24    dozen roses to be sent to her home with a romantic

25    message referencing their six-month anniversary, and

**G.App.107**

1    signing the card as Mark, meaning Mark Taylor, not

2    Mani Batchu.  According to one of Minor A's brothers,

3    he spoke with the defendant in March of 2009, and

4    said to the defendant, "That's a pretty expensive

5    gift to be sending to a 15 year old girl," and that

6    Mark responded that he really did like her.

7          On May 1, 2009, the defendant was fully

8    aware through a variety of means that Minor A was 15

9    years old.  Nonetheless, still posing as Mark Taylor,

10    the defendant got on a plane in Chicago and flew to

11    Bradley International Airport.  He rented a hotel

12    room from the Ramada, and he rented car from Hertz,

13    and he drove north to Minor A's home, picked her up

14    and drove her back to the Ramada in Connecticut where

15    he engaged in sexual acts with her.  This travel is

16    corroborated by the Ramada records, the airport

17    records, Expedia records showing the online booking

18    which the defendant termed "Pookie Trip."

19          Shortly after this, Minor A's mother took

20    Minor A to the Amherst Police Department to report a

21    complaint concerning this activity, and Minor A

22    conveyed to the defendant of the police report.  The

23    defendant stated in sum and substance he did not care

24    and nothing would come between them.  Sure enough,

25    the defendant continued to speak with Minor A in

 1    spite of the report, and he made arrangements to see

 2    her on the Memorial Day weekend, which was

 3    approximately two weeks later, for additional sexual

 4    conduct.  He further promised to bring Minor A a cell

 5    phone that she could use to contact him without the

 6    family's knowledge.

 7                To see Minor A over the weekend, the

 8    defendant drove I would say approximately 15 hours

 9    from his home in Chicago to Minor A's home in a town

10    in western Massachusetts.  He met Minor A at a

11    conservation area near her house where they discussed

12    having sex together.  He had rented a room, another

13    hotel room, this one in Hadley, Massachusetts, at the

14    Economy Lodge.  At the conservation area the

15    defendant engaged in further sexual contact with

16    Minor A.

17                On May 24th, the very next day -- I should

18    state that the defendant and Minor A were interrupted

19    by the arrival of one of Minor A's brothers, who

20    arrived at the conservation area to spy on the

21    defendant, who then sped away in the Lexus that's the

22    subject of the forfeiture in this case.

23                The very next day, on May 24th, Eastern

24    Hampshire County District Court issued a temporary

25    restraining order that ordered the defendant have no

1    contact with Minor A, and later that day a police

2    officer from Glendale Heights, Illinois Police

3    Department served the TRO on the defendant and the

4    defendant accepted service.  Two days later, the same

5    court in Massachusetts issued a permanent restraining

6    order that similarly ordered the defendant to have no

7    contact with Minor A for one year.

8            Three days after that, on May 29th, two

9    members of the Chicago Police Department served that

10   permanent restraining order on the defendant at his

11   place of employment, the University of Illinois at

12   Chicago Medical Center.  The defendant accepted

13   service and asked how long it was in effect.  The

14   defendant nonetheless violated both of these

15   restraining orders by continuing to engage in

16   contact, including sexual contact, direct sexual,

17   physical contact with Minor A.

18           On June 8, 2009, the Eastern Hampshire

19   District Court issued an arrest warrant for the

20   defendant based upon a complaint that alleged a

21   violation of statutory rape.  On June 9, 2009, as

22   your Honor is familiar with from the suppression

23   hearing, two Chicago Police Department detectives

24   arrested the defendant pursuant to that arrest

25   warrant.  The defendant was advised of and waived his

1      Miranda rights, and he told the detectives in short

2      that he had met Minor A on an internet speed dating

3      service, he had traveled to Massachusetts to meet

4      her, and she was the first Caucasian girl that he had

5      been with.

6            The very next day, on June 10th, the

7      defendant was interviewed again by the detectives.

8      He was advised of and waived his Miranda rights, and

9      the defendant admitted, among other things, that he

10     had used alias Mark Taylor with Minor A, that he

11     never told Minor A his real name or age, that he had

12     twice traveled to meet Minor A, and on the first

13     occasion he had sex with her at the Ramada Hotel at

14     the Bradley Center in Hartford, Connecticut.

15           On June 24th the defendant initially

16     appeared at the Eastern Hampshire District Court, and

17     the court held a bail hearing and ordered the

18     defendant released on cash bail with the explicit

19     conditions that the defendant refrain from abuse of,

20     stay away from, and have no contact with Minor A.

21     The court then ordered counsel, not Mr. Foley, but

22     Mr. Foley's predecessor counsel in this case, to take

23     him to the Windsor Locks County Police Department

24     where he faced statutory rape charges in Connecticut.

25           The very next day the defendant appeared in

**G.App.111**

1     Connecticut Superior Court in that case where he was

2     charged with three counts of sexual assault in the

3     second degree.  That state court in Connecticut

4     similarly released the defendant on a cash bond with

5     the condition that the defendant have no contact with

6     any child under the age of 18, including of course

7     Minor A.  The defendant violated both of these state

8     pretrial release orders, both of which had placed him

9     on clear notice that Minor A was under 18 years of

10    age.

11         On July 1, 2009, the magistrate judge in

12    the Northern District of Illinois authorized a search

13    warrant to search a Macbook computer that the

14    defendant had voluntarily provided to the Chicago

15    Police Department.  Among the items found during the

16    searches of this computer were a photograph of

17    Minor A, an audio file of a song that the defendant

18    wrote to Minor A, numerous files containing web

19    searches that indicated the defendant was searching

20    for child pornography, meaning searches with terms

21    like PTHC for preteen hardcore or Lolita or kiddie.

22         A second forensic examination that explored

23    unallocated space or deleted files recovered

24    approximately 400 video files, some of which may have

25    been duplicates, that depicted minor females, mainly

**G.App.112**

1    adolescents, appearing very similarly in age and

2    appearance to Minor A, engaged in sexually explicit

3    conduct such as masturbating or displaying their

4    genitals.  One of these videos depicted Minor A

5    herself.  According to Minor A, she was in

6    Massachusetts at the time that she was communicating

7    with the defendant and using a webcam.

8           In at least two other videos the defendant

9    can be heard either moaning or speaking to the

10   adolescent females who were depicted either

11   masturbating or displaying their genitals or their

12   genital area in a lascivious manner.  In addition to

13   those hundreds of videos, the forensic examination

14   recovered approximately 1,200 image files, picture

15   files, that similarly depicted adolescent females,

16   similar in appearance to Minor A, engaged in sexually

17   explicit conduct.

18          On July 22, 2009, Minor A and her family

19   went on a well-deserved vacation.  The family

20   believed that the defendant had been arrested,

21   released on pretrial release orders that prohibited

22   any contact between the defendant and Minor A, and to

23   seek a respite from the ordeal that they were

24   suffering, they traveled to Vero Beach, Florida for

25   vacation.  Unbeknownst to the family, Minor A and the

**G.App.113**

 1    defendant remained in contact with each other, and

 2    moreover, the defendant had arranged to visit Minor A

 3    in Florida so that he could engage in yet further

 4    sexual contact with her.

 5              According to Minor A, the defendant flew

 6    to Fort Lauderdale on July 22nd and rented a dark

 7    gray Nissan Altima.  He drove to the nearby town of

 8    Sebastian where he checked into a Best Western

 9    hotel.  On the very next day, the defendant drove to

10    Minor A's hotel in Vero Beach and met her and engaged

11    in sex with her there, and he continued to see

12    Minor A for the next several days without her

13    family's knowledge, having sex with her at least one

14    more time.  Prior to the defendant checking out and

15    returning home, the defendant told Minor A that she

16    could refuse to testify against him, and that if

17    anyone ever asked, she should deny having sex with

18    him.

19              According to U.S. Airways, the defendant

20    did fly on July 22, 2009, from Chicago to Fort

21    Lauderdale and returned on the 25th.  According to

22    rental car records, the defendant rented a car

23    between July 22nd and 25th.  In fact, it was a Nissan

24    Altima, and according to the Best Western Sebastian,

25    the defendant stayed in a hotel room from July 22nd

**G.App.114**

1      to July 25th, 2009.  All of this was unknown to law
2      enforcement and to the family.
3              On August 4th, 2009, the defendant was
4      scheduled to appear in Connecticut Superior Court for
5      a proceeding in his criminal case involving Minor A.
6      Unbeknownst to law enforcement and Minor A's family,
7      the defendant remained in continuous contact with
8      Minor A, and planned to visit her yet again, in a
9      clear violation of the permanent restraining order
10     and the state pretrial release orders.  The defendant
11     flew, according to the flight records, on a U.S.
12     Airways flight from Chicago to Hartford on August 3,
13     2009, and on that same day, according to the Thrifty
14     Car Rental records, he rented a car from the Bradley
15     International Airport location.
16             Now, according to Minor A, instead of
17     remaining in Connecticut until his court appearance,
18     the defendant used a computer to instant message
19     Minor A his plans to meet with her.  They planned to
20     meet ultimately at the Hampshire Mall in Hadley,
21     Massachusetts.  The defendant and Minor A did meet at
22     the mall.  Minor A was there purportedly to see a
23     movie with her sister.  She excused herself from the
24     theater and never returned.  Where she was was with
25     the defendant engaging in sexual conduct at another

1    location in the mall.

2              The sister became concerned and alerted law

3    enforcement.  Law enforcement arrived and began

4    looking for the defendant and his Lexus.  Ultimately

5    they found the defendant in the Hadley Mall food

6    court in close proximity to Minor A, in violation of

7    that restraining order.  When a member of the Hadley

8    Police Department asked the defendant why he was in

9    the Hadley Mall foot court, the defendant said

10   falsely that he had traveled to the mall so that he

11   could eat at Fuji Chen, which is one of the fast food

12   restaurants in the mall's food court, when in fact

13   his purpose for visiting the mall was so that he

14   could contact Minor A and engage in sexual conduct

15   with her.

16             That is a brief recitation, your Honor, of

17   the facts that we would be able to establish at

18   trial.

19             THE COURT:  All right.  Mr. Foley, do

20   you wish to make any comment or express any

21   disagreement with the factual summary presented by

22   Mr. Breslow just now?

23             MR. FOLEY:  There are sufficient facts

24   to support each of the charges.

25             THE COURT:  Mr. Batchu, did you want

**G.App.116**

```
1    to make any comment or express any disagreement with
2    any of the facts just summarized by Mr. Breslow?
3               THE DEFENDANT:  No, I do not.
4               THE COURT:  Very good.  Mr. Breslow,
5    would you please take a look now at the plea
6    agreement, and point out any provisions of the plea
7    agreement that you think merit special comment.
8               MR. BRESLOW:  Yes, your Honor.  We
9    have agreed to dismiss Count Six, which carries a
10   15-year mandatory minimum term.
11              Your Honor, the guidelines are reflected on
12   page three.  The defendant's base offense is 32
13   pursuant to §2G1.3(c)(1) and §2G2.1(a) because the
14   defendant's conduct involves causing a minor to
15   engage in sexual conduct.  I'm just paraphrasing.
16              He receives a two-level enhancement because
17   this offense involved a minor who had not yet
18   attained the age of 16, who was between the age of 12
19   and 16 years old.  He receives another two-level
20   enhancement because his offense involved the
21   commission of a sexual act or sexual conduct.  He
22   receives another two-level increase because of his
23   conduct for the purpose of producing sexually
24   explicit material or transmitting such material live,
25   for example, by way of a webcam transmission.
```

 1          His offense involved either the knowing

 2     representation of a participant's identity, namely

 3     his own, to induce, entice, coerce or facilitate the

 4     travel of a minor to engage in sexually explicit

 5     conduct, or the use of a computer or internet

 6     computer service to induce, entice, coerce or

 7     facilitate the travel of a minor to engage in

 8     sexually explicit conduct or otherwise solicit

 9     participation by a minor in such conduct.

10          He receives an additional two-level

11     enhancement because he willfully obstructed or

12     impeded or attempted to obstruct or impede the

13     administration of justice with respect to his

14     admonition to Minor A on the final day of the Florida

15     trip, and I should state that the evidence at trial

16     would have established that Minor A did not initially

17     tell law enforcement about the sexual conduct in

18     Florida or the sexual conduct in the Hampshire Mall.

19          Overall, Counts One through Five form a

20     group with a total Offense Level of 40, but because

21     there were two additional adolescent females who were

22     similarly exploited by the defendant, two other

23     groups are formed, and the total Offense Level or the

24     combined Offense Level is 43.  Now, the defendant has

25     agreed, on page four, to contest the formation of

1    these two groups on the basis that the females are

2    not minors, so that's something that your Honor will

3    have to address at sentencing.

4         We have agreed that the defendant is

5    entitled to only two levels of reduction based on his

6    very untimely acceptance of responsibility.  Your

7    Honor may recall that it was only on the eve of what

8    was the then scheduled trial date of April 4th that

9    we had reached a potential resolution in the case.

10   So the overall Offense Level is 41.

11        The defendant falls within Criminal History

12   Category I as far as we know, and so he's facing a

13   guideline range of 324 to 405 months.  We've agreed

14   to recommend incarceration within that Sentencing

15   Guideline range.  I'm now at the bottom of page five,

16   paragraph four.  So the U.S. Attorney's office has

17   agreed to recommend a sentence within 324 to 405

18   months.

19        We've also agreed to recommend a fine

20   within the guideline range, and we've agreed to

21   recommend 365 months supervised release, and there

22   are a number of conditions that the defense has

23   agreed should accompany the supervised release term

24   in whatever amount the Court deems to impose, meaning

25   whatever amount of time the Court deems to impose.  I

1    want to highlight them because many of them are

2    important to Minor A and her family, and some of them

3    your Honor may not be familiar with.

4         The first is that the defendant shall not

5    contact directly or indirectly any victim, including

6    Minor A, or any family member of any victim of the

7    charged offenses.  Second is that the defendant shall

8    promptly notify the Probation Department of any

9    contact, direct or indirect, by any victim, including

10   Minor A, or any family member of any victim of the

11   charged offenses.  Third is that the defendant shall

12   submit to search by law enforcement or a probation

13   officer with reasonable suspicion pursuant to

14   18 U.S.C. §3583(d).

15        Fourth, the defendant shall participate in

16   a sex offender specific treatment program and submit

17   to periodic polygraph testing.  Fifth is that the

18   defendant shall not engage in any occupation,

19   business or profession that would require him to have

20   direct or indirect supervision of any person under

21   the age of 18, and that the defendant should not have

22   unsupervised contact with any person under the age of

23   18.  Sixth, the defendant shall not possess a

24   computer or related materials, except as deemed

25   necessary by the court or the Probation Department

**G.App.120**

Case: 21-1292     Case 3:10-cr-30008-MGM     Document 103     Filed 05/01/12     Page 47 of 53     Document: 00116874744     Page: 247     Date Filed: 05/01/12     Entry ID: 6507951

47

1       for work purposes.

2                Seventh is that the defendant shall allow

3       the Probation Office to install software designed to

4       monitor his computer activities.  Eighth is that he

5       shall have no use of the internet at his home, work

6       or elsewhere unless the Probation Office determines

7       otherwise.  The ninth is that he should be prohibited

8       from viewing or possessing any kind of pornography.

9       The tenth requires him to report his address and any

10      address changes to the probation officer.

11               The eleventh requires him to register as a

12      sex offender under federal or state law, in any state

13      where he resides or carries on a vocation or is a

14      student.  Twelfth is that he should use his true

15      name, and defendant is prohibited from using any

16      false identifying information.  The defendant has

17      agreed that the imposition of any supervised release

18      term shall be no less than 15 years, and in any event

19      should include all of the supervised release

20      conditions that are specified above.

21               Paragraph seven provides for a waiver of

22      rights to appeal and to bring collateral challenge.

23      In particular I want to emphasize that the defendant,

24      in B he has waived his right to challenge his

25      conviction on direct appeal or in a collateral

```
 1      challenge, and C, in exchange for the U.S. Attorney's
 2      agreement to dismiss Count Six of the indictment, he
 3      has agreed he will not file a direct appeal nor
 4      collaterally challenge any sentence of imprisonment
 5      of 293 months or less, or any orders relating to
 6      supervised release, fines, forfeitures and
 7      restitution.  This provision is binding even if the
 8      Court employs a guideline analysis different from the
 9      one set forth in the agreement.
10              Similarly, the U.S. Attorney has agreed
11      that regardless of the analysis employed by the
12      Court, the U.S. Attorney will not appeal any
13      imprisonment sentence of 324 months or more.  There
14      is a waiver of any Hyde Amendment claim in paragraph
15      nine, and specifically defendant has agreed to the
16      forfeiture of the computer media that were seized in
17      this case by the Chicago Police Department or even by
18      the Amherst Police Department, and the silver Lexus
19      that we discussed earlier.
20              Lastly, the defendant has agreed to the
21      entry of a restitution order based on the full amount
22      of the victim's losses, and he agrees to pay
23      restitution for the full amount, and he agrees to
24      make full and accurate disclosure of his financial
25      affairs to the United States by completing a personal
```

**G.App.122**

1       financial statement before his sentencing.

2               I have been consulting with Minor A's

3       family on this, and they have requested that I make a

4       request either of defense counsel, or of the Court in

5       the event that defense counsel does not agree, for

6       access to that personal financial statement.  So I

7       may be making a motion at some point, your Honor, for

8       victim's access to the financial statement.

9               On page 13, your Honor, paragraph 17, the

10      defendant is acknowledging that he understands that

11      under SORNA, the Sex Offender Registration

12      Notification Act, he must register as a sex offender,

13      and in particular in paragraph 18, the defendant

14      agrees never to seek profit financially in any way,

15      either directly or indirectly, from the crimes he

16      committed in the instant case.  In other words, the

17      defendant is not to publish a magazine article or a

18      music video or anything like that, make a film about

19      his experiences.

20              He's agreed to submit to medical tests for

21      HIV or other sexually transmitted diseases, and he

22      agrees to have no contact or communication with the

23      minor victims and the victims' families without

24      explicit written permission from the Court or the

25      United States Probation Office for a period of 365

1    months following his release from imprisonment,

2    regardless of the term of supervised release that's

3    provided by the Court, and he has agreed never to

4    identify in any manner the minor victims or their

5    families.

6             THE COURT:  All right.  Let me touch

7    with you, Mr. Batchu, on a couple of points that you

8    just heard summarized by Mr. Breslow.  First of all,

9    when we began speaking there were estimates of what

10   you might be looking at in terms of a potential

11   sentence here, and I talked about a ten-year minimum

12   mandatory and a possible life imprisonment maximum

13   with regard to one of the offenses.  We now have a

14   little bit more concrete notion of the sentence that

15   you'll be looking at, and it is a very substantial

16   sentence.  I want to make sure that you understand

17   that.

18             We had been talking about a minimum

19   sentence of at least ten years, but the government

20   has pointed out that the Sentencing Guideline range

21   here involves a potential sentence going well above

22   30 years as a potential sentence here if I impose a

23   sentence within the Sentencing Guideline range, and

24   you in your plea agreement have agreed not to appeal

25   any sentence I may impose that is no more than 293

```
 1    months, which is a little bit under 25 years.  Do you
 2    understand that?
 3                    THE DEFENDANT:  Is it possible to
 4    speak with counsel about that?
 5                    THE COURT:  You may, sure.
 6                    MR. BRESLOW:  Your Honor, before we
 7    do, just to clarify that the agreement is not to
 8    appeal or collaterally appeal.
 9                    MR. FOLEY:  He wishes to go to a room
10    for a minute to conference.
11                    THE COURT:  Fine.  We'll suspend this
12    plea proceeding, and we'll let the marshals escort
13    the defendant to a place where he can speak with his
14    lawyer.
15                    (Pause.)
16                    THE COURT:  We had another plea
17    scheduled for three o'clock, and I saw Mr. Grant and
18    Mr. O'Connor here.  I think I'm going to go ahead and
19    take that plea, and then we'll come back and resume
20    on this plea just to get that out of the way.
21    Mr. Grant, we've had to take a break in this
22    particular proceeding, and I think I may see if I can
23    squeeze you and Mr. O'Connor in in the Fish matter if
24    Mr. O'Connor's available.
25                    MR. GRANT:  Yes, he's right back
```

```
 1        there.
 2                    THE COURT:  Good afternoon.  We're
 3        having to take a break in the plea that I was just
 4        currently doing, and I thought we might take
 5        Mr. Fish's plea now.  Is he here?
 6                    MR. O'CONNOR:  He is here, your Honor.
 7        He has some questions about the plea and some of the
 8        provisions of the agreement.
 9                    THE COURT:  In that case we will wait.
10                    MR. O'CONNOR:  I apologize.
11                    THE COURT:  We'll wait and see who's
12        ready to go forward first.
13                    MR. O'CONNOR:  I'll try to move it
14        along quickly, your Honor.
15                    THE COURT:  Very good.  I appreciate
16        your patience.  I'm going to step off the bench now,
17        and we'll be notified I'm sure shortly, so I suspect
18        we'll be going forward in the next 10, 15 minutes.
19        I'll step off the bench, and we'll be letting you
20        know.  Court's in recess.
21                    (Brief recess taken at 3:19 p.m.)
22                    (Court came in at 3:30 p.m.)
23                    THE COURT:  Please be seated.  We're
24        back now in the *United States v. Batchu* matter.  When
25        we had suspended, we were going over the potential
```

```
 1    sentences here as summarized by Mr. Breslow, and I
 2    was reviewing those with you, Mr. Batchu.
 3           One of the things that I do whenever I take
 4    someone's plea is I try to give someone an idea of
 5    the risks that they're facing.  I don't know, as I
 6    said before, what sentence I'm going to impose here.
 7    It does appear from the plea agreement that I'm going
 8    to be imposing a sentence of at least ten years,
 9    which is in itself a significant sentence, and that
10    there will be a period of supervised release of at
11    least I believe five years, and that's really the
12    floor of the sentence.
13           Mr. Breslow was describing what the
14    government might be asking for as a sentence, and
15    certainly the government may convince me at the
16    sentencing to impose a sentence at that level.  One
17    of the things he said is that by his calculation
18    right now, the Sentencing Guideline range is between
19    324 and 405 months.
20           Now, your attorney, I'm sure, when we come
21    to sentencing will be trying to persuade me that the
22    Sentencing Guideline range should really be lower,
23    and he might succeed in persuading me of that.  On
24    the other hand, Mr. Breslow might succeed in
25    persuading me that the appropriate Sentencing
```

**G.App.127**

1    Guideline range is between 324 and 405 months, and so

2    we're out there in the neighborhood of 30 years in

3    prison for the Sentencing Guideline range, and that

4    is a sentence that I could impose.  I don't know that

5    I will, but I could impose a sentence as high as

6    that.  I just want to make sure that you understand

7    that that is the risk that you are facing as a result

8    of your pleading guilty here.  Do you understand

9    that, Mr. Batchu?

10               THE DEFENDANT:  Yes, I understand.

11               THE COURT:  And then the government

12   takes the position that once you have served your

13   sentence, that you should then be placed on

14   supervised release, not for five years which would be

15   60 months, but for 365 months, which if I'm doing the

16   math right is itself over 30 years in supervised

17   release.  So under the government's proposal, the

18   risk that you face is not only that you could get a

19   prison sentence in the neighborhood of 30 years, but

20   once you serve that prison sentence, you would be

21   released and you would be placed on supervised

22   release for a period of an additional 30 years.  So

23   we're out in the year somewhere around 2070 --

24               THE DEFENDANT:  I'll be gone.

25               THE COURT:  -- for your prison

**G.App.128**

1    sentence and your period of supervised release as a

2    risk of what you are facing here.  Now, I want to

3    repeat, I don't yet know what sentence I'm going to

4    impose except that if the calculation of the statute

5    is right, it's going to be at least ten years plus

6    five years of supervised release.  So it's going to

7    be somewhere in there.  It's an extremely heavy

8    sentence, and I just want to make sure that you do in

9    fact understand what your risk is here if you plead

10   guilty.  Do you understand?

11            THE DEFENDANT:  Yes, I do.

12            THE COURT:  Now, there is this issue

13   of an appeal.  You have to a very great extent waived

14   your right or you have limited the right of appeal

15   that you might have.  Every defendant who pleads

16   guilty or is found guilty by a jury ordinarily has

17   the right to take an appeal.  That appeal goes to a

18   panel of three judges in Boston.  They look over the

19   record of the case, including my words as I'm

20   speaking them right now and they're going into the

21   transcript, and they make a decision as to whether I

22   erred, made a mistake when I was taking your plea, as

23   I'm doing right now, or when I impose sentence, as I

24   will at some point in the future.

25            If I have made a mistake, they can correct

1        the mistake themselves or they'll send it back here

2        to me to tell me to correct it, and everyone has that

3        right.  You have given up that right to a very

4        substantial extent.  You have agreed that as long as

5        my sentence is no more than 293 months, you're not

6        going to appeal it.  That means if I should make a

7        mistake, but I impose a sentence lower than that,

8        you'll be giving up your right to appeal.

9                There are qualifications to that.  The

10       surrender of the right to appeal is never complete.

11       If the Supreme Court were to come down with some case

12       law that no one could have predicted and the legal

13       landscape changes as a result of that opinion, maybe

14       you could take an appeal.  Moreover, I'm not

15       permitted to behave in some irrational or capricious

16       or unprofessional way in imposing sentence.  I don't

17       have a license to forget my professional

18       responsibilities.

19               But assuming that I go about my work

20       properly, if I happen to make a mistake in the course

21       of doing that and I impose a sentence of less than

22       293 months, which is well above 20 years, going on 25

23       years, you're stuck with that sentence.  You're not

24       going to be able to appeal it.  Do you understand

25       that?

  1                    THE DEFENDANT:  I do understand that.

  2                    THE COURT:  All right.  The government

  3    has also agreed that if the sentence is at least a

  4    certain number, that the government will also not

  5    have a right to appeal as well.  You understand that?

  6                    THE DEFENDANT:  I do understand that.

  7                    THE COURT:  Now, there's one more

  8    detail that I want to just touch base with you about,

  9    and that is a second form of an appeal.  I've talked

 10    about your right to take an appeal.  Then there's

 11    something called the right to do a collateral attack

 12    on a sentence.  It's a tool that defense attorneys

 13    have to have another layer of appeal.  It's sometimes

 14    called a petition for habeas corpus, or we call it by

 15    the statutory number which is §2255.

 16            So ordinarily, just as every defendant has

 17    the right to take an appeal, every defendant has a

 18    second right to bring what's called a petition for

 19    habeas corpus or §2255.  You have similarly given up

 20    your right to that type of second layer of appeal.

 21    In that second layer of appeal, you can argue that

 22    I've done something in either taking your plea or

 23    imposing your sentence that violates your

 24    constitutional rights.

 25            With the qualifications that I have just

**G.App.131**

```
 1    described with regard to your appeal, you have also
 2    given up your right to bring a petition for habeas
 3    corpus with regard to your plea or sentencing.  Do
 4    you understand that?
 5                   THE DEFENDANT:  I do understand that.
 6                   THE COURT:  Well, I am satisfied that
 7    the defendant is able to offer his pleas of guilty
 8    here knowingly, intentionally and voluntarily.  We're
 9    going to take your plea now.  I'm going to ask you to
10    stand.  Ms. Pelegano's going to ask you first if you
11    wish to change your plea.  If you say yes, she'll
12    take your pleas to Counts One, Two, Three, Four, and
13    Five.
14                   THE CLERK:  Mr. Batchu, you have heard
15    the Court read the charges against you.  On a
16    previous occasion, you pled not guilty to these
17    charges.  Do you wish to change your plea to guilty
18    at this time?
19                   THE DEFENDANT:  Yes.
20                   THE CLERK:  How do you plead to Count
21    One, guilty or not guilty?
22                   THE DEFENDANT:  Guilty.
23                   THE CLERK:  How do you plead to Count
24    Two, guilty or not guilty?
25                   THE DEFENDANT:  Guilty.
```

```
 1                    THE CLERK:  How do you plead to Count

 2        Three, guilty or not guilty?

 3                    THE DEFENDANT:  Guilty.

 4                    THE CLERK:  How do you plead to Count

 5        Four, guilty or not guilty?

 6                    THE DEFENDANT:  Guilty.

 7                    THE CLERK:  And how do you plead to

 8        Count Five, guilty or not guilty?

 9                    THE DEFENDANT:  Guilty.

10                    THE COURT:  Thank you very much.  You

11        can return to your seat at counsel table.

12               I want to make some findings for the

13        record.  Obviously I've had an opportunity to

14        question Mr. Batchu and his attorney concerning these

15        pleas of guilty.  I've learned and am entirely

16        satisfied that Mr. Batchu and Mr. Folly have

17        conferred concerning these pleas of guilty, including

18        all aspects of the charge against the defendant, any

19        defenses he may have, and the elements of the

20        offenses.

21               I've observed Mr. Batchu in making his

22        answers to my questions.  I've noted his demeanor and

23        manner and his intelligence in offering his answers.

24        I've observed that Mr. Batchu is not under the

25        influence of any medication or in the grip of any
```

**G.App.133**

```
1    emotional state that would in any way compromise his

2    judgment.

3            I find that the pleas of guilty of the

4    defendant to Counts One through Five of the

5    indictment do have a factual basis as summarized by

6    Assistant U.S. Attorney Breslow.  I find that the

7    pleas are free of any coercive influence, and that

8    they're voluntary made with full knowledge of the

9    charges, and particularly specific knowledge of the

10   consequences of the pleas.  I find that there have

11   been no promises of any kind made to Mr. Batchu by

12   anyone and no threats exerted upon him in any manner.

13           Based upon this, I order that the pleas of

14   the defendant to Counts One through Five of the

15   indictment be accepted and entered into the records

16   of this court.  We will be setting this down for a

17   sentencing, which will probably be in the early fall

18   to ensure my availability and the ability of the

19   Probation Department to put together a detailed

20   Presentence Report.  So Ms. Pelegano, if you can give

21   us a date for sentencing.

22                   THE CLERK:  October 5th, 2011, at two

23   o'clock.

24                   THE COURT:  October 5th at 2 p.m.

25   Mr. Batchu will remain in the custody of the U.S.
```

```
 1    Marshal pending the sentencing at that time.  If
 2    there's nothing further, the court will be in recess.
 3                 MR. FOLEY:  Just one brief, your
 4    Honor.  I've been in communication with the U.S.
 5    Attorney in the district of Chicago, Illinois.
 6    Obviously he's of course aware where Mr. Batchu
 7    resided, and he agreed for the record that the U.S.
 8    Attorney out there is not going to be seeking any
 9    further charges against him relative to the facts
10    that were presented in court today.
11                 THE COURT:  Further meaning beyond the
12    ones that are at issue here.
13                 MR. FOLEY:  Correct, the five charges
14    that he's plead guilty to.
15                 MR. BRESLOW:  I've had preliminary
16    conversations with Assistant U.S. Attorney Matthew
17    Madden, but I've not had any confirmation, so I can't
18    comment one way or another on this last point.
19                 THE COURT:  Is it M-a-d-d-o-n?
20                 MR. BRESLOW:  M-a-d-d-e-n.
21                 THE COURT:  I want to particularly
22    offer tribute to the family that has been here today.
23    I know this has been a very difficult time.  I want
24    to also compliment the young woman for her poise and
25    bravery being here today.  So thank you very much for
```

1    being here.

2                    I'm going to step off the bench for about

3    five minutes.  Mr. Grant, we'll be back here at that

4    time, and Mr. O'Connor, for the Fish matter.  Thank

5    you.  Court's in recess.

6                    (Court is in recess at 3:42 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    UNITED STATES OF AMERICA

 2    DISTRICT OF MASSACHUSETTS

 3    CITY OF SPRINGFIELD

 4

 5

 6

 7         I, Sarah L. Mubarek, Registered Professional

 8    Reporter, hereby certify that the foregoing is a true

 9    and accurate transcript of my stenographic notes to

10    the best of my knowledge and ability.

11

12

13
                        /s/Sarah L. Mubarek
14                      Sarah L. Mubarek
                        Registered Professional Reporter
15

16
      DATED:  April 30, 2012
17

18

19

20

21

22

23

24

25
```

**G.App.137**

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **V.** | ) | **10-CR-30008-KPN** |
| | ) | |
| | ) | |
| **MANI BATCHU** | ) | |

### MOTION TO CONTINUE

NOW COMES Mani Batchu, Defendant in the above captioned matter, by and through his attorney, Richard N. Foley, Esq. who moves this Honorable Court to continue the sentencing in this matter.

As grounds for this Motion the following is set forth:

1. This matter is set for sentencing on November 11, 2011 at 11:00 AM before this Honorable Court.

2. Your Defendant has arranged for an evaluation by Dr. David Medoff, a licensed psychiatrist, to aid this Honorable in deciding the appropriate sentence in this matter.

3. Dr. Medoff's services are expensive and your Defendant has just now been able to secure the requisite fees.

4. Dr. Medoff has advised the undersigned that he needs 45 days to complete his evaluation.

5. The Government (A.U.S.A. Steven H. Breslow) has been contacted and does not object based upon the stated need, however, objects on the

**G.App.139**

basis of the minor victim's desire for a prompt resolution of this matter.

WHEREFORE, your Defendant respectfully requests that this Honorable Court continue sentencing in this matter from November 11, 2011 to December 22, 2011 and grant such other and further relief as may be deemed just and proper.

/s/ Richard N. Foley

_____

Richard N. Foley, Esq.

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the within MOTION TO CONTINUE has been served upon the Government by ECF.

/s/Richard N. Foley

_____

Richard N. Foley,Esq.

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS


**UNITED STATES OF AMERICA** )

)

)

**V.** )                    **10-CR-30008-KPN**

)

)

**MANI BATCHU** )



## <u>MOTION TO RECONSIDER</u>


NOW COMES Mani Batchu, Defendant in the above captioned matter, by and through his attorney, Richard N. Foley, Esq. who moves this Honorable Court to reconsider It's denial of your Defendant's Motion to Continue the sentencing in this matter.

As grounds for this Motion the following is set forth:

1. This Honorable Court denied your Defendant's Motion to Continue on the basis that he waited too long to arrange for an evaluation.

2. Your Defendant, through counsel, discussed an evaluation by Dr. David Medoff beginning in June of this year.

3. Dr. Medoff's services are expensive and he requires prepayment of $8,500.00.

4. Your Defendant had $10,000.00 cash bail with the Connecticut State Court which Court and Prosecution agreed to release $9,500.00 through your Defendant's State court counsel, Attorney Frank O'Brien.

5. Through no fault or delay attributable to your Defendant the

**G.App.141**

monies were not received by the undersigned until October 6, 2011 and Doctor Medoff stands ready to conduct the evaluation upon receipt of the monies.

6. The Government (A.U.S.A. Steven H. Breslow) previously continued this sentencing based upon a business conflict by the victim's mother.

7. Due process requires that your Defendant be allowed to present a psychological evaluation to aid this Honorable Court in determining the appropriate sentence.

WHEREFORE, your Defendant respectfully requests that this Honorable Court continue sentencing in this matter from November 18, 2011 to December 22, 2011 and grant such other and further relief as may be deemed just and proper.

/s/ Richard N. Foley

_____

Richard N. Foley, Esq.

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the within MOTION TO CONTINUE has been served upon the Government by ECF.

/s/Richard N. Foley

_____

Richard N. Foley, Esq.

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA      )
                                  )
                                  )

V.                                )      **10-CR-30008-KPN**
                                  )
                                  )

**MANI BATCHU**                   )

## SENTENCING MEMORANDUM

NOW COMES Mani Batchu, defendant in the above captioned matter, by and through his attorney Richard N. Foley who submits this Sentencing Memorandum to aid this Honorable Court in arriving at a sentence that is sufficient, but not greater than necessary.

The Supreme Court held in United States v. Booker that the mandatory nature of the sentencing guidelines system violated the Sixth Amendment of the United States Constitution. 543 U.S. 220, 226-27, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). Rather the sentencing guidelines are truly guidelines, merely advisory, and are not binding on the sentencing court. Id at 245, 125 S.Ct.738.

"The Guidelines are not the only consideration, (and) the district court judge should consider all of the Section 3553(a) factors" Gall v. United States __U.S.__, 128 S.Ct. 596, 169 L.Ed.2d 445 (2007).

The sentencing court "may not presume that the Guidelines range is reasonable" but rather must "make an individualized assessment

**G.App.145**

based on the facts presented" Id 128 S.Ct. at 597.

The sometimes conflicting issues between the Sentencing Guidelines and the other factors in Title 18 section 3553(a) is highlighted by the subject of this very case, a child exploitation-related offense.

This issue was addressed in U.S. v. Shipley 560 F.Supp. 739 (S.D.Iowa 2008).

Philip Allen Shipley pled guilty to receiving visual depictions of minors engaged in sexually explicit conduct. The Guideline Range was 210 to 240 months. Nevertheless the Sentencing Court imposed an incarceration sentence of 90 months. Passim.

The Court found that "...the guidelines for child exploitation offenses were not developed using an empirical approach by the Sentencing Commission, but rather were mainly promulgated in response to statutory directives. Specifically, the Project Act directly amended guideline 2G(2.2) by amending the guideline enhancements for specific offense characteristics. These modifications do not appear to be based on any sort of empirical data, and the Court has been unable to locate any particular rationale for them beyond the general revulsion that is associated with child exploitation-related offenses...(T)hus, because the guidelines at issue in this case do not reflect the unique institutional strengths of the Sentencing Commission in that they are not based on study, empirical research, and data,...this Court 'affords them less deference than it would to empirically-grounded guidelines.'"

The nature and circumstances of the instant offense and the history and characteristics of the defendant warrant a 120 month sentence which is sufficient but not greater than necessary to address the sentencing factors of Title 18 section 3553.

The defendant has done significant honorable civil service to this country coupled with his complete lack of criminal history and the shame he feels for his conduct warrants this sentence. The Court has received numerous letters regarding the character of the Defendant. Thje letters describe an intelligent, thoughtful and honorable man, always willing to help others when needed.

Based upon his situation personally and culturally there is no concern that the defendant will recidivate. He has led a law abiding life and there is reason to believe that he would return

He has been significantly punished already with the passing of his father while incarcerated and his present as well as future inability to assist his mother who struggles with life due to her mental illness that together with the stigma that he will carry through life and the loss of his ability to practice medicine, a long and hard earned accomplishment that is now gone, will punish him for the rest of his life.

Lastly, restitution will be aided by him being able to resume being a productive citizen of society.

Respectfully submitted,
MANI BATCHU
By his attorney,

_____
Richard N. Foley, Esq.
55 Market Street 2B
Portsmouth, NH 03801
603.433.1303
Bar No. 553321

/s/ Richard N. Foley

_____
Richard N. Foley, Esq.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the within SENTENCING

MEMORANDUM has been served upon the Government by ECF.

/s/Richard N. Foley

_____

Case: 21-1292   Document: 00117900744   Page: 152   Date Filed: 07/05/2022   Entry ID: 6507951
Case 3:10-cr-30008-MAP   Document 99   Filed 12/28/11   Page 1 of 101

1

```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2                          WESTERN SECTION

 3

 4

 5    ...........................
      United States of America   .
 6                               .         Criminal No.
           v.                    .         10-30008-MAP
 7                               .
      Mani Batchu                .
 8    ...........................

 9

10

11              Before the Honorable Michael A. Ponsor,
                     United States District Judge,
12           Sentencing Hearing Held on November 18, 2011.

13

14
      APPEARANCES:
15

16    For the government:  Steven Breslow, Assistant U.S.
           District Attorney, 300 State Street, Springfield, MA
17         01105.

18
      For the defendant:  Richard Foley, 55 Market Street 2B,
19         Portsmouth, NH 03801.

20

21                    Alice Moran, CSR, RPR, RMR
                      Official Federal Court Reporter
22                    300 State Street, Room 303D
                         Springfield, MA 01105
23              Tel: (413)731-0086  Fax: (413)737-7333
                       alice.moran@verizon.net
24

25
```

G.App.149

Case: 21-1292    Document: 00117900744    Page: 153    Date Filed: 07/05/2022    Entry ID: 6507951
Case 3:10-cr-30008-MAP Document 99   Filed 12/28/11  Page 2 of 101

2

```
 1                            INDEX

 2

 3

 4   Witness Name:        Direct   Cross    Redirect    Re-cross

 5

 6
     Mani Batchu          83
 7

 8

 9

10   Government's Exhibits:                               Page

11

12

13   None

14

15

16

17   Defendant's Exhibits:                               Page

18

19   None

20

21

22

23

24

25
```

**G.App.150**

Case: 21-1292   Document: 00117900744   Page: 154   Date Filed: 07/05/2022   Entry ID: 6507951
Case 3:10-cr-30008-MAP  Document 99   Filed 12/28/11   Page 3 of 101

3

| | |
|---|---|
| 1 | **(Court commenced at 12:17.)** |
| 2 | **(The defendant is present.)** |
| 3 | THE COURT:  Good afternoon.  Please be seated. |
| 4 | THE CLERK:  Criminal Action 10-30008-MAP, United |
| 5 | States versus Mani Batchu. |
| 6 | THE COURT:  We are here this afternoon for the |
| 7 | sentencing of the defendant, Mani Batchu, following his |
| 8 | pleas of guilty to one count of transportation of a minor |
| 9 | to engage in criminal sexual activity and three counts of |
| 10 | interstate travel for the purpose of engaging in illicit |
| 11 | sexual conduct of a minor and one count of use of a |
| 12 | facility of interstate commerce to entice a minor to |
| 13 | engage in criminal sexual activity. |
| 14 | I want to begin by reviewing the materials that I |
| 15 | have absorbed in preparation for today's proceeding.  I've |
| 16 | taken another look at the indictment.  I have read the |
| 17 | sentencing memoranda of both the defendant and the |
| 18 | government, including the amended memorandum of the |
| 19 | government. |
| 20 | I have read the letters that have been submitted on |
| 21 | behalf of Mr. Batchu, some have been just handed up to me, |
| 22 | but I believe I've already seen most of them.  These are |
| 23 | letters from the defendant's cousin, his uncles, friends, |
| 24 | family members attesting to their affection and expressing |
| 25 | their support for Mr. Batchu. |

**G.App.151**

Case: 21-1292   Document: 00117900344   Page: 155   Date Filed: 07/05/2022   Entry ID: 6507951
Case 3:10-cr-30008-MAP   Document 99   Filed 12/28/11   Page 4 of 101

4

1        I have also read once more the plea agreement.  I've

2    read the evaluation note of the clinician Bruce Ecker, and

3    also the other materials that were submitted by Ms.

4    Krause, the certified public accountant, who's made

5    certain projections with regard to the damages suffered by

6    the victim and her family.

7        I have read the statement of the victim.  I have read

8    the statement of the victim's mother.  I have read the

9    statement of the victim's father and brother, and in fact

10   there have been a couple of statements that have been

11   submitted by the victim's father and I've read both of

12   those.

13       I have also reviewed the CDs of the material seized

14   by the government, and, in connection with that, I want to

15   put on the record that as I was attempting to access the

16   CDs, I was having trouble.

17       I could open up a couple of them but there was some

18   problems that I encountered accessing certain files.  I

19   called the U.S. Attorney's office and Mr. Breslow came

20   and, without any substantive comment related to the case,

21   cued up the areas and left the room.  I viewed the

22   material.  He came back, cued up other segments of the

23   material, left the room.  I watched the material and then

24   I returned all the -- there were three CDs and I returned

25   two of them, signing them as having been resealed.  I have

1   the third one here and before this proceeding is over I'm

2   going to return the third CD then.

3       The material included, I guess we could say, three

4   categories of material:  CDs including videotapes of

5   interactions that the defendant had with the victim who's

6   identified as victim A.  I viewed that; CDs of

7   interactions that the defendant had with an individual who

8   has been otherwise unidentified but who is denoted in the

9   materials as victim B, and another third individual who

10  has been unidentified but who the government identifies as

11  victim C.

12      I have read -- I've reviewed that material, and then

13  I have made a cursory review of the third category of

14  pornographic material, much of it involving people who are

15  obviously minors, which were seized from the defendant's

16  computer.

17      So that is the three -- those are the three segments

18  of material that I have familiarized myself with in

19  preparation for today's sentencing proceeding.  That's

20  what I've reviewed.  I do not see the defendant's counsel

21  or the government counsel have any expressions of concerns

22  so I'm assuming that I've digested everything that I was

23  intended to digest to prepare for today's proceeding.

24      I may not have said it, but I should add that I have

25  read and re-read carefully the presentence report in this

Case: 21-1292 Document: 00117900744 Page: 157 Date Filed: 07/05/2022 Entry ID: 6507951
Case: 3:10-cr-30008-MAP Document 99 Filed 12/28/11 Page 6 of 101

6

1    case and I have that in mind, of course, as we start out

2    today.

3         This is a very tough case in a number of ways that I

4    think are already obvious and that may become more obvious

5    as we proceed here over the next half hour or 45 minutes.

6         I want to express my gratitude for the people who've

7    come to court today to see this proceeding.  I am always

8    very appreciative of people who come to see what we do

9    here and how things actually unfold in our court system.

10        I do want to request that the spectators, and I don't

11   think there will be any problem with this, refrain from

12   any expressions of any kind that may in any way complicate

13   things for the attorneys and, to some extent, for me.

14        We all have a difficult task this afternoon and so

15   I'll appreciate your restraint as we go through this

16   pretty difficult exercise here today.

17             MR. BRESLOW:  Your Honor, a member of the

18   victim's family has a hearing impairment.  Would it be

19   possible for the courtroom audio to be turned up, or

20   failing that, could I request that the Court and counsel

21   speak a little louder than ordinarily so that minor A's

22   father could hear adequately.

23             THE COURT:  There.  This will give a somewhat

24   louder projection of my voice, and I hope that will be

25   helpful to anyone who may be having difficulty hearing.

 1          So I would like to proceed first to address the

 2    objections that have been filed to the presentence report

 3    and give you rulings on those objections, and then proceed

 4    to the question of what the appropriate sentence should be

 5    in this case.

 6          I believe that there are no objections, Mr. Breslow,

 7    that have been filed by the government to the presentence

 8    report, am I correct?

 9               MR. BRESLOW:  That is correct, Your Honor.

10               THE COURT:  Okay.  So let's then turn to the

11    objections that have been filed by Mr. Foley on behalf of

12    the defendant.

13          I wanted to begin with -- it's okay.  You could have

14    a seat, Mr. Foley.  I'm just going to tee this up a bit.

15          The first objection really pushes to the surface the

16    primary issue I think that's raised by the defendant in

17    his objections to the presentence report in various forms.

18          The objection has to do with paragraph 60 which

19    relates to victims B and C in this presentence report.

20    Several of the objections filed by the defendant take the

21    position that the defendant did not engage in any criminal

22    conduct with victims B and C because those victims were

23    not -- or the Court at least is not in a position to be

24    able to determine that those two victims were under the

25    age of 16.

1    As I said earlier, I believe that is true, I'll stand

2    corrected if I am wrong, these two young ladies, women,

3    girls, have never been identified.  Their names are not

4    known; their addresses are not known; their birth dates

5    are not known, but the materials contained in the

6    defendant's computer include video interactions between

7    Mr. Batchu and these two young women which are quite

8    similar to the interchanges that he had with victim A who

9    is identified and whose age is known.

10    So the question becomes whether I'm in the position

11    to conclude with a sufficient degree of certainty that the

12    two young unidentified women in the videos that were found

13    in Mr. Batchu's computers were in fact under 16 and I'm

14    not sure there is -- yes?

15           MR. BRESLOW:  Your Honor, they -- Your Honor

16    need only conclude by a preponderance of the evidence that

17    the females identified as B and C were minors, meaning

18    that they were under the ages of 18.

19           THE COURT:  I see.

20           MR. BRESLOW:  Not 16.

21           THE COURT:  Okay.  Well, let me just take a look

22    at that so that I'm sure.

23    Well, I'm looking at the presentence report at page

24    19 where the calculation of the presentence report --

25    where the calculation of the offense level is made, and

 1    paragraph 76 says with regard to minor B:  "According to

 2    Section 2G2.1(b)(1)(B), if the offense involved a minor

 3    who had attained the age of 12 years but not attained the

 4    age of 16 years, increase by two levels."

 5        The same phrase is repeated with regard to Group 3

 6    related to unidentified minor C.  So the presentence

 7    report at least appears to rely upon a finding that the

 8    two individuals who Mr. Batchu was interacting with were

 9    in fact under the age of 16, so.

10            MR. BRESLOW:  Okay.  There are actually two cuts

11    to this.  The first cut is whether they were minors

12    subject to the statute that prohibits the production of

13    child pornography, and the second cut is the guideline

14    cut.  So, yes, Your Honor must essentially make two

15    findings:  One, whether they're minors and, second,

16    whether they merit the enhancement under that particular

17    guideline section.

18            THE COURT:  Well, then let's pursue that a step

19    further because I would appreciate some help.

20        Before I pursue these questions, I want to talk to

21    the people who are gathered here so you know why we're

22    going through this.  It may sound extraordinarily

23    technical and needling to be going through this, but every

24    time that I sentence someone in federal court, I begin by

25    determining what the sentencing guideline range is and the

Case: 21-1292    Document: 00117898744    Page: 161    Date Filed: 07/15/2022    Entry ID: 6507951
Case 3:10-cr-30008-MAP Document 99   Filed 12/28/11   Page 10 of 101

10

1    sentencing guideline is produced by a grid which has a

2    person's criminal history across the top, whether they

3    have previous convictions, and then down the side is the

4    offense level.

5        Mr. Batchu has no previous convictions so his

6    criminal history category is one.  So that means that the

7    potential sentence in this case may very well be effected

8    by the sentencing guideline range, and that sentencing

9    guideline range in turn is driven by the offense level.

10       If Mr. Batchu is guilty and he has pled guilty to

11   offenses with relation only to victim A who is identified,

12   then his offense level is at a certain level.

13       If he is also guilty of relevant conduct involving

14   other minors, two other minors or two other females under

15   the age of 16, that increases his offense level

16   significantly and therefore increases his potential

17   sentence.  So what we are talking about will affect the

18   sentencing guideline range and his potential sentence.

19       So the next question I have for you, Mr. Breslow, is

20   let's assume, and I don't know whether I can make this

21   finding, but let's assume that I find that these two

22   individuals, victim B and victim C whose names are

23   unknown, although we do know that Mr. Batchu engaged in

24   interactions with the two of them that involved sexually

25   explicit conduct on the part of victim B and victim C, but

Case: 21-1292    Document: 00117898344    Page: 162    Date Filed: 07/15/2022    Entry ID: 6507951
Case 3:10-cr-30008-MAP    Document 93    Filed 12/28/11    Page 11 of 101

11

1    if I find that they were minors but not under the age of

2    16, then what effect do you say that would have on the

3    calculation of the guideline range?

4         The sentencing -- the presentence report takes the

5    position that the two females were under the age of 16.

6              MR. BRESLOW:  Well, that's the government's

7    position as well, and Your Honor need only find that by a

8    preponderance.  But if Your Honor does not, I think that

9    it is irrelevant to the ultimate advisory sentencing

10   guidelines range for the following reasons and I will --

11   and I'll note that the chief probation officer, Mr. Gomes,

12   is here to correct my understanding of the guidelines if

13   I'm incorrect.

14        If Your Honor finds that they are minors, then a

15   separate group, Group 2 and Group 3, will be applied

16   because each indicates -- each video was a separate

17   instance of sexual exploitation of a minor, meaning of

18   somebody under the age of 18.

19        If Your Honor further finds that they were under the

20   age 18 but Your Honor can't make that determination that

21   they were under the age of 16, then the two-level

22   enhancement that Your Honor talked about will not apply.

23        What that means is that for each of the two other

24   groups, Group 2 and 3, instead of being a 38 as the

25   probation department calculated, it will be a 36.

1          So Group 1 would be a 40, Group 2 would be a 36, and

2     Group 3 would be a 36, and now we move to whether under

3     the grouping rules in the guidelines that matters at all,

4     and it does not because 3D1.4(a) provides that we count as

5     one unit the group with the highest level.  That's the

6     group involving minor A, that's 40, and then we look to

7     the other two groups, Group 2 which is minor B or victim B

8     and Group 3 which is victim C.

9          Those, even without the finding that they are below

10    16 years old, are 36.  So they are within four levels of

11    the first group which is 40.

12         So you apply 3D1.4(a) which says count as one unit

13    the group with the highest level, that's one, and then

14    count one additional unit for each group that is equally

15    serious or from one to four levels less serious, that's

16    3D1.4(a).  So because they are still within four levels of

17    that top group, 36 to 40, they each count as one

18    additional unit for a total of three units.  Three units

19    yields three levels; three levels are added to 40; 40 is

20    43.

21         So I think we come out exactly the same whether Your

22    Honor considers them to be minors who are between 18 and

23    16 or less than 16.  I don't think it matters, but I would

24    certainly ask counsel for Mr. Batchu or the probation

25    officer to correct me if I'm misstating the guidelines.

Case: 21-1292    Document: 00117898744    Page: 164    Date Filed: 07/15/2022    Entry ID: 6507951
Case 3:10-cr-30008-MAP   Document 99   Filed 12/28/11   Page 23 of 101

13

1             THE COURT:  Did you want to be heard on that,

2     Mr. Foley?  The grouping rules with regard to the

3     sentencing guidelines are one of the more tangled thickets

4     in the guidelines and how we go about grouping is

5     something that is a little nuanced.  Do you have anything

6     to say?

7             MR. FOLEY:  I'm familiar with the grouping, Your

8     Honor.  I have no objection to my brother's assessment of

9     the grouping protocol under the guidelines.

10            THE COURT:  All right.  Well, then this is what

11    it comes down to.  Let me summarize where we are and then

12    let me summarize what is a pretty, I would say,

13    uncomplicated but tough decision that I have to make here.

14        We have agreed that if the two individuals who are

15    identified as minor B and minor C are under 18, the

16    groupings would remain the same and Mr. Batchu would be

17    facing the same offense level.

18        If we find -- if I find that I cannot conclude that

19    the individuals are under 18, then that would affect the

20    grouping and affect the determination of the offense

21    level.

22        It comes down to this:  I've seen the videos.  I've

23    looked at the videos and this is the brain that is

24    supposed to be influenced, and I'll tell you what my

25    impressions were.  Victim B I cannot make a call that she

**G.App.161**

| | |
|---|---|
| 1 | is under 18 years old.  She is physically rather |
| 2 | developed.  She could be 18.  She could be 19.  She could |
| 3 | be 17.  She could be 16. |
| 4 | Young women at this age develop at different rates |
| 5 | and I simply cannot tell with regard to this particular |
| 6 | person.  It's distasteful, extremely distasteful, to even |
| 7 | have to have this kind of conversation, much less in |
| 8 | public to be talking about physical development of a young |
| 9 | female, but there is no way to avoid discussing it. |
| 10 | So I have to say having looked at that video, which |
| 11 | was an extremely unpleasant experience personally, I can |
| 12 | say I have a very hard time concluding that that |
| 13 | particular individual is in fact under the age of 18. |
| 14 | My conclusion is quite different with regard to |
| 15 | victim C.  Victim C I was prepared to hear argument as to |
| 16 | whether she was under 16 or not.  She's very young, very |
| 17 | young.  She could easily be 14.  She could possibly have |
| 18 | been 16.  She is definitely not 18, and I can say that |
| 19 | with confidence.  I don't think that any fair-minded |
| 20 | person looking at the video that involves victim C could |
| 21 | conclude that that young lady is 18 years or older. |
| 22 | Again, it is repugnant to have to have this kind of a |
| 23 | conversation at all, but that's my responsibility.  The |
| 24 | videos are part of the record.  They could be reviewed, |
| 25 | but the young lady in the video, who's been identified as |

1    victim C, in my opinion is beyond debate under 18 years

2    old.  There might be a debate as to whether she's under

3    16, but there's no question that she's under 18.

4         I'm also assisted, if that's the word, in making this

5    evaluation by the fact that there's only one video of Mr.

6    Batchu interacting with victim B and there are four videos

7    that we have of Mr. Batchu interacting with victim C, and

8    so I have a much better opportunity to gauge her level of

9    physical maturity and her level of frankly childish

10   conduct during the course of the video.  She's a very

11   young girl both physically and in terms of how she is

12   behaving on the video.

13        Victim B I think there's more of a debate.  So that's

14   what went into my mind when I was looking at the

15   videotapes.  It's a call that I have to make and I really

16   don't know where the debate could go.

17        If there are any things that either one of you would

18   like to point out to me that I should have been more

19   attuned to and may have overlooked, I'll be happy to hear

20   what you have to say.

21        So I think I will hear first from Mr. Foley.  It's

22   your objection.

23             MR. FOLEY:  Your Honor, I too also reviewed

24   those and, quite frankly, without conjecture, I'm an older

25   man.  I have a hard time telling the difference between

1    somebody who's 25 versus 18.  They all look young to me.

2    People under 35 look young to me.  So I think the Court

3    can only conjecture as to their age.

4        In my life I've met people well in their 20s who look

5    like very young teenage girls and conversely 16, 17 year

6    olds that appear at first blush to be of drinking age.

7        I think the Court can only conjecture and the burden

8    is on the government to prove their allegation.  I

9    understand the Court's position but I think it's just

10   conjecture versus even a preponderance of the evidence.  I

11   was unable to even come close to what their age might be,

12   five years either way.

13            THE COURT:  Okay.  Mr. Breslow.

14            MR. BRESLOW:  Your Honor, I would only add with

15   respect to the female that you feel you can't conclude is

16   a minor that Your Honor only need do so by a preponderance

17   of the evidence.  Meaning is it more likely than not based

18   on your viewing of the video that she's a minor.

19       So keeping that relatively low standard in mind, we

20   would submit that based on her physical appearance, her

21   interactions with the defendant, the setting in which the

22   video took place, which my recollection serves is like a

23   bedroom in her family's home, the type of clothing.

24            THE COURT:  Or her own apartment.  I don't know.

25            MR. BRESLOW:  Right, and the video speaks for

**G.App.164**

1    itself.  I would only ask Your Honor to keep in mind the

2    relatively low standard that the government must

3    establish, which is by a preponderance of the evidence.

4             THE COURT:  Right.  Thank you.

5        This is a tough thing for any attorney to argue

6    because it's just simply a question of what my call is.  I

7    having, as I said, had the unpleasant experience of having

8    to look carefully at these videos, listen to the audios

9    which included Mr. Batchu's voice at least for part of the

10   time, and observe the behavior as well as the physical

11   development of both the individuals, I cannot say by a

12   preponderance of the evidence that the individual

13   identified as minor B was under the age of 18.

14       I can say with complete confidence that the female

15   who's identified as minor C is under the age of 18.  There

16   might be a debate about under the age of 16 but there

17   isn't any debate about under the age of 18.

18       So I am going to sustain the objection of the defense

19   to the characterization of victim B as under 18.  I'm

20   going to overrule the objection with regard to the age of

21   victim C.

22       If we are calculating our offense levels as Mr.

23   Breslow suggests we should and as Mr. Foley agrees we

24   should, that means that the adjusted offense level would

25   be 42 rather than 43 and with two points off for

**G.App.165**

Case: 21-1292    Document: 00117898344    Page: 169    Date Filed: 07/15/2022    Entry ID: 6507951
Case 3:10-cr-30008-MAP Document 99    Filed 12/28/11    Page 18 of 101

18

1    acceptance of responsibility, we would be at an Offense

2    Level 40 rather than an Offense Level 41.

3         Just on the fly, Mr. Gomes, does that strike you as

4    correct?

5              PROBATION OFFICER:  That is correct, Your

6    Honor.

7              THE COURT:  All right.  So I'm looking at page

8    21 of the presentence report.  You'll see the grouping

9    there, and we have a Group 1, Level 40.  In the grouping

10   there's one additional point for that, and Group 2 --

11   Group 3 is a 36 and there's one point for that, 40 plus

12   two is 42; minus two, for acceptance of responsibility

13   puts us at an Offense Level 40 I believe.

14             MR. BRESLOW:  Your Honor, forgive me if I wasn't

15   clear when I made the point earlier, but my reading of the

16   guidelines and of the grouping rule in particular is that

17   even if the adjusted offense level for Group 2 is 36, it

18   still yields one unit, one additional unit.

19             THE COURT:  Right, but the adjusted offense

20   level for Group 2 isn't there.  It's gone.  The defendant

21   hasn't committed any crime with regard to Group 2.

22             MR. BRESLOW:  Yes, I'm sorry.  Forgive me.

23             THE COURT:  That's gone.

24             MR. BRESLOW:  You're absolutely correct and

25   that's where we are.

```
 1              THE COURT:  Okay.

 2              MR. BRESLOW:  I have no objections to Your

 3     Honor's rationale.

 4              THE COURT:  Okay.  So we are at an Offense Level

 5     40 at this point and we'll proceed to address the other

 6     objections and then see what that generates as an offense

 7     level.

 8         So, as I've said a moment ago, Objection No. 1 is

 9     sustained as to unidentified victim B.  It's overruled as

10     to unidentified victim C.

11         Objection No. 2, the issue of the defendant's

12     obstruction of justice is another one that we need to take

13     a moment to discuss.

14         There is no question that the defendant here -- there

15     may be a question and I will hear it if there is, but I

16     don't believe there is a question that the defendant here

17     continued to contact the victim after he was, A, informed

18     that the family had notified the police; B, informed that

19     there was a restraining order against him which barred him

20     from contacting the victim; C, had been formally charged

21     and arraigned in two different state court proceedings and

22     released on bail which prohibited him from contacting the

23     victim; and D, had had his apartment searched and had been

24     arrested in Chicago and still continued to harass and

25     pursue the defendant (sic) while she was on vacation.
```

G.App.167

1          So the course of conduct was determined and quite, in

2     my experience, unprecedented.  I'll just leave it at that.

3          So the question is does that type of behavior, which

4     is I think undisputed and undisputable, does that type of

5     conduct constitute obstruction of justice?

6          Then there are two other areas in which the

7     government alleges that the defendant obstructed justice

8     and where the defense at least disputes that.  One is that

9     the defendant gave false statements to the police officers

10    who were interviewing him in Chicago.  And the second is

11    that the defendant testified falsely at the hearing on the

12    motion to suppress in this case as well.

13         I guess the questions that I have are -- well, the

14    question that I have is, is it sufficient to support a

15    finding of obstruction of justice simply to conclude that

16    Mr. Batchu continued to pursue this victim after he had

17    been repeatedly warned and legally barred from making

18    these kinds of overtures to the victim, is that enough?

19    Or do I have to make a finding that he actually lied in

20    his interactions with the police officers and lied in this

21    courtroom during the hearing on the motion to suppress?

22         There may be other conduct by the defendant which the

23    government alleges constitutes obstruction of justice, but

24    let's just for a moment linger on those three areas.

25    Again, it's your objection, Mr. Foley, so I will hear you

1    on that.

2              MR. FOLEY:  Well, I don't see how it all,

3    pursuing the victim, Your Honor, rises to obstruction of

4    justice.  It may be in violation of a restraining order

5    and other court's orders, but I don't see how that could

6    come within the ambit of obstruction.

7              THE COURT:  I'm sorry, I overlooked another

8    thing which you should comment on.  There's one other

9    thing.  We have the statement of the victim that Mr.

10   Batchu instructed her to lie if there was an inquiry from

11   law enforcement that the two of them had had sexual

12   relations.

13       I know in your submission you claim that the

14   defendant denies that.  I don't know if I need to have an

15   affidavit to support that.  I'm not sure I even have an

16   affidavit from the victim.  I have a statement.

17       The government takes the position and the victim in

18   her statement asserts that she was told by Mr. Batchu not

19   to be honest with the police if they inquired of her as to

20   whether or not the two of them engaged in sexual

21   relations.

22              MR. FOLEY:  I don't remember seeing anything in

23   the discovery material that the victim stated that she was

24   instructed to lie.  I notice in her two-page statement,

25   which I just received momentarily when I came in here

1    today, she stated that "when it came down to it for me to

2    talk to the police, you got me to lie for you."

3         I'm not sure how that's to be construed.  "Got me"

4    rather than instructed, whether she felt she wanted to

5    because of feelings for him or feelings expressed for her.

6    So that in and of itself says that he instructed her.  She

7    obviously lied but we're not sure from that statement what

8    the motivation is.

9         I know the government characterizes it as obstructing

10   her, but I saw nothing in her interactions with the Hadley

11   police that she was told to lie; that she did lie to them

12   also -- I mean, she lied but then she recanted, but in the

13   recorded conversations I saw nothing that indicated that

14   she had been told to do that, whether or not it was her

15   own decision to present false evidence.

16        So I don't think that rises to the level of him

17   instructing her.  The government can characterize it as

18   that, but obviously we'd characterize it otherwise.

19             THE COURT:  That leaves two other, the

20   interaction that Mr. Batchu had with the Chicago police

21   officers and his testimony here in court.

22             MR. FOLEY:  I didn't see anything that he lied

23   to the Chicago police officers.  They stated he said

24   certain things and in his affidavits to suppress the

25   evidence seized he had a different version of what was

1    said.

2        I didn't see anything that he told them wrong facts.

3    His position is he didn't tell them the facts that they

4    asserted were told.  I don't think asserting your

5    constitutional rights rise to the level of obstruction of

6    justice.

7        THE COURT:  Correct.  That doesn't.

8        MR. FOLEY:  And that's all he did.  He did not

9    testify in this court on those hearings.  He stood by his

10   affidavits which challenged the propriety of the searches.

11   I don't think that could be used against him as

12   obstruction.  He has a right to assert his constitutional

13   rights and not be in peril and be punished for that.

14       THE COURT:  Yes, I should make sure the record

15   is clear.  Mr. Batchu did not take the stand and testify

16   under oath.  He submitted an affidavit contesting some of

17   the things that the government was suggesting.

18       MR. FOLEY:  And that's our position, Your Honor,

19   an assertion of a constitutional right cannot be used

20   against you to penalize you.

21       THE COURT:  Okay.  Mr. Breslow.

22       MR. BRESLOW:  Yes, Your Honor.

23       Your Honor, the first point that I'd note is that the

24   defense in executing the plea agreement has waived this

25   claim.  They have agreed that the obstruction of justice

Case: 21-1292    Document: 00117898344    Page: 175    Date Filed: 07/15/2022    Entry ID: 6507951
Case 3:10-cr-30008-MAP  Document 99  Filed 12/28/11  Page 24 of 101

24

1    enhancement applies.  Now, Your Honor needs to make the

2    proper finding, but --

3              THE COURT:  Where does -- can you just refer me

4    to the paragraph in the plea agreement?

5              MR. BRESLOW:  Yes, we cited it in the sentencing

6    memo, and in particular if you have the plea agreement.

7              THE COURT:  I do.

8              MR. BRESLOW:  Okay.  Well, in the plea agreement

9    the government's guidelines calculation is set forth on

10   paragraphs 3 -- in pages 3 and 4.

11             THE COURT:  Right.

12             MR. BRESLOW:  And in item --

13             THE COURT:  F.

14             MR. BRESLOW:  -- F, the government's calculation

15   includes the two-level enhancement for obstruction of

16   justice.

17        Now immediately following the government's guidelines

18   calculation, the defendant agreed to a limited challenge

19   of the guidelines calculation; namely, what we just

20   discussed, whether the two additional victims were minors

21   or not.  The defendant agreed that with that one exception

22   the foregoing application of the sentencing guidelines is

23   correct.

24             THE COURT:  I see that.  Thank you.

25             MR. BRESLOW:  So the entire defense argument is

1    barred, and I don't take Mr. Foley to be deliberating

2    attempting to slip a fast one by the Court.  It was a

3    complicated plea agreement, a complicated guidelines

4    calculation.  But as we indicated in our sentencing memo,

5    we think the defense has to withdraw the objection because

6    they were barred from the plea agreement from making it,

7    and the plea agreement gave an extraordinary concession to

8    the defense.  It agreed to dismiss a count of production

9    which carried a mandatory minimum of 15 years.

10       So it's not an insignificant part of the plea

11   agreement, this agreement to the foregoing application of

12   the sentencing guidelines, and with all due deference to

13   Mr. Foley, he simply can't make the argument here.

14            THE COURT:  I hear you.  Now let's move to the

15   substance.

16            MR. BRESLOW:  So the Court still has to find on

17   its own whether the enhancement applies, and I think it's

18   abundantly clear from all the evidence that the

19   enhancement does apply.  Taking your first question first,

20   whether the defendant's continuation of contact with minor

21   A constitutes in and of itself obstruction of justice, our

22   position is, yes, it does.

23       But Your Honor doesn't have to rely on that because

24   there are other instances more clear of obstruction of

25   justice, but I'll address Your Honor's immediate question

1    first and that is to say it does.

2         Now the obstruction of justice guideline contains

3    examples of covered conduct and not covered conduct, and

4    it also contains application notes that discuss how Your

5    Honor should be applying the guideline.

6         The first thing that I want to say, with respect to

7    Your Honor's immediate question, is that there are at

8    least three examples of covered conduct that by analogy

9    can inform Your Honor's decision.

10        So I'm now at page 353 of the guidelines and the

11   particular guideline is 3C1.1 --

12            THE COURT:   Okay.

13            MR. BRESLOW:   -- and in particular 4(a) which

14   provides for -- which provides as a non-exhaustive --

15   among the non-exhaustive list of examples of covered

16   conduct, "threatening, intimidating," and this is the

17   point that matters, "or otherwise unlawfully influencing a

18   witness or attempting to do so."

19        And I think that it should be abundantly clear that

20   when the defendant is served a restraining order,

21   arrested, subjected to a search by consent, arraigned in

22   not one but two state courts and then issued restraining

23   orders, pretrial release orders that carry conditions that

24   he not contact the primary victim and therefore the

25   primary witness in those two state cases, that when he

Case: 21-1292  Document: 00117898344  Page: 178  Date Filed: 07/15/2022  Entry ID: 6507951
Case 3:10-cr-30008-MAP  Document 99  Filed 12/28/11  Page 27 of 101

27

1    continues to contact her and in particular in the manner
2    in which he did, laying aside whether in fact he actually
3    said I want you to deny that we ever engaged in any sexual
4    conduct, laying that aside, just confronting the fact that
5    he continued to maintain what can only be characterized as
6    persistent daily contact with her through e-mails and text
7    messages, I'm talking hundreds of hours of time on the
8    phone, and plots, schemes to meet with her surreptitiously
9    without the knowledge of law enforcement or her family,
10   the people who are truly looking out for her, that all of
11   this taking as a whole constitutes unlawfully influencing
12   a witness.
13       He is engaging in a relationship with the primary
14   witness against him in two separate state cases, and so I
15   don't think Your Honor even has to go any further to find
16   that his conduct, regardless of whether he actually had to
17   tell her to lie or not, falls within 4(a), unlawfully
18   influencing a witness or attempting to do so.
19       In addition, I think that there are two other
20   examples of covered conduct that apply by analogy, and the
21   second is (f), "providing materially false information to
22   a judge or a magistrate judge."
23       I'd submit that when the defendant essentially agrees
24   to be released on the primary condition that he not
25   contact minor A and he does so repeatedly in the manner

**G.App.175**

1    that we have described, he knows full well when he's in

2    court in Massachusetts and in Connecticut and he is

3    released on the condition that he not contact her again,

4    he knows that's false.

5        He knows it's a lie.  He knows that he's going to go

6    out and he's immediately going to resume contact with her

7    because in fact that's exactly what he did.

8        So by analogy, Your Honor, I think you can find that

9    he was providing materially false information to the

10   judges who released him on the assumption that he would

11   honor the conditions of his pretrial release, which he

12   clearly flouted in persistent and horrible ways.

13       Then the third provision that I think applies by

14   analogy is (j), "failing to comply with a restraining

15   order or injunction issued pursuant to 21 U.S.C. Section

16   853(e)."

17       Now these deal with property with injunctions of

18   property, but I think by analogy it can inform the Court's

19   decision.

20       The defendant is essentially failing to abide by

21   clear orders, either a civil restraining order but more

22   importantly criminal pretrial release orders, to not

23   contact the primary victim and the primary witness in the

24   case against him, and by doing so he is unlawfully

25   influencing that witness.

Case: 21-1292    Document: 00117898344    Page: 180    Date Filed: 07/15/2022    Entry ID: 6507951
Case 3:10-cr-30008-MAP  Document 99  Filed 12/28/11  Page 29 of 101

29

1      Even if he never said, look, I want you to -- I want

2    you to lie and deny that we've met, deny that we've had

3    sex, that's exactly what he's doing when he maintains

4    contact with her.

5      He's keeping her under his spell.  He's keeping her

6    close.  He's keeping her in a manner that she will not be

7    able to do the right thing and stand up against him when

8    time comes, and you know what?  He was actually pretty

9    successful because she initially didn't disclose to her

10   family or law enforcement who was actively investigating

11   the defendant at the time.  He knew that not only was he

12   under pretrial release conditions but he was a subject of

13   a federal criminal investigation, the instant

14   investigation the FBI and this office commenced.

15           THE COURT:  Well, he knew that as soon as he was

16   arrested in Chicago.

17           MR. BRESLOW:  Yes.  Exactly, and shortly

18   thereafter I sent a subject letter to -- I think it was a

19   target letter frankly to his then-counsel, the predecessor

20   to Mr. Foley.

21      So, in any event, my point is simply this:  When he

22   did what he did with minor A by calling her, texting her,

23   e-mailing her, by staying so enmeshed in her life, he did

24   so with the I think clear intent to obstruct justice and

25   prevent her from becoming a witness against him, and

Case: 21-1292    Document: 00117898344    Page: 181    Date Filed: 07/15/2022    Entry ID: 6507951
Case 3:10-cr-30008-MAP    Document 99    Filed 12/28/11    Page 36 of 101

30

1     frankly he very nearly succeeded in doing so.

2              THE COURT:  Okay.

3              MR. BRESLOW:  That's the first question.  But

4     then I think we go to the second and third aspects of his

5     obstruction of justice, and I think Mr. Foley -- there was

6     an enormous amount of discovery that the government gave,

7     including many prior statements of the witness, and among

8     that discovery that we provided there were clear

9     statements that she made in which she said on the last day

10    of their family trip to Florida when he surreptitiously

11    joined them, he told her that she did not have to tell

12    anybody that they were engaging in sexual conduct.

13         It was a clear attempt to obstruct justice and

14    influence the witness and that was disclosed in the course

15    of discovery, and that can form the basis of an

16    obstruction finding.

17         And lastly Your Honor's recalling correctly that he

18    did not testify but he submitted affidavits and the

19    affidavits were so patently false that this Court, which

20    in my experience is reluctant to find on the face of an

21    affidavit any intentional falsity, that this Court stated

22    that the affidavits were either false or clearly shaky.

23         From my perspective, as government attorney, I think

24    they were not shaky but clearly false.  They were false in

25    a number of respects.  And Your Honor may recall the

 1    testimony of the not one but two detectives of the Chicago

 2    Police Department testified at the suppression hearing and

 3    it was very clear that, according to their testimony, that

 4    he was advised of his right to remain silent and his right

 5    to counsel.  In his affidavit he said he was not.  That's

 6    black and white.

 7        He was -- he did consent or permit a search of his

 8    laptop and that was black and white because we had a

 9    consent form in which he executed a knowing, intelligent,

10    and voluntary consent to search the laptop, and that he

11    also executed a consent form to search I believe his

12    messenger bag.

13        And lastly, and this is the most preposterous of the

14    claims, that he was never informed he was under arrest.

15    He was never informed by the detectives he was under

16    arrest.  That sort of just is just so patently false as to

17    be ridiculous.

18        I have to say that when I read that claim in what I

19    think was the second affidavit, I could hardly fathom the

20    statement because the defendant was arrested.  He was

21    placed under arrest and he was booked and he was held.  He

22    was held in Chicago and he was frankly brought over in

23    custody until he was arraigned in Massachusetts and

24    Connecticut.

25        And so for him to be representing in a sworn

Case: 21-1292    Document: 00117898344    Page: 183    Date Filed: 07/15/2022    Entry ID: 6507951
Case 3:10-cr-30008-MAP    Document 99    Filed 12/28/11    Page 32 of 101

32

1    affidavit to this Court in an effort to suppress key

2    evidence in his case that he was never informed that he

3    was under arrest, it just, it just -- I don't have the

4    words to describe how patently false that is, and so I

5    think the affidavit is the third prong on which Your Honor

6    can rest a conclusion that he obstructed justice.

7            THE COURT:  Okay.  Based upon what Mr. Breslow

8    has just said, for all the reasons that he's just stated,

9    I'm going to overrule Objection No. 2.

10            I do think that Mr. Batchu engaged in a persistent

11    and determined effort to obstruct justice here.  Knowing

12    that he was in the spotlight, he was subject to a criminal

13    investigation, he continued to manipulate the victim who

14    was going to be inevitably the primary witness against

15    him.

16            He continued -- even if he did not explicitly say it,

17    I think there was a concession he said something that she

18    didn't have to testify against him.  Well, I think the

19    message is obvious.  And beyond that I do think that the

20    falsehoods that the defendant uttered in connection with

21    the suppression hearing were blatant, but I don't even

22    think we need to go there.  The attempts to obstruct

23    justice were repeated and vigorous.  So Objection No. 2 is

24    overruled.

25            Objection No. 3 is a reference to the two

Case: 21-1292    Document: 00117898344    Page: 184    Date Filed: 07/15/2022    Entry ID: 6507951
Case 3:10-cr-30008-MAP   Document 99   Filed 12/28/11   Page 33 of 101

33

1    unidentified victims.  It is sustained in part as to

2    victim B and overruled as to victim C for the reasons I've

3    already stated.

4         Objection No. 4 is overruled.  I do find that he did

5    attempt to obstruct justice.

6         Objection No. 5 is overruled in part.  The offense

7    level I think, as we have already found, is 40, not 41 and

8    not 38.

9         Objection No. 6 again refers to the two unidentified

10   minor victims and it is sustained in part and overruled in

11   part.

12        The same ruling for Objection No. 7.  The offense

13   level is -- the adjusted offense level in paragraph 95

14   should be 42.  The total offense level is 40, and to that

15   extent those two objections, that's Objection 8 and

16   Objection 9, are sustained.

17        Objection 10 has already resulted in an edit to the

18   presentence report having to do with the defendant's

19   father.

20        Objection 11 I do not need to rule on because it's

21   not going to influence my sentence in any way.  It has to

22   do with statements with regard to the defendant's

23   relationship history.  I'm not going to rule on that

24   because it's not necessary for me to rule on that.

25        Objection No. 12, I find that the sentencing

**G.App.181**

Case: 21-1292    Document: 00117898744    Page: 185    Date Filed: 07/15/2022    Entry ID: 6507951
Case 3:10-cr-30008-MAP Document 99  Filed 12/28/11  Page 34 of 101

34

1   guideline range in this case is 292 to 365 months instead

2   of the guideline range that we have here.  That is an

3   offense level 40, Criminal History Category I, 292 to 365

4   months.

5        Objections No. 13 and 14 do not require a ruling.

6   They simply indicate that the defendant will be making

7   certain arguments in favor of a lower sentence.  I don't

8   think there is -- well, I'll just have to wait and see.  I

9   do not have a motion from the government under 5K1.

10            MR. BRESLOW:  No, Your Honor.

11            THE COURT:  I don't expect I will be getting

12   one.  We will have to hear from the government on that or

13   hear from the defense on that.

14        That concludes my rulings on the objections to the

15   presentence report.  I want to go back and make sure that

16   we haven't slipped here so that there is no confusion with

17   regard to how I've gone about calculating the sentencing

18   guideline range here.

19        Group 1, which is the group of offenses directly

20   related to minor A, the identified victim here, begins

21   with the base level of 32.

22        I'm enhancing that by two points because the offense

23   involved a young woman who had not attained the age of 16

24   years and that is two points.  Two additional points have

25   to do with the fact that there was an actual commission of

**G.App.182**

1    sexual contact and so that is two more points.  So that

2    takes us from 32, 34, 36.

3        Specific offense characteristics involving the

4    knowing misrepresentation of the participant's identity,

5    in this case the defendant it is undisputed used the

6    identity of Mark Taylor.  He used a false photograph.  He

7    used a false age at least in the initial contacts, and

8    that, in addition to the other matters specified in the

9    presentence report, requires an additional two points.

10   That takes us to an Offense Level 36 -- sorry -- Offense

11   Level 38.

12       So we start at 32 and plus six is 38, and then for

13   the reasons that I've already stated, we add two more

14   points and that takes us to a Level 40 and that's for

15   obstruction of justice.

16       So Group 1 is a Level 40.  Group 2 I have eliminated.

17   I haven't been able to find -- I do not find by a

18   preponderance of the evidence that the individual depicted

19   in that particular video was under the age of either 16 or

20   18.  That individual could easily be 19 or 20 based upon

21   my observations.

22       I do find, however, that with regard to minor C she

23   was under the age of 18 and that results in a Level 36 for

24   Group 3, and the grouping then means that we start out

25   with a Level 40.  We add one point from the grouping

1    process for that and with regard to Group 3 we are at a

2    Level 36.  If we add one unit for that, that takes us to a

3    Level 42.

4        We subtract two points for acceptance of

5    responsibility and we are at a Level 40, Criminal History

6    Category I, which generates a sentencing guideline range,

7    again to repeat, of 292 to 365 months and that is the

8    kick-off guideline range.

9        There being no other objections to the presentence

10   report, I want the record to reflect that I incorporate

11   into this sentencing proceeding all of the details of the

12   presentence report.

13       I do not feel it necessary to recite all those

14   details, but I have read the presentence report carefully

15   and I have all of the particulars in mind and I

16   incorporate them into this sentencing proceeding.

17       At this point I'm prepared to hear the recommendation

18   of the government with regard to where the sentence should

19   be within that guideline range.

20           MR. BRESLOW:  Yes, Your Honor.

21       Your Honor, at the outset, I'll state that, as you

22   noted earlier, there are members of both the defendant's

23   family and minor A, members of her family, and I expect

24   that the members of minor A's family, if not minor A

25   herself, would like to address the Court --

**G.App.184**

Case: 21-1292    Document: 00117898744    Page: 188    Date Filed: 07/15/2022    Entry ID: 6507951
Case 3:10-cr-30008-MAP    Document 99    Filed 12/28/11    Page 37 of 101

37

| | |
|---|---|
| 1 | THE COURT: All right. |
| 2 | MR. BRESLOW: -- directly. |
| 3 | We are recommending that the Court impose a sentence |
| 4 | of 360 months, to be followed by 365 months of supervised |
| 5 | release with the special conditions that were agreed to by |
| 6 | the defendant in the plea agreement and specified in the |
| 7 | plea agreement and in our sentencing memo. I won't recite |
| 8 | them now because they're far too lengthy, and then |
| 9 | restitution of approximately $5.9 million which covers |
| 10 | reimbursable expenses and lost future earnings, lost |
| 11 | Social Security benefits and future expenses. |
| 12 | We would request that this restitution be ordered to |
| 13 | be paid immediately so that the United Attorney's office |
| 14 | financial litigation unit can begin to do its work in |
| 15 | attempting to locate assets, to the extent that they exist |
| 16 | that could be used to satisfy the restitution and |
| 17 | forfeiture as set forth in Your Honor's preliminary |
| 18 | forfeiture order and in the indictment. |
| 19 | Your Honor has asked about the sentence and we are |
| 20 | asking for 360 months, which I should state the government |
| 21 | recognizes is an extraordinarily long sentence and |
| 22 | possibly a sentence that the Court has not issued before |
| 23 | or in a very long period of time. |
| 24 | THE COURT: Right. I've done several life |
| 25 | sentences so this is not the longest sentence but it is a |

Case: 21-1292  Document: 00117898344  Page: 189  Date Filed: 07/15/2022  Entry ID: 6507951
Case 3:10-cr-30008-MAP  Document 99  Filed 12/28/11  Page 38 of 101

38

1  long one.

2  MR. BRESLOW:  Okay.  We recognize that it is a

3  long sentence and we recognize that it's a long sentence

4  for a human being to have to endure, but we, nonetheless,

5  think that it's necessary.

6  I think it should be noted that at the time the

7  defendant committed these offenses, he was nearly 30 years

8  old.  In other words, twice the age of the primary minor

9  victim.

10  And as Your Honor has seen from the voluminous child

11  pornography that the defendant amassed, there were many,

12  many other victims who unfortunately we'll never be able

13  to identify, including minor C, who as Your Honor noted

14  was just a child, the same way that minor A was just a

15  child.

16  At this time he was nearly 30 and he was a

17  physiatrist, a doctor, practicing in Chicago with an

18  interest in adolescent psychiatry and some pretty

19  significant prior experiences dealing with children.

20  So I think what should be abundantly clear from the

21  government's -- from the presentence memo, the

22  government's submission and also the letters submitted by

23  minor A was that the defendant used all of the tools that

24  he had acquired through his life, all of his skills, his

25  wit and his charm and his intelligence and his ability to

1    relate to people generally and children in specific.

2         That he used all of those skills to exploit minor A

3    in particular, in addition to minor C and possibly others,

4    in the collection that he had amassed.

5         She was only 15 at the time, and as Your Honor noted

6    he used -- he lied to her repeatedly.  He used a fake

7    name, a fake age, a fake photograph.

8         It is very hard for -- it may be very hard for the

9    Court to imagine how a 15-year-old girl in the prime of

10   her life, happy in school and with a supportive family and

11   friends, could end up sort of under the sway and the spell

12   of a man like the defendant.  But when you look at the

13   sheer volume of text messages and phone time that this

14   defendant spent, you begin to realize that he truly did --

15   to borrow the phrase of minor A and her family --

16   "brainwash" her.

17        He completely turned her upside down and in doing so

18   caused her to engage in conduct that she would never have

19   engaged in and that he should never have engaged in.

20        He committed at least four statutory rapes of minor

21   A, at least on four separate occasions repeatedly I would

22   submit at least on some of those occasions.

23        The first was on May 1st to 2nd when he flew to

24   Hartford, Connecticut and then drove up to Western

25   Massachusetts, transported minor A back to the Bradley

1    area and he engaged in contact with her.

2        After that her parents notified the local police and

3    minor A notified the defendant and said to him the police

4    know about what happened, and the defendant frankly was

5    undeterred and he returned approximately two weeks later.

6        Your Honor, I think in order to sort of appreciate

7    the gravity of the crime and the need -- the necessity to

8    incapacitate the defendant, I think Your Honor has to put

9    yourself, if you can, in the mind of the defendant on

10   about May 21st or 22, 2003 because what he did he was in

11   Chicago and he didn't fly to Hartford as he did.  He got

12   into his car, the very car that Your Honor will be

13   forfeiting --

14            THE COURT:  His Lexus.

15            MR. BRESLOW:  His Lexus.  -- and he drove all

16   the way to Massachusetts.  That is a very, very long car

17   ride.  That is a lot of time for you to think about what

18   you're doing, and that is a lot of time to consider and

19   reflect and think about whether it is really a good idea

20   to be meeting this minor whose parents have notified the

21   police, but that's exactly what he did.

22       He got in his car and he drove all the way to meet

23   her so that he could engage in sexual contact with her

24   again.  And then, as we know, he was ultimately served

25   with a temporary restraining order and then a permanent

1    restraining order, and then on or about June 9th he was

2    arrested by Chicago police and he made admissions to the

3    Chicago police.

4        He was held in Chicago.  He was transported in

5    custody to Massachusetts and he was arraigned there.  So

6    he was brought in.  He had a lawyer and a judge, a judge

7    just like you, sitting in Massachusetts state court,

8    decided to release the defendant on his pledge that he

9    would, among other things, not contact minor A.

10       And after he was done in Massachusetts gaining his

11   release, he went to Connecticut the very next day and

12   appeared before another judge just like you and he said

13   the same thing essentially - I will not contact minor A

14   again.  I understand.  I have now committed or been

15   alleged to commit two statutory rapes of a minor.  I'm not

16   going to contact her again.  I've got two criminal cases.

17       So he was released and he went back to Chicago and

18   what did he do?  He continued to contact minor A.  And

19   when I say he continued to contact minor A, contact is a

20   very sort of neutral term.  He continued to communicate

21   with minor A, but what he was doing was pursuing his

22   illicit relationship with her.  He was influencing her as

23   a witness and he was flouting the court's orders, four

24   frankly orders by my count, two restraining orders and two

25   pretrial release criminal no contact orders.

1     And as shocking as it is to recount, his family --

2 her family thought that they were -- they had the worse

3 behind them, and they went to Florida to take a little

4 vacation in July and they thought, you know what, we just

5 need a break. We need to get our family together. We

6 need to regroup and we need to just escape this total

7 chaos that our life had become and astonishingly he booked

8 a flight and a hotel and rented a car and he went down to

9 Florida and he engaged in sexual contact with her again

10 unbeknownst to the family and law enforcement.

11     He returned to Chicago. She returned to Western

12 Massachusetts, and then he had to come back. He had to

13 come back to this area so he could appear in court and the

14 court case was in Connecticut. So he flew into Bradley

15 and instead of staying in Connecticut, he crossed state

16 lines again.

17     He came up here to Western Massachusetts and engaged

18 in a pretty horrendous exploitation of a young minor, who

19 frankly deserved a lot better from somebody who professed

20 to be caring for her. Just horrendous conduct, and then

21 when he was found by the police in violation of a

22 restraining order, he gave them some bogus story about how

23 he was at the mall so that he could go to a Chinese

24 restaurant and that was basically the first of probably

25 the third instance of his lies.

**G.App.190**

1      And unbeknownst to minor A, unbeknownst to minor A,

2 not only was he deceiving her through his age and what he

3 really looked like initially and what his real name was

4 and who knows what else, but he was surreptitiously

5 recording their sexual contact, some of which had occurred

6 remotely by web cam.

7      So the deceptions just piled up. He was deceiving

8 the minor. He was deceiving her family. He talked to at

9 least two members of her family directly over the course

10 of this truly perverted courtship, and he deceived the

11 courts and he deceived law enforcement, and lastly he

12 deceived you, this very court in an attempt to suppress

13 evidence that would lead to his conviction.

14      So for all of those reasons, this is just a

15 horrendous crime and the minor has suffered tremendous

16 harm, which is synopsized in our sentencing memo. I won't

17 belabor it now. I think that the minor and/or family can

18 address the Court best themselves on this point.

19      And the victims, the other victims of the crime, this

20 poor child, minor C, doesn't even know and we will never

21 be able to contact her, she doesn't even know that, you

22 know, the agent has seen her image; that I've seen her

23 image; that the defendant has saved, you know, had this

24 image on his computer and now Your Honor has seen her

25 image.

1          So in terms of the factors that Your Honor has to

2     consider, the seriousness of the harm -- of the offense is

3     I think just utterly grave.

4          And focusing on the history and characteristics of

5     the defendant, which is the second factor, statutory

6     factor that Your Honor has to consider, I think that what

7     seems to be really clear, and I think this drives the

8     government's sentencing recommendation and perhaps Your

9     Honor's sentence in the end, is that this defendant cannot

10    control himself.

11         That no order of the court would limit the

12    defendant's ability to contact at least minor A, if not

13    other minors.  We just don't know, but just focusing on

14    the one child that you have before you, minor A, it's

15    really clear that no amounts of family intercession, no

16    amounts of police intervention, no amounts of court orders

17    would keep this defendant away from this minor, and that's

18    really scary.  That's really scary to the minor and it's

19    really scary to her family and it's scary to the

20    government, and I hope it frightens Your Honor because,

21    because a lot of the conduct that occurred was -- could be

22    deemed as non-forceble.

23         I won't say that it was consensual contact with

24    consent as we would normally talk about consent, but it

25    was non-forcible.  These statutory rapes were

Case: 21-1292    Document: 00117898344    Page: 196    Date Filed: 07/15/2022    Entry ID: 6507951
Case 3:10-cr-30008-MAP   Document 99   Filed 12/28/11   Page 45 of 101

45

1    non-forcible, but what happens when minor A finally says,

2    you know what, I don't want you in my life anymore, as I

3    believe she is -- she is at this point and he's out there

4    and he's released.  Well, who knows.

5         The one thing we know is that the defendant is really

6    not deterred by the threat of incarceration and so it's

7    really scary to conceive of a time when in this minor's

8    life when he's out and he's released, and I think minor

9    A's mother attempted to depict in her sentencing letter

10   the terror that she and her family felt when they realized

11   that he was going to be released from custody in his state

12   case because he had made bail.

13        I mean, that's just a terrifying moment in the life

14   of this family when they think that a man who has so

15   exploited their daughter is out and released again, when

16   he had -- when he had so clearly established that he

17   couldn't abide by the law and keep himself away from their

18   daughter.

19        And so I know -- I expect that Mr. Foley will stand

20   up and Mr. Foley will say he's got no criminal history,

21   and my argument to you is that's irrelevant.  The

22   defendant doesn't have to have a criminal history for Your

23   Honor to determine that he's a recidivist.

24             THE COURT:  Well, he's getting credit for having

25   no criminal history --

1          MR. BRESLOW:  Already.

2          THE COURT:  -- by being in Criminal History

3    Category I.

4          MR. BRESLOW:  Exactly.  That's an excellent

5    point.  He falls within Criminal History Category I and

6    that's because he doesn't have a prior conviction and

7    that's credit enough.

8       But in terms of a variance based on the fact he's got

9    no criminal history, I think that this case makes

10   abundantly clear to the Court that he has a history and

11   the history is he can't abide by court orders.  He can't

12   abide -- he can't control himself with respect to this

13   victim, this minor, and he's dangerous and he needs to be

14   incapacitated for by the government's estimation 30 years.

15      In the government's view he is a true persistent sex

16   offender and a recidivist and he's highly likely to

17   recidivate again when he is released from prison whenever

18   that is.

19      And the other facet of his personal history is that

20   there doesn't really seem to be anything mitigating what

21   I've already talked about.

22          THE COURT:  Right.

23          MR. BRESLOW:  He wasn't under the influence of

24   drugs or alcohol, or he didn't appear to have any history

25   of mental or emotional health problems.  He had no

Case: 21-1292    Document: 00117898344    Page: 198    Date Filed: 07/15/2022    Entry ID: 6507951
Case 3:10-cr-30008-MAP    Document 99    Filed 12/28/11    Page 47 of 101

47

1  physical health problems.  He's bright; he's well

2  educated; he's talented beyond, beyond most people's good

3  fortunate.

4    His sentencing letters, I've read them carefully and,

5  you know, they are pretty consistent.  He was a charming,

6  witty, intelligent, talented guy - the kind of guy who you

7  could see somebody wanting to like, you know, somebody

8  wanting to be around.

9    All of those talents he put into the exploitation,

10  the very successful exploitation of a really innocent

11  child, and so there doesn't seem to be anything mitigating

12  a harsh sentence here or an appropriate sentence, which we

13  think is 30 years.

14    And for the other statutory factors, the seriousness

15  of the offense, the respect for the law, just punishment,

16  and most importantly the deterrence and protection of the

17  public, that's the key one that I want to emphasize is

18  that this really isn't about exacting a pound of flesh for

19  minor A or minor A's family, although they may feel that

20  genuine desire.

21    It's about the need to incapacitate this defendant.

22  It's about making sure that he never, ever harms another

23  family and another child the way he's harmed this family

24  and this child, and that's why we're asking for 30 years

25  and that's why we're asking for a supervised release term

Case: 21-1292    Document: 00117898344    Page: 199    Date Filed: 07/15/2022    Entry ID: 6507951
Case 3:10-cr-30008-MAP Document 99    Filed 12/28/11    Page 48 of 101

48

1    of 365 months with all those conditions.

2         I'll note, Your Honor, that the defendant has agreed

3    to a period of supervised release of at least 15 years or

4    of 15 years with all those conditions.

5              THE COURT:  All right.  Thank you.

6         Let's for a minute talk about what's the best way to

7    proceed here.  Ordinarily, Mr. Foley, I would hear from

8    you next.  Mr. Breslow has made reference to the fact that

9    there are family members who would like to be heard and

10   perhaps victim A herself, I don't know.

11        Would you prefer to be heard now or would you prefer

12   to have the government's --

13             MR. FOLEY:  I think the government should go

14   forward with their case and then I will go forward with my

15   case.

16             THE COURT:  Fine.  Mr. Breslow, if you have

17   people who would be -- who are interested in addressing

18   the court, the law gives victims the right to be heard

19   before I decide the sentence.  Even if it didn't, I would

20   be interested in hearing from people who wish to speak.

21        This is obviously a very difficult situation and I'm

22   hoping that people could keep their remarks to three or

23   four minutes or something in that ballpark.  I'm not going

24   to cut anybody off, but I'm hoping we can keep it to

25   roughly that amount of time.

Case: 21-1292    Document: 00117898344    Page: 200    Date Filed: 07/15/2022    Entry ID: 6507951
Case 3:10-cr-30008-MAP  Document 99  Filed 12/28/11  Page 49 of 101

49

1         So, Mr. Breslow, just let me know who you think would

2    like to be heard and I'm happy to hear from anybody who

3    wants to speak.

4              MR. BRESLOW:  May I have just one moment to

5    consult?

6              THE COURT:  Yes.

7              MR. BRESLOW:  May I request the Court's

8    permission for minor A's father to sit --

9              THE COURT:  Sure.

10             MR. BRESLOW:  -- to sit here at counsel table?

11             THE COURT:  No problem.

12             MINOR A's FATHER:  Thank you, Your Honor.

13        This horrendous episode has had a devastating effect

14   upon my family.  My daughter has not been able to attend

15   school with any regularity.  She did not graduate last

16   year as she was supposed to and has had to retake her

17   senior year starting over again this year.  Tending to

18   classes has been a real problem, as she is unable to

19   attend and face her classes.

20        She is depressed, guilt-ridden, which keeps her from

21   functioning in a normal way.  I fear that she will not

22   finish high school and that she will be unable to provide

23   for herself.  She -- excuse me, Your Honor.  She spends a

24   good part of days lying in bed having a very hard time to

25   get moving.  It is very painful to see my daughter curled

1     up in bed unable to function.

2          She has been brainwashed and made to believe that she

3     cannot do anything without him.  Many nights she has

4     nightmares in her dreams fearing that she will be

5     abducted.

6          The loss of her brother, who was very close and

7     protective of her, has added to the problem.  He was

8     worried about her well-being and the possibility of her

9     being kidnapped.  This worrying consumed and added to his

10    anxiety in life that pushed him over the edge, resulting

11    in his taking his own life.

12         My older daughter has been so upset with these

13    episodes that her classes at college were incomplete and

14    will have to be completed this year.  My sons also in

15    college and have had trouble with their grades and have

16    had difficulty keeping focused on their work and

17    schooling.

18         I find that everyone in the family, including my wife

19    and myself, find it hard to maintain a clear mind.  It's

20    been very difficult for everyone to worry about her being

21    abducted or doing harm to herself.

22         It's very hard and difficult for me to put into words

23    the pain and torment that I and my family have had to go

24    through.  It has taken a great toll on our family's health

25    and well-being.  This man needs to be put away where he

**G.App.198**

1    can do no more harm to young girls and bring such pain and

2    anguish to their families. Respectfully submitted, Your

3    Honor. Thank you.

4           THE COURT: Thank you, sir.

5           MINOR A's MOTHER: Your Honor, I brought my son

6    with me. He stays close to me, and I wanted him to be

7    heard and represented today because he did pay the

8    ultimate price.

9      I want to start by reading *****'s statement. She

10   said, "My whole world flipped upside down the moment Mani

11   came into my life. Being young and naive, not knowing any

12   better, he made me trust him and believe every word he

13   said to me. Lying to me about simple things which grew to

14   much more.

15      "He made a fantasy that only a little girl would

16   want; telling me I'd have every dream and anything I ever

17   wanted, making my future so secure, promising me things

18   and sending me gifts to get me closer to him.

19      "Spending hours and hours talking to me every day

20   making sure he was always there so I would think he was

21   the best thing that ever happened to me and so I would

22   trust him. During his work hours with his patients and

23   even at night he'd still be there talking to me. He was

24   always just a text message or a phone call away. Only a

25   little girl would want that type of attention and that

Case: 21-1292    Document: 00117898344    Page: 203    Date Filed: 07/15/2022    Entry ID: 6507951
Case 3:10-cr-30008-MAP  Document 99   Filed 12/28/11  Page 52 of 101

52

1    type of promises.

2         "Overall you got my trust and you got me to love you,

3    making yourself the most important thing in my life.  You

4    got me to do things a 15 year old shouldn't ever know

5    about, and you were on the other side of the camera as an

6    entirely different person disrespecting me.

7         "When you reveled your true self, you sent me a

8    picture over the computer.  I knew things weren't right,

9    but you kept me on the phone and you tricked me once again

10   making me feel guilty, when my gut, as a little girl, knew

11   everything was not right.  Convincing me that everything

12   was okay with a sob story and crying that everything

13   you've told me was true.

14        "When my family started to find out about you, you

15   still didn't give up on me and kept drilling things into

16   my head telling me when I was 18, that everything would be

17   okay and that we'd move in together and have a wonderful

18   life without my family.  Turning me against my family,

19   making me think my mom didn't want me to be happy, but she

20   just wanted to take everything away from me.

21        "When it came down to it for me to talk to the

22   police, you got me to lie for you until the true facts

23   came up and broke me.

24        "The impact that you have caused my family and I is

25   unbelievable.  You did a very good job ripping my family

**G.App.200**

1    apart and ripping my life to shreds.  Over the past three

2    years it has been an extremely long and difficult haul,

3    and I never thought I would be sitting here right now

4    typing this.

5        "For the first year and a half, it was a challenge

6    with trying to figure out what was real and who was

7    telling the truth.  Feeling so guilty thinking that I did

8    this to you and put you where you are today.

9        "I couldn't go to school because everyone knew what

10   was going on and kids were bothering me about it.  I lost

11   almost all of my friends because of you.  You made me

12   think I was worthless and disgusting.

13       "I constantly have panic attacks and be so scared to

14   be alone thinking that you sent someone out to grab me.

15   Until this day I still can't focus on things that I need

16   to do.  I can't arrive at school like everyone else in the

17   morning.  I don't have the energy to do what normal

18   teenagers can do.

19       "I feel like I can't trust anyone in this world.

20   There are so many deep emotions that probably will always

21   be there, and I don't know how to solve it or even know

22   what they are.

23       "You've turned my home into bad memories.  My home

24   will never be home again.  You've haunted me until today

25   thinking that you're behind me, following me, even in my

**G.App.201**

1    bedroom standing over me when I'm sleeping.  I still wake

2    up from nightmares and have frequent panic attacks from

3    what you have done.

4        "You made everything in this world about you –

5    placing bad memories every single place I go.  You used

6    songs that are always on the radio, stores in the mall, my

7    entire home and made them all about you.  My family has

8    taken a huge toll from you as well.  It has ripped our

9    family apart."

10       This is my statement:  I constantly ask myself the

11   question how someone could so selfishly destroy someone's

12   life and the lives of all their family and friends in

13   pursuit of one's pleasure.

14       My daughter, our family, are the joy of our lives.

15   She was always happy, peaceful, a joy to be with until her

16   world changed.  You crept into her life and purposefully

17   groomed her to be your captive.  You slowly led her down a

18   path which took her away from us.

19       Your training in child psychiatry gave you all the

20   ammunition and tools you needed.  You were a professional.

21   You were trained in all the areas of the mind.  You knew

22   exactly what you were doing and what the results of that

23   action would be, and I honestly feel that the only reason

24   you took on this training was to be the best at what

25   you've done.  I do not think you ever pursued a medical

1   degree to help people.

2       You met her on line.  You knew that she was a

3   vulnerable person, someone with significant learning

4   disabilities.  Your training allowed you to find someone

5   who was trusting and naive.

6       As her language-based teacher explained to me, she

7   believed that other people thought as she did.  She was

8   honest and caring.  Her perspective of the world was that

9   other people were as well.  Never would she have

10  contemplated that someone with Mani's perspective existed.

11      She projected innocent trust and caring spirit in

12  your dark designs, that was exactly what you wanted.  You,

13  a 29-year-old doctor, who took an oath to help people set

14  out on your path to destroy her.  You convinced her to

15  tell no one about your secrets.

16      You would call her in the middle of the night.  She

17  would go to the sofa and she would spend hours on the

18  phone sometimes until as late as 6 a.m. in the morning for

19  a period of time of four hours.  When I looked at the

20  phone records, that phone line had been connected despite

21  the fact she was sleeping.

22      You brainwashed her.  We have seen the effects of

23  this.  There's no question.  How could you live with

24  yourself knowing you brainwashed her?  You altered her

25  mind.  How did this child ever have a chance to survive

**G.App.203**

1   what you put her through or what you demanded of her?

2        You controlled her through music.  You barraged her

3   with constant texts or e-mails that included music or

4   music videos, knowing, as you did, that music is a very

5   potent medium for adolescents.  She would associate the

6   music with various concepts you implanted in her brain,

7   thus music became an association with another thought,

8   another way that you would anchor you to her very being.

9        You did this purposefully knowing the powerful

10  message that music was in a young, vulnerable mind.  Every

11  song she heard was somehow connected to you.  She could

12  not even listen to music because it was just devastating

13  how that controlled her.

14       You told her subliminally that her purpose in life

15  was to provide pleasure to men.  That she only existed for

16  that purpose.  It took her two years to realize that you

17  had implanted those thoughts into her very being; that she

18  could not succeed in school without you.  She had been an

19  honor student prior to meeting you.  After this occurred,

20  she did not think she could finish a class without your

21  help.

22       She -- because of all this unknown brainwashing that

23  has occurred, we have no way to determine how it has

24  affected her or will affect her.  We do know that slowly

25  she's realizing how you destroyed her mind and you've left

1    her feeling guilty, worthless, angry, and unable to live.

2        And I honestly think he implanted that she could not

3    succeed at school.  I think she fights that every day.

4    She's not a normal child who tries to go to school.  She

5    has to overcome all the thoughts that were implanted in

6    her brain that told her she couldn't do this.  She could

7    not be independent.  She could not survive without him.

8        For the most part, she lives in her room suffering

9    with anxiety and fear.  I believe that all the

10   subconscious control -- suggestions and controls you

11   created during her sleep control her world.

12       I remember May 23, 2009 when Mani had returned to

13   Amherst for the second time and came to the conservation

14   area which abuts our home.  He had come to bring her a

15   secret cell phone because I was taking her cell phone

16   away.  He wanted to make sure he would always be able to

17   stay connected with her 24 hours a day.

18       That night after we realized that Mani was there and

19   the Amherst police had gone and discovered that he had

20   been at the hotel, my three boys spent the majority of

21   that night driving looking in hotel parking lots for his

22   car.  Our family was just devastated that this could have

23   happened to her and we were very fearful that he was

24   coming back to kidnap her.

25       I remember a day going to the school to pick her up

```
 1    from school and walking into the office and seeing a man

 2    of Indian descent and not really thinking about it but she

 3    wasn't where she was supposed to be, I panicked.  I

 4    panicked and ran down the hallways worried not knowing who

 5    was coming, what was coming.  There was no rationale with

 6    anything with this.  I didn't know who he was.  I didn't

 7    know what he was.  I didn't know who else he might

 8    involve.

 9        I knew he was a doctor.  I knew his livelihood, his

10    life was at stake, and in my mind I felt certain that he

11    would do anything to stop this from going forward.  And

12    when he had told her when we went to the police originally

13    that he did not care, nothing would keep them apart, he

14    blatantly felt he controlled her and nothing would stop

15    that.

16        So we were dealing with an unknown and you can just

17    imagine our horror, unable to sleep at night, worrying is

18    somebody coming into the house, what's going to happen

19    next and trying to keep her protected, which is almost

20    impossible to do and keep all of the technology away.

21        When we were in Florida on vacation, we felt we were

22    going to have a respite and he came.  And the way we knew

23    something was wrong was that she, who has a very sweet

24    nature, was all of a sudden fighting and arguing and

25    sneaking off and running off.  So our vacation was spent
```

**G.App.206**

1    trying to find her and when you're at the beach, it's

2    impossible.  You can go anywhere.

3         You know, to later hear what he convinced her to do,

4    he had no respect for her.  He defiled her in every way he

5    possibly could in public places.  As she said, no 15 year

6    old should even know about things that he asked her to do,

7    nonetheless to have no ability to even understand because

8    he controlled her so deeply.

9         She couldn't say no even though I said to her, "I'm

10   worried he's going to take you."  She understood that.

11   She was fearful he was going to take her but when she saw

12   him, it was like she had been under hypnosis and she just

13   complied with whatever he had requested.

14        And then, you know, the day that he appeared in the

15   mall, I thought that's it.  I don't even -- he's here.

16   He's in a rental car.  We don't even know what

17   description.  How would we find her?  I mean, we spent 15

18   minutes at the mall searching for her.  How would we find

19   her?  Fortunately my children all came so there were many

20   of us who had spread out and they searched and they could

21   not find her.

22        Finally he came around the corner and my son spotted

23   him and he spun around and tried to associate with another

24   man who said, "you're not with me."  He begged me to let

25   me talk to him and I said to him, I've asked -- I asked

1   you to talk to me when you first took her on May 1st.

2   Prior to that I had had a phone conversation with him

3   because I told her she could not continue to talk to him

4   if I did not talk to him.

5       I had that phone conversation with him.  He pretended

6   to be a high school student who was a senior in South

7   Hadley.  He pretended that his father -- well, he said his

8   father was dying of cancer, which his father did die of

9   cancer.  My husband had a similar diagnosis so I felt

10  like, you know, she is trying to help him.  It's a phone

11  conversation, but he lied.  He lied about who he was; he

12  lied about what his age was.

13      When she came home and I found out she had been with

14  him, there was an elaborate story and I said -- I called

15  his phone and I said, "you need to call me."  I told her

16  that night I needed to meet with her and him.  If he was a

17  high school kid, I needed to meet him.  I needed to know

18  what was going on.

19      I, as a parent, was not going to back down and I told

20  him "if you do not respond by Wednesday, I am going to the

21  police."  On Sunday the phone was shut off and I felt a

22  little stupid going to the police station, but I felt I

23  had to lay a very clear message that what I said I meant.

24  I went to the police station and that night we found out

25  that it was a prepaid phone.  There was no one by the name

Case 3:10-cr-30008-MAP    Document 93    Filed 12/28/11    Page 61 of 101

1    of Mark Taylor which was the first my daughter knew of

2    this alias.

3         It's just been one deception after another of a man

4    who was so highly skilled and trained that the day that he

5    was to be released in Northampton, I spent eight hours on

6    the phone.  We had -- we had filed a case in Florida.  I

7    was pleading with everyone, is there any way that you can

8    detain him?  Is there -- because I had originally thought

9    if he was released in Northampton that he would then have

10   to go to Connecticut but that there was some technicality

11   that that didn't happen.

12        So I was pleading.  I pled with the prosecutor in

13   Connecticut.  He offered to place our family in the

14   witness protection program.  That's how strongly I felt

15   because I felt if I could control her, I would have a

16   chance.  But where I couldn't control her, I had no

17   chance.  If he came back, and as his notebook later

18   revealed, he was planning on taking her.  She would have

19   been gone.  That would have been the end.  I couldn't let

20   that happen.

21        The children going to school because of the way

22   things got released in the press, which I would plead with

23   the press that they should not in any way try to identify

24   these children because kids knew and my kids were

25   harassed.  The kids would say horrible things under their

1    breathe to my daughter, to my son who had to protect her,

2    horrible things.

3         I don't care what the school does.  They can't stop

4    that and people don't understand.  They hear that someone

5    is a victim and they all want to play devil's advocate.

6    They don't understand what was involved.  People say,

7    well, couldn't you have just let it go?  And I said, there

8    was nothing to let go.  I didn't even know what this was

9    when it started.  Honestly if he had heeded our word and

10   left, we wouldn't be here today, but he could not stop.

11        The children have had to endure things through the

12   school system which they shouldn't have had to, but

13   unfortunately for victims there is no way to notify the

14   school that really this is happening in their lives.

15        You know, these poor kids had to endure so much.  And

16   honestly if I knew now what I know then, you're in the

17   middle of an investigation as a parent, you're not given a

18   lot of information, you're trying to understand what's

19   going on, you're trying to determine the best course for

20   your child, I innocently thought in the beginning if I

21   could just mix up her life, she'd forget about this, but I

22   didn't realize how deep the tentacles went and how this

23   controlled.

24        Unfortunately we lost our son November 14th of 2010.

25   He died of a self-inflicted gunshot wound, and we know it

1   was a very impulsive act and I know that once it was done,

2   he said, "what did I do?"  But he was a kid who couldn't

3   handle anxiety.

4       He, as a normal student, struggled sleeping at night

5   with anxiety, but he was so devoted to his sister and he

6   was so worried for her that he couldn't, he couldn't go

7   on.

8       The teacher who worked with actually both of my

9   children at the high school for four years commented that

10  Jeff saved her life; that was her first comment when she

11  heard that he had passed, and she knew that Jeff worked

12  tirelessly to try to protect her and to help her.

13      I wrote as a victim she received minimum help from

14  the school system.  She had teachers who were supportive,

15  but the administration closed their eyes in what was

16  happening.  Only when my son died, did they realize how

17  challenged we were.  Only then did they understand my

18  fears.

19      There should be a system in place to help these

20  victims.  After all these children have given to the world

21  and cooperating with authorities, these children should

22  not be left behind.  Bullying should not be allowed to

23  happen.

24      These children should be protected and any help

25  necessary to educate them for their future should be

**G.App.211**

1    provided.  This type of crime needs to protect the

2    victims.  Our world needs to be educated to understand how

3    heroic these children are.  They are making the world a

4    better place for other children; their needs should not be

5    forgotten.

6         This type of crime is especially difficult because it

7    is a secret.  To protect my daughter, we've told as few

8    people as possible about the situation, only essential

9    people.  We, as a family, have had to continue as if

10   nothing had happened.  Yet, the trauma we've experienced

11   is intense.  It's difficult to go through this without

12   support.  Many of the problems we've encountered in moving

13   forward were because of the lack of support.

14        In losing my son, the shock and trauma have felt like

15   a traumatic brain injury.  I could not perform the routine

16   tasks I was accustomed to performing.  I could not

17   manipulate data in my head.  I could not focus or

18   comprehend what was being said to me if the conversation

19   was more than 15 minutes long.

20        I had someone tell me that what I experienced was

21   like a heart attack.  No one could know how deep the

22   effect was except me.  My entire family has experienced

23   this.  My daughter in her young age has had to try to put

24   her life together step by step through this.  It is a long

25   and arduous task for an adult.  I can't imagine how

Case: 21-1292    Document: 00117898344    Page: 216    Date Filed: 07/15/2022    Entry ID: 6507951
Case 3:10-cr-30008-MAP    Document 99    Filed 12/28/11    Page 65 of 101

65

1    difficult it is for an adolescent.  No one ever can

2    imagine the pain.

3        Most of all, I worry for my daughter who's had to

4    endure this horrible crime.  Her life is permanently

5    affected.  I worry for her when I'm gone.  I struggle to

6    maintain a life insurance policy to help provide for her

7    future.  She's not been able to attend school.  The course

8    work she's completed is minimal.  The furthest she's gone

9    in math is algebra 1; the furthest in science is biology.

10       We are doing everything in our power to help her

11   graduate and educate her but the course is unclear.  She's

12   struggled so much at times I have had to help her with

13   school, exams, and it is sometimes just difficult to know

14   what she needs.

15       She's been so depressed at times that she can't move.

16   She's had anxiety attacks where she can't breathe and is

17   shaking.  She's tried to take her life.  The problems go

18   on and on.  What is the worth of a human soul or of a

19   young child whose adolescence was taken away, of damages

20   so deeply embedded in her spirit?

21       Judge Ponsor, I am requesting that you impose the

22   sentence of the maximum amount of time.  This man has

23   never shown remorse.  He is so intelligent that he was

24   able to pursue a medical degree.  With that degree he

25   served missions and orphanages in foreign countries.  His

**G.App.213**

1    notebook, which was confiscated by authorities, confirmed

2    our worst fear.  He did notate that his plan was to take

3    her.  We are fortunate that he was stopped.

4         I'm thankful for all the many people who worked

5    tirelessly on this case and for the protection of our

6    daughter.  I have requested a reimbursement for future

7    projected expenses and expenses that we've incurred.

8    There's no amount of money that could ever restore my

9    daughter's life, my son's life, or our family.  The damage

10   is immeasurable.

11        Please impose the longest sentence to keep the man

12   where he belongs - incarcerated.  This will give our

13   daughter safety from him and the chance to begin healing

14   and the safety to all other children.

15             THE COURT:  Will anyone else be speaking?

16             MR. BRESLOW:  No, Your Honor.

17             THE COURT:  We've been going for quite a while

18   now and I want to take about a ten-minute recess, and then

19   we'll come back and we will hear from Mr. Foley.

20             MR. FOLEY:  Thank you, Your Honor.

21             THE COURT:  I'm counting on everyone to continue

22   behaving in a restrained and respectful way during this

23   recess, and we'll come back here let's make it 2:15.  See

24   everyone back here at 2:15.  All right.  Court's in

25   recess.

1    **(A recess was taken at 2:01 until 2:34.)**

2    **(The defendant is present.)**

3              THE COURT:  I thank you for your patience.  That

4    went on a bit longer than I planned, but we are back

5    again.

6         Mr. Foley, I'll hear you.

7              MR. FOLEY:  Yes, Your Honor.  I ask that Mr.

8    Batchu be able to address the Court from the box?

9              THE COURT:  He can address me right from

10   there.

11             MR. FOLEY:  He's going to do a written statement

12   that he's going to read to you, Your Honor, as well as

13   there's some specific facts that we want a present in a

14   question-and-answer format.

15             THE COURT:  Okay.  I haven't done that before.

16   Are you saying that Mr. Breslow would be able to

17   cross-examine?

18             MR. FOLEY:  Well, I presume in the course that

19   he would because it would be facts that would be presented

20   to the Court.

21             THE COURT:  Well, all right.  I've never done

22   this before.  I've never had a defendant take the stand.

23             MR. FOLEY:  It's not normal, Your Honor.  I

24   agree.  I think this is the first one I've done in

25   probably a hundred sentencings.

**G.App.215**

1            THE COURT:  Mr. Batchu, if that's what you want

2      to do, we will allow you to do that.  The stakes are very

3      high here.  If that's what you and your attorney have

4      decided that you would like to do as an approach, we'll

5      let you do that.

6            THE CLERK:  Raise your right hand.

7      **Mani Batchu (sworn)**

8            THE COURT:  Okay.  Now let's back up.  I'm

9      assuming you're going to question?

10           MR. FOLEY:  Well, he's going to directly address

11     you, Your Honor, with a written statement he had prepared.

12           THE COURT:  Okay.

13           MR. FOLEY:  And then after that I'll stand back

14     up and then address him and we'll go back and forth on

15     normal direct.

16           THE COURT:  All right.  We'll see how this goes.

17     This is a new one on me.  We'll let Mr. Batchu make his

18     statement and then if you wish to follow up with any

19     questions, we will give you a chance to do that.

20           MR. FOLEY:  Thank you, Your Honor.

21           THE DEFENDANT:  Your Honor, distinguished

22     members of the court, and United States government, family

23     members present, and especially the victim and her family.

24        Umm, first and foremost, I think to pay our respects,

25     we've lost two loving important individuals today on both

1    sides of today's case, a brother, a son, for the victim

2    and victim's mother, and my father for the Batchu family.

3         I implore the Court for this moment if we may bow our

4    heads.

5              THE COURT:   I'm not going to do that.

6              THE DEFENDANT:   Okay.

7              THE COURT:   Let's move on.

8              THE DEFENDANT:   Sure.   It's very difficult for

9    me to express it all in words.   Everything that's run

10   through my mind that's happened to me over the past two

11   years, but I'm going to try to convey the best I can what

12   I have in my heart and what I've had in my heart since my

13   re-arrest.

14        I'm going to use kind of my papers here to ground me

15   because my emotions and my nerves are, of course, getting

16   the best of me here.   So please allow me and bear with me.

17        We are gathered here in attendance, primarily, for

18   this necessary imposition of a sentence upon me.   For me,

19   as I have been eagerly waiting for this opportunity

20   afforded to me by Your Honor, it is finally up to me to

21   have a chance to convey in words, as best I can, what my

22   heart and conscience has wanted to express over the past

23   28 months of incarceration.

24        Leadership, education, family values, charity,

25   compassion, respect for others, and unparalleled morals

1    were all ideals and are all ideals synonymous with my

2    family and the Batchu name.

3        My father, who's with me here in spirit, along with

4    his six brothers and five sisters, two of whom have

5    actually flied from Chicago and Michigan, used these

6    principles to help them achieve and became professionals

7    in the United States from a poor village in India, where

8    for them growing up electricity and running water were a

9    sacristy.

10       My father studied and worked tediously to become a

11   chemical engineer and soon thereafter was happily arranged

12   to wed my mother, who I'm very proud to see made a trip

13   from India actually to be here today.

14       He was offered a position as an engineering professor

15   at a top university in Manipal; Manipal, a town rich in

16   education and community service and my eventual place of

17   birth on October 28, 1979.

18       My father named me Mani, which in Sanskrit, an

19   ancient language of India, translates to a gem whose

20   qualities shine upon society.  My middle name is Madhav

21   and he named me that after the founder of Manipal, Dr.

22   Madhav Pai, who foundered the city upon the principles of

23   integrity, education, and community service, especially to

24   those less fortunate and poor, and that is what he founded

25   as the nucleus of what Manipal's residents should embody.

1          Your Honor, for nearly 30 years of my life I have

2     done my best to live up to my namesake and the

3     long-standing ideals of the Batchu family that were

4     brought over to the U.S. when we all immigrated here for a

5     better life.  Specifically my parents came here to afford

6     me a chance at a better education than they received and

7     more opportunities.

8          Overcoming numerous obstacles and challenges along

9     the way, it was not easy for me.  I came over here when I

10    was a year old from India.  From my mother's mental

11    illness and her struggles when I was a young child, to my

12    father's cancer diagnosis just as I was being admitted to

13    the University of Illinois, I managed to somehow still

14    achieve success in my dream of becoming a physician, and

15    along the way I fulfilled my parents', as well my

16    family's, dream.

17         I made my family, friends, and especially my parents

18    so proud from my academic achievements, local and

19    international community service with the poor and

20    especially the undying moral and ethical standards in my

21    actions that I upheld through my journey to becoming a

22    physician.

23         With the ridged ideals of my father, in tandem with

24    the love and tender care and nurture of my mother, that

25    only a mother could provide, they provided as ideal an

**G.App.219**

1   environment as they could possibly to allow for me to

2   flourish and strive for my dreams.  I owe all my past

3   achievements to my parents and I just wanted to say that.

4       But, Your Honor, one lesson in particular that was

5   reinforced and emphasized throughout my life was

6   responsibility for one's own actions.  A principle I lived

7   by previously yet completely and utterly neglected with

8   the choices I made and repulsive actions I took from which

9   many innocent individuals in two loving families were

10   harmed, no one greater than the victim's family and the

11   victim herself.

12       And I'd like to address them personally at this time

13   if you may so allow me, Your Honor.

14           THE COURT:  All right.

15           THE DEFENDANT:  For the victims --

16           THE COURT:  I'd like you to speak to me.

17           THE DEFENDANT:  Okay.

18           THE COURT:  They're listening.  Let's make the

19   eye contact this way.

20           THE DEFENDANT:  Sure.  No problem.

21       First, and foremost, from a son who lost his father

22   two years ago, I'd like to finally have the chance to

23   offer my deepest condolences and sincere sympathy for the

24   loss of your son.

25       For the reasons we are gathered here, a case that has

**G.App.220**

Case: 21-1292 Document: 00117898344 Page: 224 Date Filed: 07/15/2022 Entry ID: 6507951
Case 3:10-cr-30008-MAP Document 99 Filed 12/28/11 Page 73 of 101

73

1    spanned over two years, a result of the transgressions and

2    inexcusable, despicable actions I've committed against

3    your daughter and whose effects have rippled through your

4    family, I can only hope and ask that you are able to

5    somehow consider and possibly accept in time my sincerest

6    apologies and remorse, and perhaps, at some point in the

7    distant future, at your choosing, you may find in your

8    heart to forgive me, though I know that will be a very

9    difficult task to swallow.

10        With the deception of my actions embodied in the

11   crimes I have committed, I know it is difficult to truly

12   believe my words today as I speak.  Please understand that

13   I am not the same individual I was over 28 months ago, the

14   one who had committed these atrocious crimes.

15        I have changed for the better and since my

16   incarceration, I've actively chosen to transform what has

17   been defined as the biggest mistake in my life into the

18   greatest triumph for a member of the Batchu family,

19   specifically through morality in my actions.

20        At this point I wanted to specifically address the

21   victim herself.  Again, first, my deepest condolences for

22   the loss of your brother.

23        You have every right to ignore what I have been

24   sitting here saying and what I'm about to say.  In my

25   actions, when we first met, I lied to you.  I deceived

**G.App.221**

Case: 21-1292 Document: 00117898744 Page: 225 Date Filed: 07/15/2022 Entry ID: 6507951
Case 3:10-cr-30008-MAP Document 99 Filed 12/28/11 Page 74 of 101

74

1     you.  I betrayed you, but most of all I hurt you in so

2     many ways.

3         For me, sentencing began the day I was arrested as

4     I've been living with the guilt, shame, and painful

5     knowledge of what I've done to you and how it has affected

6     your life.

7         I ruined your innocence, your trust in men and

8     relationships, and even worse as an ideal held highly by

9     my family, I disrupted your education.  And actually this

10    was the first time I actually heard obviously from the

11    statements from her family, which I'm thankful for,

12    exactly the extent of disruption of her education.

13        I have no words to describe my regrets and my remorse

14    for ruining every single aspect of what I've just

15    discussed there, and especially the education because that

16    was something afforded to me and was not taken away from

17    me, yet I, through my actions, did, especially at the most

18    critical point in her life, her transition from

19    adolescence into adulthood.

20        To me, in sum, I ruined your life.  In my actions, I

21    went against everything I have ever stood for or my family

22    stood for and who instilled in me over 30 years.  I've

23    betrayed my true character quite literally and in doing

24    so, I betrayed your trust.

25        As I told your mother and the rest of your family, I

**G.App.222**

Case: 21-1292 Document: 00117898344 Page: 226 Date Filed: 07/15/2022 Entry ID: 6507951
Case 3:10-cr-30008-MAP Document 99 Filed 12/28/11 Page 75 of 101

75

1   am a much different person than I was that dark summer of

2   2009.  I have gradually changed from the Mani who lacked

3   the integrity in my actions to a man who attempts to

4   employ morality in every action he pursues.  I am still

5   maturing in that respect and I trust with the resources I

6   have available in prison and the community, I expect to be

7   an even better man.

8        So to come to my main point, I can never fully

9   understand the exact feeling of pain, disgust, suffering

10  that you, yourself, have actually experienced over these

11  past two and a half years, or even what you're thinking

12  right now as I sit here and what you think of me as I say

13  the things that I say.

14       But I do hope, and I can only hope, and ask that you

15  are able to consider and again in time possibly accept my

16  sincerest apologies, and, likewise, at some point in the

17  future, if you choose it's comfortable, that you may find

18  it in your heart to forgive me.

19       I pray and wish that if you do decide to look back on

20  this day, November 18, 2011, you will be able to

21  acknowledge that the words I speak now are the whole truth

22  and nothing but the truth.

23       And now I'd like to address my family.  As a

24  collateral consequence of my actions and crimes, I have

25  deeply hurt the many innocent family members, my uncles,

**G.App.223**

Case: 21-1292    Document: 00117898344    Page: 227    Date Filed: 07/15/2022    Entry ID: 6507951
Case 3:10-cr-30008-MAP Document 99    Filed 12/28/11    Page 76 of 101

76

1    my aunts, my cousins, and of course my parents who had

2    loved and cared for me, watched me grow up and achieve so

3    much success.

4        I've disappointed all of you.  I've angered most of

5    you and brought shame to the Batchu name and always stood

6    for India as well as the United States after our

7    immigration.  That is a crime in and of itself against my

8    family, for which I have to pay for and redeem through my

9    actions for the rest of my life.

10        Since my incarceration, I have realized and do

11    comprehend the effects on our family by what I've done.

12    It is a result of my own irresponsibility, a lack of moral

13    judgment in the actions that I took, and complete

14    selfishness that I ended up in this predicament sitting

15    here at a hearing that will open up probably the most

16    challenging chapter of my life.

17        In fact, just as I digress, I can't even express how

18    to apologize for even having this hearing here.  We should

19    not even be sitting here.  It is completely and utterly my

20    fault and I accept that and I fully am aware of that, and

21    I apologize for the resources the court must go through

22    for the state level and even to the federal level.

23        This next chapter is challenging as I have mentioned.

24    Superficially the challenges that lay ahead include, but

25    are not limited to, adapting to prison life, for example,

**G.App.224**

Case: 21-1292    Document: 00117898344    Page: 228    Date Filed: 07/15/2022    Entry ID: 6507951
Case 3:10-cr-30008-MAP    Document 99    Filed 12/28/11    Page 77 of 101

77

1    and my restricted freedoms.

2        But upon closer examination, it is the challenge of

3    whether I choose between selfishness or generosity in my

4    actions and how, if I so choose so, those actions are

5    immersed in morality.  Already I have chosen to travel

6    down the path of generosity, a path I had strayed from in

7    committing these crimes.

8        In every interaction in jail, I truly have sought the

9    betterment of the lives of others I have met, something

10   that I have done in my life before my arrest.  And I've

11   done this through filtering my every action with morality

12   and, of course, largely in part through my sense of humor.

13   By no means am I making light of the situation I placed

14   myself in, nor the damage I have done, but simply

15   reminding everyone in this court that I still possess the

16   same emotional spectrum under the label of an inmate as

17   anyone sitting in this court today.

18       But I digress, I want to make it clear in person to

19   my family that I express sincere regrets and apologize for

20   the harm and shame and anger my actions have caused you

21   all.  I hope in time I will fully be granted your

22   forgiveness as well.

23       Truly, though, nothing pains me more in my family

24   than the hurt I've caused my mother and my father.  I was

25   arrested on August 3, 2009.  My father passed away on

**G.App.225**

Case: 21-1292    Document: 00117898344    Page: 229    Date Filed: 07/15/2022    Entry ID: 6507951
Case 3:10-cr-30008-MAP   Document 99   Filed 12/28/11   Page 78 of 101

78

1    August 13, 2009.  The impact of that event, compounded by

2    the fact that I was unable to attend his funeral, nor pay

3    my final respects due to my incarceration, magnified the

4    gravity of my actions one-hundred fold.

5        Learning that my mother cried alone at his casket,

6    without me to comfort her, was like having a searing knife

7    piercing through my heart.  I blamed myself for his death

8    initially for a long time sitting in my cell in jail.

9        Through grief counseling, which I actively sought, I

10   accepted that it was the cancer's metastasis and sequelae,

11   but in no doubt in the back of my mind I realized the

12   stresses that I have caused may have contributed to that

13   as well.

14       I do rightfully blame my action for leaving my poor

15   helpless mother by herself who now struggles financially.

16   But worst of all, struggles by herself with her chronic

17   mental illness and medical ailments without her only child

18   to look after and care for her.

19       As a result of my actions, I am now unable to honor

20   my deeply rooted cultural values and obligation to take

21   care of my elderly mother.  I have still tried my best to

22   assist her in jail through phone or when she's visited me

23   in person, and even through the many dozens of letters

24   I've written to the Illinois Department of Mental Health I

25   have tried to advocate for her to attain physical and/or

1    financial assistance due to her extenuating circumstance

2    and her mental illness.

3        Unfortunately I am unable to speak on my father's --

4    or to my father directly today to truly convey my

5    heartfelt apologies and remorse for all my actions which

6    have resulted in our painful separation.

7        I actually brought with me a symbol of religion from

8    my Hindu faith.  My mother presented me with a picture of

9    a Hindu god and this is my only kind of memory in spirit

10   of my father.  I actually don't have even a photograph of

11   my father in jail at this point unfortunately, but this

12   every day this reminds me of him and I speak through my

13   prayers to him.  And as I'm sure he is listening to all of

14   this today, I can only hope that I can regain his pride

15   and respect in me in time through repaving my path of

16   generosity and especially employing morality in all my

17   actions.

18       To my friends, co-workers, and medical staff at the

19   University of Illinois Chicago Medical Center, Department

20   of Psychiatry, and my former patients, first I can't

21   forget all my friends who I've disappointed and hurt.  The

22   other physiatric residents, nurses, attending doctors, and

23   especially the residency director, Dr. Robert Marvin, as

24   well as all the patients whom I had a therapeutic

25   relationship with and was making progress with to help

Case: 21-1292    Document: 00117898344    Page: 231    Date Filed: 07/15/2022    Entry ID: 6507951
Case 3:10-cr-30008-MAP  Document 99   Filed 12/28/11  Page 80 of 101

80

1    them overcome their own struggles in life, both mentally

2    and medically.

3        Apologies may not ever be able to repair the bridges

4    I've burned, but I sincerely express regret and remorse

5    for all the actions I've committed that have ignited those

6    fires.  I hope everyone can recover, especially my

7    patients because of my neglected obligations to them as a

8    doctor and physician since my arrest and incarceration.

9        Your Honor, I've taken this time to attempt to

10   express to everyone in this courtroom, and especially the

11   victim and her family, my acceptance of responsibility of

12   the crimes I committed and the sincere remorse, regret,

13   and sympathy for my actions and the harm that they have

14   caused.

15       Your Honor, I've lost more than just my freedom since

16   my incarceration.  Your Honor, I've lost an opportunity to

17   kiss and hold my father before he was cremated, an

18   obligation to care for my ill mother as her only child,

19   and a medical career which I worked all my life to

20   achieve.

21       I've lost contact with many close friends who've

22   grown up with me, attended high school with me, attended

23   college and/or even medical school with me during this

24   time period.

25       Most of all, Your Honor, I've lost my most important

**G.App.228**

1    ideals that have been instilled in me by my father and by

2    the Batchu family - I've lost my self respect.  I've lost

3    my dignity; I've lost my integrity.  For these were all

4    ideals I held solid for 30 years of my life until that

5    dark summer of 2009.

6        Your Honor, I hope that you can take all this into

7    consideration.  I hope I've even expressed even a fraction

8    of what my heart and my mind holds that I've thought about

9    day in/day out sitting in my cell in jail about what's

10    happened to the victim and her family.

11        I hope you take these into consideration as part of

12    the sentencing factors you consider in imposing this

13    necessary sentence today.

14        In closing, I understand and recognize the wrongs

15    I've committed.  But suggesting that history is destiny

16    and that individuals are created by their pasts is an

17    insult to the capacity of human beings to overcome.  The

18    implication is that there is no individual responsibility

19    to overcome.  Your Honor, I think there is as I've tried

20    to express.  Everyone must overcome something.  That

21    simply is the journey of life.

22        To draw inspiration from someone who has been jailed

23    many times, yet has achieved greatness, and to paraphrase

24    his message, "Everything can be taken away from a man but

25    one thing:  The last of the human freedoms - to choose

Case: 21-1292    Document: 00117898344    Page: 233    Date Filed: 07/15/2022    Entry ID: 6507951
Case 3:10-cr-30008-MAP    Document 99    Filed 12/28/11    Page 82 of 101

82

1     one's attitude in any given set of circumstances, to

2     choose one's own way."

3          That was a paraphrased statement by a great Indian

4     leader Mahatma Gandhi who was jailed on numerous occasions

5     and achieved independence for the nation of India.

6          I, Your Honor, have chosen generosity and morality in

7     all my actions.  And as lengthy a sentence that I will

8     have to serve, I know I will never lose the freedom and

9     responsibility in having chosen these ideals and honoring

10    that choice of generosity that I have made.

11         Your Honor, members of the courtroom, and family,

12    thank you.

13              THE COURT:  All right.  Can you give me a little

14    bit of a preview as to how long you expect to be?

15              MR. FOLEY:  Ten minutes maximum, very short,

16    five, ten minutes.

17              THE COURT:  Then will we be done or is there

18    more?

19              MR. FOLEY:  We'll be done.

20              THE COURT:  Okay.

21              MR. FOLEY:  May I speak to him briefly, Your

22    Honor?

23              THE COURT:  Yes.

24              MR. FOLEY:  Thank you.

25    (Discussion off the record.)

**G.App.230**

Case: 21-1292   Document: 00117898344   Page: 234   Date Filed: 07/15/2022   Entry ID: 6507951
Case 3:10-cr-30008-MAP Document 99   Filed 12/28/11   Page 83 of 101

83

**DIRECT EXAMINATION BY MR. FOLEY**

Q.   Prior to August of '08, I take it you were using the internet for dating sites?

A.   Yes.

Q.   How did that come about?

A.   Sure.  I'm about -- when I graduated medical school, I had achieved a great achievement of graduating and in turn I placed at my top choice for residency at the University of Illinois, Medical Center in Chicago, pursuing a specialty in psychiatry.

At this point in time I thought I had achieved everything I wanted and I thought it was proper, and in fact fitting, to get the other half of my persona and life together - that being to have a life-long companion to settle down with and eventually wed so that I could start my own family, which has always been a dream of mine.  My family is aware of how much I've always wanted kids and my own family.

At that point, due to my busy lifestyle and upon recommendation of many colleagues of mine actually, I joined a couple adult dating websites, including, not that it's relevant, Match.com and including SpeedDate.com.

THE COURT:  Next question.

MR. FOLEY:  I'm sorry.

Q.   (By Mr. Foley)  Was there any family dynamics

Case: 21-1292    Document: 00117898344    Page: 235    Date Filed: 07/15/2022    Entry ID: 6507951
Case 3:10-cr-30008-MAP  Document 99   Filed 12/28/11   Page 84 of 101

84

1    relative to your single status?

2    A.    Yes.  In fact, being single at the age that I was,

3    and especially after graduating medical school and

4    entering residency, at that point in time my family, most

5    of my cousins' generation whom I had grew up with were

6    either married or already in long-term relationships.

7    That was kind of a cultural aspect in Indian culture is to

8    have that secured at an early point in life when your

9    career has been kind of cemented in a way.

10   Q.    Did your family take any steps relative to assisting

11   you in finding a wife?

12   A.    Absolutely.  Actually since, oddly enough, since

13   college my parents have had arranged multiple people in

14   India to be wed to.  The first instance was in college.

15   We had taken our trip to India --

16            THE COURT:  I think we've got the answer to the

17   question.  I'm having a hard time seeing the relevance of

18   this particular matter.  Make me a proffer as to what the

19   relevance is.

20            MR. FOLEY:  Certainly, Your Honor, in his

21   culture marriage is arranged quite common as well as an

22   age difference between husband and wife.

23            THE COURT:  I understand that.  I have a great

24   deal of respect for the depth, richness, and extraordinary

25   grace of Indian culture.

**G.App.232**

Case: 21-1292    Document: 00117898744    Page: 236    Date Filed: 07/15/2022    Entry ID: 6507951
Case 3:10-cr-30008-MAP   Document 99   Filed 12/28/11   Page 85 of 101

85

1    There isn't a single aspect of Indian culture that

2    involves contacting someone who's half your age, giving

3    her a phony name and a phony picture and arranging to meet

4    her without telling her parents.

5        If you're going to suggest to me that Indian culture

6    in any way justifies what Mr. Batchu did, I'm sorry.  It's

7    just not going to convince me as an explanation.  To the

8    extent that you're telling me that the fact that his

9    parents assisted him in finding a wife has some relevance

10   to this, it doesn't.  Move on to another topic.

11           MR. FOLEY:  Sure.

12   Q.  (By Mr. Foley) At some point you had obviously gone

13   on the internet.  How did that picture come about?

14   A.   Yeah.

15           THE COURT:  How did what come about?

16           MR. FOLEY:  The picture.

17           THE COURT:  The picture.

18           MR. FOLEY:  The picture, Your Honor.

19           THE COURT:  The picture that the defendant sent

20   to the victim?

21           MR. FOLEY:  The one on the website, not sent to

22   her.  It's on his profile.

23           THE COURT:  Okay.

24           THE WITNESS:  Well, actually initially when I

25   joined that website, as well as the other adult dating

**G.App.233**

Case: 21-1292    Document: 00117898744    Page: 237    Date Filed: 07/15/2022    Entry ID: 6507951
Case 3:10-cr-30008-MAP  Document 99  Filed 12/28/11  Page 86 of 101

86

1    websites, to try to find you know a companion, I had my

2    picture, my true image of myself on my profile with my

3    true age and entire true identity.

4         As an odd practical joke, one of my friends had

5    simply switched out the picture as a stupid practical

6    joke, and in return I had actually told him -- I actually

7    told this individual that, you know, I was interested in

8    women outside my race, as in fact most of my family

9    members who are very multicultural, and so that initially

10   was how the picture came about.

11   Q.   (By Mr. Foley)  Was the purpose of the picture to

12   deceive anybody?

13   A.   Not at all; not to my intent.

14   Q.   At some point you had -- you came in contact with the

15   victim in this case, correct?

16   A.   Say that again.

17   Q.   At some point you came in contact with the victim in

18   this case?

19   A.   Yeah.  At that time --

20            THE COURT:  The answer is yes.  Move on to the

21   next question.

22   Q.   (By Mr. Foley)  Where did you on the web?

23   A.   On SpeedDate.com.

24   Q.   What was your understanding of people who utilized

25   that website?

**G.App.234**

1    A.    That they're adults, 18 years or older.

2    Q.    So when you first contacted or interacted with the

3    victim, you thought she was of age?

4    A.    Absolutely.  In fact, the website clearly has a

5    disclaimer that you must be 18 years old in order to use

6    the website and it even has credit card verification to

7    that respect.

8    Q.    And on that basis you started to have interactions

9    with her?

10   A.    Yes.

11   Q.    And did that progress with feelings or anything

12   relative to her?

13   A.    Say that again.

14   Q.    Did that progress to feelings or anything?

15   A.    Absolutely.  Absolutely.  I fell in love completely

16   after months of speaking to her and talking to her.

17   Q.    At some point you came to find out her real age,

18   correct?

19   A.    That time was when I was served with my restraining

20   order.

21   Q.    How -- strike that.

22         Why did you continue interacting with her?

23   A.    Past the point?

24   Q.    Yes.

25   A.    Basically and utterly I was still in love with her.

**G.App.235**

 1   My emotions, I was already deep in love with her and

 2   unfortunately that was kind of why I wanted Dr. Madolf to

 3   be an expert witness today to I guess put some light on

 4   how or why that may have occurred.

 5   Q.    As you sit here today, how do you view your actions

 6   back then?

 7   A.    I find it despicable and atrocious and not who I've

 8   been for the past 30 years before I got to that point.

 9   Q.    Are you making excuses for your actions?

10   A.    Absolutely not.  There is absolutely no excuse for

11   any of my actions.  I have committed the crimes that I've

12   pled out to and there is absolutely no excuse, as there's

13   no explanation and nor any excuse for what has happened

14   and what I've done to cause that harm.

15              MR. FOLEY:  Nothing further.  Thank you.

16              THE COURT:  Very good.  Thank you.  You can step

17   down.

18        Mr. Breslow, there's no need to cross-examine.

19              MR. BRESLOW:  Yes, Your Honor.  Understood.

20              MR. FOLEY:  The defendant rests, Your Honor.

21              THE COURT:  Very good.

22        I'm going to impose a sentence at the top of the

23   guideline range, which is 365 months on Mr. Batchu.  I'm

24   going to impose a term of supervised release of 360

25   months, and I'm going to impose an appropriate amount of

**G.App.236**

1    restitution.

2        I can't, Mr. Batchu, pretend that -- you could be

3    seated.  You could be seated.  It's not necessary for you

4    to stand.

5        I can't pretend that it's possible for me to get to

6    know anybody in a courtroom proceeding, and I understand

7    that this is a very awkward situation for you and you're

8    under a great deal of stress.  So I don't mean to suggest

9    that I've made a decision about the presentation that you

10   just heard.

11       It may have been sincere.  It may have been earnest

12   on your part, but I have a very, very strong sense that

13   you are a supreme phony and that what we just heard was a

14   pretentious, frothy, narcissistic performance.

15       I could be wrong about that, and it could possibly be

16   that you do not even have an understanding into yourself,

17   but that strikes me as one of the most tinny performances

18   I've heard, very wordy and full of a lot of noise.

19       When you said that you fell in love completely, I

20   have seen you on the videos.  I have heard the way that

21   you spoke to the victim.  I have heard you urging her to

22   do things that no one, no one who could pretend to care

23   about anyone would ever do, Indian or American.  There is

24   no culture or other excuse for what you did.

25       So I'm sorry, if your performance was sincere, I

**G.App.237**

1    missed it.  It struck me as completely phony and

2    narcicisstic and self-justifying.

3         I have not seen a more determined course of criminal

4    conduct in 28 years on the bench.  You say the dark summer

5    of 2009, this began in August of 2008.  I do not believe

6    that you did not know the age of this person from early

7    on.  But even after you were served with a restraining

8    order, you obviously did know.  You do not take someone

9    that you love and have sex with them in the fitting room

10   or in a car while their parents are waiting for them.

11        This is nothing that any culture could ever have

12   defined as love, and I really hope that some day if you're

13   interested in being really honest with your family, let

14   them listen to the video of you talking to this victim as

15   I did yesterday.  Let them listen to you going "Oh, baby,

16   show me this; show me that."  It was disgusting.  It had

17   nothing whatsoever to do with love.

18        So a sentence at the top of the guideline range is

19   justified both because of the course of conduct that you

20   engaged in and because of the rather sophomoric and

21   pretentious and obliquely and carefully self-justifying

22   little speech we just heard.

23        I think you've got a long way to go to get on the

24   moral path that you claim to be on.  A long way to go to

25   self knowledge, and I wish that you arrive there someday

**G.App.238**

```
 1    and you're going to have plenty of time to get on that

 2    path.

 3         So that is the sentence in summary that I will be

 4    imposing.  I want to say again I've had the great pleasure

 5    and the very, very satisfying experience knowing people

 6    from India.  I've had them as law clerks and I got a

 7    little bit of sense of Indian culture.

 8         This has nothing -- what happened here has nothing,

 9    cannot begin to be justified by any culture differences or

10    any culture customs.  This was pure exploitation of the

11    ugliest sort.  So we will put that to one side.

12         I think I'd like to say myself one or two quick

13    comments to the victim and the victim's family.  They have

14    been through a terrible, terrible time, almost comparable

15    to some horrible disease.

16         I think that the victim in this case will emerge from

17    this period, will find her feet, will become stronger.  I

18    think that the experience that she had will put her in a

19    position someday to help other young women credibly and

20    competently to face the same kind of abuse that she's

21    faced.

22         I hear the despair in the parents' voice and the

23    terrible time you've gone through, but I feel that perhaps

24    today there will be a new dawn in the life of the victim

25    and of the victim's family, and that as painful as this
```

```
 1    is, everything happens for a reason and the victim will
 2    some day be able to pull herself beyond this.
 3         Mr. Batchu is never going to be able to hurt you
 4    again.  He's gone.  I think the best way that you can
 5    vindicate the memory of your brother is to live a happy
 6    life and find a way to get out of the terrible ordeal that
 7    you've been through perhaps to others who are going
 8    through similar ordeals.
 9         So that's my two cents.  I hope my own contribution
10    doesn't sound too frothy and pretentious, but I can tell
11    you it is sincere.  I have my own daughter and son and so
12    it's not hard for me to imagine what the family has gone
13    through.
14         So the sentence here is the top of the guideline
15    range.  I think it's fully justified by the extreme
16    version of this offense, and pursuant to the Sentencing
17    Reform Act of 1984, and having considered the sentencing
18    factors enumerated at 18 U.S. Code 3553(a), it is my
19    judgment that the defendant, Mani Batchu, be committed to
20    the custody of the Bureau of Prisons to be imprisoned for
21    a term of 365 months.  That is the top of the applicable
22    sentencing guideline range.
23         Upon release from imprisonment, the defendant shall
24    be placed on supervised release for a term of 30 years on
25    each count to be served concurrently.
```

Case: 21-1292    Document: 00117898344    Page: 244    Date Filed: 07/15/2022    Entry ID: 6507951
Case 3:10-cr-30008-MAP  Document 99  Filed 12/28/11  Page 93 of 101

93

1          Within 72 hours of release from custody of the Bureau

2     of Prisons, the defendant shall report in person to the

3     district to which he is released to begin his period of

4     supervised release.

5          I'm going to adopt in part the submission made by the

6     victim and her family seeking restitution.  I am going to

7     set aside a portion of that for the expenses that have

8     been incurred for the provision for therapy which the

9     victim will continue to benefit from, and a portion to set

10    aside to reimburse her for possible reduction in wages and

11    Social Security.

12         Although I remain hopeful, quite hopeful, that this

13    young woman, who has many strengths despite the ordeal,

14    that she will come through this and will find her path now

15    and get her life in order and go on to be the successful

16    and happy young woman that she was on track to before her

17    unfortunate encounter with Mr. Batchu.

18         I'm going to set the amount of restitution at $2.5

19    million.  That will be the restitution.  This is obviously

20    an estimate.  The Court is permitted to make such an

21    estimate.  I am taking into consideration the accountant's

22    submission here.  I think $2.5 million is an appropriate

23    number.

24         Two practical aspects obviously:  One, no amount of

25    money can ever compensate the victim or her family for

94

1   what they've gone through; and, second, Mr. Batchu is not

2   going to be in any position for the next 30 years to make

3   any significant contribution towards that restitution.

4        It is probably a ceremonial or symbolic gesture but

5   that will be the amount of the restitution.  I'm going to

6   ask that the restitution payments be made -- direct that

7   the restitution payments be made to the clerk, United

8   States District Court, for transfer to the victim's

9   representative.  I will ask the U.S. Attorney to notify

10  the clerk as to the address where the clerk can forward

11  any restitution payments.

12       This restitution shall begin immediately and shall be

13  made according to the requirements of the Federal Bureau

14  of Prisons' inmate financial responsibility program while

15  the defendant is incarcerated and according to a

16  court-ordered repayment schedule during the term of

17  supervised release.

18       Once the defendant completes his prison term, he

19  shall notify the United States Attorney for this district

20  within 30 days of release so that he may begin his period

21  of supervised release.

22       I'm not going to impose any fine because I think that

23  would be meaningless, but I am going to impose forfeiture

24  as set forth in my preliminary forfeiture order.

25       The conditions of supervised release will be as

1    follows:  They are lengthy and I want to read through them

2    and they were largely agreed to in the plea agreement.

3         First, there are mandatory conditions imposed in

4    every case.  The defendant shall not commit any other

5    federal, state, or local crime, and shall not illegally

6    possess any type of controlled substance.

7         During his 30 years of supervised release, he shall

8    refrain from any unlawful use of a controlled substance.

9    He shall submit to one drug test within 15 days of release

10   from imprisonment and at least two periodic drug tests

11   thereafter, up to 104 tests per year if and as directed by

12   the probation office.

13        The defendant shall submit to the collection of a DNA

14   sample as directed by the probation office and he shall

15   comply with the standard conditions that have been adopted

16   by the court which are described at Section 5D1.3C and

17   which will be set forth in detail in the written judgment.

18        The defendant is prohibited from possessing any

19   firearm, destructive device, or other dangerous weapon.

20        The defendant is prohibited from incurring any new

21   credit charges or opening additional lines of credit

22   without the approval of the probation office while any

23   financial obligation remains outstanding.

24        The defendant is to provide the probation office

25   access to any requested financial information which may be

1    shared with the financial litigation unit of the U.S.

2    Attorney's office.

3         The defendant is to participate in a sex offender

4    specific treatment program during his period of supervised

5    release which may include sex offender's specific testing

6    at the direction of the probation office.

7         He will be required to contribute to the cost of this

8    sex offender treatment program if he's able to pay for it

9    or if there is an insurer or other third-party payer.

10        The defendant is required to submit to periodic

11   polygraph testing as a means to ensure that he is in

12   compliance with the requirements of his therapeutic

13   program.  No violation proceeding will arise based solely

14   on the defendant's failure to pass the polygraph.  Such an

15   event, however, could generate a separate investigation.

16        While submitting to the polygraph exam, the defendant

17   does not waive his Fifth Amendment rights and the

18   defendant's exercise of his Fifth Amendment rights will

19   not give rise to the violation proceedings.

20        The defendant will be required to contribute to the

21   cost of the polygraph testing again based on his ability

22   to pay or the availability of an insurer or other

23   third-party payer.

24        The defendant is prohibited from engaging in an

25   occupation, business, or profession that would require or

**G.App.244**

1    enable him to have direct or indirect supervision of

2    children under the age of 18, and is not to have

3    unsupervised contact with anyone under the age of 18.

4         The defendant is prohibited from possessing a

5    computer and other related material accept as deemed

6    necessary for work purposes.

7         The defendant shall allow the U.S. probation office

8    to install software, this is once you finish the prison

9    sentence and is on supervised release, to install software

10   to monitor computer activities on any computer the

11   defendant is authorized to use.

12        This may include, but is not limited, to software

13   that may record any and all activity on the computer the

14   defendant may use, including the capture of key strokes,

15   application information, internet use history, e-mail

16   correspondence, and chat conversations.

17        The defendant shall have no access to the internet at

18   his work, home, or elsewhere.  The defendant is prohibited

19   from viewing or possessing any kind of pornography or

20   sexually explicit materials, adult or otherwise.

21        The defendant shall report his address and subsequent

22   change of address to the probation office.

23        The defendant shall register as a sex offender as

24   required in any state where he resides, is employed,

25   carries on a vocation, is a student.

**G.App.245**

1      The defendant shall use his true name and is
2  prohibited from the use of any false identifying
3  information, which includes, but is not limited to, any
4  alias, false dates of birth, false Social Security
5  numbers, incorrect places of birth.
6      The defendant shall not contact directly or
7  indirectly by any manner, any manner, letter, e-mail,
8  third person, in any way shall not contact directly or
9  indirectly the victim in this case or victim C to the
10  extent that the defendant obviously knows who this person
11  was, or any family member of any victim and particularly
12  victim A of these charged offenses.
13      The defendant shall promptly notify the probation
14  department of any contact, even if it's accidental, direct
15  or indirect, by any victim or any family member of the
16  victim with the defendant.
17      The defendant shall submit his person and any
18  property, house, residence, vehicle, papers, computers,
19  other electronic communications or data storage device or
20  media to a search at any time, with or without a warrant,
21  by law enforcement or probation officers with a reasonable
22  suspicion concerning a violation of the conditions of
23  supervised release.
24      It is furthered ordered that the defendant pay the
25  United States a special assessment of $500 which shall be

**G.App.246**

 1    due immediately.

 2         Mr. Batchu, you have the right to appeal this

 3    sentence.  The fact that you have pled guilty does not

 4    deprive you of the right to appeal.  If you cannot afford

 5    an attorney to assist you with your appeal and if there is

 6    an appeal which is available in light of the plea

 7    agreement, you may seek appointment of an attorney to

 8    assist you.

 9         I'm going to remand you to the custody of the U.S.

10    marshals.  I'm going to order that he be designated to a

11    federal facility within 30 days, and until that time he

12    will be held by the U.S. marshal pending designation.

13         If you have a location for designation, I'll be happy

14    to make it.

15              MR. FOLEY:  Yes, Your Honor, the closest

16    penitentiary to Chicago.

17              THE COURT:  All right.  I would ask that the

18    defendant be placed in a facility which is as close as

19    possible to Chicago.

20              MR. BRESLOW:  Your Honor, we move to dismiss

21    Counts 6, 7, 8.

22              THE COURT:  The motion to dismiss is allowed.

23    If there's nothing further, the court will be in recess.

24         Again, as you're leaving, please maintain the same

25    atmosphere of dignity and respect that you all have very

```
 1    well maintained on both sides, both the family of the
 2    defendant and of the victim.  Let's just keep it the way
 3    it's been.
 4         I do, despite my harsh words, Mr. Batchu, I do
 5    congratulate you on having family members here who are
 6    showing their support for you.  You will be needing their
 7    support and they need your support as you begin to serve
 8    out your sentence.  Court's in recess.
 9    (Court concluded at 3:29.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1          C E R T I F I C A T E

2

3

4      I, Alice Moran, Official Federal Court Reporter for

5   the United States District Court for the District of

6   Massachusetts, do hereby certify that the foregoing is a

7   correct transcript from the record of proceedings in the

8   above-entitled matter.

9

10

11

12                    /s/ Alice Moran

13              ─────────────────────────

14                 Dated December 9, 2011

15               Alice Moran, CSR, RPR, RMR

16             Official Federal Court Reporter

17                300 State Street, Room 303D

18                  Springfield, MA 01105

19                     413-731-0086

20               alice.moran@verizon.net

21

22

23

24

25

AO 245B(05-MA)　　(Rev. 06/05) Judgment in a Criminal Case
　　　　　　　　　Sheet 1 - D. Massachusetts - 10/05

# UNITED STATES DISTRICT COURT
## District of Massachusetts

UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE**
**V.**

**Mani Batchu**

Case Number: **3: 10 CR 30008 - 01 - MAP**

USM Number: 91057-038

Richard N. Foley

Defendant's Attorney

☑ Additional documents attached

Date of Original　　　　　　11/18/11

restitution

☐

## THE DEFENDANT:

☑ pleaded guilty to count(s)　　1, 2, 3, 4, 5

☐ pleaded nolo contendere to count(s)
which was accepted by the court.

☐ was found guilty on count(s)
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:　　　　Additional Counts - See continuation page ☐

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC § 2423(a) | Transportation of a Minor engaged in Criminal Sexual Conduct | 05/01/09 | 1 |
| 18 USC § 2423 (b) | Interstate travel for purp. of engaging in illicit sexual conduct w/minor | 05/01/09 | 2 |
| 18 USC § 2423 (b) | Interstate travel for purp. of engaging in illicit sexual conduct w/minor | 05/23/09 | 3 |
| 18 USC § 2423 (b) | Interstate travel for purp. of engaging in illicit sexual conduct w/minor | 08/03/09 | 4 |
| 18 USC § 2422(b) | Use of Fac.of Int. Commerce to entice minor to engage in sexual conduct | 08/03/09 | 5 |

The defendant is sentenced as provided in pages 2 through ___11___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☑ Count(s)　　6,7,8　　　　☑ is　☐ are　dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

11/18/11

Date of Imposition of Judgment

Signature of Judge

The Honorable Michael A. Ponsor

Judge, U.S. District Court

Name and Title of Judge

11/30/11

Date

**G.App.251**

AO 245B(05-MA)    (Rev. 06/05) Judgment in a Criminal Case
Sheet 2 - D. Massachusetts - 10/05

DEFENDANT: **Mani Batchu**    ⊞

Judgment — Page    2    of    11

CASE NUMBER: **3: 10  CR  30008  - 01  - MAP**

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:    365    month(s)

to run concurrently

☐ The court makes the following recommendations to the Bureau of Prisons:

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m. on _____ .

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

**G.App.252**

AO 245B(05-MA)     (Rev. 06/05) Judgment in a Criminal Case
Sheet 3 - D. Massachusetts - 10/05

DEFENDANT: **Mani Batchu**                                              Judgment—Page    3    of    11
CASE NUMBER: **3: 10 CR 30008    - 01    - MAP**

## SUPERVISED RELEASE

☐ See continuation page

Upon release from imprisonment, the defendant shall be on supervised release for a term of :       360    month(s)

to run concurrently

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, not to exceed 104 tests per year, as directed by the probation officer.

☐ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

☑ The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

☑ The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☑ The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

☐ The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

**G.App.253**

AO 245D    (Rev. 1207) Judgment in a Criminal Case for Revocations
Sheet 3A — Supervised Release

DEFENDANT: Mani Batchu
CASE NUMBER: 10-30008

Judgment—Page __4__ of __14__

## ADDITIONAL SUPERVISED RELEASE TERMS

1. The defendant is prohibited from possessing a firearm, destructive device, or other dangerous weapon.

2. The defendant is prohibited from incurring new credit charges or opening additional lines of credit without the approval of the Probation Office while any financial obligations remain outstanding.

3. The defendant is to provide the Probation Office access to any requested financial information, which may be shared with the Financial Litigation Unit of the U.S. Attorney's Office.

4. The defendant is to participate in a sex offender specific treatment program which may include sex offender specific testing at the direction of the Probation Office. The defendant shall be required to contribute to the costs of services for such treatment based on the ability to pay or availability of third-party payment.

5. The defendant shall be required to submit to periodic polygraph testing as a means to insure that he is in compliance with the requirements of the therapeutic program. No violation proceedings will arise based solely on a defendant's failure to "pass" the polygraph. Such an event could, however, generate a separate investigation. When submitting to a polygraph exam, the defendant does not waive his Fifth Amendment rights, and the defendant's exercise of his Fifth Amendment rights will not give rise to violation proceedings. The defendant shall be required to contribute to the costs of testing based on the ability to pay or availability of third-party payment.

6. The defendant is prohibited from engaging in an occupation, business, or profession that would require or enable him to have direct or indirect supervision of children under the age of 18 and is not to have unsupervised contact with anyone under the age of 18.

7. The defendant is prohibited from possessing a computer and/or related materials except as deemed necessary for work purposes.

8. The defendant shall allow the U.S. Probation Office to install software (IPPC) designed to monitor computer activities on any computer the defendant is authorized to use. This may include, but is not limited to, software that may record any and all activity on the computers the defendant may use, including the capture of keystrokes, application information, internet use history, email correspondence, and chat conversations. The defendant will pay any costs related to the monitoring of his computer usage.

9. The defendant shall have no use of the Internet at his home, work, or elsewhere.

10. The defendant is prohibited from viewing or possessing any kind of pornography or sexually explicit materials, adult or otherwise.

11. The defendant shall report his address, and any subsequent address changes, to the Probation Office.

12. The defendant shall register as a sex offender as required in any state where he resides, is employed, carries on a vocation, or is a student.

13. The defendant shall use his true name and is prohibited from the use of any false identifying information which includes, but is not limited to, any aliases, false dates of birth, false social security numbers, and incorrect places of birth.

14. Defendant shall not contact, directly or indirectly, any victim, including Minor A, or family member of any victim, of the charged offenses.

15. Defendant shall promptly notify the Probation Department of any contact, direct or indirect, by any victim, including Minor A and Minor C, or family member of any victim, of the charged offenses.

16. Defendant shall "submit his person, and any property, house, residence, vehicle, papers, computer, other electronic communications, or data storage devices or media, and effects to search at any time, with or without a warrant, by any law enforcement or probation officer with reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct by the person, and by any probation officer in the lawful discharge of the officer's supervision functions," pursuant to 18 U.S.C. § 3583(d).

**G.App.254**

AO 245B(05-MA)    (Rev. 06/05) Judgment in a Criminal Case
Sheet 5 - D. Massachusetts - 10/05

DEFENDANT: **Mani Batchu**                                    Judgment — Page  5  of  11

CASE NUMBER: **3: 10 CR 30008  - 01  - MAP**

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $        $500.00 | $ | $        $2,500,000.00 |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| S. Marie Krause | $2,500,000.00 | $2,500,000.00 | |

☐ See Continuation Page

| **TOTALS** | $        $2,500,000.00 | $        $2,500,000.00 |
|---|---|---|

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☑ the interest requirement is waived for the    ☐ fine  ☑ restitution.

☐ the interest requirement for the    ☐ fine  ☐ restitution is modified as follows:

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

Judgment — Page ____6___ of ____11___

DEFENDANT: **Mani Batchu**
CASE NUMBER: **3: 10 CR 30008  - 01  - MAP**

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

A ☐   Lump sum payment of $ _____ due immediately, balance due

    ☐   not later than _____ , or
    ☐   in accordance ☐ C, ☐ D, ☐ E, or ☐ F below; or

B ☐   Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

C ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E ☐   Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F ☒   Special instructions regarding the payment of criminal monetary penalties:

Special assessment fee to be paid immediately.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

☐ See Continuation Page

    Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

AO 245B(05-MA)   (Rev. 06/05) Judgment in a Criminal Case
Sheet 6B - D. Massachusetts - 10/05

DEFENDANT:      **Mani Batchu**

CASE NUMBER:    **3: 10  CR  30008  - 01   - MAP**

Judgment—Page ___7___ of ___11___

## ADDITIONAL FORFEITED PROPERTY

(1) one Apple MacBook Pro with serial number
W8734MNOZ5W;
(2) one Apple MacBook Pro bearing serial number
W8928JY566D;
(3) one black SanDisk Cruzer Micro 2.0 GB flash USB memory
drive bearing number BE06063BB;
(4) one silver Casio Exilim 3.2 MP digital camera bearing serial
number 1280444A; and
(5) one silver 2002 Lexus IS 300, bearing Vehicle Identification
Number JTHBD192820035037 and Illinois Registration
Number VBATCHU

**G.App.257**

Cert. Mail: 7013 2630 0000 0955 8627                          Page 2

**MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT**

**SENTENCE BY A PERSON IN FEDERAL CUSTODY**

| United States District Court | District of Massachusetts | |
|---|---|---|
| Name (under which you were convicted):<br>Mani Batchu | | Docket or Case No.:<br>10-CR-30008-MAP-1 |
| Place of Confinement:<br>USP Marion, Marion, Illinois | Prisoner No.:<br>91057-038 | |
| UNITED STATES OF AMERICA | Movant (include name under which you were convicted) | |
| v. | Mani Batchu | |

**MOTION**

1. (a) Name and location of court that entered the judgment of conviction you are challenging:

   United States District Court for the District of Massachusetts
   300 State Street
   Springfield, Massachusetts 01105

   (b) Criminal docket or case number (if you know): 10-CR-30008-MAP-1

2. (a) Date of the judgment of conviction (if you know): 11/30/2011


   (b) Date of sentencing: 11/18/2011

3. Length of sentence: 365 months imprisonment and 360 supervised release

4. Nature of crime (all counts):

   Count 1, 18 U.S.C. sec. 2423(a), Transportation of minor to engage in criminal sexual conduct
   Counts 2-4, 18 U.S.C. sec. 2423(b), Interstate travel for purpose of illicit sexual conduct w/ minor
   Count 5, 18 USC sec. 2422(b), Use of fac. of int. com. to entice minor to engage crim. sex. activity
   Counts 6-7, 18 U.S.C. sec. 2251(a), Sexual exploitation of minor (dismissed)
   Count 8, 18 U.S.C. sec. 2252(a)(4)(B), Poss. of mat. involving sex. exploitation of min (dismissed)


5. (a) What was your plea? (Check one)

   (1)  Not guilty ❑          (2)  Guilty ☑          (3)  Nolo contendere (no contest) ❑

   (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count

   or indictment, what did you plead guilty to and what did you plead not guilty to?

   Guilty, counts 1-5

   Not guilty, counts 6-8


6. If you went to trial, what kind of trial did you have? (Check one)        Jury ❑        Judge only ❑

7.  Did you testify at a pretrial hearing, trial, or post-trial hearing?    Yes ☑    No ☐

8.  Did you appeal from the judgment of conviction?    Yes ☑    No ☐

9.  If you did appeal, answer the following:

   (a) Name of court:   United States Court of Appeals for the First Circuit

   (b) Docket or case number (if you know):   11-2414

   (c) Result:   sentence affirmed

   (d) Date of result (if you know):   7/13/2013

   (e) Citation to the case (if you know):   US v. Batchu, 724 F.3d 1 (1st Cir.2013)

   (f) Grounds raised:

   See attachment A, which is fully incorporated herein.

   (g) Did you file a petition for certiorari in the United States Supreme Court?    Yes ☑   No ☐

      If "Yes," answer the following:

      (1) Docket or case number (if you know):   13-6914

      (2) Result:

       Petition for writ of certiorari denied

      (3) Date of result (if you know):   11/18/2013

      (4) Citation to the case (if you know):   Batchu v. US, 134 S. Ct. 663, 187 L. Ed. 2d 438 (2013)

      (5) Grounds raised:

       See attachment B, which is fully incorporated herein.

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications concerning this judgment of conviction in any court?

      Yes ☐    No ☑

11. If your answer to Question 10 was "Yes," give the following information:

   (a) (1) Name of court:

      (2) Docket or case number (if you know):

      (3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?    Yes ❑  No ❑

(7) Result:

(8) Date of result (if you know):

(b) If you filed any second motion, petition, or application, give the same information:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?    Yes ❑   No ❑

(7) Result:

(8) Date of result (if you know):

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1) First petition:    Yes ❑   No ❑

(2) Second petition:    Yes ❑   No ❑

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

12. For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the <u>facts</u> supporting each ground.

**GROUND ONE:**

I was sentenced in violation of my Sixth Amendment right to conflict free counsel.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

See attachment C, which along with the entire record in this case is fully incorporated herein.

(b) **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ❑    No ☑

(2) If you did not raise this issue in your direct appeal, explain why:

The factual record was not sufficiently developed to raise this issue on direct appeal.

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ❑    No ☑

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

    Yes ❏   No ❏

(4) Did you appeal from the denial of your motion, petition, or application?

    Yes ❏   No ❏

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

    Yes ❏   No ❏

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND TWO:**

I was constructively denied counsel contrary to the Sixth Amendment at and before sentencing.

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

See attachment C, which along with the enitre record in this case, is fully incorporated herein.

(b) **Direct Appeal of Ground Two:**

   (1) If you appealed from the judgment of conviction, did you raise this issue?

      Yes ❑   No ☑

   (2) If you did not raise this issue in your direct appeal, explain why:

    The factual record was not sufficiently developed to raise this issue.


(c) **Post-Conviction Proceedings:**

   (1) Did you raise this issue in any post-conviction motion, petition, or application?

      Yes ❑   No ☑

   (2) If your answer to Question (c)(1) is "Yes," state:

   Type of motion or petition:

   Name and location of the court where the motion or petition was filed:


   Docket or case number (if you know):

   Date of the court's decision:

   Result (attach a copy of the court's opinion or order, if available):


   (3) Did you receive a hearing on your motion, petition, or application?

      Yes ❑   No ❑

   (4) Did you appeal from the denial of your motion, petition, or application?

      Yes ❑   No ❑

   (5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

      Yes ❑   No ❑

   (6) If your answer to Question (c)(4) is "Yes," state:

   Name and location of the court where the appeal was filed:


   Docket or case number (if you know):

   Date of the court's decision:

   Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND THREE:**

I was denied the right to effective assistance of counsel at and before the sentencing.

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

See attachment C, which along with the entire record in this case is fully incorpoated herein.

(b) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ❑   No ❑

(2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ❑   No ❑

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):


(3) Did you receive a hearing on your motion, petition, or application?

   Yes ❑    No ❑

(4) Did you appeal from the denial of your motion, petition, or application?

   Yes ❑    No ❑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

   Yes ❑    No ❑

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:


Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):


(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:




**GROUND FOUR:**

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

(b) **Direct Appeal of Ground Four:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        Yes ❑  No ❑

    (2) If you did not raise this issue in your direct appeal, explain why:


(c) **Post-Conviction Proceedings:**

    (1) Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ❑  No ❑

    (2) If your answer to Question (c)(1) is "Yes," state:

    Type of motion or petition:

    Name and location of the court where the motion or petition was filed:


    Docket or case number (if you know):

    Date of the court's decision:

    Result (attach a copy of the court's opinion or order, if available):


    (3) Did you receive a hearing on your motion, petition, or application?

        Yes ❑   No ❑

    (4) Did you appeal from the denial of your motion, petition, or application?

        Yes ❑   No ❑

    (5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

        Yes ❑  No ❑

    (6) If your answer to Question (c)(4) is "Yes," state:

    Name and location of the court where the appeal was filed:


    Docket or case number (if you know):

    Date of the court's decision:

    Result (attach a copy of the court's opinion or order, if available):

Case: 21-1292    Document: 00117898744    Page: 271    Date Filed: 07/15/2020    Entry ID: 6507951
Case: 3:10-cr-30008-MAP Document 126    Filed 11/21/17    Page 10 of 13

Page 11

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

13. Is there any ground in this motion that you have <u>not</u> previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

Grounds one, two and three were not previously presented in federal court because the factual record was not sufficiently develped to raise the issues.

14. Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the judgment you are challenging?    Yes ❏    No ☑
If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:
(a) At preliminary hearing:
 n/a
(b) At arraignment and plea:
 Richard Foley
(c) At trial:
 n/a
(d) At sentencing:
 Richard Foley

(e) On appeal:

Claudia Leis Bolgen

(f) In any post-conviction proceeding:

(g) On appeal from any ruling against you in a post-conviction proceeding:

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?     Yes ☑ No ❑

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?     Yes ❑ No ☑

(a)  If so, give name and location of court that imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?    Yes ❑   No ❑

18. TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

   The motion is timely.

---

\* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

   A one-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of —

      (1) the date on which the judgment of conviction became final;

      (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;

      (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

      (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Page 14

Therefore, movant asks that the Court grant the following relief:

  Vacate the sentence and order resentencing.

or any other relief to which movant may be entitled.

_____

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on

(month, date, year).

Executed (signed) on *NOVEMBER 18TH 2014* (date).

_____

Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

Attachment A
*Issues Raised on Direct Appeal*

Issue 1: The appeal waiver in the plea agreement does not prevent appellate review.

Issue 2:     The district court erred in enhancing Mr. Batchu's offense level with regard to conduct relating to minor C.

> a. The district court erred in finding that Minor C was a minor and thus erred in applying a two level increase in offense level to Mr. Batchu on account of Minor C.

> b. The district court erred in treating as "relevant conduct" any conduct related to Minor C.

> c. The district court erred in applying a two level increase in offense level on account of Minor C as there was no "lascivious exhibition" and thus no "sexually explicit conduct" with respect to that person.

Issue 3:     The district court erred in applying the obstruction of justice enhancement to Mr. Batchu.

> a.     The district court made insufficient findings that Mr. Batchu had obstructed justice by committing perjury in two affidavits submitted in connection with a motion to suppress.

> b.     The district court made a legal error in finding that Mr. Batchu's conduct in continuing to contact Minor A after criminal proceedings had begun against him was conduct that constituted obstruction of justice.

Issue 4:     The district court erred by imposing a procedurally and substantively unreasonable sentence on Mr. Batchu.

a.    The district court's sentence was procedurally unreasonable.

b.  Mr. Batchu's 365 month sentence was
     substantively
unreasonable.

Issue 5:    The district court imposed an illegal sentence on Mr. Batchu by sentencing him to 365 months of imprisonment on counts two, three and four of the indictment when the statutory maximum for each of these counts was thirty years of incarceration.

Attachment B
*Issues Raised in Petition for Writ of Certiorari*

Issue:       Whether the First Circuit's holding that expert
testimony is not required to carry the Government's burden
of proving the minority of an unknown, post-pubescent
individual appearing in a video is in conflict with the
decisions of other United States courts of appeals on this
same important matter.

## Attachment C
### *Facts that Support Claims for Relief*

a. I retained the firm of Imhoff & Associates in Los Angeles, California
   to represent me. Imhoff & Associates then retained attorney Richard
   Foley to represent me in the case. Attorney Foley entered an
   appearance in the district court on April 22, 2010 and represented me
   through the sentencing proceedings.

b. An actual conflict of interest developed no later than after the plea
   hearing and before the sentencing hearing. Attorney Foley favored
   his own interests over my interests when he declined to timely retain
   an expert to evaluate me and submit a report for sentencing.
   Specifically, attorney Foley claimed as a fee and converted to his own
   use money that was available and earmarked to retain an expert. To
   cover up the fact that he intended to convert and did convert the
   expert money to his own use, attorney Foley failed to petition the
   court for expert funds. This conflict adversely effected attorney
   Foley's performance as counsel because it put me in the position of no
   expert input on important sentencing issues.

c. The only written representation agreement that I signed was with
   Imhoff and Associates. I did not have a written representation
   agreement with attorney Foley.

d. My family provided $5,000 to a trust account. The agreement with
   Imhoff and Associates expressly states that this money was to be used
   only for the purpose of retaining an expert witness to assist in the
   case.

e. Shortly after the plea hearing, when it was time for attorney Foley to
   retain the sentencing expert, he told me that he could not access the
   money in the trust account. I later learned that attorney Foley had
   access to the money in the trust account because he spent $200 of the
   money in the trust account on what he described as "court costs,"
   notwithstanding the fact that the $5,000 was only supposed to be
   used for an expert on my behalf.

f.  After attorney Foley told me that he could not access the trust account money, we discussed the fact that I had $10,000 posted in a state case.  Attorney Foley suggested that I authorize him to use this money to retain the sentencing expert.  Based on his representation that he would use the $10,000 to retain the sentencing expert, I authorized attorney Foley to obtain the money and use it for that purpose.

g.  At least $9,500 of this bail money was returned and available to attorney Foley to engage the expert no later than October 6, 2011.  Notwithstanding the fact that attorney Foley had this $9,500 no later than October 6, 2011, he failed to use it to retain the sentencing expert.

h.  On November 1, 2011, attorney Foley filed a motion to adjourn the sentencing hearing in this case.  Attorney Foley alleges in the motion that he arranged for an evaluation by a licensed psychiatrist.  He further alleges that the psychiatrist needs 45 days for the evaluation.  He further alleges that the "Defendant has just now been able to secure the requisite fees."

i.  On November 7, 2011, the court denied the requested adjournment, stating in a text order that the "defendant has waited too long to arrange for the evaluation."

j.  On November 13, 2011, attorney Foley filed a motion to reconsider the motion to adjourn the sentencing hearing.  In the motion to reconsider Foley asserts that the sentencing expert requires prepayment of $8,500. Foley admits that on October 6, 2011, $9,500 of the bail money was made available to attorney Foley to retain the expert, but that as of November 13, 2011 Foley had not yet provided any money to the expert.   Specifically, attorney Foley asserts in the motion to reconsider that the expert "stands ready to conduct the evaluation upon receipt of the monies."  In the motion to reconsider attorney Foley requests an adjournment of the sentencing from November 18, 2011 until December 22, 2011.

k.  I verbally directed attorney Foley to use the bail money for the sentencing expert, but I had no written agreement with attorney Foley regarding this money.   Immediately after sentencing, since the money was not used on an expert, I directed attorney Foley to return

the bail money to me.  Attorney Foley refused to return the bail
money.  He informed me that he intends to keep the bail money as a
fee.

l.  Between the plea and sentencing hearing in this case attorney Foley
repeatedly complained to me that he was not making enough money
for his work in this case.

m. I repeatedly asked attorney Foley to provide me the details of his
financial arrangements with Imhoff and Associates.  He refused to
provide these details, except that we did discuss the fact that my
agreement with Imhoff and Associates provided for $5,000 in a trust
account for the purpose of an expert.  He also told me not to tell
Imhoff and Associates about the bail money that he kept as a fee.

n.  I was constructively denied counsel in violation of the Sixth
Amendment when counsel did not take the time to review and
counsel me on my prepared allocution and when counsel failed to
offer me any statement at the sentencing hearing in support of a
reduced sentence.  I was also denied my Sixth Amendment right to
the effective assistance of counsel when defense counsel failed to
retain an expert for sentencing, failed to take the time to review and
counsel me on my prepared allocution, failed to prepare me for
sentencing, failed to present any coherent strategy at sentencing, and
failed to offer any statement at the sentencing hearing in support of a
reduced sentence.

o.  I prepared a written statement to the court in advance of the
sentencing hearing.  I attempted to review the letter with attorney
Foley at the courthouse on the day of the sentencing.  The meeting
was rushed and attorney Foley acted like he did not care to hear
statement.  He offered me no advice or criticism about the contents of
the statement.  Instead, he told me that he would engage me in a
question and answer exchange where he would ask me a questions
and I would answer on the record.  He told me that I should mention
Dr. Medoff's name in the question and answer session, otherwise he
did not prepare me for the questions he planned to ask.

p.  The judge was extremely critical of the allocution, calling it
"pretentious, frothy" and "completely phony and narcissistic and self-

justifying." The judge also indicated that the allocution gave him the "very, very strong sense that [I am] a supreme phony."

q. If attorney Foley would have taken the time to review my proposed allocution and offer advice on changes I should make, I would have changed the allocution or eliminated it altogether and I would not have made such a bad impression on the judge. The bad impression of me that the judge received from the allocution was obviously a significant factor in the sentence that I received.

r. Apart from objections to the guideline calculations, Attorney Foley failed to offer any argument at the sentencing hearing in support of a reduced sentence.

s. The government urged the court to impose a 30 year sentence. After the government presented its sentencing argument, the court asked attorney Foley if he wants to be heard on sentencing. Attorney Foley indicated that the government should go forward with its case and he will go forward with his case. The government then presented statements by the victim's parents, both of whom harshly criticized me. After the victim's parent's statements the court suggested a recess and said that after the recess "we will hear from Mr. Foley." After the recess I made a statement to the court, followed by a question and answer session where attorney Foley asked me questions about the case on the record and I answered them. At the end of the question and answer session, attorney Foley informed the court that "the defendant rests" without making in statement in support of a lower sentence.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MANI BATCHU,

         Petitioner,      )
                        )     Case No.: **14-cv-30203-MAP**
                        )
                        )             10-cr-30008-MAP
        v.              )
                        )
                        )
                        )     **PETITIONER'S SUPPLEMENTAL PETITION**
UNITED STATES OF AMERICA,  )     **FOR RELIEF UNDER 28 U.S.C. 2255**
                        )
         Respondent.     )
                        )
_____)

**TO THE HONORABLE DISTRICT JUDGE MICHAEL A. PONSOR:**

    **COMES NOW**, Petitioner <u>pro se</u>, Mani M. Batchu, D.O. ("Batchu"), respectfully files this supplement to his motion for relief pursuant to 28 U.S.C. sec 2255, based upon the Government's proposal. In support Batchu states as follows:

## I. INTRODUCTION AND FACTUAL BACKGROUND

    This case involves two individuals who sought a relationship online, through a <u>legal</u>, <u>adult</u> dating website(where members were verified to be adults on the basis of a credit card). As is commonplace now, in the Internet Age and especially on dating websites for adults, both individuals fabricated information about themselves to appear more palatable or attractive to the other party, and not for the intensive purposes of engaging in nefarious criminal acts or deception to the extent of criminal intent. Unfortunately, what was conceived as naive misrepresentations of their profiles, drew both individuals into a very ill-considered relationship on both accounts. Undeniably, Batchu used extremely poor judgement in choosing to continue such a relationship.

1. In August 2008, at the time of his offenses, Batchu was a 28-year-old Doctor of Osteopathic Medicine and second-year resident in Adult Psychiatry at the University of Illinois at Chicago. Originally from India, Batchu became a naturalized United States citizen at the age of 23. Batchu was the only child of a very ailing father, **with an** acutely terminal prognosis, and an extremely unstable, unhealthy mother suffering from Paranoid Schizophrenia for the past 20 years.

2. By virtue of his parents' failing health, and pressures to get married from all his family members, Batchu began browsing various **legal**, **adult dating websites**(as opposed to chat rooms, social media, or sites tailored to sexual relationships only). He soon came across a profile of an 18-year-old female, who initially purported herself as a college student studying accounting at the University of Massachusetts-Amherst. Initially, Batchu used another name "Mark Taylor" and a picture of someone other than himself at the time of interacting with, who would later be discovered, Minor A who was actually 15 years old. Batchu and Minor A's relationship, without his knowledge of her real age, grew romantically through online and phone conversations during the remainder of 2008 and until May of 2009.

3. In the course of the relationship, both Batchu and Minor A exchanged various expressions of love and marriage mutually, in addition to cards and gifts sent from **both** parties to each other. Naively believing Minor A's repeated assertions that she was 18 years old, the relationship developed sexually as well(both online and in person). After nearly ten months of a deeply-invested, consensually romantic and intimate relationship, Batchu discovered Minor A's actual age, via her date of birth printed on a restraining order.

**G.App.282**

4. Criminal proceedings soon followed addressing the following incidences involving sexual contact with Minor A:

        a. May 1, 2009 in Hartford, CT
        b. May 23, 2009 in Amherst, MA
        c. July 22, 2009 in Vero Beach, FL
        d. August 3, 2009 in Hadley, MA.

(Items (c) and (d) occurred where their relationship continued, after a restraining order and no contact order in MA and CT)

5. In addition to these offenses, Batchu's laptop revealed the existence of videos of consensual webcam interactions involving sexual content of Minor A and him. Videos of Batchu communicating with two other unknown females were found, where based on general observation the Court found one female was of age and another female was underage(Minor C). Other image files were reportedly recovered by the Government that depicted post-pubescent females engaging in sexually explicit conduct.

6. Batchu was charged in an eight-count federal indictment dated April 1, 2010 as follows: Transportation of a minor to engage in criminal sexual activity(Count One: 18 U.S.C. 2423(a));interstate travel for the purposes of engaging in illicit sexual conduct with a minor(Counts Two through Four: 18 U.S.C. 2423(b));use of a facility of interstate commerce to entice a minor to engage in criminal sexual activity(Count Five: 18 U.S.C. 2422(b));sexual exploitation of a minor (Counts Six and Seven: 18 U.S.C. 2251(a)); and possession of material involving the sexual exploitation of a minor(Count Eight: 18 U.S.C. 2252(a)(4)(B); and Asset Forfeitures which included a Lexus vehicle and included the following items that were illegally searched and seized: two macbook computers, a flash drive, and a digital camera.

**G.App.283**

7. On February 23, 2011, the Government filed a motion to dismiss Counts Seven and Eight when they found that **numerous officers had been illegally accessing and repeatedly viewing <u>sexually-explicit</u> videos of <u>Minor A</u>.** These videos were illegally inventoried, searched and seized from a flash drive and computer found in a rental car.

8. On February 24 and 25, 2011, the Court held a Motion to Suppress Hearing relative to Miranda and 4th Amendment Violations that occurred in Chicago at Batchu's residence and place of employment. This Court denied without prejudice the first motion to suppress on March 31, 2011 in light of Mr. Batchu's intention to plead guilty. Subsequently, the Court denied the second motion on May 9, 2011 the day of the Rule 11 Hearing.

9. On May 9, 2011, Batchu pled guilty to Counts One through Five, and in the context of a plea agreement, the Government agreed to dismiss Count Six.

10. On November 1, 2011, Attorney Richard N. Foley ("Attorney Foley") filed a motion to continue to arrange for a psychological evaluation by Dr. David Medoff("Dr. Medoff"). This Court denied the motion on November 7, 2011 stating "defendant has waited too long to arrange for evaluation." A subsequent motion for reconsideration on November 13, 2011 was filed and denied the next day for the same reason, but adding the "defendant may of course submit copies of existing medical records as part of his sentencing memorandum."

11. On November 18, 2011, this Court sentenced Batchu to concurrent terms of imprisonment of 365 months on all five counts of the indictment to which Batchu pled guilty, followed by concurrent terms of 360 months of supervised release.

Batchu was represented in the Court by Attorney Foley from April 22, 2010 (Arraignment) through November 18, 2011(Sentencing).

12. A timely direct appeal was filed and a court-appointed attorney represented Batchu through this process. On July 18, 2013, the First Circuit Court of Appeals affirmed this Court's decision, though Judge Torruella said "I would conclude otherwise on the need for expert testimony regarding the age of sexually abused victims where that finding cannot be documented by official records or by testimony of the victim."(United States v. Batchu, 724 F.3d 1 (1st Cir. 2013)). Petition for Certiorari to the Supreme Court was subsequently filed and denied.

13. On or about November 21, 2014, Batchu filed the instant Motion Under Section 28 U.S.C. sect. 2255 To Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody(the "2255 Motion").

The 2255 Motion alleged three grounds, notably related to Attorney Foley and the firm of Imhoff & Associates:

      a. Batchu was sentenced in violation of his Sixth Amendment right to conflict-free counsel.

      b. Batchu was constructively denied counsel contrary to the Sixth Amendment at and before sentencing.

      c. Batchu was denied the right to effective assistance of counsel at and before sentencing.

In support of these grounds, Batchu submitted "Facts that Support Claims for relief."

14. Since Batchu's 2255 Motion effectively waived his attorney-client privilege, the record must be supplemented by Batchu and Attorney Foley (and likely Imhoff & Associates) so that the Government can adequately respond to the motion. Specifically, the Government requests that Batchu file a supplemental petition providing a full and complete version of every significant conversation or communication he had with Attorney Foley.

## II. RELEVANT FACTS ESTABLISHING BATCHU'S
## REPRESENTATION BY IMHOFF & ASSOCIATES

1. In March 2010, Batchu retained the firm of Imhoff & Associates ("Imhoff"), located in Los Angeles, California, to represent him. Unbeknownst to Batchu, Imhoff handed off the representation to an attorney out of New Hampshire, Attorney Foley. As the first of a slew of surprises in store for Batchu, Batchu was never informed by Imhoff that Attorney Foley would be managing his case. By no means at all, did Batchu ever voluntarily, knowingly, nor intelligently make an informed choice in having Attorney Foley represent him in any respect on his case. In fact it wasn't until an unexpected visit that Batchu even knew of Attorney Foley's identity, which occurred just a day prior to the Arraignment Hearing set for April 22, 2010; concomitantly, the date which he entered his first appearance in this Court.

2. The **only** **written representation agreement that Batchu signed was with Imhoff.** He **did not** have a written representation agreement at any time with Attorney Foley. Attorney Foley's name was never mentioned, written or otherwise, in the agreement Batchu signed. The agreement clearly stated that Imhoff would represent Batchu through trial and sentencing; a full, and complete resolution of the case including all state and federal charges.

3. Batchu's family agreed to pay the flat-fee retainer amount of $37,500 to Imhoff, with the expectation of Imhoff representing Batchu. Imhoff requested Batchu's family to provide an additional $5,000 to hold in a trust account. The agreement with Imhoff **expressly states that this money was to be used** **only** **for the purpose of retaining an expert witness** (i.e. forensic psychologist/psychiatrist) **to assist**

in the case. Imhoff stated that this amount was **more than adequate** to have an expert evaluate Batchu, submit a report, and/or provide testimony. Batchu asserts that it was his expectation to utilize any amount, up to and/or including the $5,000 necessary to retain an expert for the case. As Imhoff assured Batchu that this amount was enough, Batchu expected to use this money **only** and no more for its intended purpose.

4. Batchu establishes the fact that he had $10,000 in bail money posted in a state case in Connecticut. It remains unclear as to the extent of Imhoff's knowledge or interest in this amount. What is clear, however, is Attorney Foley's strong suggestion that Batchu authorizes him to use this bail money to retain the expert and not the $5,000 reserved in the trust for this distinct purpose.

### III. BATCHU'S GROUNDS FOR HABEAS RELIEF

A. GROUND ONE: BATCHU WAS CONVICTED AND SENTENCED IN VIOLATION OF HIS SIXTH AMENDMENT RIGHT TO CONFLICT FREE COUNSEL

1. Attorney Foley was aware of the critical nature of an expert opinion for purposes of sentencing, as revealed in the Government's offer of a plea bargain, no later than March 2011. As a matter of fact, Attorney Foley was given a draft of the agreement by Batchu's previous counsel among numerous other discovery materials just after Attorney Foley entered his appearance in April 2010. Furthermore, Batchu had directed Attorney Foley to seek an expert to assist with the case, well before the actual plea hearing and no later than March 2011. The plea agreement itself, explicitly states:

> "Defendant reserves the right to contend that there is a basis for departure from, or a sentence outside, the otherwise applicable Sentencing Guideline range based on his cultural background and on his medical, mental and/or emotional condition."

(Doc. 79, page 4).

2. An **actual** conflict of interest developed no later than after the plea hearing and before the sentencing hearing. Attorney Foley favored his own interests over Batchu's interests when he declined to timely retain an expert to evaluate, submit a report, and/or provide testimony at sentencing with respect to Batchu's cultural background and his medical, mental and/or emotional condition. Specifically, **Attorney Foley claimed as a fee and converted to his own use money that was available and earmarked** to retain an expert. To cover up the fact that he intended to convert and did convert the expert money to his own use, Attorney Foley failed to petition the court for expert funds. Even if there was no money available to Attorney Foley as he claimed, he still had the option to request a court-appointed expert and/or petition the court for funds. The Supreme Court observed that:

> "An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under <u>Strickland</u>."

(See <u>Hinton v. Alabama</u>, U.S., No. 13-6440, decided February 24, 2014) Particularly,

> "The inexcusable blunder here was the lawyer's erroneous belief about the money and his failure to research whether he had more resources available to him," the court said.

(See <u>Hinton v. Alabama</u>)

Mirroring Attorney Foley's unreasonable error and ignorance of a point of law, Batchu affirms that this is exactly what occurred in his case.

3. The seeds of Attorney Foley's **actual** conflict of interest, were sown from the very inception of meeting with Batchu and learning the details of his case. It was further sown when Batchu's previous counsel sent Attorney Foley all the relevant case materials and notes, including the fact that Batchu had posted $10,000 in bail money in Connecticut. Moreover, once Batchu signed and executed the agreement with Imhoff, Attorney Foley was made aware of the particular terms of the agreement, particularly the existence and purpose of the $5,000 in the trust account. This is notwithstanding the fact that Batchu himself made Attorney Foley aware of these funds in their very first meeting.

4. Despite the fact that **$15,000**($10,000 in Connecticut bail money **and** $5,000 from Imhoff's trust account) **was available to Attorney Foley**, though he contends a total of $14,300($9,500 in bail and $4,800 from Imhoff). It was still, more than enough money to hire the expert who Attorney Foley asserts costs $8,500. Instead of pursuing this "plausible alternative defense strategy" for Batchu, Attorney Foley favored his own motives and interests by claiming these funds as a fee and converting the expert money available to his own use(See Familia-Consoro v. United States, 160 F.3d 761, 764(1st Cir. 1998)).

5. Attorney Foley's deep-seated interest in the $15,000 was especially evident as the case approached critical stages in the proceedings(i.e. the Suppression Hearing, the Rule 11 Hearing, the Sentencing Hearing, and other critical deadlines to submit motions/affidavits/memoranda). Most significantly, in the days leading

up to submitting Batchu's Supplemental Memorandum in support of his Motion to Suppress and Batchu's Sentencing Memorandum, Attorney Foley repeatedly complained to Batchu that he was not making enough money for his work. Specifically, as Batchu attempted to prepare and discuss strategy for his expected trial, Attorney Foley would consistently interject that Imhoff pays him a miniscule amount of money and always emphasized the enormity of Batchu's case.

6. Batchu repeatedly asked Attorney Foley to provide him details of his financial arrangements with Imhoff. Attorney Foley refused to provide these details. This was particularly the case on March 25, 2011, when Attorney Foley made another dubious, unexpected visit with Batchu. Coinciding ironically with the deadline given by the Court to submit his Supplemental Memorandum, which the Government had just submitted, Attorney Foley urged Batchu to accept the Government's offer of a plea bargain. He falsely claimed to Batchu that the Court had denied their Suppression Motion, when in fact the ruling was still pending. In fact, the Court asked him that very question at the Rule 11 Hearing, and to Batchu's surprise, Attorney Foley affirmed under Oath that he was aware that the ruling on the motion was still pending, quite contrary to his statement to Batchu on March 25th(Docket entry dated 5/9/11

7. At the March 25th meeting with Batchu, Attorney Foley used his knowledge of the $15,000 available, in persuading Batchu that he would timely retain an expert. He claimed that this expert's evaluation and report would satisfy the Court's and plea agreement's basis for a departure from, or a sentence outside the applicable Sentencing Guidelines, specifically a sentence of 10 years.

8. Unaware of this sprouting conflict of interest by Attorney Foley, Batchu agreed to enter into the plea agreement. Unknowingly, and befitting for Attorney Foley, the plea papers presented to Batchu were a different copy labeled "draft" and did not include nor did they discuss the applicable Sentencing Guidelines range that Batchu was made aware of with the Court's copy of the plea agreement at the Rule 11 Hearing on May 9, 2011. In fact, Batchu needed to discuss this apparent discrepancy with Attorney Foley at the Rule 11 Hearing when Batchu asked the Court,

"Is it possible to speak with counsel about that?"

and Foley responds,

"He wishes to go to a room for a minute to conference."
(See Doc. 103, page 51, lines 3-4 and 9-10).

During the private conference, Batchu confronted Attorney Foley about the plea agreement discrepancy and the fact that the ruling on the Suppression Motion was still pending on March 25th, the day Attorney Foley made his visit and stated it had been denied. In fact, the motion was denied without prejudice on March 31, 2011(See Docket entry dated 03/31/2011). With his financial motives in mind, Attorney Foley simply dismissed Batchu's claims and once again exclaimed "we'll get the expert and you'll get 10 years, if you go to trial then you'll get life!" He also insisted on Batchu not obstructing the hearing any further and to just agree to all the questions asked by the Court. Batchu complied reluctantly, unaware that Attorney Foley's conflict of interest would impede him from securing the expert (See Mickens v. Taylor, 535 U.S. 162, 172 n.5, 122 S. Ct 1237, 152 L.Ed. 2d 291 (2002); Yeboah-Sefah v. Ficco, 556 F.3d 53, 73(1st Cir. 2009))

9. Shortly after the plea hearing, some 6 months prior to sentencing, Batchu awaited communication from Attorney Foley with respect to finally retaining the psychiatrist for sentencing. Attorney Foley eventually responded, stating that he could not access the money in the trust account. Batchu later learned that **Attorney Foley had access** to the **money in the** trust account, **because he spent $200 of the money in the trust account** on what he described as "court costs," notwithstanding the fact that **the $5,000 was only supposed to be used for an expert on Batchu's behalf.** Attorney Foley yet again falsely claimed that he would work on the issue promptly. Batchu received no confirmation or other communication with regards to the progress of his alleged efforts, meanwhile, the clock kept ticking closer to sentencing.

10. Finally, after Attorney Foley told Batchu that he could not access the trust account money, they discussed the fact that Batchu had $10,000 bail posted in Connecticut. Attorney Foley strongly advised Batchu to authorize him to use this money to retain the expert for sentencing. Based on his representation that he would use the $10,000 to retain the expert, Batchu authorized Attorney Foley to obtain the money and use it for that purpose.

11. At least $9,500.00 of this bail money was returned and available to Attorney Foley to engage the expert no later than October 6, 2011. Attorney Foley even admits to receiving the "$9,500.00 from Connecticut bail via Atty Frank O'Brien ( Batchu's previous counsel) and $4,800.00 from Imhoff." (See Exhibit A).

12

Notwithstanding the fact that Attorney Foley had at least the $9,500.00, let alone the $4,800.00 that he freely admits to having as well, no later than October 6, 2011, he failed to use it to retain the expert for sentencing.

12. On November, 1, 2011, Attorney Foley filed a motion to adjourn the sentencing hearing in this case. Attorney Foley alleges in the motion that he arranged for an evaluation by a licensed psychiatrist, Dr. Medoff, who is actually a psychologist. Attorney Foley further alleges that the psychiatrist needs 45 days for the evaluation. At no time whatsoever, did Attorney Foley discuss with Batchu the length of time required by Dr. Medoff. Furthermore, he claims that the "Defendant has just now been able to secure the requisite fees," which is patently false based on the aforementioned facts.

13. On November 7, 2011, the Court denied the requested adjournment, stating in a text order that the "defendant has waited too long to arrange for the evaluation." If not for Attorney Foley's conflict of interest, in choosing to convert the money reserved for the expert for his own use, the evaluation could have been done in a timely manner. Instead, Attorney Foley effectively abandoned his client's preserved defense claim in the plea agreement, and abandoned their plan to contend that there is a basis for departure from or a sentence outside the Sentencing Guidelines based on the factors previously mentioned in the agreement.

14. On November 13, 2011, Attorney Foley filed a motion to reconsider the motion to adjourn the sentencing hearing. In the

motion to reconsider Attorney Foley asserts that the expert for
sentencing requires prepayment of $8,500. Attorney Foley never
mentioned at anytime the actual fee required by the expert they
were seeking. Again, Attorney Foley admits that on October 6, 2011,
$9,500 of the Connecticut bail money was made available to him for
the purpose of retaining the expert, but that as of November 13,
2011, Attorney Foley had not yet provided any money to the expert.
Specifically, Attorney Foley asserts in the motion to reconsider
that the expert "stands ready to conduct the evaluation upon receipt
of the monies." In the motion to reconsider Attorney Foley requests
adjournment of the sentencing from November 18, 2011 until
December 22, 2011. Attorney Foley's conflict of interest,
heightening in fervor as the case proceeded through critical stages,
paralyzed and obliterated the adequacy of his representation of Batchu.
It placed Batchu in the position of no expert input on important
sentencing issues, and consequently forced Attorney Foley into
an improvisational performance at sentencing as is evident in
the sentencing transcripts (See Doc. 99, page 67, lines 7-25, page
68, lines 1-19).

15. To clarify a previous fact, Batchu directed Attorney Foley
to use the bail money for the expert but no written agreement with
him regarding this money. Immediately after sentencing, since none
of the money available to Attorney Foley was used on an expert,
Batchu directed him to return the bail money back to his family.
Attorney Foley refused to return the bail money. As an additional
cover-up to keeping the money for his own use, he informed Batchu

that he intends to keep the bail money as his fee. In furtherance
of his deceitful actions, Attorney Foley attempted to implicate
Batchu himself by telling him not to inform Imhoff about the bail
money that he kept as a fee. In exchange, he stated that he would
do the appeal for Batchu. Additionally, Attorney Foley did not want
Batchu to inform Imhoff that he was going to undertake the appeal as well.
Clearly, the written representation agreement between Batchu and
Imhoff did not cover an appeal. Batchu emphatically refused Attorney
Foley's cunning offer, and again requested him to return the
monies. After multiple attempts of contacting Attorney Foley, by
Batchu and his family, through phone and mail, the monies still
remained in his possession.

16. This conflict of interest adversely affected Attorney Foley's
performance as counsel in multiple ways, as stated earlier, but the
effect is far more reaching and spills over into the next two grounds
of Batchu's 2255 Motion. Even more significant, is that Attorney
Foley failed to meet his ethical obligations to inform the Court
that a conflict of interest arose in the course of the proceedings
(See Guaraldi v. Cunningham, 819 F.2d 15, 18(1st Cir. 1987).
This was evident by his failure to petition the Court for expert funds,
when he was allegedly having trouble accessing the monies.

17. Astonishingly, Batchu was made aware that this was not the
first instance of Attorney Foley's misappropriation of monies.
According to a report and decision written by the Professional
Conduct Committee of New Hampshire, Attorney Foley had been suspended

15

**G.App.295**

for a period of six months, stayed originally for one year then amended to 18 months (See Exhibit B - <u>Foley, Richard N. advs. Robin Sawyer</u>, 11-01, amended December 11, 2011). Furthermore, the report clarified two aggravating factors present "Mr. Foley's substantial experience in the practice of law; and two prior warnings: OO-N-118 on September 27, 2002, and 10-057 on April 25, 2011." The case is available here for reference, but Batchu would like to draw the Court's attention to particularly numbered facts: 3, 5, 9, 11, 12, 25, 26, 29, 32, 33, 34, 37, 39, 41, 42, 43, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, **56-61, 62-66** (the bolded numbers are the particular violations of the Rules of Professional Conduct found by the Professional Conduct Committee). Also, it is critical to elicit the specific breaches under their three-prong analysis which are strikingly similar to Batchu's observations and communications with Attorney Foley. Moreover, Attorney Foley was suspended from practice on December 23, 2013 by the Massachusetts Board of Bar Overseers of the Supreme Judicial Court based on similar claims. Despite the obvious similarities, Batchu asserts the importance that in Batchu's criminal case, Attorney Foley's negligence and misconduct occurred concurrently with their cases <u>and</u> **adversely affected his performance as counsel that in turn significantly harmed Batchu and his outcome.**
(See <u>Romero-Barcelo v. Acevedo-Villa</u>, 275 F. Supp 177 (1st Cir. 2003))

    18. These effects are clear in Attorney Foley's procrastination and negligence throughout the proceedings involving Batchu and his case. Particularly shocking is his lack of  communication with Batchu as sentencing approached, but more so is his untimely and lack of communication with this Honorable Court. Attorney Foley waited until

November 1, 2011, to notify the district court of his need to delay the Sentencing Hearing so that Dr. Medoff could perform his evaluation. This request was denied by the Court because the hearing was due to take place on November 18, 2011.

19. Batchu alleges that Attorney Foley's delay in notifying the Court about the difficulty in securing funds for Dr. Medoff's evaluation was unprofessional and unreasonable. Where Attorney Foley represented (in his November 1, 2011, motion for postponement) that "Defendant has just now been able to secure the requisite fees" to pay Dr. Medoff, Batchu affirms that (1) Attorney Foley knew about the funds no later than October 6, 2011 (as admitted in the subsequent motion for reconsideration filed on November 13, 2011), and (2) Attorney Foley was ineffective under the Sixth Amendment for failing to notify the Court early-on of the need for an expert and the difficulty in securing funds. Batchu demonstrates that these deficiencies in performance are the direct result of Attorney Foley's deep-seated conflict of interest, and pervaded his ability to advocate effectively under the Sixth Amendment.

B. __GROUND TWO__: BATCHU WAS CONSTRUCTIVELY DENIED COUNSEL CONTRARY TO THE SIXTH AMENDMENT AT AND BEFORE SENTENCING

Attorney Foley's conflict of interest inherently colors Batchu's constructive denial of counsel claim and yet is also supported by the following facts:

1. From the moment that the actual conflict of interest was conceived by Attorney Foley, there was an immediate impact on his performance and effectiveness which concomitantly expressed itself as a constructive denial of counsel. Most notably, Batchu asserts

an obvious demonstration of this claim at a particularly **critical stage** of the proceedings, **the Sentencing Hearing** which reveals itself in the following ways:

a) Batchu was constructively denied counsel in violation of the Sixth Amendment when Attorney Foley did not take the time to review and counsel Batchu on his prepared allocution and written letter and when Attorney Foley failed to offer <u>any</u> statement at the Sentencing Hearing in support of a reduced sentence.

b) Absent any advice from Attorney Foley himself, Batchu drafted a written statement to the Court through the suggestion of fellow inmates at his detention facility. Batchu asserts that Attorney Foley **never** advised him on how to prepare, let alone suggest what to prepare, in advance of his hearing. Batchu was made aware of the importance and admissibility of such items as: letters of support, a written letter to the Court, and an allocution, only through passing conversations with other inmates at his facility and not through any counseling or advice from Attorney Foley.

c) With extremely limited access to the appropriate resources, Batchu was fortunate enough to draft a letter to the Court and write an extremely raw version of an allocution, only the night prior to the actual Sentencing Hearing itself. Batchu would have missed the opportunity to submit these two items, had it not been for the assistance, albeit questionable, of an inmate who had just been sentenced the day prior and was residing in his unit. Batchu admits to drafting the written letter and allocution **without the advice or availability** of Attorney Foley at any time, through no fault of Batchu's good-faith efforts in seeking his timely advice.

d) Batchu attempted to review both the letter and the allocution with Attorney Foley , at the courthouse, on the day of sentencing. The meeting was rushed, and Attorney Foley simply stated "Give me the letter and I'll give it to the judge, it'll be fine." With regards to the allocution, Attorney Foley acted like he did not care to hear the statement. The only feedback Batchu received was to go ahead and ask the Court for a "moment of silence" for the members of the families who had passed away. In fact, Attorney Foley encouraged Batchu to start with this gesture to impress upon the Court that Batchu was human with genuine sympathy towards others.

e) Attorney Foley offered Batchu no advice or criticism about the contents of the statement. Instead, he told Batchu that he would engage him in a "question-and-answer" exchange, where he would ask Batchu questions and Batchu would answer on the record. Attorney Foley told Batchu to mention Dr. Medoff's name somewhere in the exchange, otherwise he did not prepare Batchu for the questions he planned to ask. With the meeting rushed, and Attorney Foley's hurried demeanor, Batchu was never able to ascertain the purpose of this never-before-discussed tactic.

f) The Court was extremely critical of Batchu's suggestion for a "moment of silence" by stating, "I'm not going to do that.. Let's move on." (Doc. 99, page 69).Though Batchu intended to convey humility, sincerity, and being earnest in his delivery, the Court called it:       "a pretentious, frothy, narcissistic performance"
          "you are a supreme phony"
          "one of the most tinny performances I've heard,
          very wordy and full of a lot of noise"
          "if your performance was sincere, I missed it"
          "struck me as completely phony and narcissistic
          and self-justifying."

(Doc. 99, page 89-90)

g) If Attorney Foley would have taken the time to review Batchu's proposed allocution and offer advice on changes he should make, he would have changed the allocution or eliminated it altogether and he would have not made such a bad impression on the Court. The bad impression of Batchu that the Court received from the allocution was obviously a significant factor in the sentence he received, as noted by the Court,

> "a sentence at the top of the guideline range is justified.. because of the rather sophomoric and pretentious and obliquely and carefully self-justifying little speech we just heard." (Doc. 99, page 90)

h) Attorney Foley never acknowledged to the Court whether Batchu's additional letters of support or his personal written letter to the Court was actually received and read. In fact when the Court reviewed the materials it had received and read, as noted on the record,

> "I do not see defendant's counsel...have any expressions of concerns so I'm assuming that I've digested everything that I was intended to digest to prepare for today's proceeding." (Doc. 99, page 5),

Attorney Foley raised no concern. Assuming the Court did read Batchu's letter, the contents of which were unreviewed by Attorney Foley, it clearly factored in badly to the sentence Batchu received.

i) Apart from the objections to the guideline calculations, Attorney Foley failed to offer **any** argument at the Sentencing Hearing in support of a reduced sentence. Attorney Foley repeatedly reassured Batchu that they would have the expert's report/testimony at sentencing. Attorney Foley stated that the expert's opinion, <u>alone</u>, would be more than sufficient in arguing and providing a basis for a reduced sentence; specifically, a sentence of 10 years.

j) The Government urged the Court to impose a 30-year sentence. The Government made a well-articulated, lengthy argument incorporating their facts of the case, addressing the individual factors of 18 U.S.C. sect. 3553, and weaving the impact of the course of Batchu's conduct on the victim **and** her family. The Government's argument, as delivered at sentencing, was well-grounded in their 19-page Sentencing Memorandum, as would be expected from a competent, adversarial lawyer bent on testing the defendant's case. However, Attorney Foley simply failed his professional duty as Batchu's advocate, in failing to present **any** testing of the prosecution's case in this respect. The Court asked Attorney Foley if he wanted to be heard after the Government's vigorous and substantial testing, but he indicated that the Government should go forward with its case and he would go forward with his case. The Government then presented powerful, heartrending statements by the victim's parents, both of whom also harshly criticized Batchu. The Court then suggested a recess, after which Attorney Foley was expected to speak.

k) After the recess, Batchu made a statement to the Court, followed by a "question-and-answer" exchange with Attorney Foley. At the end of the exchange, **Attorney Foley informed the Court that "the defendant rests" without even making a single statement in support of a lower sentence.** This constructive abandonment at sentencing, to convey even a single reason in support of a reduced sentence, was presumptively unfair, unprofessional, unreasonable and not the type of counsel guaranteed by the Sixth Amendment. **The circumstances presented demonstrates the constructive absence of an attorney dedicated to the protection of his client's rights under our adversarial system of justice** (United States v. Swanson, (9th Cir. 1991)); (Evitts v. Lucey, 469 U.S. 387, 394, 83 L.Ed.2d 821, 105 S.Ct. 830 (1985)).

1) Attorney Foley **never** provided any rhyme or reason to Batchu as to his surprise implementation of a "question-and-answer" session. In fact, even the Court questioned his daring approach by saying,

> "The stakes are very high here."

Attorney Foley himself even conceded his unusual and unfounded approach stating,

> "It's not normal...I agree...this is the first one I've done in probably a hundred sentencings."

(Doc. 99, page 67-68)

It remains unclear as to whether Attorney Foley intentionally used this approach, which further bolstered the prosecution's case, in order to cunningly conceal the pursuit of his own interests; retaining the expert funds that were made available as his fee. Clearly, Attorney Foley's abnormal approach further solidified the Court's disbelief in Batchu's credibility and sincerity in his statements from the stand. As is palpable from the record, during the course of the proceedings, the Court frequently interjected asking Attorney Foley to move on or questioned and discarded his ratiocination (See Doc. 99, pages 83-88).

m) The maleficent method of Attorney Foley adversely affected Batchu's outcome, as it induced him to reveal incriminating details. The Court saw these details as delusional fodder of Batchu's character and again, harshly criticized him in what the Court saw as a "pretentious, frothy, narcissistic performance"(Doc. 99, page 89). Attorney Foley told Batchu during the earlier recess, that without the expert present, we are left to essentially "wing it" with the question and answer session. It is Batchu's assertion, that Attorney

Foley gave Batchu <u>no other option</u> and unduly coerced Batchu to have
blind faith in his ill-equipped plan. Batchu affirms that his
participation in the exchange was not done voluntarily, knowingly,
or intelligently.

n) Attorney Foley's **constructive abandonment** of his duty of
loyalty to Batchu and effectively assisting the prosecution in
persuading the Court to impose a 30-year sentence, created instantly
a secondary, **actual conflict of interest** therein. In furtherance of
Attorney Foley's already established conflict of interest, Batchu was
left unarmed, fending for himself against the barbs of yet another
conflict foe. Justifiably so, as a result of the <u>double-dose</u> of Attorney
Foley's conflicts, the Court freely reprimanded every fiber of Batchu's
character and credibility while imposing an <u>unopposed</u> sentence of
365 months.

o) Attorney Foley, incentivized by the expert money in his
possession and as part of his grand cover-up, connivingly told Batchu
as the sentence was being imposed that he would file a notice of appeal
and claim himself as ineffective on direct appeal. Specifically, he
said he had to meet an immediate deadline or Batchu would lose his
chance of an appeal. Unaware of Attorney Foley's ploy, Batchu agreed
to let him file this notice of appeal. Attorney Foley then stated
that he would claim himself as ineffective at sentencing, in order
to reverse Batchu's sentence on appeal. In fact, at a visit with Batchu
just after sentencing, Attorney Foley essentially admitted to the
commission of deliberate ineffectiveness at sentencing, in order to
create reversible error on appeal. He mentioned to Batchu that he

would submit an affidavit claiming his ineffectiveness **before and at** sentencing, in order to create reversible error on appeal. Batchu made it clear at this visit that he wanted a court-appointed counsel to represent him on **appeal**, as Batchu's family was financially strained. Attorney Foley stated that he had already begun work on the appeal and claimed his fee, despite no agreement by Batchu. After this visit, Batchu and his family, attempted to contact Attorney Foley and Imhoff on **numerous** occasions to return the $15,000.00. They both simply refused and **both Imhoff and Attorney Foley halted all communications** with Batchu and his family.

p) Batchu asserts that Attorney Foley's commission of deliberate misconduct at and before sentencing, is a pure reflection of Attorney Foley's constructive abandonment of Batchu. This, in turn, is a direct consequence of Attorney Foley's aforementioned conflicts of interest which caused him to favor his own interests over Batchu's. It is unclear as to Imhoff's role in this entire operation, but Batchu prays that the Court or Attorney Foley can further elucidate Imhoff's part in this blatant unconstitutional violation and instance of attorney misconduct that impacted Batchu's sentence.

2. Batchu asserts that Attorney Foley constructively abandoned Batchu at another **critical stage** of the proceedings, the **negotiation of the plea agreement**. Specifically, there was a breakdown in communication with Batchu concerning a plea offer and negotiation of this offer in the following ways:

a) A breakdown in communication began soon after the Motion To Suppress Hearing in February. Attorney Foley did not contact nor was he available to respond to Batchu's attempts at communication.

Attorney Foley never communicated any progress or efforts to his Supplemental Memorandum that was **critical** to the Court's decision on suppression of damaging evidence against Batchu, which was due on March 25, 2011. Batchu repeatedly asked as to the status of the motion, yet no response was ever given.

  b) Attorney Foley never discussed his progress or efforts with regards to a plea agreement. Batchu asserts that he always made it clear to Attorney Foley that he intends to go trial, but was open to review any offers proposed by the Government during the course of the proceedings. In light of this, Batchu repeatedly asked Attorney Foley for copies of emails and communications with the Government in relation to the negotiation of a plea agreement, yet he provided no such details.

  c) Unexpectedly, in a surprise visit on March 25, 2011 (coincidentally the day his memorandum was due), Attorney Foley brought a draft copy of a plea agreement that was the <u>**same**</u> agreement given to Batchu by his previous counsel prior to his termination in February 2010. **This copy did not have the calculated Sentencing Guideline range, that Batchu observed on the copy given to him at the Rule 11 Hearing.** Attorney Foley simply said that this was the best offer they would get and emphasized that with the hiring of an expert, the Court would be able to depart from the Guidlines and sentence Batchu to 10 years. Attorney Foley unduly coerced Batchu into signing a signature form that was independent of the rest of the draft copy, falsely asserting that this was the actual plea agreement. He assured

**G.App.305**

Batchu that, in the worst case scenario, he would claim himself as ineffective in relation to the negotiation of this agreement and directed Batchu's attention to this very preserved clause in the agreement itself as follows,

> "Defendant reserves the right to claim that Defendant's lawyer was ineffective in connection with the negotiation of this plea agreement or the entry of the guilty plea"
> (Doc. 79, page 9).

d) Attorney Foley failed to provide any communication with regards to the next step in the proceedings, the Rule 11 Hearing. Again, at yet another **critical stage**, Attorney Foley never informed Batchu or prepared him for the Rule 11 Hearing's format or contents. More importantly, he never emphasized Batchu's rights during the hearing specifically his right to object to the facts. Attorney Foley simply told Batchu to agree with all the statements and enter his guilty pleas, so as to not anger the Court, particularly the judge. Batchu asserts that he felt utterly unprepared and anxious at the hearing because of Attorney Foley's lack of communication.

e) These significant instances of a break-down in communication between Attorney Foley and Batchu, prevented Batchu from receiving effective representation and clearly demonstrates a **constructive denial of counsel.** Notwithstanding the fact that most of Attorney Foley's actions or inactions are rooted in his self-serving conflict of interest, which stands on its own, his inability to provide Batchu any communication or evidence of his efforts with respect to the plea agreement, demonstrate a lack of meaningful adversarial testing of the prosecution's case in violation of the Sixth Amendment (See United States v. Theodore, 468 F.3d 52(1st Cir. 2006); United States v. Cronic, 466 U.S. 648, 659, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984)).

## C. <u>GROUND THREE</u>: BATCHU WAS DENIED THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT AND BEFORE THE SENTENCING

Attorney Foley's ineffectiveness, though tightly intertwined with Batchu's previous two grounds, is also mutually exclusive of them and can be dissected into the following series of defense counsel's failures, negligence, and overall deficient representation that "fell below an objective standard of reasonableness" (<u>Strickland v. Washington</u>, 466 U.S. 668, 688 & 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674(1984)) :

1. Batchu was denied his Sixth Amendment right to the effective assistance of counsel when Attorney Foley failed to retain an expert for sentencing, failed to fully investigate Batchu's mental health background and upbringing, failed to fully ascertain the immediate stressors surrounding the time period leading to and present at the time the offenses were committed, failed to take the time to review and counsel Batchu on his prepared allocution, failed to prepare him for sentencing in any manner, failed to present any coherent strategy at sentencing, failed to offer any statement at the Sentencing Hearing in support of a reduced sentence, and other unreasonable omissions at sentencing which are all further expanded upon herein:

a) Again, Batchu emphasizes that, though the actual representation agreement was between Batchu and Imhoff, **it remains unclear of the communications and underlying, furtive nature of the relationship between Attorney Foley and Imhoff** throughout the proceedings. It is clear that Imhoff failed to communicate with Batchu at any time, once Attorney Foley entered his appearance in April 2010. Though it was Imhoff that requested the $5,000.00 to be placed in a trust and reserved for retention of an expert, which Batchu's family provided

upon execution of the agreement in March 2010, it is unclear on whether the money was deposited into an account held by Imhoff, Attorney Foley, or both. It is clear that Attorney Foley failed to retain an expert at sentencing, and instead converted the money allocated for such purpose, to his own use.

b) Alternatively, Attorney Foley failed to petition the Court for funds, when he was allegedly having difficulty acessing the available funds. Attorney Foley himself had suggested an expert he was personally familiar with, Dr. Medoff, shortly after the plea hearing. Batchu affirms that he agreed to retain Dr. Medoff for the purposes of sentencing, and informed Attorney Foley to utilize the funds allocated for that purpose. For some reason still unknown, Attorney Foley failed to timely notify the Court that he was having problems securing the available funds to "prepay" Dr. Medoff. Clearly, at least $9,500.00 of the Conneticut bail money was returned and available to Attorney Foley to engage the expert no later than October 6, 2011. Notwithstanding the fact that Attorney Foley had access to the $5,000.00 prior to October 6, 2011, he failed to use any of the available $14,500.00 to fulfill the alleged "prepayment of $8,500.00" that Dr. Medoff allegedly required in a timely manner. It is clear in his November 1, 2011 motion for continuance of sentencing, that Attorney Foley **falsely alleges** that the " Defendant has just now been able to secure the requisite fees," knowing the sufficient amount was available to him, <u>at the least</u> no later than October 6, 2011. Attorney Foley further deceives Batchu, and indirectly the unknowing Court, by asserting in his November 13, 2011 motion for reconsideration

that the expert "stands ready to conduct the evaluation upon receipt of the monies," monies of which Attorney Foley is clearly aware are in his possession by this time. Batchu was unaware of any of these reasons in support of his two motions for continuance, as Attorney Foley never discussed or showed Batchu these motions; a cunning act to **cover up his own <u>unethical misconduct</u>**. Attorney Foley kept telling Batchu that there was difficulty accessing the funds, and mentioned he would ask the Court for a continuance of the hearing, and assured Batchu that Dr. Medoff would be visiting him promptly. Dr. Medoff never visited or communicated with Batchu at anytime, as Attorney Foley kept assuring Batchu that he has been in contact with him and they were "working things out."

c) Attorney Foley **failed to <u>fully investigate</u>** Batchu's medical and mental health background. He <u>never inquired</u> into whether Batchu had ever experienced any traumatic brain injury, accidents, environmental insults, bullying, physical/sexual abuse, depression, anxiety, or a plethora of other medical/psychological conditions. In fact, it was clear that he relied on the Pre-Sentence Interview to fill in those gaps, absolving him from any investigative effort on his part. Attorney Foley failed to prepare Batchu for the Pre-Sentence Interview in any sense. In fact, Batchu had to seek advice on what to reveal or not reveal from inmates at his facility, which proved to be most unreliable and impacted his sentence. Only five minutes prior to the interview, was Attorney Foley available to tell Batchu to "just tell your life story...but don't say too much." With such a vague statement and no other advice, Batchu felt inadequately prepared during the interview and felt uncomfortable revealing many significant

details that would have made an impact in the sentence he received.

d) Attorney Foley failed to attain or acquire information about Batchu from his mother or extended family. Attorney Foley simply avoided Batchu's mother once Batchu informed him that she has been suffering from Schizophrenia/Schizoaffective Disorder. Batchu told Attorney Foley that she had some difficulty speaking English but that he should feel free to speak with her at anytime about the case. Attorney Foley never asked Batchu about his uncles, aunts, or cousins and whether they would be willing to corroborate any mitigating factors in preparation for the Pre-Sentence Interview and sentencing.

e) Attorney Foley failed to attain or acquire information about Batchu from his former classmates, friends, medical colleagues and staff at the hospitals where he was employed. Batchu had remained in communication with some friends while in jail, who were comfortable in speaking about Batchu, yet Attorney Foley never inquired or pursued these options. Attorney Foley never took any initiative in investigating these possibilities, including Batchu's former girlfriends whom he met in a similar fashion, and whom with he engaged in a relationship in a similar manner all of whom were consenting adults at that time. Again, the information was available to him, yet he failed to do the work and fulfill his duties as an effective counsel.

f) Attorney Foley failed to fully investigate Batchu's cultural background, even after Batchu apprised him of his East Indian background. Batchu informed him of many unique cultural practices that he had been subject to or witnessed, that may be considered taboo or illegal in the United States, yet Attorney Foley never pursued this matter further.

Many of Batchu's family members in the U.S. and in India were willing
to corroborate many of the customs, pressures, and influences of
growing up in an Indian household, particularly Batchu's household.
In fact, Attorney Foley never asked or advised Batchu to provide
a family member's name when Batchu was asked by the probation
officer if they could interview his mother. Batchu felt that his
mother, due to the language barrier and mental illness, would not
be wholly reliable for purposes of the Pre-Sentence Interview.
When the Pre-Sentence Report was compiled, it mentioned that Batchu
gave no other family members to interview, yet this was never made
aware to Batchu by Attorney Foley. In other words, Batchu assumed
that the Probation Department could only interview Batchu's immediate
family, largely due to the lack of advisement and communication
from Attorney Foley. When Batchu brought this up to Attorney Foley,
he mentioned that it was already too late. Again, these failures
significantly impacted Batchu's sentence, as these factors were
essential in his efforts to depart or argue for a lower sentence
than the Guidelines recommended, as was **notably preserved in his
plea agreement** (Doc. 79, page 4).

　　g) Attorney Foley failed to fully investigate the stressors
and circumstances immediately surrounding the time period leading
to and present when the offenses were committed. Attorney Foley
never inquired into Batchu's state of mind or surrounding psychological
factors/stressors when Batchu was in the process of seeking out a
relationship online or otherwise. Attorney Foley also failed to inquire
into the nature of the relationships that Batchu was seeking.

31

**G.App.311**

Specifically, Attorney Foley never asked or elicited the details
and nature of the communications and relationship with the victim,
or if Batchu had any evidence that demonstrated a romantic relationship,
not insinuating it as lustful as the Court observed through an extremely
<u>limited</u> sample of 'lustful' evidence related to the victim,

> "if you're interested in being really honest with your family...
> let them listen to you going 'oh, baby, show me this; show me
> that'...it was disgusting...it had nothing whatsoever to do with
> love"
> (Doc. 99, page 90, lines 12-17).

Had Attorney Foley investigated and considered the details Batchu
asserted repeatedly, the Court would not have peered through such
tunnel-vision lenses in characterizing the landscape of Batchu's
relationship. Clearly, as noted by the Court's own words on record,
this limited insight and scope of their relationship significantly
impacted the sentence Batchu received.

    h) Batchu affirms that there were specific items of mitigating
evidence conveying a mutually romantic relationship, or at the very
least not illicitly sexual in nature. Batchu even had his family send
Attorney Foley some mitigating items of evidence related to the
nature of the relationship, but Attorney Foley never made it available
to the Government or the Court at anytime. In fact, Attorney Foley
stated that the evidence is very helpful to the case, yet he completely
neglected it. Furthermore, Batchu urged Attorney Foley to seek out and
inquire into items of evidence that were seized yet never given out
in discovery. These withheld items included an item on the seized
computer's hard drive and another item which should have been inventoried
and seized as evidence from the rental car, which was significant to

**G.App.312**

Batchu's mitigation and case. Batchu emphasizes that these items of
evidence are <u>real</u> and not hypothetical in nature, yet Attorney Foley
neglected to investigate or pursue these important items that served
in Batchu's favor.

   i) Attorney Foley failed to prepare Batchu or present any coherent
strategy for sentencing. As mentioned in Batchu's constructive denial
claim earlier, Attorney Foley failed to communicate with Batchu or
his family on how to prepare, what to prepare, or the strategy and
points of contention that Attorney Foley would present at sentencing
in favor of a reduced sentence.

   j) Attorney Foley failed to take the time to review and counsel
Batchu on his prepared allocution and personal, written letter
addressed to the judge himself. As noted earlier, the allocution
was thought of on Batchu's own initiative through conversations with
sentenced inmates willing to share or offer such advice. Attorney
Foley did not review it, read it, or counsel Batchu on whether the
contents evoked remorse and humility, rather than narcissism and
pretentiousness as palpable on the record and observed by the Court.

   k) Attorney Foley failed to offer any statement in support of a
reduced sentence at the Sentencing Hearing. Even in his objections,
Attorney Foley failed to provide an argument of any substance or
grounded in any law or legal studies. Significantly, he failed to
mention that he was not even aware that there were four videos of
Victim C, as he admitted to viewing only one video to Batchu just
after sentencing. Attorney Foley claimed the prosecution withheld
videos from him and that the distribution and viewing of the CDs

that contained pornographic material, between the prosecutor and the Court and the circumstances surrounding the private viewings can be viewed as prosecutorial and judicial misconduct. He mentioned this after sentencing, yet he was aware of this at sentencing and never brought the issue up in Court at that time. This despite the fact that Attorney Foley should have received a copy of a cover letter addressed to the Court, explaining all the pertinent videos to be viewed and which stated that defense counsel had already reviewed these items. Aside from this, Attorney Foley passively participated in a question-and-answer exchange that had no purpose, was a surprise to Batchu, and ended up fruitless if not damaging in the end. After this, Attorney Foley simply said "the defendant rests" without making any statement in support of a reduced sentence. Even the prosecutor expected a statement from Attorney Foley, as observed on the record,

> "I expect that Mr. Foley will stand up and Mr. Foley will say that he's got no criminal history"
> (Doc. 99, page 45, lines 19-20).

Yet Attorney Foley **never** stood up and said **anything** to that effect or at all in favor of a reduced sentence, as compared to his effective and competent adversary on the side of the prosecution. Batchu claims this was not just deficient, but unprofessional and unreasonable for Attorney Foley to neglect to make any statement in support of a reduced sentence, essentially conceding the Government's elaborative argument for their recommendation of 30 years, which Batchu's family had to unfortunately bare to witness in awe.

1) Attorney Foley's lack of communication, preparation, presentation, ratiocination, and absence of any sense of reasonable, competent adversarial testing of the prosecution's case was part and parcel to the overall violation of Batchu's Sixth Amendment right to effective

Case 3:10-cr-30008-MAP   Document 132   Filed 03/06/15   Page 35 of 46

counsel at sentencing.

m) Attorney Foley's sparse and cursory objections at sentencing, though noted on record, were not fully investigated in themselves nor were other more significant objections or challenges made to the prosecution's case and argument for a 30-year sentence. Attorney Foley failed to challenge the authenticity of the victim's impact statement, as was mentioned to him with regards to the style and use of certain trigger words(i.e. "little girl") which raised suspicions of having been written/coached by another individual (Doc. 99, page 51, lines 15, 25). Attorney Foley failed to hold her accountable and challenge a part that read,

> "You got me to do things a 15 year old shouldn't ever know about"
> (Doc. 99, page 52, line 3-4).

Batchu informed Attorney Foley repeatedly that the victim had a significant sexual history with other men she had met online, including computer evidence of such interactions _identical_ to Batchu's case, yet Attorney Foley never brought it up at the very least in an argument demonstrating that she had insight and experience in her actions on previous occasions. Attorney Foley failed to object to the Court's **use** of the video of Victim C, particularly at the time of negotiation of the plea agreement **not just** arguing that she was not under the age of 18. Attorney Foley made no challenge to the sufficiency of evidence with regards to the date of creation of the video, asking for further investigation into this vital date as it related to an enhancement of 2 levels of Batchu's sentence for relevant

conduct. Without argument, the Court was left to <u>assume</u> creation of this video occurred <u>AFTER</u> he began his relationship with the victim in his case., which impacted the sentence he received. Furthermore, Attorney Foley never objected to the fact that the video of Victim C was deemed sexually explicit, but Attorney Foley claimed to Batchu that he had never seen four videos of Victim C and only one and so whether he had or not still remains unclear. It is clear that, Attorney Foley's failures with respect to providing substance to and bringing forth other significant challenges, hurt Batchu in the sentence he received.

n) Attorney Foley failed to ask the Court if Batchu's family members could speak to Batchu's character and upbringing in support of a reduced sentence, despite the fact that they were ready and willing at the sentencing. Batchu informed Attorney Foley that he would have family members  present <u>to attest to **details** not present in the letters of support given to the Court already</u>, yet he never fulfilled his promise of allowing this to happen. It is clearly noted on the record that the Court was willing to allow members of the respective parties speak where the Court remarked,

> "I would be interested in hearing from people who wish to speak ...and I'm happy to hear from anybody who wants to speak" (Doc. 99, pg:48, lines 19-20; page 20, lines 2-3).

Subsequently, multiple members of the victim's family were allowed to speak at length by the Court's above mentioned invitation. Batchu's uncles, aunts, and own mother, who flew directly from India for the opportunity to speak to the effect of noting numerous  significant mitigating details of Batchu's background not present in the letters of support, were extremely disappointed that they were not afforded

**G.App.316**

the **same chance** to be heard as the Government's side was given. It is clear that Attorney Foley's failure to, at least, **request** for Batchu's family members to be heard, greatly impacted the Court's decision in its imposition of a sentence due to the fact that Attorney Foley failed to make any argument in favor of a reduced sentence. Batchu asserts his family was prepared, willing, and standing by to assist in Batchu's cause and provide statements in mitigation of his sentence.

2. Batchu was denied his Sixth Amendment right to effective assistance of counsel, before sentencing at other **critical stages**, when Attorney Foley committed the following failures and omissions as follows:

a) At the **Suppression Hearing**, Attorney Foley denied Batchu's right to testify on his own behalf, despite having promised Batchu himself and as he conveyed to the Court on record,

"Attorney Foley indicated that he does have a witness...that he would like to offer,"

then Attorney Foley confirms back to the Court the identity of said witness,

"It will be my client, your Honor"
(Doc. 69, page: 128, lines 20-25).

Batchu asserts, based on prior discussions with Attorney Foley, he was ready and prepared to take the stand. Yet, for no strategic reason and through no reason given to Batchu, Attorney Foley simply neglected to call Batchu to testify in support of his written affidavits. Clearly, this played a role in the Court's characterization of Batchu's credibility and the reliability of his affidavits, as noted by the Court here,

"I also have in mind the fact that the government did not have an opportunity to cross-examine Mr. Batchu...I can take that

into consideration in determining which version of the events
is **most persuasive to me**"
(Doc. 70, page: 57, lines 4-9).

To top it off, Attorney Foley mistyped a few of Batchu's statements
in the affidavits submitted, because there are clearly items of
contradiction and or dispute in the Court's eyes. Attorney Foley
did not give Batchu a chance to read carefully the typed affidavits
before signing them for submission. It was actually Attorney Foley's
professional responsibility to check for contradictions in any
statements that he had typed, for which he might have misunderstood
Batchu as he explained the events that took place on June 9, 2009
which were **critical** to this Suppression Hearing. Attorney Foley
simply handed the typed forms to sign, and so Batchu asserts that
his signature on these forms was not done knowingly, intelligently,
or voluntarily and <u>without the time</u> to review these forms and
statements with a fine-toothed comb and discuss them at length with
counsel.

b) Attorney Foley, blind-sided Batchu again, by not requesting
the Court to rule on the suppression motion prior to any notion of
Batchu's intention to plead guilty. Again, the conflict of interest
rears its ugly head and clouds Attorney Foley's need to submit his
Supplemental Memorandum due on March 25th, by coercing Batchu to
plead out, thereby avoiding the need   to request a ruling. Despite
that, Attorney Foley seemingly neglected requesting a ruling on
Motion 54 <u>and</u> 56 at least prior to the Rule 11 Hearing. This impacted
the course of action to be taken subsequently by Batchu, and the
preservation of the issue on appeal.

Attorney Foley sought the course of least resistance, in terms of workload and effort, in order to favor his own interests and resolve the case without consideration of Batchu's desires or input. It is clear that these events became quite noticeable when and after the fact that Attorney Foley failed to allow Batchu to testify, despite Batchu's insistence on taking the stand.

c) If it hasn't been made obvious yet, Batchu asserts that Attorney Foley failed to submit the Supplemental Memorandum in support of his motion, as requested by the Court, in order to avoid preparing for a trial that would have tentatively started April 4th as mentioned by the Court. Instead, Attorney Foley favored his own interests in the finances available to him by Batchu's trust account and Connecticut bail money, at least nearly $15,000.00 in addition to whatever "small fee" he was earning via Imhoff. This failure changed the course of what Batchu had expected and was in preparation for, an eventual trial to be starting in the next 4 weeks or so(as dated from the deadline of March 25th for the submission of the Supplemental Memorandum). The Government timely submitted their memorandum, yet Attorney Foley decided to show up unexpectedly on the 25th of March to coerce Batchu to plead out, thereby avoiding work and effort on Attorney Foley's part and gaining financially for himself.

d) Attorney Foley's lack of effort and unreasonable representation continued, where for no strategic reason, he failed to secure and obtain a psychological evaluation for sentencing purposes. Batchu affirms that Attorney Foley discussed with him that this was their **main course of action in preparation for sentencing,** and he never suggested that he was not going to obtain the assessment.

e) Batchu further submits that he was persistent in his efforts to get Attorney Foley to secure a forensic psychologist in a timely manner, and he alleges that Attorney Foley was constitutionally ineffective when failing to do so. To be clear, no objectively reasonable attorney would fail to hire a forensic expert under the circumstances in this case, and the notation in the plea agreement (reserving the right to request a mitigated sentence, specifically via an expert or otherwise, due to Batchu's "medical and/or emotional condition," and based on his "cultural background").

f) Attorney Foley failed to prepare or advise Batchu of his <u>rights</u> at another **critical stage**, the **Rule 11 Hearing**. Attorney Foley simply told Batchu to acquiesce and agree with the Court's management and diction of the proceedings. He stated, in substance, that the easier and less resistance Batchu shows during the hearing, the <u>less likely</u> he would irritate the Court and receive a harsh sentence later on. Batchu affirms that during a mid-hearing conference requested by him to speak with his counsel, Attorney Foley became quite angry when Batchu expressed his desire to discontinue with the proceeding and go to trial, subsequent to the fact that Batchu did not agree to some pertinent facts stated by the Government in their version of the "Statement of Facts" related to the case. Batchu submits that had Attorney Foley understood his client's mental/emotional/cultural background and its effect on Batchu's mental state and ability to assess situations regarding confrontation and positions of authority, then Attorney Foley would have known that Batchu simply acquiesced to Attorney Foley's and the Court's position of power and not pleaded knowingly, intelligently, or voluntarily. Batchu states that his family could easily have and was willing to corroborate these

circumstances of power and Batchu's inability to reason properly, based on his upbringing and cultural/psychological background, and his need to avoid confrontation at all costs by simply submitting to figures of authority, as Batchu had in his abusive upbringing. Ofcourse, a psychologist/psychiatrist, could have elicited all substantially relevant factors and circumstances that Batchu would have revealed where the Court and Attorney Foley could have been more cognizant of and intervened appropriately, or treated a situation differently during the Rule 11 Hearing.

g) Attorney Foley failed to present any argument of substance or reasonable evidence of legal research, in barely filing his **three-page Sentencing Memorandum. The Government, submitted a timely, nearly 20-page Sentencing Memorandum, with 28 case citations, references to statutes, references to the PSR details, references to expert evaluations of the victim, and reasons in requesting a restitution of $5,946,540.** Altogether, a very effective and reasonable presentation of their interest and advocacy for their recommended sentence and restitution request. As noted by the record, Attorney Foley barely submitted a memorandum(if that even sufficiently qualifies such a title) that was **docketed on the day of sentencing** -- November 18, 2011, and **it was remiss with errors, both typographical and otherwise, no statement of facts/introduction, failure to address the specific 3553 factors in favor(other than a superficial mention of them), with 3 case citations(from 2005, 2007, 2008), and in sum, failure to advocate effectively in this important memorandum(to subject the prosecution's case to reasonable adversarial testing).**

Knowing that the sentencing Court was not going to allow more time to secure the expert, or failing himself(Attorney Foley) in securing the expert, there is no possibility that any **objectively reasonable attorney** would fail to perform his duty/obligation to research enough law or provide adequate argument in support of a mitigated/reduced sentence, under the circumstances in this case. Batchu asserts that Attorney Foley had reasonable time, **well in advance of the sentencing hearing**, to research the law and provide adequate argument in support of a lower sentence. Instead, Attorney Foley was unprofessional and unreasonable in neglecting his professional duty as effective counsel in **violation of Batchu's Sixth Amendment right.**

h) Attorney Foley disregarded the Court's order/instruction, as docketed by the Court on November 29, 2010, where the Court specifically told counsel that "(he) must in future use the court's ECF system." This was in relation, and as a result of multiple motions and documents submitted by hand, that Attorney Foley repeatedly explained to Batchu was because his computer had crashed or there was a virus involved. Attorney Foley consistently used a modern-day variant of an old adage that "the dog ate my homework", as Attorney Foley would be late in submitting motions, paperwork, and meeting other **critical deadlines essential to advocating effectively for Batchu, which significantly impacted Batchu's outcome and decision process during the proceedings.**

i) Attorney Foley was significantly ineffective in informing Batchu of his right to terminate counsel and have a court-appointed counsel represent him at anytime. Batchu had invested so much money, particularly Batchu's family, in two attorneys that Batchu was never made aware of opting for a court-appointed counsel to represent him

if he felt dissatisfied with current counsel. Ofcourse, Batchu was
completely under the impression that Attorney Foley was going to be
effective and come through on his guarantee to secure the expert
in time for sentencing, as well as being a competent, responsible,
professional, and reasonable counsel as guaranteed by the Sixth
Amendment as soon as Batchu entered into an agreement with Imhoff
back in March 2010. In fact, some members of the U.S. Marshalls
at the courthouse inquired to Batchu if he was going to keep or
change his lawyer again, and Batchu responded "I can't, I have no
more money." Batchu affirms that had he been aware that Attorney
Foley was operating under a conflict of interest or other
self-served motivation, and had he been aware of the option of
having a court-appointed counsel to secure the expert as had been
planned, then Batchu would have knowingly made this choice with no
hesitation. Absent this information and forethought, Attorney
Foley's significantly deficient representation of Batchu clearly
affected **the sentence** he received and was prejudicial,
notwithstanding his esoteric conflict of interest and privy financial
motive.

  j) Attorney Foley never addressed and failed to argue against
specific conditions during the negotiation(if he even showed effort
in this cause or wholly relied on previous counsel's efforts) of
the plea agreement, with regards to supervised release terms.
Further, he failed to argue or contend justification for a nearly
$6,000,000.00 restitution. In fact, he never even mentioned this
amount nor was it even present in the plea agreement draft copy he
had given Batchu to sign.

Furthermore, Attorney Foley never objected to the fact that the PSR explicitly stated that,

> "In this case, the Probation Department is unaware of any restitution requests by the identified victims of this offense"
> (PSR, page 35, paragraph 150).

He never objected to the issue of blind-siding them with an exorbitant amount of restitution, not explicit in the PSR. batchu was never made aware of the restitution amount until he heard the amount, as stated by the Government during their presentation at sentencing. Nonetheless, even after hearing this amount, Attorney Foley failed to rebut this "projection/estimate" made by an accountant, or at the very least to argue against or towards a lower amount. This instance of surprising Batchu, without a known request or amount stated in the PSR, is a **clear violation of Batchu's due process**, and Attorney Foley's inability to recognize this or raise an eyebrow demonstrated his ineffectiveness in raising a critical issue at sentencing.

k) Once more, **Batchu emphasizes Attorney Foley's utter neglect in keeping Batchu apprised** of important motions, deadlines, hearing dates, strategic decisions, or changes thereof and the validation or logic behind such errant tergiversation. Attorney Foley failed to mail Batchu any information prior to Sentencing, such as his Sentencing Memorandum, the Government's Memorandum, victim impact statements, his notion or details regarding a surprise strategy of a question-and-answer exchange, nor any other details that Batchu should prepare in advance of this **critical stage**, such as an allocution or letters of support or a personal

letter to the Court. As stated previously, Attorney Foley's breakdown in communication and information in reaching Batchu, was **significantly prejudicial to him** and it formed the basis of a "reasonable probability ...sufficient to undermine the confidence in the outcome" (Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct 2052, 80 L.Ed. 2d 674 (1984)).

l) To add insult to the injury already meted out on Batchu, Attorney Foley never attempted to retrieve copies of "(Batchu's) existing medical records as part of (Attorney Foley's) sentencing memorandum"(See Court Order denying Motion 86 on November 14, 2011). Attorney Foley never informed nor approached Batchu about the Court's suggestion. Batchu asserts that his family physician was ready and willing to submit such records had it been requested by counsel. This was clearly prejudicial to Batchu and would have added significant mitigating details and substance to the record, and Batchu would not have received such a harsh sentence.

m) Attorney Foley was blatantly ineffective in failing to faithfully pursue a valid 5K.1 agreement with the Government. Batchu had substantial and critical information with regards to multiple other individuals involved in committing sexual offenses(of a felony nature) against Minor A and instances of severe physical abuse against Minor A and her sister by multiple members of her own family, prior to and during the time of Batchu's offenses.Attorney Foley simply told Batchu that the Government was too vested in Minor A and her family that they didn't care to hear evidence of other crimes perpetuated against Minor A.

## VERIFICATION

I, Mani M. Batchu declare under Penalty of Perjury (28 U.S.C. 1746) that the foregoing is true and correct to the best of my knowledge and memory. This supplement is prepared in good-faith and it is not to delay the proceedings.

Mani M. Batchu

## CERTIFICATE OF SERVICE

I, Mani M. Batchu, hereby certify under penalty of perjury (28 U.S.C. 1746) that I have mailed a true copy of this instrument in a sealed, properly stamped envelope for first-class mail via USPS and addressed to:

    AUSA Steven H. Breslow
    United States Attorneys' Offices
    300 State Street
    Springfield, Massachusetts 01105

Executed on this 26th day of February 2015, in County of Willliamson, State of Illinois.

Mani M. Batchu

BATCHU'S SUPPLEMENTAL PETITION IN SUPPORT OF 2255 MOTION

**G.App.326**

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS


**UNITED STATES OF AMERICA** )

)

)

**V.** )    **10-CR-30008-KPN**

)

)

**MANI BATCHU** )


## VERIFIED AFFIDAVIT OF RICHARD N. FOLEY


NOW COMES Richard N. Foley, Esq., former counsel for defendant Mani Batchu in the above captioned matter who states as follows:


**Background**

1. I was Counsel for the defendant in this matter and state the following upon personal knowledge and belief.

2. I initially began representing the defendant in April 2010. Between then and sentencing in November 2011 I met with him to discuss his case (including court appearances) on 4/22/10, 5/3/10, 5/8/10, 6/9/10, 6/15/10, 7/9/10, 9/14/10, 9/15/10, 10/15/10, 1/24/11, 1/31/11, 2/24/11, 2/25/11, 3/25/11, 4/4/11, 5/9/11, 9/23/11, 10/30/11 11/17/11, 11/18/11, 12/6/11.

3. I was initially contacted by Imhoff & Associates who are an internet advertising law firm that maintains relationships with

**G.App.327**

attorneys in various jurisdictions. They paid me a flat fee for
representing the defendant before the United States District Court
for the District of Massachusetts.

4. Prior to my involvement as counsel the defendant was represented
by Attorney Francis Quinn who was involved with representing him in
Massachusetts, Connecticut and Florida state courts.


**GROUND ONE**

5. Imhoff & Associates received $5,000.00 from Mr. Batchu for expert
expenses which they held. Mr. Batchu and I discussed several times
the use of a psychologist/psychiatrist in his defense. I had
previously utilized Dr. David Medoff in sex offense cases and think
well of his work and recommended him to Mr. Batchu. Dr. Medoff was
one of the original panel members of the Massachusetts Sexual
Offenders Registry.

6. Mr. Batchu had been told by a fellow inmate that he should retain
a Dr. Ablow out of Boston and Mr. Batchu advised me that was who he
wished to utilize. I made many attempts to contact Dr. Ablow but I
never received a response. See Letter of September 8, 2011 annexed
hereto as Attachment A.

7. Dr. Medoff advised me that he needed $8,500.00 up front to do the
requisite work and that he was swamped with work and would need at
least 45 days to complete his report. The $5,000.00 that Imhoff &
Associates possessed was insufficient, so I told Mr. Batchu, when we
discussed my September 8, 2011 letter on September 23, 2011, that he

**G.App.328**

needed the $9,500.00 bail money held by the State of Connecticut to make up the difference. I did not apply for court funds as there was sufficient funds owed Mr. Batchu but due to circumstances beyond my control I could not access them in time to permit Dr. Medoff time to complete his report.

8.  On October 6, 2011 the State of Connecticut issued the $9,500.00 return of bail. See photostat of check annexed hereto as Attachment B.

9.  Connecticut forwarded the above check to Attorney Quinn who forwarded the same to me. I went to see Mr. Batchu in Central Falls R.I. Detention facility where we discussed the untimeliness of the receipt of the bail money and the need to file a continuance of the sentencing hearing which I promptly filed the next business day as well as placed the bail money in my trust account. See endorsement and posting on back of check in Attachment B.

10.  The November 13, 2011 the Motion for Reconsideration erroneously asserts that I had received the bail money on October 6, 2011 rather than that the State of Connecticut had released the monies on that day.

11. At no time did I tell Mr. Batchu that I was being paid '...a minuscule mount of money...'.I did not '...claim(ed) as a fee and converted to (his) own use money that was available and earmarked to retain an expert'

12. At no time did I '...falsely claim(ed) that to Batchu that the Court had denied (their) Suppression Motion'.

**G.App.329**

13. After the November 18, 2011 sentencing Mr. Batchu and I discussed an appeal. Mr. Batchu did not advise me that he wanted the monies from the bail returned to his family. He asked that I pursue his appeal and agreed to pay me with the bail money as well as the escrowed Imhoff monies.

14. I proceeded to prosecute Mr. Batchu's appeal: filing the notice of appeal within the requisite 10 days; Appearance form; Transcript Report/Order Form; Review file and Identify Issues on Appeal. See letter of December 2, 2011 annexed hereto as Attachment C.

15. On December 1, 2011 Imhoff released $4,800.00 payable to me. See photostat annexed hereto as Attachment D.

16. Imhoff required me to obtain a release from Mr. Batchu of the funds to me which I obtained from Mr. Batchu when I visited him on December 6, 2011 to discuss his appeal and subsequently placed the funds in my trust account on December 9, 2011. Attachment D.

17. At no time did Mr. Batchu mention that he wanted court appointed appellate counsel or the return of monies to his family. When he executed the release of $4,800.00 to me he was in full agreement that it was for my representation of him on his appeal that he insisted go forward.

18. On March 21, 2012 Mr. Batchu advised me that due to finances he wished to have appointed appellate counsel. See Batchu Exhibit A.

19. I followed up on April 23, 2012 concerning the return of unearned fees. See Attachment E annexed hereto.

20. I returned $4,800.00 in unearned fees.

**G.App.330**

21. I advised him of the briefing schedule. See May 4, 2012 letter annexed hereto as Attachment F.

22. In the absence of successor counsel I continued working on his appeal and once he provided a formal request for court appointed appellate counsel I sought to protect his appeal. See Motion to Hold in Abeyance annexed hereto as Attachment G.

**GROUND TWO**

23. I discussed at length with Mr. Batchu the issues for sentencing. We talked about letters from family and for which I provided a template to be followed. In fact many letters were provided by friends and family to me and which I forwarded to the Court. Inexplicably, the same letter writers sent copies of the letters to the Court which were forwarded to me with the admonition that it was inappropriate to be sent by them to the Judge.

24. It was expected that a psychological evaluation would provide much information to the Court at sentencing but that did not happen.

25. In discussions I advised Mr. Batchu to keep his allocution simple. Mr. Batchu kept wanting to tell the Court that he was in love with the victim and about her dysfunctional environment and I advised him that was not appropriate. I did not advise nor expect him to provide a 'personal' letter to the Court.

26. When I met with Mr. Batchu the day of sentencing he had a lengthy written speech. In it he had proffered a 'moment of silence' at the beginning to which I greatly disagreed. He argued with me

insisting that it would 'impress upon the Court he was human with genuine sympathy towards others'.

27. I reviewed Mr. Batchu's allocution and advised him that during our discussions I had suggested to keep it simple. Mr. Batchu was adamant about the contents of his speech and I suggested following with a question and answer presentation to smooth out Mr. Batchu's soliloquy instead of continuing to argue immediately before the hearing where it was apparent that Mr. Batchu wanted to make his statement.

28. I did not advise Mr. Batchu that I was deliberately ineffective in order to create reversible error on appeal nor that I would file an affidavit claiming ineffectiveness.

29. Mr. Batchu never mentioned court appointed appellate counsel during our discussions after sentencing and later during out meeting on December 6, 2011.

30. During our discussions about his appeal I advised him that in addition to any issues with the case, he had a right to claim ineffectiveness of counsel but it could not be raised on direct appeal, could not be raised by me and that he would have to talk to other counsel concerning that issue.

**GROUND THREE**

31. Mr. Batchu, at the time a Doctor  of Osteopathic Medicine and second year resident in Adult Psychology, exhibited no symptoms of mental, social or medical infirmities. Dr. Batchu made no mention of any family, social or cultural issues that were germane to a defense

**G.App.332**

of his situation. The only fact that he repeatedly asserted was that involvement with underage women in India was OK there.

32. After M. Batchu's change of plea I sent him a profile and financial statement to fill out and return to me prior to his P.S.R meeting. See May 13, 2011 letter annexed hereto as Attachment H.

33. Also contained with the correspondence was AUSA Breslow's STATEMENT OF FACTS that the Government presented for the P.S.R..

34. I met with Mr. Batchu before his interview to discuss the issues and was present for the full interview.

35. Over the course of the case we discussed all possibilities of any mitigating factors and the only one's that Mr. Batchu could come up with that could be corroborated by friends and family members were that he had prior relationships with adult women whom he met on the internet and that he was in love with the victim and that it was a 'mutually romantic relationship'.

36. I fully explored the communications and relationship between the parties and facts pertaining to Mr. Batchu himself including:love letters; video recorded masturbation sessions; many files of internet pornography contained on Mr. Batchu's computers; exchanged tokens of love and all interviews with the victim, police reports and evidence acquired during the police investigation in New England, Florida and Chicago.

37. I found no mitigating circumstances.

38. I was not aware of four (4) videos of internet sex video between Mr. Batchu and a separate woman that were given to the Court, having

viewed only one of that woman and did not realize the objection until after the hearing. The A.U.S.A's transmittal letter was not in the file and I never saw the same. See Petitioner's Exhibit A: email from successor appellate counsel.

39.  Not challenging the authenticity of the victim's impact statement was a tactical decision.

40.  Not having Mr. Batchu testify at the suppression hearing was a tactical decision.

41.  I went over Mr. Batchu's Affidavits with him prior to his execution of them.

42.  We discussed at length his plea agreement versus trial and I saw nothing to indicate that his choice to plead guilty was anything other than fully knowing, intelligent and voluntary.

43. When we discussed the possible sentencing range I utilized the sentencing table on the inside of the back cover of the United States Sentencing Commission Guideline Manual.

44.  I discussed Mr. Batchu's possible cooperation in seeking a 5K.1 downward departure with AUSA Breslow.

45.  AUSA Breslow was not interested in pursuing a 5K.1 departure for Mr. Batchu's assertion that he had knowledge of the victim having sex with other adult males prior to him.

46.  I kept Mr. Batchu apprised of all aspects of his case and at no time did I have a conflict of interest of any kind.


SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY May 6 , 2015


**G.App.334**

/s/ Richard N. Foley

_____

Richard N. Foley, Esq.

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the within VERIFIED AFFIDAVIT
OF RICHARD N. FOLEY has been served upon the Government
electronically and Mr. Mani Batchu #91057-038 U.S.P. Marion P.O. Box
1000 Marion, IL 62959

_____

Richard N. Foley,Esq.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES of AMERICA,

                        Case No. 3:10-cr-30008 MGM

     v.

                        EVIDENTIARY HEARING REQUESTED

MANI BATCHU,

         Defendant-Petitioner.

## Filed by Leave of Court, Doc. 240
### PETITIONER'S HEARING BRIEF

#### Preliminary

     Defendant-petitioner, Mani Batchu ("petitioner"), by his
counsel, Kevin L. Barron, Esq., respectfully submits this brief
in connection with an evidentiary hearing on the petitioner's
three claims for relief under the Sixth Amendment:  (1) an
actual conflict of interest created by trial counsel delaying
receipt of and diverting petitioner's expert funds to pay said
trial counsel's retainer for an appeal; (2) denial of counsel at
sentencing by, *inter alia*, failing to present a sentencing
defense because of the pecuniary conflict of interest trial
counsel created and allowing petitioner to make an uncounseled,
highly-prejudicial allocution; and (3) ineffective assistance
for failing to present a then-obvious and meritorious sentencing
defense that petitioner presented an average or moderate risk of
reoffense and could likely be managed successfully on community
supervision as shown in a standardized evaluation prepared in
these proceedings (Exhibit A, sealed document).

SUMMARY OF ARGUMENTS

Point I:  Conflict of Interest

An actual conflict between the demands of adequate
representation and trial counsel's pecuniary interest adversely
affected the adequacy of representation.  See, *Mickens v. Taylor,*
535 US 162 (2002).  Trial counsel created a personal pecuniary
conflict of interest by delaying receipt of and diverting
$4,800.00 in escrowed expert funds and $9,500.00 in state bail
money until after sentencing so that trial counsel could take
this money for a retainer on petitioner's appeal.  See, "Facts
that Support Claim for Relief", p. 4, Doc. 126-1.  Petitioner's
family had paid a $37,500.00 retainer to a California
"nationwide" internet referral firm which, in turn, bargained
with trial counsel to accept petitioner's case for a flat fee of
$10,000.00.  See, Supplemental Petition, p. 6. Doc. 132.
Petitioner's family also paid the referral firm $5,000.00 in
escrow for anticipated expert services.  Trial counsel offers no
explanation for his eighteen months' delay between his April 22,
2010 entry of appearance and finally obtaining and depositing
these funds on November 2 (two weeks before the November 18,
2011 sentencing) and December 9, 2011 (two weeks after
sentencing).  Given the nature of the evidence in this case -
seized computers containing video evidence, electronic
communications, phone and travel records and a confession - it

would have been apparent to any competent attorney, after a
cursory review of discovery, that petitioner would be convicted
and sentenced as a sex offender and that an expert evaluation of
petitioner's risk level needed to be undertaken.  The lack of
such an evaluation had an adverse effect on defendant's sentence,
as Dr. Sorrentino's evaluation shows.  Ex. A (sealed).
According to widely-accepted, standardized clinical testing,
petitioner presents a 7.7% risk of reoffense and could be
managed successful under a program of community supervision and
treatment after having served his sentence of incarceration.

Point II:  Constructive Denial of Counsel at Sentencing

     Petitioner was denied counsel at sentencing within the
meaning of *United States v. Cronic*, 466 US 648 (1984).  Trial
counsel abandoned petitioner for counsel's own interest by
withholding funds and failing to produce and present helpful
expert evidence.  This denial of counsel infected the entire
sentencing proceeding, persuading the Court that petitioner
presented a danger of reoffense and lacked remorse.  Counsel
raised no meaningful argument for a variance at the sentencing
hearing despite having expressly preserved the right to do so in
petitioner's plea agreement.

POINT III:  Ineffective Assistance of Counsel for
Failure to Offer A Sentencing Defense

     Dr. Batchu was denied the effective assistance of counsel
within the meaning of *Strickland v. Washington,* 466 US 668, 687-
88 (1984).  Trial counsel failed to conduct a standardized sex
offender risk evaluation even though it should have been readily
apparent that petitioner may have presented a manageable risk on
supervision.  As the evaluation with standardized clinical risk
assessment indices conducted in this proceeding by Dr. Renee
Sorrentino shows, petitioner presents a an "average" risk of
reoffense of 7.7% within five years and is manageable on
community supervision.  Had counsel provided a constitutionally
adequate assistance, it is reasonable to believe that the
outcome of petitioner's sentencing would have been different.

                            FACTS

A.   Charging by Complaint and Subsequent Indictment

     The government first charged petitioner in this District by
a September 17, 2019 complaint (Doc. 1) and moved for detention.
The complaint alleged transportation of a minor with intent to
engage in criminal sexual activity in violation of 18 USC
§2423(a).  The petitioner appeared with his initial retained
counsel (who would later withdraw after the appearance of trial
counsel).  The Magistrate held a detention hearing on September
23, 2009 and ordered the petitioner detained for trial.

**G.App.340**

On February 11, 2010, petitioner's first counsel moved for leave to withdraw and to appoint CJA counsel (Doc. 18) which motion was denied without prejudice pending submission of a form CJA23 financial affidavit.

After an assented-to motion for extension of time, a grand jury returned the indictment (Doc. 22) against petitioner on April 1, 2010, charging violation of five different sections of Title 18 in eight separate counts:  count one, transportation of a minor to engage in criminal sexual activity, §2423(a); counts two through four, interstate travel for the purpose of engaging in illicit sexual conduct with a minor, §2423(b); count five, use of a facility of interstate commerce to entice, §2422(b); counts six and seven, sexual exploitation of a minor §2251(a); and, count eight, possession of material involving sexual exploitation of a minor, §2254(a)(4)(B).  (The government would later dismiss counts seven and eight because the evidence supporting these charges was obtained in an illegal search.  The government dismissed count six after sentencing pursuant to the plea agreement.)

B.    Trial Counsel's Appearance

Petitioner's family paid a $37,500.00 flat-fee retainer and $5,000.00 in escrow to a Los Angeles internet referral firm called Imhoff & Associates, PC.  Imhoff makes the deceptive claim on its website of being a "multi-jurisdictional law firm

serving clients coast to coast".[1]  According to trial counsel's deposition testimony (discussed, *infra*, subsection "N") Imhoff Associates had an informal, unwritten business relationship with trial counsel in which it bargained for the price of counsel's services.  November 15, 2019 Deposition Transcript (Tr.), pp. 21 - 25.  Imhoff made trial counsel a take-it-or-leave-it offer to defend petitioner's case for a flat fee retainer of $10,000.00 together with reimbursement of $2,995.00 in expenses. Tr. 26, Deposition Exhibit G.  Trial counsel was later to depose that he had no written agreement with Imhoff or with petitioner but that he accepted Imhoff's offer.  Tr.  21 - 22.  He further deposed that he knew nothing of the escrowed $4,800.00 and had no control over those funds.  Tr. 29 - 30.  See, letter to petitioner dated March 28, 2012 (Deposition Exhibit O, p. 7).

Trial counsel entered his appearance for petitioner at arraignment on the indictment before the Magistrate Judge on May 3, 2010.  Entry of Appearance, Doc. 27.

C.    Discovery Reviewed & Motion Practice

It should have been apparent - and it very likely was apparent - to trial counsel by September of 2010, 13 months before sentencing, that defendant would be convicted and that funds were needed for expert testimony to support a strong

---

[1] "We at Imhoff & Associates, PC are proud to have the resources and staff required to represent accused individuals across the United States."  https://www.criminalattorney.com/Locations.aspx

sentencing defense.  More than a year before the November 18, 2011 sentencing hearing, trial counsel made a status report that the defense had been provided all discovery.  According to the joint status report, dated September 14, 2010, trial counsel had received all anticipated discovery and reviewed pornography on defendant's computers on May 3 and June 15, 2010.  September 14, 2010 Status Report, Doc. 43.  The report states that the government had provided trial counsel with discovery on May 14, 17, 20, 25 and 27, 2010 and on June 8 and 18, 2010.  The government reported to trial counsel on July 8, 2010 that all the files the government had obtained from petitioner's additional computer, flash drive and camera were available for review upon request.

D.   Progress of Case to Change of Plea

The parties had a final status conference on October 15 and the Magistrate issued his report (Doc. 50) on October 28, 2010, sending the case up to the District Court.  Trial counsel filed motions to suppress on November 23, 2010 (Docs. 54 - 57) and the government filed opposition papers.  The Court heard these motions on February 24 & 35, 2011 and took the matter under advisement.  The government dismissed counts seven and eight based on the lack of a search warrant for defendant's car. Transcript, March 9, 2011 suppression hearing, Doc. 69, pp. 4 - 5.  The government filed its pretrial memorandum and motions in

limine on March 27, but the parties moved jointly for a status
conference on March 28, 2011 in anticipation of petitioner's
guilty plea.  Doc. 77.

E.    Plea Agreement

The dates and signatures on the plea agreement filed with
the Court (Doc. 79) indicate that petitioner executed an April 4,
2011 plea agreement (Doc. 79) on March 30, 2011.  The plea
agreement itself appears on Department of Justice Letterhead
dated April 4, 2011 but the signatures of defendant and trial
counsel are dated March 30, 2011.  The document recites that
petitioner agreed to plead guilty to counts one through five[2] in
exchange for dismissal of count six, the count charging
exploitation of a minor (for the purpose of producing any visual
depiction) with a 15-year mandatory minimum sentence.

The plea agreement acknowledges the applicable mandatory
minimum and allowable maximum sentences and finds a base offense
level of 32 and a total offense level of 43.  The agreement
reaches TOL 43 by adding two additional victims (females B & C)
and application of the grouping rules for three additional
points and certain other two-point offense level adjustments for

---

[2] count 1, transportation of a minor for criminal sexual activity,
§2423(a); counts 2 - 4, interstate travel for the purpose for
illicit sexual conduct with a minor, §2423(b); count 5, use of a
facility of interstate commerce to entice, §2422(b).  The first
and fifth counts carried ten-year mandatory minimum sentences
and a maximum of life.

victim's age, sexual contact, production or transmission of sexually explicit material involving minors and obstruction of justice.  Doc. 79, p. 3.  Defendant reserves the right to contest the addition of two offense groups for minors B and C and to move for a variance "based on his cultural backgrounds and on his medical, mental and/or emotional condition."  Doc. 79, p. 4.  The government further agrees to recommend a Guidelines sentence (but not bottom of range) and 365 months of supervised release subject to 12 special sex-offender conditions.  Doc. 79, pp. 6 - 7.  The plea agreement's waiver of rights reserved defendant's right to claim ineffective assistance of counsel.

F.   May 9, 2011 Guilty Plea

The defendant appeared on May 9, 2011 and entered guilty pleas to counts one through five.  See, transcript of plea hearing, Doc. 103.  Petitioner asked to speak to trial counsel twice during the plea colloquy, first when he was asked whether he understood the plea agreement (Doc. 103, p. 15) and again when the Court questioned defendant about his waiver of the right to appeal a sentence of less than 293 months.  Doc. 103, p. 51.  The transcript shows an 11-minute recess, although the time was probably several minutes longer since the transcript contains a notation of "(pause)".  Doc. 103, pp. 51 & 52.

The fact that the March 31, 2011 signatures of petitioner and trial counsel predate by five days the April 4, 2011 plea

agreement filed with the Court (Doc. 79) corroborates

petitioner's claim that the plea agreement he had reviewed and

signed was not the one filed with the Court.  This inconsistency

of dates indicates that the agreement filed with the Court was

not the one that petitioner read and signed and is the reason

for petitioner's request for an adjournment to confer with

counsel.  Petitioner states in his February 26, 2015

Supplemental Petition (Doc. 132, p. 11) that

> the plea papers presented to Batchu were a different
> copy labeled "draft" and did not include nor did they
> discuss the applicable Sentencing Guidelines range
> that Batchu was made aware of with the Court's copy of
> the plea agreement at the Rule 11 Hearing on May 9,
> 2011. In fact, Batchu needed to discuss this apparent
> discrepancy with Attorney Foley at the Rule 11 Hearing
> when Batchu asked the Court [to confer with trial
> counsel]. . . . .  During the private conference,
> Batchu confronted Attorney Foley about the plea
> agreement discrepancy and the fact that the ruling on
> the Suppression Motion was still pending on March 25th,
> the day Attorney Foley made his visit and stated it
> had been denied. . . . Attorney Foley simply dismissed
> Batchu's claims and once again exclaimed "we'll get
> the expert and you'll get 10 years, if you go to trial
> then you'll get life!" He also insisted on Batchu not
> obstructing the hearing any further and to just agree
> to all the questions asked by the Court.

Supplemental Petition, Doc. 132, p. 11.

G.    Objections to PSR

The Final PSR's offense level computations were in

agreement with the offense level calculations contained in the

plea agreement with a TOL of 41 after deduction of two points

for acceptance of responsibility.  PSR pp. 17 - 22.

On September 26, 2011, trial counsel submitted objections
to the PSR.  PSR, pp. 39 - 41.  Petitioner raised two sets of
substantive objections.  First, petitioner denied that a court
could find on a preponderance that alleged females B & C were
minors.  Secondly, petitioner objected to the obstruction of
justice offense level adjustment on the grounds that petitioner
had not instructed A to lie and that any statements made in
connection with the motion to suppress were protected as a
matter of his Fifth and Sixth Amendment right.  Petitioner
objected to the Total Offense Level findings and maintained that
the correct TOL was 38.

H.  Extraordinary Delay in Obtaining Expert Funds

Petitioner claims that counsel delayed receipt of bail
money from Connecticut and escrow funds held by Imhoff totaling
$14,300.00 so that these funds would be available for counsel to
take as a retainer on appeal.  Petition, Ground One, Doc. 126,
p.4.  The objective evidence supports this claim.

There were two sources of available funds for retaining an
expert, neither of which trial counsel obtained until 16 days
before sentencing.  Firstly, petitioner had posted a $10,000.00
cash bond in the Connecticut courts for state charges there
connected with the offense conduct.  Secondly, petitioner's
family had deposited $5,000.00 in escrow to use for expert
services.

The travel of this case to sentencing shows that trial counsel had ample time in which to marshal what turned out to be $14,300.00 in available funds.[3]  The Magistrate had granted the government's motion for detention on September 23, 2009 and denied a motion for reconsideration of bail on December 22, 2009. The Court arraigned petitioner on the indictment on May 3, 2010 and petitioner made no further attempts at seeking release.

Petitioner pled guilty to counts one through five of the indictment on May 9, 2011.  Between indictment and petitioner's guilty plea, it would have been obvious to any counsel reviewing discovery that petitioner would be convicted by plea or at trial and that it was necessary to prepare for sentencing.  The Connecticut bail funds may have been available after issuance of this Court's order of detention.  The bail monies would assuredly have been available after defendant's guilty plea in this Court.

Even according to trial counsel's verified affidavit, he did not discuss with petitioner the need to obtain the Connecticut bail money until September 23, 2011, some four months after petitioner's guilty plea and only seven weeks before the then scheduled November 11 sentencing.  Trial counsel did eventually obtain a check from the State of

_____

[3] Imhoff retained $200.00 and the Enfield Superior Court retained $500.00 of these amounts.

**G.App.348**

Connecticut Judicial Department, dated October 6, 2011,
refunding $9,500.00 in bail money and counsel deposited this
amount in his escrow account only on November 2, 2011, 16 days
before sentencing.  Doc. 134-1; also Deposition Exhibit B.
After obtaining Batchu's written waiver and forwarding it under
cover of November 21, 2011 (Deposition Ex. H), trial counsel
received a check from Imhoff & Associates for $4,800.00 in
escrow monies dated December 1, 2011, deposited it in escrow
December 9, 2011, two weeks after sentencing.  Doc. 143-3.

(In his November 15, 2019 deposition, discussed, *infra*,
subsection "N", trial counsel was largely unable to remember or
explain his delay in obtaining the bail money from the
Connecticut courts or the escrow money from referral firm Imhoff
& Associates.  After sentencing, trial counsel kept the
$9,500.00 in Connecticut bail money under his alleged unwritten
"flat fee" agreement for work on petitioner's direct appeal,
even though CJA counsel was appointed and perfected the appeal.)

I.   Denial of Motion to Continue Sentencing

Eight months elapsed between signing of the March 30/April
4 plea agreement and the November 18, 2011 sentencing.  As
stated in trial counsel's May 6, 2015 affidavit in answer to the
petition (Doc. 133), petitioner and trial counsel had frequently
discussed and planned to conduct an expert evaluation to prepare
for sentencing.  "Mr. Batchu and I discussed several times

the use of a psychologist/psychiatrist in his defense."
Verified Affidavit of Counsel, Doc. 133, p. 2.  Furthermore, the
plea agreement contemplated the use of an expert at sentencing
by reserving petitioner's right to move for a variance based on
"his medical, mental and/or emotional condition."  Doc. 79, p. 4.
At the latest, the need to obtain funds for an expert was known
to counsel before filing the March 28, 2011 joint motion for a
status conference, representing to the Court that "[t]he
defendant has agreed to plead guilty pursuant to a written plea
agreement." (Doc. 77, p. 1.)  This gave the defense ample time
in the seven months and 18 days before sentencing to obtain
$14,300.00 from Imhoff and the Connecticut courts for an expert
retainer.

In spite of having ample time to gather funds, the Enfield,
Connecticut Superior Court did not issue a check for the bail
money until October 6 and that money was not deposited for
another four weeks.

On November 1, 2011, trial counsel moved to continue
sentencing on the grounds that "your Defendant has just
now been able to secure the requisite fees."  (Motion to
Continue, Doc. 84, p. 1.)  The government objected on the
grounds that the victim's family wanted resolution of the case.

Counsel deposited the check of the Connecticut courts to his trust account on the following day, November 2, 2011. (Deposit slip to trial counsel's trust account, Doc. 134-1.)

On November 7, 2011, the Court denied petitioner's motion to continue the sentencing hearing.  Five days later, on November 13, trail counsel moved for reconsideration of the Court's denial of the motion to continue and the Court denied this motion as well on the following day.

J.   November 18, 2011 Sentencing

Petitioner claims that trial counsel was unprepared for sentencing and that trial counsel abandoned petitioner during the hearing and provided ineffective assistance.  Petition, Grounds Two and Three, Doc. 126.  The record strongly corroborates this claim.

Trial counsel made no formal motion for a variance prior to sentencing.  Instead, trial counsel filed a three-page sentencing memorandum by facsimile on the day of sentencing, November 18, 2011, arguing for a mandatory minimum 120-month sentence.  Doc. 89, p. 2.  (Neither the Court nor counsel would make reference to this memorandum or its arguments at the sentencing hearing.)  Citing *United States v. Shipley*, a 2008 Southern District of Iowa case, the memorandum reasoned under *Booker* and *Gall*, that "the Guidelines for child exploitation offenses were not developed using an empirical approach by the

Sentencing Commission...." without reference to "any sort of empirical data" or to "any particular rationale".  Doc. 89, p. 2.

Petitioner's sentencing went forward before the Hon. Michael A. Ponsor on the afternoon of November 18 with the victim's family in attendance.  It appears from the transcript that the Court had not had time to read all petitioner's materials.  The Court noted, inter alia, that it had read letters on behalf of petitioner and that "some have been just handed up to me, but I believe I've already *seen most* of them." [emphasis added]  Transcript of sentencing hearing, Doc. 99, p. 3.  In contrast, the Court had read a wealth of materials filed by the government sufficiently in advance of hearing, the report of the victim's clinician, an expert accounting of damages, and letters from the victim's mother and brother and two letters of the victim's father.  *Id.*  p. 4.  The Court had also viewed certain pornographic and illegal material on defendant's computer.  *Id.* pp. 4 - 5.

The Court reviewed and heard argument on petitioner's objections to the PSR and sustained one objection; that is, the Court agreed with petitioner that the Court could not determine that unidentified female B in a recorded chat session found on petitioner's computer was less than 18 years old.  *Id.* pp. 8 - 18.  It therefore reduced petitioner's total offense level to 40

from 41 after application of the grouping rules and consulting
on record with Probation.  *Id.* pp. 18 - 19.

The Court denied the remainder of petitioner's objections
to the PSR.  Concerning petitioner's objection to the
obstruction of justice enhancement, the government argued that
petitioner had specifically waived this argument under the plea
agreement by agreeing to the government's recitation of offense
level adjustments except for the age of females B & C.  *Id.*, pp.
24 - 25; Plea Agreement, Doc. 79, p. 4.  The Court overruled
this objection and all the others not pertaining to the age of
female B or made no ruling where none was necessary.

The Court found a Guidelines Sentence Range ("GSR") of 262
- 365 months.  *Id.*, p. 36.  Next, the Court heard the parties'
recommendation of sentence.  The government argued for
imposition of the top of GSR, 360 months followed by 365 months
of supervised release and a $5.9M order of restitution.  The
government argued that petitioner used his learning and
abilities in psychiatry to manipulate female A and that
petitioner had brainwashed her in a torrent of calls, chats and
messages.  The government emphasized the petitioner's
persistence, willingness to drive or fly to meet female A and
his violation of the state-court bail and protective orders.
The experience, the government argued, had a profound damaging
effect on the victim.  The government maintained that defendant

was not deterred by the threat of incarceration and was a
persistent sex offender.  Doc. 99, p. 45-46.  The government
commented on the lack of evidence of any mitigating
circumstances.  *Id.* pp. 46 - 47.  Indeed, none of this evidence
was presented.

The government's principal argument, however, was the need
for incapacitation.  There had been no review at any point of
the petitioner's risk level.  The argument was based entirely on
the offense conduct without any reference to the social sciences.

> It's about the need to incapacitate this defendant.
> It's about making sure that he never, ever harms
> another family and another child the way he's harmed
> this family and this child, and that's why we're
> asking for 30 years . . . .

Doc. 99, p. 47.

The victim's parents gave extensive and impassioned Crime
Victim's Rights Act statements, after which the Court commented
"We've been going for quite a while now and I want to take about
a ten-minute recess...." before the defense made its sentencing
presentation.  *Id.* pp. 49 - 66.

Following the recess, the Court responded to petitioner's
improvised presentation saying that the allocution was one
reason for imposing its 365-month sentence.  "So *a sentence at
the top of the guideline range is justified* both because of the
course of conduct that you engaged in and *because of the rather
sophomoric and pretentious and obliquely and carefully self-*

*justifying little speech we just heard.*"   [emphasis added] *Id.,*
p. 90.

As petitioner writes in his supplemental petition, "[w]ith
no expert input on important sentencing issues" trial counsel
was forced "into an improvisational performance at sentencing as
is evident in the sentencing transcripts".  Supplemental
Petition, Doc. 132, p. 14.  Trial counsel had not "take[n] the
time to review and counsel Batchu on his prepared allocution and
written letter".  Doc. 132, p. 18.  Petitioner did not have
counsel's assistance in preparing for sentencing.  *Id.* p. 19.

The record corroborates this claim.  After the recess,
trial counsel informed the Court that petitioner would read a
written statement and then testify to "some specific facts that
we want a present in a question-and-answer format."  Sentencing
Transcript, Doc. 99, p. 67.  The Court responded that it had
"never done that before" and asked whether the government would
cross examine petitioner.  *Id.*  Trial counsel stated that the
government would be permitted to cross-examine "because it would
be facts that would be presented to the Court".  *Id.*  The Court
again stated that it had "never done that before."  *Id.*  Trial
counsel admitted that it was "not normal" and the first time he
had done it in "over a hundred sentencings".  Id.  The Court
commented again: "This is a new one on me."  *Id.* p. 68.

All the circumstances show that the defense was unprepared

for sentencing and had no strategy.  Trial counsel's statements

about the allocution reveal that there had been no preparation

for sentencing and that the performance was, as claimed, an

"improvised" one.  Trial counsel maintained in his verified

affidavit (Doc. 133) that when petitioner presented him with an

allocution the day of sentencing, counsel disapproved of many

aspects of the allocution and that

> I suggested following with a question and answer
> presentation to smooth out Mr. Batchu's soliloquy
> instead of continuing to argue immediately before the
> hearing where it was apparent that Mr. Batchu wanted
> to make his statement.

Doc. 133, p. 6.  The logical inferences from the above statement

are that petitioner and trial counsel had not prepared a for

sentencing and that the defense did not have a sentencing

strategy.  It is not believable that a defendant with an

advanced education, given good counsel and advice in preparation

for sentencing, would have made such a harmful and disorganized

allocution.

Trial counsel made no attempt to interrupt petitioner's

presentation and request a recess.  When asked in his deposition

why trial counsel did not attempt to interrupt petitioner and

gain control over the presentation, trial counsel responded that

interrupting a defendant was damaging:

Q. And in this case the Defendant's allocution was
harmful?

A. The Court didn't like it. That's what I remember
about it.

Q. Why didn't you interrupt him and get him to stop?

A. He has a right to allocute.

Q. Indeed, but don't you -- he has a right to allocute.
As counsel, wouldn't you want to stop him if he
started saying all the wrong things, confer,
interrupt?

A. Well, it's a hard call because the damage you do by
interrupting your own Defendant as he's speaking his
mind to the Court, so I didn't stop him.

Tr. 74.

The allocution wandered over many subjects with petitioner

attempting to cast himself in a good light.  What was intended

to be apologetic and introspective ended up sounding

"pretentious, frothy and narcissistic" as the Court would later

conclude.  Sentencing Transcript, Doc. 99, p. 89.

The defense moved next to the unconventional "question and

answer" presentation.  *Id.*, pp. 83 - 88.  The Court interrupted

the examination several times, directing counsel to move to the

next question or cutting off the examination as irrelevant.

The sentencing transcript shows that, together with the

offense conduct, the unprepared, improvised sentencing

presentation materially prejudiced petitioner. The Court found

that defendant's sentencing presentation was an aggravating

factor that justified an increased sentence:  "So *a sentence at the top of the guideline range is justified* both because of the course of conduct that you engaged in and *because of the rather sophomoric and pretentious and obliquely and carefully self-justifying little speech we just heard*."  [emphasis added] *Id.,* p. 90.

The sentencing transcript shows in its totality that the lack of any sex offender risk assessment prejudiced petitioner in the Court's decision to impose a top-of-range sentence; the Court had no countervailing information that petitioner's risk level might be lower than the offense conduct suggested.  There was no clinical assessment of petitioner's risk level or his prospects for management on supervised release.  The Court expressed to the victim and her family its belief that a long prison sentence was necessary to prevent reoffense: "Mr. Batchu is never going to be able to hurt you again.  He's gone." *Id.,* p. 92.

K.  Appeal

Petitioner exhausted his remedies on direct appeal and obtained no relief, even on counts two through four where the Court's sentence exceeded the 30-year statutory maximum by five months.  *United States v. Batchu*, 724 F.3d 1 (1st Cir. July 18, 2013).  Petitioner challenged certain findings relative to female C, imposition of the obstruction of justice enhancement,

the procedural and substantive reasonableness of the sentence
and the lawfulness of a sentence exceeding the statutory maximum.
The Supreme Court denied certiorari on November 18, 2013.
*Batchu v. United States*, 134 S. Ct. 663, 187 L. Ed. 2d 438
(November 18, 2013).

None of the grounds raised in this petition were raised on
appeal because "the factual record was not sufficiently
developed to raise these issues". Petition, Doc. 126, p. 10.

L. Petition and Appointment of Counsel

Petitioner timely filed this motion under 28 USC §2255 in
prison mail on November 18, 2014 to vacate, set aside or correct
the sentence. Doc. 126. The three claims of the petitioner are
all excepted from the plea agreement's "appellate waiver" as
claims concerning ineffective assistance of counsel. Plea
Agreement, Doc. 79, p. 9.

The Court granted petitioner's motion for appointed counsel
by order dated December 28, 2016 (Doc. 166) and instant
counsel's appearance was entered on January 12, 2017.

M. Discovery Ordered

The parties had an initial March 28, 2017 status conference,
and motion practice followed. The Court granted petitioner's
motion for discovery (Doc. 208) by order of January 2, 2019 (Doc.
215). The Court allowed service of documentary and deposition
subpoenas on trial counsel. This counsel had difficulty in

securing counsel's attendance at the deposition and obtaining
records, despite leaving voice messages to a working phone
number and sending emails to trial counsel's functioning email
address.  The Marshals Service offices in New Hampshire and
Maine made unsuccessful attempts at service.  Returns of Service,
Docs. 222, 223, 230-232.   Having no success serving subpoenas
on trial counsel, petitioner filed and the Court granted an
emergency motion (Doc. 227 & 228) to compel compliance with the
Court's order for a deposition and production of documents.  On
November 7, one week before the November 15, 2019 scheduled
deposition, the Court caused copies of its order to be served on
trial counsel by mail to his official mailing address.

N.   Deposition of Trial Counsel

        Petitioner's counsel deposed trial counsel at the US
Attorney's Office in Worcester on November 15, 2019.  The Court
may wish to view trial counsel's non-specific deposition
testimony and lapses of memory in light of certain background
events of this §2255 litigation.  Trial counsel never withdrew
and has remained a counsel of record on ECF.  This Court's order
allowing the deposition and document subpoenas issued over
eleven months before the deposition.  Petitioner's counsel sent
numerous emails concerning the upcoming deposition, attaching
the subpoenas and the relevant orders of Court.  Lastly, this

was a major case and a memorable one resulting in a 365-month
sentence.

Trial counsel deposed that he had received the Court's
order to compel at noon on the November 13 and had a trial that
afternoon.  Tr. 19.  He stated that he had "whatever documents I
possess."  *Id.*  When asked about this counsel's emails
forwarding motions, orders and other attachments, trial counsel
testified further that "I'm not sure I opened them [the emails],
but I received them."  November 15, 2019 Deposition Transcript
("Tr."), p. 21.  He explained he had not read the emails and
resented technology.  Tr. 22.)

This counsel inquired about Imhoff & Associates, the firm
receiving $37,500.00 from petitioner's family, and the documents
that trial counsel had brought in response to the subpoena
(consisting of 48 pages, mostly print outs from trial counsel's
computer records).  Trial counsel did not find any written
agreement with Imhoff & Associates and did not remember ever
having had a written agreement with Imhoff, despite having
accepted approximately 30 referrals from Imhoff over a period of
20 years.  Tr. 21 - 22.  Trial counsel acceded that his
arrangement with Imhoff was a fee sharing arrangement in which
trial counsel acted as an "independent contractor".  Tr. 23.
Trial counsel was shown one of the records he produced
(Deposition Exhibit G) and stated that he had received a

$10,000.00 flat fee from Imhoff to represent petitioner together with an additional $2,995.00. Tr. 25.  Any amounts trial counsel later obtained from a defendant for an appeal were not subject to fee sharing with Imhoff.  Tr. 27.  Trial counsel never disclosed to petitioner his fee sharing agreement with Imhoff. Tr. 27-28.  Trial counsel was shown a March 28, 2012 letter (Deposition Ex. O, p. 7) in which trial counsel wrote defendant that he had no control over the monies deposited with Imhoff. Tr. 29; March 28, 2012 letter, Deposition Exhibit C.  When asked about the $4,800 escrow, trial counsel stated that his fees were escrowed by Imhoff and also that the $4,800.00 were his "fee" but moments later referred to this money as "expert funds" Tr. 32.  Tr. 29 - 31.  Trial counsel obtained a release from petitioner and sent it to Imhoff three days after sentencing on November 21, 2011 (Deposition Ex. H) and deposited the $4,800.00 check on December 9, 2011.  Tr. 88 - 89.  Trial counsel explained that he had contacted Imhoff about the money by phone sometime before his November 21, 2011 letter but had no recollection of when those calls were made or the date on which he obtained petitioner's signature on the release.  Tr. 32-33. Trial counsel deposed that he made no written retainer agreement with petitioner for trial or appeal or with Imhoff.  Tr. 47.

Trial counsel deposed that he had no recollection of what efforts he had made between April and November 2011 - the time

between the status conference requesting a Rule 11 hearing and the sentencing hearing - to obtain either the Connecticut bail money or the Imhoff escrowed funds.  Tr. 36.

When asked why he did not get the Connecticut bail money sooner, trial counsel replied that he had "no idea" and "no control" or knowledge "as to why it took the State of Connecticut until October to cut the check", he had "no idea". Tr. 52 - 53.  He could not recall contacting petitioner's initial counsel (also counsel in the related Connecticut and Massachusetts criminal proceedings) but said "I expect I probably did it promptly." *Id.*

Trial counsel was asked why he had not applied for CJA funds to retain an expert and he replied that he was "sure there is a process" but that he had "no knowledge of what that process is".  Tr. 55.  He did not know why he did not apply for CJA funds to retain an expert.  *Id.*  On further questioning, trial counsel explained he perhaps did not apply for public funds because he was expecting to obtain the funds from Imhoff and Connecticut.  Tr. 56.

Trial counsel kept the $9,500.00 in Connecticut bail money as his flat fee for working on petitioner's direct appeal and gave the $4,800 from Imhoff to petitioner's mother.  Tr. 66. Trial counsel explained that CJA appellate counsel was appointed because petitioner wanted appointed counsel and a refund of his

family's money.  Tr. 68.  Counsel explained further that he
retained the $9,500.00 because "it was a flat fee" agreement and
he had "already earned it".  *Id.*  Trial counsel never sent
petitioner an account of billable hours for his work; it was a
"verbal flat fee" agreement, the same as his agreement with
Imhoff, and that he did all his appellate work for "flat fees".
Tr. 69.

Trial counsel could not recall his strategy for sentencing
or other significant events in this case.  He deposed that he
had no recollection of the charges, the mandatory minimum and
maximum penalties, negotiation of the plea agreement or defense-
favorable information in discovery.  Tr. 70 - 71.  When asked
about the plea agreement or other exhibits, trial counsel said -
as he did frequently - that "the document speaks for itself." Tr.
72.  Trial counsel further testified he could not remember
petitioner's allocution other than "the judge being pissed off".
Tr. 73.

Trail counsel was asked why he did not interrupt
petitioner's harmful allocution.  Tr. 74.  Trial counsel replied
that "He has a right to allocute."  *Id.*  Pressed further why he
would not interrupt and request adjournment when the allocution
was going badly, trial counsel replied "it's a hard call because
the damage you do by interrupting your own Defendant" and so he
did not stop petitioner.  *Id.*

28
**G.App.364**

Case 3:10-cr-30008-MGM   Document 242   Filed 03/10/20   Page 29 of 56

Trial counsel was questioned about a letter stating he would forward the balance of unearned funds to petitioner's family. Tr. 84. When counsel was asked how he could know whether funds had been earned in working on petitioner's direct appeal, trial counsel agreed that he must have made a good faith estimate because he had not kept time logs but had "looked at where I was in the appeal and felt that was a fair return of funds". Tr. 84 - 85.

Trial counsel further deposed that he did not have trust account records for the period from November 2011 to September 2012. Tr. 92. Trial counsel offered that he had changed computers and changed locations and, referring to a New Hampshire bar inquiry into his client funds practices, that his "book keeping was lackadaisical". *Id.*

O.   Expert Report Finding Manageable Moderate or Average Risk

Petitioner obtained CJA funds to retain Renee Sorrentino, MD, to conduct an evaluation and offer a clinical opinion about petitioner's risk of reoffense and management on supervised release. Dr. Sorrentino's February 17, 2020 Psycho-Sexual Evaluation (Exhibit A) applied the "Static-99R" and the "STABLE-2007", standardized risk assessment clinical tests and found petitioner to present an "average" or "moderate" risk and could likely be managed successfully in the community:

1)    Dr. Batchu's composite assessment places him in the Level III category.  Individuals placed in Level III are considered Average Risk using the standardized risk level framework.  **The Level III category has a 3.8% risk of sex offender recidivism (defined as new sexual charge or conviction) in one year and 7.7% in five years.**
2)    Dr. Batchu is motivated to engage in treatment, which will further reduce his risk of committing a future sexual offense.  His treatment should address his dynamic risk factors for offending.  **Individuals with average risk for sexually reoffending can be adequately treated in the community by addressing the risk relevant factors for reoffending.  Dr. Batchu's treatment needs can be successful managed in the community . . . .**

Ex. A, p 25.

ARGUMENT

POINT I:
COUNSEL CREATED ACTUAL
CONFLICT OF INTEREST THAT
ADVERSELY AFFECTED REPRESENTATION

A.  *Mickens v. Taylor*: Conflict of Interest Claims
    Require Showing of Some Actual Effect But Not The
    Prejudice Prong of *Strickland v. Washington*

Batchu has shown conclusively that a conflict of trial
counsel's personal interest actually affected the adequacy of
representation such that he need not demonstrate prejudice to
obtain relief. *Mickens v. Taylor,* 535 US 162, 171 (2002)
(conflict of interest claimed in defense counsel's successive
representation of defendant's murder victim in a prior case).

*Mickens v. Taylor* addresses the conflicts of interest
created by dual and multiple representation but has been ruled
in this Circuit to apply to claims of an attorney's personal
conflict of interest.  Applicable First Circuit precedent
discussed, *infra*, subsection C.  *Mickens* compares the minimal
showing of prejudice in conflict-of-interest claims to the
harder prejudice standard applicable to *Strickland* ineffective
assistance claims*.  Id.*  Whereas a petitioner proceeding under
*Strickland* must show prejudice that undermines confidence in the

outcome of the proceedings,[4] under *Mickens*, "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief."  *Id.* at 171 citing *Cuyler v. Sullivan*, 446 U. S. 335, 349 - 350 (1980) discussed *infra*.

B.   The Contours Conflict of Interest Remedies Under *Mickens*

Under *Mickens* "an actual conflict of interest" means a conflict that affected counsel's performance - as opposed to a mere theoretical division of loyalties.  The majority in *Mickens* arrived at this test by reviewing its precedent and rejecting the necessity of automatic reversal in most instances.  As a result, the Court narrowed application of its prior decisions in to mean that "a defendant who shows that a conflict of interest *actually affected the adequacy of his representation* need not demonstrate prejudice in order to obtain relief." *Mickens* at 171.

The High Court narrowed the instances requiring automatic reversal as opposed to remand.  It explained that its decision in *Holloway* created an automatic reversal rule only where defense counsel was forced to represent codefendants over timely objection, unless the trial court has determined that there is no conflict. See, *Holloway v. Arkansas*, 435 US 475, 488 (1978)

---

[4] Prejudice under *Strickland* is defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different".  *Strickland v. Washington,* 466 US 668, 694 (1984).

**G.App.368**

("[W]henever a trial court improperly requires joint
representation over timely objection, reversal is automatic".)
*Mickens* at 168.

The Court went on to explain its decision in *Cuyler v.
Sullivan,* 446 US 335 (1980), that only special circumstances
would trigger a court's duty to inquire about conflicts of
interest.  *Sullivan*, one of three defendants accused of murder
and tried separately, was represented by the same counsel as his
accomplices.  No party or his counsel raised objection to
multiple successive representation, and counsel's opening
argument at Sullivan's trial suggested no conflict among
defendants' interest. *Id.,* at 347-348.  Thus, the High Court
declined to extend *Holloway's* automatic reversal rule to
multiple representation and held that, absent objection, a
defendant must demonstrate that "a conflict of interest actually
affected the adequacy of his representation." 446 US at 348-349.
A trial court is thus not bound to inquire about conflict of
interest merely when it is aware of a vague possibility of
conflict such as occurs in a joint defense represented by the
same counsel.  Thus, in *Sullivan*, no "special circumstances"
triggered the trial court's duty to inquire. *Mickens* at 168 -
169.

On the other hand, certain conflict of interest claims may
require remand although not reversal.  *Wood v. Georgia*, the

*Mickens* court reasoned, established that a trial court's failure to inquire about an undisclosed conflict of interest did not necessarily merit automatic reversal but required a remand. *Wood v. Georgia, 450 US 261 (1981)* (probation revocation of three indigent defendants convicted of distributing obscene materials). There defendants had been represented by the lawyer for their employer (the owner of the business that purveyed the obscenity), and their employer paid the attorney's fees.  The possibility that counsel was actively representing the conflicting interests of employer and defendants "was sufficiently apparent at the time of the revocation hearing to impose upon the court a duty to inquire further." *Mickens, supra* at 169 citing *Wood* at 272. The High Court could not be "sure whether counsel was influenced in his basic strategic decisions by the interests of the employer who hired him" so it remanded "to determine whether the conflict of interest that this record strongly suggests actually existed." *Mickens* at 170 citing *Wood* at 273.  The majority concluded that its holding in *Wood* required a defendant to "demonstrate adverse effect when the judge fails to inquire into a conflict that was not apparent before the end of the proceeding."  *Id.*

**G.App.370**

C.  Underline: First Circuit Applies Mickens to Attorney
    Actual Conflict of Interest Claims

This Circuit applies the rule of *Mickens* to claims of an

attorney's conflict of personal interest and does not require a

petitioner to show actual prejudice.  Where defendant

demonstrates that counsel actively represented conflicting

interests and that an actual conflict of interest adversely

affected his lawyer's performance, then petitioner need not show

prejudice within the meaning of *Strickland.*  In fact, despite

the deferential standard applicable to §2554 proceedings, the

First Circuit has held that the failure of state courts to apply

*Mickens* to actual conflict of interest claims may constitute of

violation of clearly-established federal law.  See, *Yeboah-Sefah*

*v. Ficco*, 556 F.3d 53 (1st Cir. 2009) (§2254 proceeding applying

*Cuyler v. Sullivan* but holding SJC's application of same not

unreasonable in finding no actual conflict of interest):

> Under "clearly established Federal law, as determined
> by the Supreme Court," 28 USC § 2254(d)(1), an
> ineffective assistance claim normally requires
> demonstrating "prejudice," i.e. a "reasonable
> probability that, but for counsel's unprofessional
> errors, the result of the proceeding would have been
> different." *Strickland*, 466 US at 694. **If however,**
> **"the defendant demonstrates that counsel 'actively**
> **represented conflicting interests' and that 'an actual**
> **conflict of interest adversely affected his lawyer's**
> **performance,'" then Strickland's stricter prejudice**
> **showing does not apply.** Id. at 692-93 (quoting *Cuyler*,
> 446 US at 348); see *United States v. Segarra-Rivera,*
> 473 F.3d 381, 385 n.2 (1st Cir. 2007) (distinguishing
> claims alleging counsel performed incompetently, which
> require showing of prejudice, from claims **showing that**

> **counsel labored under "actual conflict of interest,"** which **may entitle petitioner to "relief without regard to proof of prejudice"**). Under the standard delineated by the Supreme Court, however, a "mere theoretical division of loyalties" is not itself, contrary to petitioner's contentions, an "actual conflict of interest." *Mickens v. Taylor*, 535 US 162, 171 (2002). [emphasis added]

*Yeboah-Sefah v. Ficco, supra.*

D. <u>Trial Counsel's Inherent Conflict with Loyalties to Petitioner</u>

Dr. Batchu's claim is not a mere theoretical division of loyalties but concretely established by direct evidence and inescapable inferences drawn from undisputed facts. Trial counsel compromised petitioner's defense in order to convert Batchu's expert retainer money for appellate retainer fees. Under the law of this Circuit, the actual conflict of interest claim succeeds where petitioner

> show[s] that (1) the lawyer could have pursued a plausible alternative defense strategy or tactic and (2) the alternative strategy or tactic was inherently in conflict with or not undertaken due to the attorney's other interests or loyalties.

*United States v. Soldevila-Lopez*, 17 F.3d 480 (1st Cir. 1994) citing *Guaraldi v. Cunningham*, 819 F.2d 15, 17 (1st Cir. 1987) (citations and quotations omitted). Trial counsel created an actual conflict of interest in delaying retrieval of available expert funds so he could keep this money as his fee. There is no other reasonable explanation. Counsel avoided and delayed expenditure of defendant's expert funds and made no effort to

obtain funds from public sources.  After sentencing, counsel
kept the escrow and bail money as a retainer for an appeal that
trial counsel never completed.  Trial counsel had no records of
billable time and could only make a good faith estimate that his
efforts justified keeping all these funds. Such facts establish
an actual conflict of interest between petitioner and trial
counsel.

E.    First Circuit Precedent on Attorney-Created
      Conflict of Interest Supports Batchu's Claim

      In a case on "all fours" with petitioner's conflict of
interest claim, the First Circuit applied *Mickens v. Taylor* to
vacate a guilty plea and remand for hearing where counsel
created a conflict between the lawyer's personal interests and
the duty of loyalty to his client.  See, *United States v.
Segarra-Rivera,* 473 F.3d 381 (1st Cir. 2007).  There, the First
Circuit held on direct appeal that the district court had erred
in denying defendant an evidentiary hearing on a motion to
withdraw his guilty plea.  *Id.* at 385.  Defendant alleged that
his attorney had coerced him into signing a plea agreement and
hidden exculpatory evidence from him to avoid a trial for which
the lawyer had failed to prepare.  *Id.*

      The court found that Segarra's Sixth Amendment challenge
below presented both *Cronic* and *Strickland* claims.  The court
reasoned that the defendant's *Strickland* claim was not

justiciable because it had not been developed below and should
be litigated under §2255.  On the other hand, it found that
defendant had "made a sufficient showing of an actual conflict
to render his claim colorable and justify further inquiry by the
district court."  *Segarra-Rivera* at fn. 2.  Specifically, the
record showed that when a hearing was held on defendant's motion
to withdraw his plea, counsel denied defendant's allegations of
coercion to sign the plea agreement and lack of trial
preparation and disparaged the client.  *Id.* at 384.  The
*Segarra-Rivera* court reasoned that Sixth Amendment guarantees an
accused's a right to counsel and attaches at all critical stages
unless knowingly and intelligently waived.  *Id.*  The guilty plea
is one such critical stage.  *Id.*  Citing *Mickens,* the court
found that Segarra-Rivera had alleged "an 'actual conflict' for
Sixth Amendment purposes that adversely affected counsel's
performance.  *Segarra-Rivera* at 385 citing *Mickens v. Taylor*,
535 US 162, 172 (2002).

There is no legally-cognizable difference between the facts
of this case and *Segarra-Rivera* for the purposes of showing
"adverse effect".  In both instances, the attorney created an
actual conflict between the attorney's personal interests and
representation of defendant in a critical stage of the
proceedings sufficient to show "adverse effect" under *Mickens*.

Segarra-Rivera's attorney coerced defendant into a plea
agreement to cover up professional negligence in failing to
prepare for trial.  Here, trial counsel denied petitioner the
opportunity to present a sentencing defense in order to keep
petitioner's escrow and bail money as his fee.

F.    Other Circuits

The government may point to other Circuits in which the
failure of a state's highest court to apply *Mickens* to claims of
an attorney's personal conflict of interest has been ruled not
to clear the deferential hurdle of 28 USC §2254(d)(1); in those
cases, contrary to this Circuit, the failure of a state court to
apply *Mickens* has been determined *not* to be "contrary to or" an
"unreasonable application of clearly established Federal law".
See, *e.g.*, *Reynolds, v. Hepp*, No. 16-3430 (7th Cir. August 30,
2018).  *Hepp* reasoned that the Supreme Court had "not given
lower courts much guidance as to what counts as an 'adverse
effect' under *Sullivan*, as distinct from a reasonable
probability of a different outcome under *Strickland*, state court
decision not contrary to or an unreasonable application of
clearly established Supreme Court law).

*Hepp*, however, has scant precedential value for this case.
It matters little to petitioner's cause that a circuit may
decide *Mickens* is not sufficiently clear for determining
unreasonable application under §2254(d)(1).  The doubly-

deferential treatment of state high court decisions under AEDPA

is far from the analysis controlling §2255 review here.

Moreover, this Circuit *does* find that the failure to apply

*Mickens* to an attorney's actual conflict of interest "involve[s]

an unreasonable application of clearly established Federal law,

as determined by the Supreme Court . . .".  28 USC §2254(d)(1).

See, *Yeboah-Sefah v. Ficco*, 556 F.3d 53 (1st Cir. 2009),

discussed *supra*.

G.  <u>No Requirement to Present Claim on Direct Review</u>

The government cannot argue that Dr. Batchu is procedurally

defaulted or that he otherwise needed to raise his *Mickens* claim

in this Court before entry of judgment and take the record up on

appeal.  Under the law of this Circuit, petitioner's actual

conflict of interest claim need not have been presented on

direct review.  See *United States v. Burgos-Chaparro*, 309 F.3d

50, 52 (1st Cir.2002) (a dual representation case distinguishing

ineffectiveness and conflict of interest claims finding that

speculation inadequate grounds to grant relief for claimed

conflict of interest Sixth Amendment violation).  A defendant-

petitioner cannot be expected to raise such a claim in district

court:

> [W]here a defendant's counsel in a criminal case
> labors under a supposed conflict, it is unreasonable
> to expect that counsel to accuse himself (or the
> already-represented defendant to represent himself on
> that issue). See generally 3 LaFave, Israel, King,

Criminal Procedure § 11.7(e) at 629 n. 53 (2d ed.
1999)

*Burgos-Chaparro,* supra at 51.


POINT II:
DENIAL OF COUNSEL AT SENTENCING
(*CHRONIC*)

A.  *Cronic* and Constructive Complete Denial of Counsel;
    Circumstances So Likely to Prejudice Defendant that
    Cost of Litigating Their Effect Unjustified

The facts of petitioner's case evince a complete denial of

counsel at a critical stage in the proceedings and pass the high

hurdle for a claim of abandonment at sentencing under *Cronic,*

*infra*, and its progeny.  *Cronic*, decided the same day as a

companion to *Strickland*, recognizes circumstances in which the

prejudice prong of the *Strickland* test does not apply.  *United*

*States v. Cronic*, 466 US 648, 658 (1984).  See, also, *Patten v.*

*Deppisch*, 434 F.3d 1038 (7th Cir. 2006) (granting relief under

*Cronic* but not *Strickland* where counsel appeared at sentencing

by speaker phone) discussed, *infra*, subsection "E", cited *passim*

this section.  These are circumstances "so likely to prejudice

the accused that the cost of litigating their effect in a

particular case is unjustified." *Id.* See, also, *Miller v.*

*Martin*, 481 F.3d 468 (7th Cir. 2007) (rejecting proffered

reasons for trial counsel's near total silence at sentencing and

reversing district court's denial of §2254 relief under both
*Strickland* and *Cronic*).

B.   When *Cronic* and Not *Strickland* Applies

     The circumstances under which *Cronic* applies are these:
where there has been a "complete denial of counsel"; where
counsel has been "prevented from assisting the accused during a
critical stage" of the prosecution; where "counsel entirely
fails to subject the prosecution's case to meaningful
adversarial testing"; or under circumstances where "although
counsel is available . . . the likelihood that any lawyer, even
a fully competent one, could provide effective assistance is so
small that a presumption of prejudice is appropriate without
[further] inquiry. . . ." *Cronic* at 659-60.  Petitioner's claim
falls under the last instance.

C.   Surrounding Circumstances Make It Unlikely that
     Petitioner Could Have Received Effective Assistance

     The circumstances surrounding petitioner's sentencing show
a constructive denial of counsel.  A *Cronic* violation occurs
where the denial of assistance of counsel was either "[a]ctual
or constructive." *Cronic* at 692 (1984).  In deciding whether to
dispense with the two-part *Strickland* inquiry, a court must
evaluate whether the "surrounding circumstances make it unlikely
that the defendant could have received the effective assistance
of counsel," *Cronic*, 466 US at 666, and thus "justify a

presumption that [the] conviction was insufficiently reliable to
satisfy the Constitution," *Id.* at 662.

D.   Combination of Factors Leading to Denial of Counsel

A combination of factors led to denial of counsel at
petitioner's chaotic November 18, 2011 sentencing.  Counsel
appeared but pursued no apparent strategy, simply improvising a
presentation with petitioner's testimony.  Counsel filed no
motion for a departure or variance, despite having reserved the
right in the plea agreement to do so 21 days before sentencing.
Trial counsel filed a perfunctory three-page sentencing
memorandum by facsimile the morning of the hearing but did not
argue for a variance during the hearing.   Trial counsel argued
defendant's objections to the PSR.  He then offered an
improvised a question-and-answer presentation of the
petitioner's testimony.  The Court remarked it hadn't "done that
before" and had "never done this before".  Sentencing Transcript,
Doc. 99, p. 67.  Trial counsel also remarked that "It's not
normal..." and that it was "the first one I've done in probably
a hundred sentencings".  *Id.*  Petitioner then careened through a
harmful allocution that the Court characterized in passing
sentence as "a pretentious, frothy, narcissistic performance"
and it called the petitioner a "supreme phony".  *Id.* at 89.

Without more, trial counsel's performance at sentencing
might be characterized as egregiously deficient and falling well

below an objective standard of reasonableness informed by
prevailing professional norms. See, Point III (*Strickland*
claim), *infra*. The combination of this deficient performance
with the lawyer's conflict of personal pecuniary interest,
however, points to a constructive denial of counsel at the
critical sentencing phase, an error that pervades the entire
proceeding. Petitioner's conflict of interest and denial of
counsel claims intersect. Where an attorney compromises the
defense for the attorney's personal interest, the attorney is
prevented from assisting the accused during a critical stage of
the prosecution. Thus, an actual conflict interest claim under
*Mickens* also supports an abandonment of representation or
constructive denial of counsel under *Cronic*. The conflict of
personal interest that emerged at petitioner's improvised
sentencing is so likely to have prejudiced petitioner that the
cost of litigating its effect in any particular case is
unjustified.

As the argument at Point I, *supra*, shows, trial counsel
compromised vigorous representation in order to keep defendant's
expert funds for an additional retainer. When a defendant is
denied assistance of counsel at a stage where he must assert or
lose certain rights and defenses, the error "pervade[s] the
entire proceeding." *Satterwhite v. Texas*, 486 US 249, 256 (1988).
See also *Bell v. Cone*, 535 US 685, 695-96 (2002) (trial

presumptively unfair where accused denied the presence of
counsel at a critical stage that holds significant consequences
for the accused); see, also *Cronic*, 466 US at 659 (same).

Trial counsel's misfeasance resulted in abandonment for
private gain of his duty to present a meritorious sentencing
defense. As a consequence, a helpful evaluation like the one
presented here showing petitioner's "moderate" risk of reoffense
was entirely absent. There can be no serious argument that, in
a sex offense prosecution with an identified victim, the
principal defense at sentencing would be whether petitioner
could be effectively managed on supervised release or whether a
maximum Guidelines sentence of 365 months was necessary to
protect the public in general and the victim in particular.
Certainly the Court believed petitioner presented a high risk to
the victim personally: "Mr. Batchu is never going to be able to
hurt you again. He's gone." Sentencing Transcript, Doc. 99, p.
92.

As a consequence of trial counsel's conflict of interest,
the defense presented no argument about the necessity of a 365-
month sentence. Of particular importance would be whether a
defendant like Dr. Batchu could be managed safely and
effectively on supervision, thus allowing a shorter sentence of
active incarceration to serve general deterrence and other
sentencing purposes.

E.    Seventh Circuit's *Patten* Decision on Point

Counsel finds no case in the First Circuit among its few
*Cronic* decisions in which it has granted relief, but the Seventh
Circuit has and the First is usually in agreement with the
Seventh.   The First Circuit's decisions are not on point with
this case because all appear to involve egregious ineffective
assistance cases, discussed *infra*, and not cases where the
conduct of counsel denied representation at a critical phase.
Particularly apposite is the Seventh Circuit's decision in
*Patten* in which it granted *habeas corpus* relief under *Cronic* for
counsel's abandonment of his duty to appear in person with
defendant at sentencing.   *Patten v. Deppisch*, 434 F.3d 1038 (7th
Cir. 2006).   Notably, counsel in *Patten* was *not* deemed to have
been ineffective under *Strickland*.   Counsel had simply appeared
by speakerphone at defendant's sentencing in the Wisconsin
criminal courts, an appearance that allowed no private
consultation between defendant and his lawyer.   *Id*.   The Seventh
Circuit held that Wisconsin courts had erred in applying
*Strickland* rather than *Cronic* to the defendant's claim and,
further, that the district court had erred in applying harmless
error to the *Cronic* violation.    *Patten*. at 1041 - 1042.

The reasoning in *Patten* applies with equal force in
Batchu's case because counsel's decision to advance his own
pecuniary interests over presenting a sentencing defense

constituted a constructive abandonment.  The Seventh Circuit

reasoned that sentencing was a "'critical stage' where an

attorney's presence is crucial because 'defenses may be . . .

irretrievably lost, if not then and there asserted.'" and that

"for most criminal defendants a change of plea hearing is the

critical stage of their prosecution."  [US citations omitted] *Id.*

at 1043.  The Seventh Circuit noted that a court deciding to

apply *Cronic* instead of *Strickland*

> "must evaluate whether the 'surrounding circumstances
> make it unlikely that the defendant could have
> received the effective assistance of counsel,' *Cronic*,
> 466 US at 666, 104 S.Ct. 2039, and thus "justify a
> presumption that [the] conviction was insufficiently
> reliable to satisfy the Constitution," *id.* at 662.

*Patten, supra* at 1043.  Because defendant Patten was foreclosed

from consulting with his attorney for want of a private line or

an adjournment in the proceedings for defendant to consult

counsel, the court held that the error pervaded the entire

proceeding.  *Patten, supra* at 1043 - 1044.

There is little precedent in the First Circuit and those

few cases, all denying relief, are inapposite to this case.  The

three principal cases petitioner finds concern a claim of

egregiously bad performance, that counsel performed so poorly

prejudice should be presumed, a position that all Circuits

appear to reject.  This argument - which could be called

*Strickland* plus or extreme *Strickland* - is not an argument that

petitioner makes; rather petitioner shows that the egregiously inadequate performance at sentencing was a symptom of trial counsel betraying his function for pecuniary gain.  To succeed in converting a *Strickland* claim to a cause under *Cronic*, a petitioner needs to show almost total nonfeasance, tantamount to non-representation, such as counsel falling asleep during trial, counsel acting on the belief that client should be convicted or sitting in silence through the entire trial.  See, *United States v. Theodore*, 468 F.3d 52 (1st Cir. 2006) (counsel having no experience or ability in federal trials, fumbling at every phase, vacating new trial order but remanding to determine prejudice).  See, also *United States v. Manon*, 608 F.3d 126 (1st Cir. 2010) (experienced counsel who conduct rigorous cross examination but did not present a defense case nowhere near standard of "ineffectiveness [must be] so egregious that the defendant was in effect denied any meaningful assistance at all"); *Fusi v. O'Brien*, No. 09-1060 (1st Cir. 2010) (unpreserved *Cronic* claim of §2254 petition, that counsel failed to prepare sufficiently for trial, in any event did not constitute constructive denial of counsel justifying presumption that "conviction was insufficiently reliable to satisfy the Constitution.")

The First Circuit's cases all rely on *Bell v. Cone*, the Supreme Court's decision refusing to extend *Cronic* to ordinary cases alleging egregious ineffective assistance.  See, *Bell v.*

*Cone,* 535 US 685 (2002) (finding no unreasonable application of *Cronic* where counsel waived closing argument in the penalty phase of a capital trial and was found not to have abandoned defendant).  *Bell v. Cone*'s rationale does not address the issues generated by trial counsel's misfeasance and the many errors attendant upon the personal conflict of interest that trial counsel created.

POINT III:
TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE
BY FAILING TO RAISE AN OBVIOUS
AND PERSUASIVE SENTENCING DEFENSE
(*STRICKLAND*)

A.  <u>No Valid Reason for Failing to Conduct an
Ordinary Sex Offender Evaluation</u>

Trial counsel's objectively deficient performance at sentencing prejudiced Batchu to a degree that undermines confidence in the outcome at sentencing.  Trial counsel had reserved the right in the plea agreement to offer a psychiatric evaluation in support of a variance at sentencing but unreasonably failed to conduct that evaluation.  There was no valid reason of strategy not to obtain a routine evaluation over the seven months between plea and sentencing, where there were two sources of available private funds and an obvious source of public funds.  Dr. Sorrentino's evaluation demonstrates that any competent evaluation using standardized, widely accepted

methodology would have provided the same clinical opinion.  Her
evaluation relies on highly standardized and widely accepted
clinical tests that any expert evaluator would likely have used,
the Static-99R and the STABLE-2007.  It found that petitioner
presents a 7.7% average risk of committing another sex offense
and that he likely can be successfully supervised in the
community.  Ex. A (sealed), p. 25.  In view of the reasons the
Court offered at sentencing that petitioner was a danger as a
persistent offender, there is a reasonable probability that but
for counsel's unprofessional error, the result of petitioner's
sentencing proceeding would have been different.

B.    *Strickland* Test for Ineffective Assistance

      Under *Strickland*, a petitioner presents a successful
ineffective assistance of counsel claim where he shows, as Dr.
Batchu shows, that: (1) counsel's performance was deficient,
meaning it fell below an objective standard of reasonableness
informed by prevailing professional norms; and (2) counsel's
deficient performance prejudiced the petitioner, meaning that
there is a reasonable probability that, but for counsel's
unprofessional errors, the result of the proceeding would have
been different.  *Strickland v. Washington,* 466 US 668, 687-88
(1984).  A deficient performance is one that falls below "an
objective standard of reasonableness." *Id.* at 688; see, also,
*Tevlin v. Spencer*, 621 F.3d 59, 66 (1st Cir. 2010); *United*

*States v. Pellerito*, 878 F.2d 1535, 1538 (1st Cir. 1989); *Hill v. Lockhart*, 474 US 52, 57-59 (1985).  In determining prejudice, a court looks to whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 US at 694.  A court may address either prong first and if it is more efficient to first address prejudice grounds, a court should follow that course. *Strickland*, 466 US at 697.

C.   <u>Trial Counsel's Performance Deficient</u>

Counsel's performance was deficient when judged against an objective standard of reasonableness informed by prevailing professional norms.  Under Strickland's performance prong, trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* 466 US at 691.  Of course, this duty does not always require a lawyer under all circumstances to probe every evidentiary lead. See, *e.g.*, *Janosky v. St. Amand*, No. 09-1012 (1st Cir. February 3, 2010).  A decision to decline an investigation "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 *supra* at 691. A lawyer's representation is deficient under Strickland "only where, given

the facts known at the time, counsel's choice was so patently unreasonable that no competent attorney would have made it." *Tevlin v. Spencer*, 621 F.3d 59, 66 (1st Cir. 2010).

D.    Any Competent Counsel Would Have Obtained an Evaluation

There was no proper or justifiable reason for trial counsel not to obtain an evaluation.  The risk level of a sex offender and the need for specific deterrence are hallmarks of all sex offense prosecutions and related civil proceedings.  The circumstances of petitioner's case point to the need to obtain an evaluation in preparation for sentencing, something any competent counsel would have done with a defendant being sentenced on a range of ten years to life.  There was no strategy to benefit from not to conducting such an evaluation, even if evaluation itself did not help defendant at sentencing. In this case, it clearly would have.

There were obvious reasons to believe an evaluation would be helpful.  Dr. Batchu was an adult first-time offender.  His sexual interest (or orientation) was for post-pubescent subjects like the victim and the vast majority of pornographic images on defendant's computers.  Of the approximately 1,200 images that this counsel and Dr. Sorrentino reviewed, only a small number, perhaps half a dozen lacked secondary sexual characteristics. It would have been obvious to trial counsel that petitioner did

**G.App.388**

not have an interest in subjects with no secondary sexual
characteristics.

E.   Funds Were Available for an Evaluation

Funds were available for an evaluation from private and
public sources.  The $9,500.00 posted in Enfield, Connecticut
Superior Court and the $4,800.00 held in escrow by Imhoff would
both have been available had trial counsel been willing to move
without unreasonable delay.  Even if there were delays in
obtaining the Connecticut bail money (other than trial counsel's
desire to have this money for an appellate retainer), the Imhoff
funds were available (but counsel did not obtain Dr. Batchu's
written release of funds until November 21, 2011, three days
after sentencing).  If Dr. Madoff wanted more than petitioner
could afford, there are many other evaluators who would accept a
$4,800.00 fee for an evaluation.  Moreover - and assuming only
for the sake of argument - if all delays in  obtaining private
funds were outside trial counsel's control, trial counsel could
have applied for Criminal Justice Act funds.[5]  Even if that

---

[5] 18 USC §3006A(c) reads in relevant part: "If at any stage of
the proceedings, including an appeal, the United States
magistrate judge or the court finds that the person is
financially unable to pay counsel whom he had retained, it may
appoint counsel as provided in subsection (b) and authorize
payment as provided in subsection (d), as the interests of
justice may dictate."  For "Services Other than Counsel", 18 USC
§3006A(e)(1) reads: "Upon finding, after appropriate inquiry in
an ex parte proceeding, that the services are necessary and that

required a recalculation of his hourly rate, it is likely that he would have been better compensated than he was under his agreement with Imhoff.

F.    Lack of Clinical Evaluation Prejudiced Petitioner

Dr. Sorrentino's evaluation shows that trial counsel's nonfeasance (or misfeasance) undermines confidence in the outcome of sentencing proceedings.  Trial counsel's sentencing performance - an improvised performance as petitioner has maintained - failed entirely to address the subject of risk. Future risk of sexual dangerousness was necessarily at the core of the Court's sentence.  The Court could have imposed any sentence of imprisonment from ten years to life and a sentence of supervised relief up to life.  The sentencing balance between the incarceration and supervision depended in large part on whether petitioner had reasonable prospects on supervision. Competent counsel (and conflict free counsel) would necessarily undertake an evaluation in any case like petitioner's.

The record of the sentencing hearing demonstrates inarguably that risk of reoffense was central to the Court's decision to impose a maximum Guidelines sentence and that the absence of an evaluation harmed petitioner.  The government argued successfully that the Court needed to impose a sentence

_____

the person is financially unable to obtain them, . . . shall
authorize counsel to obtain the services."

of 30 years to "incapacitate this defendant" and maintained that
the sentence was "about making sure that [petitioner] never,
ever harms another family and another child the way he's harmed
this family and this child."  Sentencing Transcript, Doc. 99, p.
47.  This ultimately successful argument presumed - and the
Court accepted - that Batchu presented a serious and continuing
risk of reoffense to the victim and to the public.  The
sentencing transcript affirms that the Court accepted this
argument.  The Court addressed the victim and her family to
assure them that they were safe from petitioner's future conduct.
"Mr. Batchu is never going to be able to hurt you again.  He's
gone."  Doc. 99, p. 92.

It is difficult for the government to argue that an
ordinary evaluation like Dr. Sorrentino's would have had no
mitigating effect on the Court's sentence.  The clinical risk
indicators used in evaluating Batchu, the Static 99R and the
STABLE-2007, take the persistence of petitioner's conduct into
account.  One of the Court's principal reasons for imposing a
top-of-range sentence was petitioner's determined course of
criminal conduct, the "worst" the Court had seen.  Doc. 99, p.
90.  Petitioner had restraining orders and bail conditions in
two state courts and ongoing contact with law enforcement but
persisted in illicit contact with his victim.

The evaluation would have addressed these concerns and its
absence was prejudicial.  The evaluation applies two clinical
indicators that took this conduct into account and still finds
Batchu to present a manageable "average" or "moderate" risk.
The Static-99R is an actuarial measure of sex offense recidivism.
Ex. A, p. 19.  The STABLE-2007 is an evaluator-rated measure of
long-term treatment and supervision prospects for reoffense.  Ex.
A, p. 21.  The Static-99R and STABLE-2007 both score
petitioner's repeated non-compliance in the same way as they
would prior convictions for sex offenses, but nonetheless rate a
7.7% risk of reoffense over five years.  Ex. A, pp. 21, 24 & 25.

CONCLUSION

For the reasons set forth above, the petition should be granted
or the Court should schedule an evidentiary hearing on the
petition.

Dated:    February 19, 2019    Respectfully submitted,
                               MANI BATCHU, Petitioner
                               /s/Kevin L. Barron
                               Kevin L. Barron, Esq.
                               50 Congress St. - Ste. 600
                               Boston, MA 02129-4075

CERTIFICATE OF SERVICE

Counsel certifies that he has caused a true copy of this
document to be served today on counsel for all the parties
through the CM/ECF system of this District as set forth in the
Notice of Electronic Filing and that no party requires service
by other means.

                               /s/Kevin L. Barron

1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2

3     UNITED STATES OF AMERICA,          )
                         Plaintiff,      )
4                                        )
      vs.                                )  No. 10-CR-30008-MGM
5                                        )
      MANI M. BATCHU, also known as      )
6     "Mark Taylor,"                     )
                         Defendant.      )
7

8

9

10
                   BEFORE THE HONORABLE MARK G. MASTROIANNI
11                       UNITED STATES DISTRICT JUDGE
                              EVIDENTIARY HEARING
12

13

14

15                     United States Federal Courthouse
                                300 State Street
16                     Springfield, Massachusetts 01105

17
                              February 24, 2021
18                               11:05 a.m.

19

20

21                     Kathleen Mullen Silva, RPR, CRR
                            Official Court Reporter
22         John Joseph Moakley United States Courthouse
                          One Courthouse Way, Room 7209
23                       Boston, Massachusetts 02210
                         E-mail: kathysilva@verizon.net
24
              Mechanical Steno - Computer-Aided Transcript
25

```
 1   APPEARANCES:

 2

 3           United States Attorney's Office

 4           AUSA Alex J. Grant

 5           United States Courthouse

 6           300 State Street

 7           Springfield, Massachusetts 01105-2926

 8           413.785.0395

 9           for the Government

10

11           Kevin L. Barron, Attorney at Law

12           Kevin L. Barron, Esq.

13           50 Congress Street, 6th Floor

14           Boston, Massachusetts 02109

15           617.407.6837

16           for the Defendant

17

18

19

20

21

22

23

24

25
```

**G.App.394**

INDEX


WITNESS                                                         PAGE


RICHARD N. FOLEY

   Direct Examination By Mr. Barron                             10
   Cross-Examination By Mr. Grant                               48
   Redirect-Examination By Mr. Barron                           62



E X H I B I T S



Exhibit No.                                                 Received
   99          ...................................             56

   268-1       ...................................             56

   271-1       ...................................             56

   271-3       ...................................             56

   278-2       ...................................             56

   278-3       ...................................
   278-4       ...................................             56

   278-17      ...................................             56

   79          ...................................             58

**G.App.395**

```
 1                      P R O C E E D I N G S
 2            THE COURT:  Do we have everyone ready to start?  So we
 3      have Mr. Batchu connected through audio only and not video.  Is
 4      that sufficient from the defense view to start the hearing?
 5            MR. BARRON:  Yes, Your Honor.
 6            THE COURT:  All right.  Now, of course, do we have the
 7      capability, as we're doing this right now -- I'm assuming he's
 8      connected through Zoom audio?
 9            MR. BARRON:  Yes.
10            THE COURT:  If Mr. Batchu wants to talk privately with
11      his attorney, can that be worked out?
12            THE CLERK:  No.  No, because he's calling in.  He's
13      not actually Zooming in.  So we don't have that availability.
14            THE COURT:  So you don't have breakout room
15      availability?
16            THE CLERK:  There might be a way where I can put
17      everyone back in the waiting room and just have Attorney Barron
18      and Mr. Batchu on the screen, and then they can talk privately.
19      That's the only way.
20            THE COURT:  Attorney Barron, how do you want to go
21      forward with this?  I mean, obviously all of us would like, and
22      I'm sure Mr. Batchu wants this hearing to finally occur.  But
23      without that ability, to have you consulting with him
24      privately, at least for some of the time -- my understanding is
25      this may become a full hearing soon -- how do you want to
```

**G.App.396**

```
 1   proceed?

 2        MR. BARRON:  Well, it would be good to be able to

 3   consult with the petitioner because that is part of the right

 4   of confrontation.  It's come up in a couple of cases at the

 5   trial level about whether such an inability to communicate with

 6   counsel is a denial of counsel.  The Supreme Court has said

 7   different things.  It would be good to be able to communicate

 8   with him.

 9        Ms. Rivera has suggested it would be possible to take

10   a break and put everyone back in the waiting room.  Maybe we

11   should do that and arrange time so I can consult with him and

12   then proceed again.

13        THE CLERK:  Right.  We can do that.

14        THE COURT:  Okay.  So do you want to consult with him

15   now at the start?  Or do you want to just let us know when you

16   want to?

17        MR. BARRON:  I'll ask Mr. Batchu.

18        Would you like to consult with me now?  Mr. Batchu?

19        THE CLERK:  I see him still on the line.

20        MR. BARRON:  Yeah, his phone icon is gray.  It's not

21   green.

22        THE COURT:  Ms. Rivera, how are they linked in?

23   They're just through audio?  They have nothing to do with the

24   Zoom call?

25        THE CLERK:  It's either you log into Zoom via a PC or
```

```
 1    a telephone, any smart device, or you call in the number, and I
 2    would allow them in.  But it's just audio.  They don't have
 3    Zoom capabilities out in Texas, not in the facility where he's
 4    at at least.
 5            THE COURT:  All right.  So whatever limitations we
 6    have, this is the best that could be worked out --
 7            THE CLERK:  Right.
 8            THE COURT:  -- given where he's held.
 9            MR. BARRON:  That was my understanding, Your Honor.  I
10    did consult with counsel there, and the only other capability
11    was that we would all be in the courtroom, and that there'd be
12    a video conference with the prison, which we can't do.  They
13    have video conferencing capability, not Zoom.  I think this is
14    a security thing.
15            THE CLERK:  Mr. Batchu, are you able to hear us?
16            THE DEFENDANT:  I can hear you.  I'm not sure if
17    you're able to get audio from me.  Hello.
18            THE CLERK:  Yes.
19            THE DEFENDANT:  Hello.
20            THE CLERK:  We can hear you, Mr. Batchu.
21            THE DEFENDANT:  Oh, okay.  Okay.
22            THE COURT:  Mr. Batchu, a question came up.  We're
23    trying to do the best we can with the limited technology that's
24    available where you are currently being housed.
25            THE DEFENDANT:  Okay.
```

```
 1          THE COURT:  Would you like to have a private
 2   conversation with your attorney right now, or would you prefer
 3   to start the hearing, and then, if something comes up, just
 4   notify us or your attorney will tell us and we'll try to
 5   arrange for you to have a private conversation with him on the
 6   phone?
 7          THE DEFENDANT:  Well, I think it would be wonderful if
 8   I could confer with him initially --
 9          THE COURT:  Sure.
10          THE DEFENDANT:  -- and then as the proceedings goes
11   on, if necessary, that would be wonderful as well.
12          THE COURT:  Sure.  And obviously in an ideal
13   situation, a perfect world, that's not too much to ask for at
14   all.  But under the circumstances that we're operating under
15   it's becoming more difficult.
16          THE DEFENDANT:  Sure.
17          THE COURT:  All right.  Ms. Rivera, can you arrange
18   for an attorney/client private conversation between Attorney
19   Barron and Mr. Batchu?
20          (Technical difficulties.)
21          (Discussion held off the record.)
22          MR. GRANT:  I just had a thought.  If Mr. Barron and
23   Mr. Batchu could have just a regular old telephone call sort of
24   off of Zoom and keep the Zoom going the way it is, that might
25   be a way of dealing with this.
```

**G.App.399**

```
 1              THE COURT:  That is an option.  Sometimes the attorney
 2    will use their cell phone.  It depends upon how many phones are
 3    available in the counselor's office where Mr. Batchu is.  Is
 4    that a possibility?
 5              THE DEFENDANT:  I'm not sure.  I could ask my
 6    counselor right now.
 7              THE COURT:  Yeah, you're going to have to ask him or
 8    her.
 9              THE DEFENDANT:  Okay.  Hang on one sec.
10              THE COURT:  For the court reporter, I'm sensing our
11    connections across the board are not as stable as in other
12    hearings.  So if you have any problems hearing, just raise your
13    hand and let us know.
14              THE COURT REPORTER:  Thank you, Your Honor.
15              THE COURT:  Can you hear me?
16              THE CLERK:  Your Honor, I'm back.
17              THE DEFENDANT:  So my counselor just notified me that
18    the only possibility, I guess,  disconnecting from Zoom and
19    having a private call with my attorney and then reinitiating
20    the call with the Zoom conference.
21              THE COURT:  Yeah, that does not sound like it's going
22    to work well.
23              THE DEFENDANT:  Ms. Rivera, what's your option?
24              THE CLERK:  I can put everyone -- I can assign
25    everyone into a breakout room right now except Mr. Batchu and
```

```
 1   Attorney Barron, and they can go ahead without all of us.
 2            THE COURT:  Okay.  Go right ahead.
 3            THE CLERK:  I'll create that right now.
 4            (Discussion held off the record.)
 5            THE COURT:  Call the case.
 6            THE CLERK:  Okay.  The case before the court via Zoom
 7   video is Criminal Matter 10-30008, United States of America v.
 8   Mani Batchu.
 9            Counsel, I'm going to ask you to identify yourselves
10   for the record starting with the government, please.
11            MR. GRANT:  Alex Grant for the United States.
12            MR. BARRON:  Kevin Barron for the petitioner, Mani
13   Batchu, who appears by phone over Zoom.
14            THE COURT:  All right.  Very well.  This hearing --
15   this has been going on a while.  There's been a lot of paper
16   exchanged and briefing regarding this matter.  It was
17   determined that there would be an evidentiary hearing.  Our
18   witness is present.  So my understanding is this is a one-
19   witness evidentiary hearing.
20        Attorney Barron, are you -- this is your witness under
21   subpoena, correct?  Are you prepared to start?
22            MR. BARRON:  Yes, Your Honor.
23            THE COURT:  All right.  Sure.
24            MR. GRANT:  Your Honor, could I just make --
25            THE COURT:  Oh, sure.
```

```
 1          MR. GRANT:  Your Honor, I was just going to make a
 2   suggestion.  Just if we could check in every once in a while
 3   with Mr. Batchu to make sure his connection is good.  I'd hate
 4   for us to get 45 minutes in and find out that his connection
 5   dropped off at some point.
 6          THE COURT:  Right.  So Ms. Rivera, every -- quite
 7   frankly, not longer than every five minutes, can you just
 8   mention to Mr. Batchu and, Mr. Batchu, can you verbally respond
 9   that you are still --
10          THE DEFENDANT:  Sure.
11          THE COURT:  -- participating by hearing everything
12   that's going on?  All right?
13          THE DEFENDANT:  Absolutely, yes.  That would be
14   wonderful.  Thanks.
15          THE COURT:  All right.  Good suggestion.  Thank you.
16          So swear in the witness.  It's Attorney Foley.
17          THE CLERK:  Mr. Foley, please raise your right hand.
18   Mr. Foley, can you hear me?
19          THE WITNESS:  Yes, I can.
20                    RICHARD N. FOLEY, sworn
21          THE COURT:  All right.  Go right ahead.
22                    DIRECT EXAMINATION
23   BY MR. BARRON:
24   Q.  Good morning, Mr. Foley.  Kevin Barron again.  You'll
25   recall me from the deposition.  How do you do?
```

**G.App.402**

```
 1   A.   I'm well, Attorney Barron.  Yourself?

 2   Q.   I'm good.

 3           At some point you may recall that I sent you an

 4   electronic copy of the exhibits in this case.  Did you receive

 5   them?

 6   A.   Yes, I have them.

 7   Q.   And you had a chance to review them?

 8   A.   I've looked at some of them, yes.

 9           MR. BARRON:  So I'm going to try to share the screen

10   here to be able to show these to you.  Is that allowed?  I

11   notice it says disabling screen sharing.

12           THE COURT:  No, that will be allowed.  Ms. Rivera, can

13   you arrange that?

14           THE CLERK:  It is allowed now.

15           MR. BARRON:  I have to make sure I get the right one.

16   BY MR. BARRON:

17   Q.   So I wanted to draw your attention here to this check

18   which you've seen before.  It's at page 13 of Document 278-2.

19   It's an October 6, 2011 check.  Have you seen -- do you recall

20   that?

21   A.   I don't see any check, sir.  On my screen I have a surety

22   bond issue.

23           THE COURT:  Yeah, I don't see a check either.

24           MR. BARRON:  Okay.  Has that changed?

25           THE COURT:  No.  Everyone else is still looking at a
```

```
 1   surety bond piece of paper, not a check.

 2         MR. BARRON:  Let me fix that.  I have to open these

 3   documents one at a time to avoid that.  So...

 4   BY MR. BARRON:

 5   Q.   Now do you see the check?

 6   A.   Yes, I do.

 7   Q.   Now, that is a check that you received at one point from

 8   the state court in Connecticut, the Enfield Superior Court.  Do

 9   you recall that check?

10   A.   I don't recall it, but, you know, I recognize it, what it

11   is.

12   Q.   Okay.  How did you get that check, if you remember?

13   A.   I received it from Attorney O'Brien, Francis O'Brien.  I

14   kept getting his name wrong in the deposition, but I believe it

15   was O'Brien out of Boston, prior state counsel for Mani down in

16   Connecticut.  I don't remember exactly if I went to his office

17   or he came to my office, but it was transferred in person, if I

18   remember rightly.

19   Q.   Do you have any recollection of when you first requested

20   that check?

21   A.   No.  The date, no.  I don't remember when I first

22   requested it.

23   Q.   Well, you recall making an affidavit, right, in this case?

24   A.   Yes.  Six years ago, '15, 2015.

25   Q.   Right.  And in that affidavit you mentioned that you had
```

**G.App.404**

```
 1   gotten a check for Dr. Medoff; is that not correct?  Document
 2   278-2, page 3.
 3            THE CLERK:  Mr. Batchu, the court would like to know
 4   if you're still on and still listening.
 5            THE DEFENDANT:  Yes.  I'm getting audio.
 6            THE CLERK:  Thank you.
 7   BY MR. BARRON:
 8   Q.   And do you recall writing this section?
 9   A.   I don't in detail recall it, but yes, I composed that.
10   Q.   All right.  All right.  I want to show you another
11   document here.
12            THE COURT:  Attorney Barron, can you -- maybe you did
13   this and I missed it.  Can you make a record of what document
14   you just showed him so that the record will be clear what he
15   just looked at and made a comment to.
16            MR. BARRON:  Yes, Your Honor.  I showed him Document
17   278-2, page 13, and then page 3, I believe.
18            THE COURT:  All right.
19   BY MR. BARRON:
20   Q.   I am now showing Document 271-1, 10 and 11.  I have here
21   another check on the screen at page 10 of Document 271-1.  Do
22   you see that?
23   A.   I see that.
24   Q.   And this is a check dated August 12, 2010 to Mani Batchu
25   from the same court as the previous check and in the same
```

```
 1   amount; is that not correct?

 2   A.   It's a check for $9,500 from Superior Court.

 3   Q.   Did you ever receive that check?

 4   A.   No.

 5   Q.   Here is a letter on the next page, page 11 of 271-1, which

 6   purports to be addressed to you at 55 Market Street, 2B, in

 7   Portsmouth, New Hampshire.  Do you see that?

 8   A.   I see that.

 9   Q.   Now, this letter is dated January 4, 2010; is that

10   correct?

11   A.   That's what the date is on it.

12   Q.   But you did not enter your appearance in the Batchu case

13   until April 2010?

14   A.   Correct.

15   Q.   April 23 or 22, right?

16   A.   Correct.

17   Q.   So this check -- this letter, however, says it is

18   forwarding you a check.  You have no recollection of receiving

19   this letter?

20   A.   No.

21   Q.   Did you read Mr. O'Brien's letter that forwarded these

22   documents in response to the subpoena?

23   A.   I don't remember ever receiving the January 4, 2010

24   letter.  That was before I even knew Mani existed.

25   Q.   Right.  Did you receive -- do you recall receiving
```

**G.App.406**

```
 1    another, or among these exhibits receiving a copy of
 2    Mr. O'Brien's letter in response to the subpoena, Document
 3    268-1, which I will now put on the screen?
 4    A.   I did see that letter.
 5    Q.   Yes.  And you had a chance to read it?
 6    A.   I glanced at it.
 7    Q.   Do you agree with its contents with respect to the
 8    statement that --
 9    A.   I can't tell you all what's in it.
10    Q.   Let me back up then and I'll re-ask the question.  The
11    letter mentions that -- Mr. O'Brien states that the date on the
12    previous letter, dated January 4, 2010, is probably wrong, and
13    that it should be 2011.  Can you see that portion?
14    A.   I see that, correct.
15    Q.   And right now we're on page 268-1, page 2 of 3.  And,
16    again, you have no recollection of ever receiving anything in
17    January of 2011 from Mr. --
18    A.   No.
19    Q.   So do you have any recollection at all of what
20    specifically you did to get money from Mr. O'Brien out of
21    Connecticut?
22    A.   I know I contacted him several times over the course of
23    the case, because that money was what I was expecting to pay
24    for Dr. Medoff's services.  I don't remember when.  I know
25    there was a couple times back and forth between myself and
```

**G.App.407**

```
 1    Attorney O'Brien.  And I just remember it was very difficult
 2    getting it in general.
 3    Q.   Do you have any recollection of when you started trying to
 4    get that money from Connecticut?
 5    A.   I don't remember exactly when.  I would expect it would
 6    have been around the time that I engaged him, around June.
 7         THE COURT:  Hold on one second.  We are just having
 8    problems, I think the steno as well as me, with hearing
 9    Attorney Foley.  It's nothing you're doing wrong.  It's just
10    your connection keeps going in and out.
11         Is that correct, to the court stenographer?
12         THE COURT REPORTER:  Yes, it is.  If we could have
13    that last answer repeated.
14    A.   I believe that I probably initiated a conversation with
15    Attorney O'Brien about the Connecticut bail money around the
16    time that I had discussions with Dr. Medoff about his services,
17    and I do remember Dr. Medoff.  I've dealt with him in the past.
18    He is cash upfront before he does anything.  So my expectation
19    is rather high that I discussed the case generally with
20    Dr. Medoff, and his availability for assistance in the case
21    would have been the time I first contacted Attorney O'Brien
22    about those monies.
23    Q.   Well, when did you first decide that you would need the
24    services of an expert in this case?
25    A.   I don't remember when.
```

**G.App.408**

```
 1   Q.   Well, you got the case in April of 2010.  Is it fair to
 2   say that you saw the discovery shortly thereafter, months
 3   thereafter?
 4   A.   That's a fair assessment.
 5   Q.   And you saw that there was electronic evidence in the form
 6   of the defendant's computer and records --
 7   A.   Yes.
 8   Q.   -- of phone conversations and financial records and many
 9   other things that buttressed a strong case for the government?
10   A.   Yes.  There was a lot of discovery.  I remember going down
11   to Springfield and spending a day at the FBI office to review
12   video material, which I could not possess because of the nature
13   of the material.  I remember two suppression motions relative
14   to evidence that was acquired both in Chicago, as well as
15   Connecticut.  So, yes, there was a lot of moving parts in the
16   case.
17   Q.   Well, there was a lot of evidence that would lead you to
18   believe that this is a case that you would need to defend at
19   sentencing?
20   A.   At some point, yes, it became apparent that it was in
21   Mani's interest to get a downward departure for a plea rather
22   than being sentenced after trial.
23   Q.   I mean, within --
24        THE COURT:  Excuse me, Mr. Batchu.  Are you still with
25   us?  Are you hearing this?
```

**G.App.409**

```
 1              THE DEFENDANT:  Yes, I am hearing this.
 2              THE COURT:  Okay.
 3     BY MR. BARRON:
 4     Q.   Would it be fair to say that you would need to defend at
 5     sentencing, and you knew that fairly shortly after receiving
 6     the case in 2010?
 7     A.   I don't know how to define shortly.  I'm not sure exactly
 8     when it became apparent.  But when I needed -- when I decided
 9     that I believe is when I reached out to Dr. Medoff.  And it
10     wouldn't have been my decision anyway.  It would have been
11     after discussion with Mani.
12     Q.   And this would have been in June of 2011 when you say you
13     reached out to Dr. Medoff?
14     A.   I guess.  I have no recollection as to what date.
15     Q.   Some sixteen months after you entered your appearance,
16     fourteen months; is that not correct?
17     A.   I don't remember exactly when I reached out to Dr. Medoff.
18     Q.   You posited June in one of your previous responses.
19     A.   Then that's, I guess, when.
20     Q.   Did you make any attempt to find out who the surety for
21     the Connecticut bail money was?
22     A.   No.  I had nothing to do with Connecticut.  I'm not an
23     attorney in Connecticut.  I left that up to Attorney O'Brien.
24     Q.   You didn't call the court down in Connecticut to find out
25     how the bail money could be gotten if Mr. O'Brien wasn't moving
```

**G.App.410**

```
 1  quickly enough for you?

 2  A.   No.

 3  Q.   Why couldn't you get other counsel to get that money

 4  instead of Mr. O'Brien if he wasn't getting it quickly enough?

 5  A.   Because I didn't think it was an issue.

 6  Q.   Well, I mean, months went by, and then you filed a motion

 7  on November 1 to get (inaudible) in which to retain an expert

 8  and have him do his review.

 9          (Court reporter interrupts.)

10  Q.   It's true, is it not, that you didn't file a motion for

11  additional time, a continuance of the sentencing and expert

12  review until November 1 of 2011?

13  A.   I don't remember when I filed it, but at some point I

14  filed it.

15  Q.   Well, you got -- sometime after October 6 you got the

16  check from Connecticut, October 6 of 2011; is that right?

17  A.   I believe so, yes.

18  Q.   And at some time after that you brought that check to

19  Mr. Batchu; is that correct?

20  A.   Correct.  It was made out to him.

21  Q.   And you got him to endorse it?

22  A.   Correct.

23  Q.   And then on the exhibit we saw earlier, you deposited that

24  into your trust account?

25  A.   Correct.
```

**G.App.411**

1  Q.   And then on your motion to continue, you stated that you

2  had just received the money from Connecticut?

3  A.   I believe so, yes.

4  Q.   And that motion was dated November 1, was it not?

5  A.   I have no present recollection as to when it was dated.

6  Q.   So let me draw your attention to something else.

7       THE CLERK:  Mr. Batchu, the court would just like to

8  confirm that you can still hear.

9       THE DEFENDANT:  Yes, I'm still present.

10      THE CLERK:  Thank you.

11 Q.   So here I have a document on the screen, Document 278-3, a

12 letter from you dated March 28, 2012, it purports to be.  Do

13 you recognize that document?

14 A.   I do.

15 Q.   In it you state that you were unable to get money from

16 Imhoff.  Is that a fair summary of what it says in paragraph 2?

17 A.   I'm sorry.  What was that again?

18 Q.   Let me draw your attention to paragraph 2.

19 A.   Correct.  Okay.

20 Q.   Do you see the second-to-last and last sentences?  "I

21 understand your dismay with the handling of the monies by

22 Imhoff."

23 A.   Yes.  Well, it references the fact that there was an

24 issue.

25 Q.   What was that issue?

**G.App.412**

 1   A.   The delay in getting the money, I believe.

 2   Q.   You had no control over being able to get that money?

 3   A.   No, they handled the money.

 4   Q.   You asserted that they had no control -- you had no

 5   control over getting that money?

 6   A.   Correct.

 7   Q.   And you did not get that money until after sentencing, is

 8   that correct, the balance of this trust account?

 9   A.   I believe so, yes.

10   Q.   Well, I mean --

11        THE COURT:   So, Attorney Barron, the 4,800 he got

12   after sentencing?  Is that what you're saying?

13        MR. BARRON:   That's correct, yes.  I was looking at

14   Document 278-3, page 2, and I was asking Mr. Foley if that's

15   correct when he obtained -- he did obtain the $4,800.

16   Q.   Is that correct, Mr. Foley?

17   A.   I believe so, yes.

18   Q.   And you obtained that after sentencing?

19   A.   I believe so.  The endorsement of the check would indicate

20   when.

21   Q.   And you say in here that you're an independent contractor.

22   Was that not to say that you felt you had no control over the

23   money?

24   A.   Yes.

25   Q.   Well, I draw your attention to the subpoena response from

1   Imhoff & Company.  I'll share that with you on the screen

2   there.  Is that coming up for you, 271-3?

3   A.   Yes, the cover sheet for the subpoena, yes.

4   Q.   Now, you said you had no written agreement with Imhoff &

5   Company; is that correct?

6   A.   Imhoff was a successor advertising counsel from other

7   entities.  I dealt with a couple of different entities in

8   California going back a ways.  Johnnie Cochran was involved.

9   At one point he had an entity that had different contractors

10  around the country, and Imhoff was at some point successor to

11  that whole chain.  I believe I had a written agreement at the

12  very beginning with a prior group for Imhoff.  I don't believe

13  I ever had a written agreement with Imhoff & Associates.

14  Q.   Could you look here at Document 271-3, page 10, on your

15  screen now.

16  A.   Yes.

17  Q.   An email from Miriam Donald to you,

18  rfoley@lawofficesofrichardfoley.com.  Do you see that?

19  A.   Yes, I do.

20  Q.   Is that not a confirmation in writing of your agreement

21  with Imhoff Associates?

22  A.   Yes.  That was our agreement.  It wasn't a written

23  contract.  I guess I misunderstood your question, sir, but.

24  Q.   So this tells you that the client had $5,000 in trust for

25  experts, et cetera?

```
 1    A.    Yes, it does.

 2    Q.    Weren't you able to access that money?

 3    A.    Eventually, yes.  I had to make a request of them for

 4    disbursement.

 5    Q.    Well --

 6    A.    It was not in my trust account.  I could not just cut the

 7    check for the corporate provider.

 8    Q.    Well, all right.  Let me scroll down here to page 11.

 9    Philbin Associates produced -- do you see this, page 11 from

10    Philbin & Associates?

11    A.    Yes.

12    Q.    Now, here is a -- Philbin & Associates produced a

13    transcript; is that correct?

14    A.    Yes, they did.

15    Q.    And they wanted to be paid, like any other court reporter.

16    And you arranged for their payment.  Is that correct?

17    A.    I didn't arrange for the payment.  There was a

18    disagreement over the services provided relative to how timely

19    they were.  So as I read what you have on this page here, on

20    the screen, is a June 10, 2011 email from me to Gina Radogna,

21    who was an employee of Imhoff, and it lays out my issues with

22    the Philbin group.

23    Q.    I'm not really asking that.  What I'm asking, Mr. Foley,

24    is that you made a request sometime after June 10 that these

25    people, Philbin & Associates, be paid; is that not true?
```

**G.App.415**

1    A.    No.  The last sentence in that email of mine says I am not

2    refusing to pay.  I will pay her, meaning Philbin -- please

3    leave it back up there, sir, so I can read it.  That I will pay

4    them --

5    Q.    Hold on.  Let me get it up there.

6    A.    I will pay them from the bail money from Connecticut.

7    Q.    Right.

8    A.    Not that I was requesting Imhoff to utilize money that

9    they escrowed.  I did not arrange for payment from Imhoff.

10   Q.    But they disagreed with that, didn't they?

11   A.    I believe they paid it.

12   Q.    Yes.  They paid it.

13   A.    That's why there's only $4,800 and not 5,000 in the trust.

14   Q.    Let me go down here a little bit further and here is a

15   June 29 client trust disbursement document on page 14 of the

16   same.  Right?

17   A.    Yes, it's a client trust disbursement document.

18   Q.    And the next page here is the Philbin Associates bill?

19   A.    Yup.

20   Q.    So is the next page.

21   A.    Yes.

22   Q.    And then on page 17 here is a response requesting that

23   payment be sent, a response from Gina Radogna to you, right?

24   A.    Yeah.  I have no recollection of that, but it speaks for

25   itself.

| 1 | Q. And they paid it, is that not correct, according to -- |
| 2 | A. From the document there, it appears so, but I have no |
| 3 | personal knowledge. |
| 4 | Q. Right. Okay. So certainly Imhoff was willing to pay that |
| 5 | bill, wasn't it? |
| 6 | A. They paid it. I don't know how willing they were. |
| 7 | Q. Well, you wanted to delay payment of the bill, but they |
| 8 | still paid it; is that not true? |
| 9 | A. I didn't want to delay. It was an issue that I would get |
| 10 | around to, the way I looked at it. I was not in a hurry to pay |
| 11 | it. |
| 12 | Q. All right. |
| 13 | THE CLERK: Excuse me. The court would just like to |
| 14 | confirm that Mr. Batchu is still listening in. |
| 15 | THE DEFENDANT: Yes. Still present. |
| 16 | THE CLERK: Thank you. |
| 17 | THE COURT: Thank you. |
| 18 | BY MR. BARRON: |
| 19 | Q. Page 25 here of this document, do you recognize the |
| 20 | handwriting there? |
| 21 | A. That's my handwriting. |
| 22 | Q. And this document is page 25 of Document 271-3. And if |
| 23 | you look across the top, do you see a line there, a facsimile |
| 24 | line? |
| 25 | A. Yes. |

**G.App.417**

1   Q.   With the date September 26, 2011, 6:00 p.m.?

2   A.   That's what it says, yup.

3   Q.   And there's a phone number there.  Was that your fax

4   number at the time?

5   A.   At the time, yes, that was my fax number.

6   Q.   And that's your "Law Office of Richard Foley"?

7   A.   Correct.

8   Q.   And this is a request of Imhoff & Associates to pay $4,800

9   to David Medoff, Dr. David Medoff; is that not correct?

10  A.   That's what it says, yes.

11  Q.   All right.  And in it is some -- amount of request,

12  $4,800, new balance $48.90, psych eval for sentencing, correct?

13  A.   That's what it says.

14  Q.   Then at the bottom of this same page is a check stub for

15  $48.90.  Do you see that?

16  A.   I see that.

17  Q.   Do you have any recollection of Dr. Medoff being given a

18  check for $48.90?

19  A.   Not at all.  I have no understanding why that was even

20  done, quite frankly.  No, I have no recollection why $48 was

21  sent.

22  Q.   Okay.  Well, I mean, you were asking for $4,800 for

23  Dr. Medoff on the 26th of September with a sentencing coming up

24  in November, a month and a half away.  Is that correct?

25  A.   Yes.

  1    Q.   So why were you requesting $4,800 be sent to Dr. Medoff?

  2    A.   That was all I had in the account, and I had not yet

  3    received, I don't believe, at that point Connecticut.  So my --

  4    I have no present recollection, but I would expect my process

  5    would have been if I could get Dr. Medoff the $4,800, he could

  6    start the evaluation.

  7    Q.   Right.

  8    A.   I was hoping to get the balance of funds from Connecticut

  9    to square it away.

 10    Q.   Well, so why didn't you follow up to get the correct

 11    amount sent to Dr. Medoff?

 12    A.   I never knew he had 4,800.  $4,800 came to me from Imhoff

 13    eventually.

 14    Q.   Well, eventually.  But we're talking about this period

 15    here before sentencing.  Let me go back up again to the correct

 16    page here, page 25 of this document.  All right.  So this is --

 17    this one is requesting money, $4,800, for psych eval for

 18    sentencing, and on the same page is a check stub tending to

 19    show that a check was cut for Dr. Medoff, $48.90, correct?

 20    A.   I don't know anything about that stub.  I don't remember

 21    ever seeing it particularly.

 22    Q.   But you were in communication with Dr. Medoff, weren't

 23    you?

 24    A.   Off and on periodically, yes.

 25    Q.   I mean, in your affidavit and in your motion to continue,

**G.App.419**

1   you mentioned that you were in communication with Dr. Medoff;

2   is that not correct?

3   A.   Yes.  I never discussed $48.90 with him, to my

4   recollection.  I mean, that's an odd payment.

5   Q.   Did you not ask him if he'd been -- if he had received the

6   $4,800 from Imhoff?

7   A.   No.  What happened was Imhoff sent to me -- if I remember

8   rightly, I had to get a release.  I think I requested Imhoff by

9   fax.  I believe they got back to me and stated he needed a

10   release from Mani to do that.  That's my recollection, which I

11   believe at some point I did.  But they did not send me the

12   check and, to my knowledge, they didn't send it to -- my

13   expectation would be they would have sent me the check payable

14   to Dr. Medoff, but not that they would send it to him directly.

15   My expectation was they sent it to me and then I to him.  I

16   never saw any $48.90 check.

17   Q.   So why didn't you follow up then?  If you never saw any

18   check from Imhoff, why did you not follow up with Imhoff

19   asking, "Where's the money for Dr. Medoff?"

20   A.   I believe I did, and I believe they told me that they

21   needed a release from Mani to provide the money.  That's my

22   recollection.

23   Q.   So did you not get a release from Mani in September or

24   early November for that money?

25   A.   I believe I got the release at some point, yes, because

1   then they sent the check.  I believe they sent me the check

2   that I put in my trust account.

3   Q.   Well, all right.  I'm going to scroll down here for a

4   moment.  You did get a release here.  This is page 271-3, page

5   28.  And this is a release dated November 18, 2011.  Do you see

6   that?

7   A.   I see that.

8   Q.   And you agree it's a release dated November 18, 2011?

9   A.   That's what the date is, yes.

10  Q.   Well, is that not your handwriting?

11  A.   Yes, it is.

12  Q.   And do you recognize the signature underneath?

13  A.   Do I recognize it?  No.  But I presume it's Mani's.

14  Q.   And November 18 is the date of sentencing.

15  A.   Yes.

16  Q.   And it's some six or seven weeks after the request for

17  money from Medoff?

18  A.   Yes.

19  Q.   All right.  I'll take you down a little further here.  You

20  did, in fact, get that money from Imhoff Associates, did you

21  not?

22  A.   My recollection is yes.

23  Q.   And what happened to that money?

24  A.   It went into my trust account.

25  Q.   How long did it take to get that money?

```
 1    A.    What do you mean?

 2    Q.    Well, I'm on page 30 of the same document.  There's a

 3    closing -- it says, "Closing of trust account December 1, 2011,

 4    $4,800."

 5    A.    I don't -- okay, right, yes.  And I believe it's dated

 6    12/1/11.

 7    Q.    All right.  Do you remember when you -- do you remember

 8    depositing that money in your account?

 9    A.    That is my recollection, yes.

10    Q.    Right.  You deposited it December 7, would that be

11    correct?

12    A.    It could be -- I have no recollection as to when.

13    Q.    Well, let me take you here to --

14          MR. BARRON:  Share screen again.

15    Q.    Can you see this Imhoff & Associates check for $4,800 at

16    134-3?

17    A.    Yes.

18    Q.    And this is on page 15 of Document 278-2.  Do you see

19    that?

20    A.    I see it, yes.

21    Q.    Do you recognize what's immediately above it, a deposit

22    slip?

23    A.    It's 12/9/11.

24    Q.    Is that your handwriting?

25    A.    Yes, it is.
```

**G.App.422**

1  Q.   If I move over to the right here, there are some numbers

2  indicating the account and possibly -- does that refresh your

3  memory that you deposited it somewhere on December 9?

4  A.   I think that's what it says, yes.

5  Q.   Don't those three transactions show that Imhoff was

6  responsive in giving you money when you asked for it from the

7  client trust account?

8  A.   Yeah, three months later.

9  Q.   Well, they paid Philbin's bill when Philbin complained to

10 them?

11 A.   Mm-hmm.

12 Q.   They sent the wrong amount, but they responded to your

13 request for payment to Dr. Medoff?

14 A.   I have no knowledge that they sent that payment, the $48

15 one.  I have no memory about that whatsoever.

16 Q.   Mm-hmm.  And then when you asked for the dissolution of

17 the trust, you got a release or waiver from Mani Batchu and

18 they sent it to you on December 7 within three weeks of your

19 obtaining that waiver from Batchu.  Is that correct?

20 A.   Yes.

21 Q.   All right.  Now, doesn't that indicate that you had

22 reasonable control over the use of the funds in the client

23 trust account?

24 A.   Define "control."

25 Q.   When you wanted the money, they gave it to you.

**G.App.423**

1   A.   Well, yes.

2   Q.   So when you were having difficulty getting the money from

3   Connecticut, as you say, what about -- did you try to contact

4   any evaluator in the Springfield area who might evaluate

5   Mr. Batchu, Dr. Batchu --

6   A.   No.

7   Q.   -- who might do it for the $4,800 that you had in the

8   trust account?

9   A.   I didn't contact any evaluator in the Springfield area.

10  Q.   Dr. Medoff wanted $8,500; is that correct?

11  A.   I'm sorry?

12  Q.   Dr. Medoff insisted on having $8,500 for the evaluation?

13  A.   Correct.

14  Q.   You'd been a lawyer for many years, at that time for about

15  25 years, right?

16  A.   I guess.  Time flies.  Yes.  I couldn't say how long prior

17  to that point.  I mean, I'd have to look at my degrees, but

18  yes.

19  Q.   You were admitted in 1988 or something; isn't that

20  correct?

21  A.   In Massachusetts, yes.

22  Q.   So at that point you'd done probably a hundred federal

23  cases, hadn't you?

24  A.   Probably around there, yeah.

25  Q.   All right.  And you'd done a lot of state cases?

**G.App.424**

```
 1   A.    Yes.

 2   Q.    And you'd use evaluations in sex offense cases before,

 3   hadn't you?

 4   A.    Yes.

 5   Q.    So failing the ability to get somebody like Dr. Medoff,

 6   you could have gotten somebody cheaper at least, couldn't you?

 7   A.    I didn't know of anybody cheaper or anybody that was as

 8   qualified as Dr. Medoff.

 9   Q.    Dr. Medoff was on the original sex offender registry

10   board, wasn't he, or something --

11   A.    That's my understanding, yes.

12   Q.    But you're aware that there are many cases where appointed

13   counsel represent defendants in sex offense cases in the

14   Massachusetts courts, right?

15   A.    Am I aware, yes.

16   Q.    So why didn't you try and get somebody else when you

17   failed to get Dr. Medoff?

18   A.    I didn't expect it to be that difficult to get the monies.

19   Q.    Mm-hmm.

20         THE CLERK:  Excuse me.  The court would just like to

21   confirm that Mr. Batchu is still on the line.  Mr. Batchu, are

22   you there?  Are you listening?

23         THE DEFENDANT:  Yes.  I can hear you, audio.

24         THE CLERK:  Okay.  Thank you.

25   BY MR. BARRON:
```

**G.App.425**

1  Q.    So you eventually did get the $9,500 and you got the

2  $4,800 into your trust account; is that correct?

3  A.    Correct.

4  Q.    What happened to it?

5  A.    Meaning?

6  Q.    Well --

7  A.    It went into my trust account.

8  Q.    Right.  It went into your trust account.  Is it still

9  there?

10  A.    No.  Some of it went to my fees for the appeal and some of

11  it went to Mani's mother.

12  Q.    You sent $4,800 to Mani's mother?

13  A.    I believe so, yes.

14  Q.    And you kept $9,500 for your appeal?

15  A.    Correct.

16  Q.    What did you do in the appeal for the $9,500?

17  A.    Processed the obligations for notice of appeal, assessment

18  of issues on appeal, review of the evidence for those issues,

19  reviewed the case law for that.

20  Q.    Did you forward any of this material to Claudia Leis

21  Bolgen?

22  A.    I gave Ms. Bolgen my file.

23  Q.    Right.  But any work product from the appeal?

24  A.    I don't remember what was in the work file.

25  Q.    So in the appeal, what did you file, what documents did

**G.App.426**

1    you file?

2    A.    Well, there was obviously a notice of appeal done in ten

3    days.  So that was done.  After that, I don't remember.  I

4    believe at the end, when there was a delay of Mani's request, I

5    believe I did a motion to stay the appeal.  No recollection of

6    it.

7    Q.    You didn't keep written time records of any of this,

8    right?

9    A.    No.

10   Q.    You said you had a flat fee agreement?

11   A.    Yes.  I do all my appeals flat fees.

12   Q.    And you still -- do you keep time records of that, when

13   you do a flat fee?

14   A.    Generally not.  I should probably, but I don't.

15   Q.    Well, I mean, let me show you something here from the

16   Imhoff response.  Let me share this on the screen.  Document

17   271-3, page 45.  Do you recognize this document?

18   A.    Yes, I do.

19   Q.    Whose hand is it written in?

20   A.    Mine.

21   Q.    And those are what?

22   A.    Those are dates, time spent and actions taken.

23   Q.    In whose case?

24   A.    This case, correct, the trial case.

25   Q.    On the trial case.  I'm going to move to the next page,

 1  page 46.  Is that the same?

 2  A.   Correct.

 3  Q.   There's no -- there are maybe 40 or 50 entries here,

 4  dates, hours and work done.

 5  A.   Yes.

 6  Q.   Were you keeping time then in this case?

 7  A.   Imhoff required it.

 8  Q.   All right.  And you didn't keep time in other cases?

 9  A.   What cases?

10  Q.   You had a lot of other cases, didn't you?

11  A.   Yes.  And I -- yeah, I need something more specific than

12  that.  Some cases are flat fees, some are hourly.

13  Q.   So in flat fee cases, you didn't keep time?

14  A.   Generally not.

15  Q.   How did you know that $9,500 was a fair and reasonable

16  amount to charge for the work you did in --

17  A.   I thought about what I did, and a rough expectation of

18  time for that, and that's what I figured was appropriate.

19  Q.   Did you write any memoranda?

20  A.   No.

21  Q.   Did you produce an appendix or addendum?

22  A.   For what?

23  Q.   For the appeal.

24  A.   No.

25  Q.   And you certainly -- you didn't write or begin writing a

```
 1    brief?

 2    A.   Actually, yes.  I roughed out a lot, just general

 3    scribbles.  My handwriting is awful.

 4    Q.   Did you produce those to Ms. Bolgen?

 5    A.   I don't know if I did or didn't.  My handwriting is pretty

 6    poor for anybody else.

 7    Q.   Well, you received at some point a letter from Mr. Batchu

 8    requesting that you produce your file to Ms. Bolgen.  Is that

 9    right?

10    A.   I think it came from Ms. Bolgen, not from Mr. Batchu.  I

11    don't know.  I don't remember who requested it.

12    Q.   Well, you wrote a response, didn't you, saying that you

13    had already produced the file, wrote a response to Mr. Batchu?

14    A.   I don't remember.

15    Q.   So I wanted to move on to some other things here aside

16    from the expert money.

17            You recall the sentencing in this case, do you not?

18    A.   A little bit of it.

19    Q.   Let me back up for a second.  I want to show you something

20    here.  This is an affidavit of Ms. Leis Bolgen.  Have you seen

21    this?

22    A.   I think at some point I did.

23    Q.   Paragraph 3, "At no time did I receive any briefing,

24    memoranda, research notes, copies of cases or other materials

25    relevant to briefing the issues on appeal."  You saw that, or
```

**G.App.429**

```
 1 │ now you have?
 2 │ A.   I'm sorry, what's the question?
 3 │ Q.   Do you disagree with that statement?
 4 │ A.   I have no recollection to the contrary.
 5 │ Q.   Now, I show you Document 278-17, paragraph -- excuse me,
 6 │ starting at page 4.  Do you recognize that?
 7 │ A.   Yes.
 8 │ Q.   If you look closely at the top line, are you able to see
 9 │ that?
10 │ A.   Meaning the blue?
11 │ Q.   No.  Just below.  I said top line and I was mistaken.
12 │ It's not the top line.  It's I guess what would be the second
13 │ line, a fax transmission line.  Can you make that out?
14 │ A.   Not really.  It's kind of letter over letter.
15 │ Q.   Right.  But do you see your name in there and your phone
16 │ number?
17 │ A.   Yes.  Okay, yup.
18 │ Q.   So this is page 4 of Document 278-17.  I'm going to go
19 │ down a little farther.  It's still enlarged.  Do you know when
20 │ that document was filed?
21 │ A.   No.
22 │ Q.   Well, if you can look here at page 7 of 7, do you see a
23 │ filing stamp date of 11/18/11?
24 │ A.   Yeah.  I kind of make that out.
25 │ Q.   Isn't it true that you faxed this document in on the day
```

```
 1   of sentencing?

 2   A.   I guess.  That's what it says.  There's a fax number.

 3   Yeah, I think I can make out the number.  Correct.

 4   Q.   Yeah, November 18 on page 4.

 5          So why did you wait until the day of sentencing to

 6   submit a sentencing memorandum?

 7   A.   I believe I was expecting to get a continuance.

 8   Q.   Well, that had been denied over -- what, two weeks before,

 9   hadn't it?

10   A.   And then there was a reconsideration, but that was why --

11   that's why it took time to get that in.  That's why.

12   Q.   Other than arguing United States v. Booker and Gall v.

13   United States, what other arguments did you plan to present at

14   sentencing?

15   A.   Just orally argue for mercy.

16   Q.   I mean, you didn't make an oral argument at sentencing,

17   did you?

18   A.   I have no recollection.

19   Q.   Well, I mean, did it occur to you at any time to offer --

20   since you didn't have an expert, did it occur to you at any

21   time to offer recidivism studies?

22   A.   At any time did I think about it, is that what you're

23   saying?  Did I offer?  No, I didn't -- the memorandum speaks

24   for itself.  There was nothing beyond that document that was

25   submitted in writing.
```

**G.App.431**

```
 1   Q.    You're aware that the United States Sentencing Commission
 2   produces recidivism studies, right?
 3   A.    Not generally, no.
 4   Q.    Don't they produce recidivism studies every 15 years?
 5   A.    Personally I'm not aware of that.
 6   Q.    You're not aware that there are specific recidivism
 7   studies that were available in 2011 by the United States
 8   Sentencing Commission specifically directed at sex offenders?
 9   A.    No.
10         (Discussion held off the record.)
11         THE CLERK:  The judge is currently trying to log back
12   in.
13         Your Honor, I see that you're back.
14         THE COURT:  Yeah, I went to my iPad.  I'm on my iPad.
15   I'm not on my laptop.  The laptop won't connect to the VPN.
16   For some reason the iPad will.  Please let Phil know this if
17   you're talking to him.
18         THE CLERK:  I am.
19         Mr. Batchu, you're still on the line, correct?
20         THE DEFENDANT:  I'm still getting audio, yes.
21         THE CLERK:  Okay.  Perfect.  Thank you.
22         MR. BARRON:  Just a few more questions.
23         THE COURT:  I'm very sorry about this.  We know how
24   these technical issues go.  Sometimes -- all right.  Go right
25   ahead.
```

**G.App.432**

```
 1          MR. BARRON:  Sorry about the clumsy presentation too,
 2    Your Honor.  It's difficult.
 3    BY MR. BARRON:
 4    Q.   A few more questions, Mr. Foley.  Going back to sentencing
 5    and sentencing arguments, did you not have the ability to
 6    contact Dr. Medoff about sex offenders and sentencing for
 7    consultation?
 8    A.   Contact him, yes.
 9    Q.   Mr. Foley, were you not able to consult with Dr. Medoff
10    from time to time about sex offense cases?
11    A.   Yes.
12    Q.   Did you ever ask him in this case whether there was any
13    issue about a defendant whose subjects were not prepubescent,
14    in other words, whose subjects had secondary sexual
15    characteristics?
16    A.   What do you mean by consult with him?  He would not
17    address specific issues without being paid.  And every case is
18    fact specific.  So I didn't have any just general discussion
19    with him, if that's the question.
20    Q.   Did you ever look into the issue of whether somebody who
21    had committed offenses against people who had secondary sexual
22    characteristics were any more risky than, say, pedophiles?
23    A.   No.
24    Q.   Or whether they were any less risky?
25    A.   No.
```

**G.App.433**

```
 1   Q.   Let me take you back to the sentencing hearing itself for
 2   a moment, and that will be --
 3          Do you recall the sentencing hearing to some extent?
 4   A.   Vaguely.
 5   Q.   At some point in the sentencing hearing you proposed to
 6   put Mr. Batchu on the witness stand and have him sworn, did you
 7   not?
 8   A.   Yes.  Mr. Batchu wanted to allocute.
 9   Q.   Well, you recall that Judge Ponsor warned you against
10   that?
11   A.   I have no recollection what Judge Ponsor said.
12   Q.   All right.  Well, look here on page 67 of document 99, the
13   sentencing transcript that's part of this record, the record of
14   the case here.  "I ask that Mr. Batchu be able to address the
15   Court from the box" says Mr. Foley.  The court says, "He can
16   address me from right there."
17   A.   Mm-hmm.  That's what it reads, sir.  Is there a question?
18   Q.   So do you recall Judge Ponsor essentially warning you
19   against offering Mr. Batchu as a sworn witness at sentencing
20   subject to cross-examination?
21   A.   That's what it says, yes.
22   Q.   Yup.  And you yourself said at some point during this
23   exchange with the court that you had never done this before
24   either, in your hundreds of sentencings; is that not correct?
25   I'm looking for that right now.
```

**G.App.434**

```
 1   A.   I don't see where I said that, but I'd never done that
 2   before to my memory.
 3   Q.   You had never done it before; is that correct?
 4   A.   Correct.  To my memory, no.
 5   Q.   You say, "It's not normal, Your Honor.  I agree.  I think
 6   it's the first one I've done in probably a hundred
 7   sentencings."
 8   A.   Okay, yup.
 9   Q.   Why did you do it then?
10   A.   Mr. Batchu insisted.
11   Q.   You don't have to do everything your client insists on
12   doing, do you?
13   A.   Yeah, you do.
14   Q.   Well, allocution --
15   A.   Yeah, if he wants to speak, he's allowed to speak.
16   Q.   Yeah, but not to be sworn.
17   A.   It was Mr. Batchu's choice.  I did not decide for my
18   client anything.
19          THE COURT:  Excuse me.  Can everyone hear me?
20          MR. BARRON:  Yes, Your Honor.
21          THE COURT:  Attorney Foley, can you explain to me how
22   it came to be that Mr. Batchu said, "I want to give a statement
23   at my sentencing and be cross-examined by the government about
24   my statement"?
25          THE WITNESS:  The discussion about him taking --
```

```
 1    making any statements at sentencing was done in the jail.

 2           THE COURT:  But when did it first come up, this issue

 3    about being subject to cross-exam and not just giving a regular

 4    statement, referred to as an allocution?

 5           THE WITNESS:  I would expect that would have been when

 6    we discussed it in lock-up.

 7           THE COURT:  And whose idea was it that he be subjected

 8    to cross-examination after the giving of his statement?

 9           THE WITNESS:  Mr. Batchu insisted on everything that

10    he did at sentencing.

11           THE COURT:  Now, would you agree with me that a

12    defendant making a statement, which is their right at

13    sentencing, saying, "And oh, also I want to be subject to

14    cross-examination about what I'd say at sentencing," that's

15    extremely -- and I'm underscoring the word "extremely" --

16    unusual; isn't that right?

17           THE WITNESS:  Absolutely.

18           THE COURT:  Yet do you have a memory of this extremely

19    unusual conversation with Mr. Batchu about being cross-examined

20    by the government?

21           THE WITNESS:  Not the details of the conversation.  I

22    remember having a very disconcerting discussion in lock-up

23    about how the sentencing was going to progress with his

24    statement.  I don't remember specifically who said what when.

25    But I do remember Mr. Batchu had a very lengthy written -- I
```

**G.App.436**

 1    mean, a very lengthy written-out statement, and it's my general

 2    process to have my clients speak as little as possible.  I

 3    don't see any benefit to the client speaking more than "I'm

 4    sorry."

 5            THE COURT:  Did you review the written statement

 6    beforehand?

 7            THE WITNESS:  He read it to me is my recollection.  He

 8    gave me his written statement, presented it to me is my

 9    recollection.

10            THE COURT:  Did you suggest any modifications to it?

11            THE WITNESS:  Yes.  I suggested that he not do it at

12    all.

13            THE COURT:  Okay.  All right.  Attorney Barron, go

14    right ahead.  You can follow up obviously on anything that I

15    asked.

16    BY MR. BARRON:

17    Q.   Why didn't you interrupt when the statement started to go

18    badly and the court reacted badly to it?

19            THE WITNESS:  I already had a discussion with

20    Mr. Batchu about not doing it, and he was adamant that he

21    wanted to present this lengthy discussion on the stand, and --

22    Q.   You didn't seek an adjournment for ten minutes of

23    discussion perhaps with Mr. Batchu to tell him that it was

24    going badly?

25            MR. BARRON:  He's frozen.

```
 1              THE COURT:  I think Attorney Foley might be frozen.
 2    This is a bad day for the Internet at least with our case.
 3              Attorney Barron, could you take that down.  There we
 4    go.  So we can see who's there.  See who's left.  We have
 5    Attorney Foley.  Where did Attorney Foley go?
 6              THE CLERK:  We just lost Attorney Foley.
 7              THE COURT:  All right.  He must use my Internet
 8    subscriber too.  He must use my Internet company.
 9              THE CLERK:  Or mine.
10              THE COURT:  Oh, no.  Okay.  So who would have --
11    Attorney Barron or Ms. Rivera, do you have his cell phone to
12    try to reach him and get him back on?
13              MR. BARRON:  Yeah.  I think I happen to have it
14    because he called me before the hearing to get the link.
15              THE COURT:  Mr. Batchu, are you still listening?
16              THE DEFENDANT:  Yes.
17              MR. BARRON:  Here, I have it.  603-433-1303.
18              THE COURT:  Ms. Rivera, did you get that?
19              THE CLERK:  Yes, I did.  I'll give him a call now.
20              THE COURT:  All right.  To the court reporter, how's
21    it going from your end?
22              THE COURT REPORTER:  I've interrupted when I couldn't
23    hear, Your Honor.
24              THE COURT:  So you're doing all right.
25              THE COURT REPORTER:  So far, so good.  Thank you.
```

```
 1              THE COURT:  Mr. Batchu, again, you're there?
 2              THE DEFENDANT:  Yes, I'm present.
 3              MR. BARRON:  Could I take this moment to speak to
 4     Mr. Batchu while we're trying to get Attorney Foley on the
 5     line?
 6              THE CLERK:  I can do that.
 7              MR. BARRON:  Would that work?  I mean, to do two
 8     things at once?
 9              THE CLERK:  I'll place everyone in the waiting room,
10     and then I'll admit them after you're done, Attorney Barron.
11              MR. BARRON:  Yeah.  Give me like four or five minutes.
12              THE DEFENDANT:  Thank you.
13              THE CLERK:  Okay.
14              (Discussion held off the record.)
15              THE COURT:  Okay.
16              MR. BARRON:  Thank you, Your Honor.  Nothing further
17     at this time.
18              THE COURT:  All right.  Let me just ask you, Attorney
19     Barron, before Attorney Grant goes, just give me the sketch,
20     the quick sketch of your theory of the issues here, unless you
21     think that's unfair for you to do now before Attorney Grant
22     cross-examines.  I just want to be focusing on the right thing
23     regarding -- I mean, you asked him questions about Mr. Batchu
24     giving a statement at sentencing, which is one issue.  And then
25     you had another group of issues regarding the psychological
```

```
1   exam and the money issue and when the sentencing memorandum was
2   done and those types of things.  It's just -- are those
3   connected in some way?
4           MR. BARRON:  No, Your Honor.  Sorry.  May I -- there
5   are three separate claims.  So the latter questions were
6   directed at the Cronic abandonment claim and the Strickland
7   ineffective claim.
8           THE COURT:  All right.
9           MR. BARRON:  Obviously putting the witness on the
10  witness stand is an extraordinary event that might trigger
11  Cronic.
12          THE COURT:  You definitely don't have to argue it.
13  I'm just trying to put the separate arguments out there.
14          MR. BARRON:  That's right.  So the money issue is most
15  of my questioning.  Toward the end, though, when I moved
16  towards sentencing, when I started asking about the sentencing
17  memorandum is when I was moving to the sentencing issues,
18  claims 2 and 3.
19          THE COURT:  All right.  That helps.  Thank you.  That
20  helps in my organization of kind of assimilating what's going
21  on in the testimony.  All right.
22          Attorney Grant.  Thank you.
23          MR. GRANT:  Thank you, Your Honor.
24                      CROSS-EXAMINATION
25  BY MR. GRANT:
```

1    Q.   Attorney Foley, I want to start off with the sentencing

2    hearing that you were just testifying about.  You testified

3    that you had met Mr. Batchu the day of the sentencing; is that

4    right?

5    A.   Yes.  I mean, I was there.  I'm confused.

6    Q.   So I think you said something about seeing him in the

7    lock-up or in the jail?

8    A.   Right.  I don't remember when we discussed his statement,

9    whether it was the day of sentencing or a different day.

10   Q.   Okay.  Now, isn't it true that Mr. Batchu said he wanted

11   to have a moment of silence for the court?

12   A.   Yes.

13   Q.   And did you tell him that that was a bad idea?

14   A.   Yes.

15   Q.   And did he insist upon it?

16   A.   Yes.

17   Q.   And did he say that having the moment of silence would

18   impress upon the court that he was a human with genuine

19   sympathy toward others?

20   A.   I have no present recollection of what his rationale was,

21   but I believe it fell along those lines.

22   Q.   Okay.  Now, isn't it true that in your affidavit that you

23   testified about earlier that's what you said, that Mr. Batchu

24   insisted upon the moment of silence because it would, quote,

25   "impress upon the court he was human with genuine sympathy

**G.App.441**

Case: 21-1292  Case 3:10-cr-30008-MGM  Document 363  Document 353  Filed 03/24/21  Filed 03/24/21  Page 50 of 71  Page 250 of 71  Entry ID: 6507951

50

1    toward others"?

2    A.   Well, my affidavit was sometime after the event, but it

3    was sometime ago, too.  I really have no present recollection

4    other than the affidavit.

5    Q.   Okay.  All right.  Did you review your affidavit before

6    testifying today?

7    A.   No.  I reviewed it, actually, after the deposition.

8    Q.   Upon reviewing it, did you find that the affidavit was

9    correct?

10   A.   Yes.  But it was more clearly in my memory then than it is

11   now.

12   Q.   Okay.  So if you're not remembering specifically -- I'm

13   sorry -- if you're not remembering today Mr. Batchu's rationale

14   for having a moment of silence, would it be fair to say that

15   your affidavit more clearly states it?

16   A.   Yes.

17   Q.   Okay.  Did you tell Mr. Batchu that he should keep his

18   allocution simple?

19   A.   I mean, I presume I do, because I tell that to all my

20   clients.

21   Q.   Okay.

22   A.   I don't believe in my practice that my client saying

23   anything other than his contrition or her contrition will help

24   at sentencing.

25   Q.   Did you tell -- I'm sorry.  Mr. Batchu, was he adamant

**G.App.442**

| | |
|---|---|
| 1 | about the contents of his speech? |
| 2 | A.   Yes. |
| 3 | Q.   And did you suggest having a question-and-answer session |
| 4 | to smooth out the presentation? |
| 5 | A.   I believe so.  When he stated he wanted to testify or |
| 6 | present his statement at -- not testify, but present his |
| 7 | statement, I believe -- it would have been my method to try to |
| 8 | get away from that and maybe go to a controlled question-and- |
| 9 | answer. |
| 10 | Q.   Did you feel that doing it in question-answer form allowed |
| 11 | you at least some control over what was happening in the |
| 12 | courtroom? |
| 13 | A.   That would be why I would do it. |
| 14 | Q.   Okay.  Now, are you aware that Mr. Batchu claims that you |
| 15 | had a financial conflict of interest in this case? |
| 16 | A.   I haven't seen any direct claim, but it kind of appears |
| 17 | there might be just from the tenor of the case. |
| 18 | Q.   I'm sorry. |
| 19 | A.   Just from the tenor of the case and the questions from |
| 20 | Mr. Barron, it appears that that is what is being purported. |
| 21 | Q.   Now -- actually, before I get to that, I'll ask one last |
| 22 | question about the sentencing. |
| 23 |          MR. GRANT:  And I'm sorry for jumping around, Your |
| 24 | Honor. |
| 25 |          THE COURT:  That's all right. |

**G.App.443**

1    BY MR. GRANT:

2    Q.   Coming back to the sentencing, did you tell Mr. Batchu

3    that it was not appropriate to express your love for the

4    victim?

5    A.   Oh, absolutely.  Yes.  That I do remember in the case, is

6    he repeatedly thought that was a defense before we decided a

7    plea was appropriate.  He felt that that put him outside the

8    criminal liability.

9    Q.   Okay.  Did Mr. Batchu -- what was his reaction to your

10   suggestion that that was not appropriate?

11   A.   He insisted that he loved her, and that was appropriate.

12   Q.   Now, going back to this question of a financial conflict

13   of interest, did you ever do something or did you ever fail to

14   do something because of your own personal financial interests

15   in this case?

16   A.   No.

17   Q.   Now, you were asked a number of questions about the $9,500

18   in bail money.  Do you remember that?

19   A.   Yes, the questions.

20   Q.   Would it be fair to say that the decision to go with

21   Dr. Medoff came after you had looked into a Dr. Ablow because

22   Mr. Batchu wanted Dr. Ablow?

23   A.   Yes.  Dr. Ablow would not respond to any of my inquiries.

24   He was very difficult to find to begin with.  There was no

25   mailing address that I could find.  He had a phone number.  I

**G.App.444**

 1   remember calling him several times, but he just refused to

 2   return my call.

 3   Q.   Okay.  Now --

 4   A.   So I --

 5   Q.   Go ahead.  Finish.

 6   A.   So I believe I advised Mani that we had no choice, that we

 7   had to go with Dr. Medoff because his choice was not

 8   responsive.

 9   Q.   Now, did Mr. Batchu tell you that he had heard about

10   Dr. Ablow from a fellow inmate?

11   A.   Yeah.  Actually, I do remember that it was a client of Joe

12   Balliro's, an old criminal defense lawyer in Boston, that had

13   utilized him or through that.  And I think I got the phone

14   number from Balliro's office.  I'm thinking that.  I kind of

15   have a recollection of that is how I got Dr. Ablow's phone

16   number to begin with.

17   Q.   Now, you knew that Mr. Batchu was a trained doctor?

18   A.   Correct.

19   Q.   And that he specifically had training in psychology?

20   A.   I believe he had some.  I don't think that was his primary

21   practice is my recollection.  I think that was a subset of --

22   or something along those lines.  I knew there was some

23   psychological medical training involved, but I don't believe

24   that was his primary medical degree.

25   Q.   Okay.  This discussion that you had with Mr. Batchu about

**G.App.445**

|     |                                                                           |
|-----|---------------------------------------------------------------------------|
| 1   | which expert to get, did you give him more deference because he           |
| 2   | was a doctor and had some background in evaluating the                     |
| 3   | qualifications of potential experts in this area?                         |
| 4   | A.   I can't say that was part of my thought process.  I think            |
| 5   | it was more the fact that that was what the client wanted.  He            |
| 6   | wanted Dr. Ablow.  He was crystal clear that that was who he              |
| 7   | wanted.                                                                    |
| 8   | Q.   And did you feel like since it was crystal clear that                |
| 9   | that's who he wanted, you needed to go with that at least until           |
| 10  | the point that that possibility was exhausted?                           |
| 11  | A.   Yes.                                                                  |
| 12  | Q.   Now, you found out that Dr. Medoff needed $8,500; is that            |
| 13  | right?                                                                     |
| 14  | A.   Yes.  I found that out in a conversation with Dr. Medoff.            |
| 15  | Q.   And did you communicate that to Mr. Batchu in a September            |
| 16  | 8, 2011 letter?                                                           |
| 17  | A.   I don't know when I communicated it to him, but I presume            |
| 18  | I did.                                                                     |
| 19  | Q.   Okay.                                                                 |
| 20  |          MR. GRANT:  Your Honor, may I have screen sharing?               |
| 21  |          THE COURT:  Of course.                                           |
| 22  |          THE CLERK:  You do already.                                      |
| 23  |          MR. GRANT:  Oh, I do already.  Oh, okay.  Let me share           |
| 24  | screen here.                                                              |
| 25  | BY MR. GRANT:                                                              |

**G.App.446**

1    Q.    Attorney Foley, are you able to see my screen now?

2    A.    I can, yes, sir.

3    Q.    Okay.  I'm showing you what has been marked as Document

4    278-4.  Do you see that?  It's up at the top.

5    A.    Oh, there it is.  Yeah, right in the middle there in the

6    blue.

7    Q.    Okay.  And this is on your letterhead; is that right?

8    A.    That's correct.

9    Q.    Dated September 8, 2011?

10   A.    Yes.

11   Q.    And in the letter do you tell Mr. Batchu that his

12   sentencing is November 18 of that same year?

13   A.    That's what it says, yes.

14   Q.    And you discuss the upcoming sentencing and the failed

15   attempts to find Dr. Ablow?

16   A.    Yes.

17   Q.    Do you also enclose Dr. Medoff's CV so you can discuss it

18   with him further?

19   A.    If that's what it says, I'm sure I did.

20   Q.    Okay.

21          MR. GRANT:  Your Honor, I would move for the admission

22   of 278-4 for purposes of this hearing.

23          THE COURT:  Any objection?

24          MR. BARRON:  No.  And I move for admission of all the

25   displayed exhibits and the exhibits of record.

```
 1              THE COURT:  All right.  So all exhibits of record are
 2    admitted, I'm assuming without objection from the government.
 3    Is that correct?
 4              MR. GRANT:  Actually, I do have an objection to the
 5    letter from Mr. O'Brien as it contains hearsay upon hearsay.
 6              THE COURT:  All right.  Overruled.  Everything will be
 7    in, including what you wanted to use and are now using,
 8    Attorney Grant.
 9              (Exhibits 99, 268-1, 271-1, 271-3, 278-2, 278-3,
10    278-4, 278-17 received into evidence.)
11              MR. GRANT:  Okay.  Thank you.
12    BY MR. GRANT:
13    Q.   Now, Mr. Foley, at that point you're about two months from
14    the sentencing; is that right?
15    A.   Yes.
16    Q.   And you still don't have the money, correct?
17    A.   Correct.
18    Q.   And you get the money later, would that be fair to say?
19    A.   Yes.
20    Q.   Okay.  And you filed a motion to continue the sentencing
21    that was denied; is that right?
22    A.   Yes.
23    Q.   And then you filed a motion to reconsider that decision
24    just a few days before the sentencing; is that also correct?
25    A.   I don't remember when, but yes, I did a motion to
```

**G.App.448**

```
 1 │ reconsider.
 2 │ Q.   Was that all in order to give Dr. Medoff the time to
 3 │ produce a report in time for the sentencing?
 4 │ A.   Yes.  That was the only reason, really, that I can
 5 │ remember.
 6 │ Q.   Okay.  Were your efforts to get Dr. Medoff sincere?
 7 │ A.   Absolutely.
 8 │ Q.   Okay.  Were your efforts to delay the sentencing sincere?
 9 │ A.   Yes, to obtain the doctor's expertise.
10 │ Q.   And if you had gotten the continuances, would it be fair
11 │ to say that you would have spent $8,500 of the $9,500 that you
12 │ got from the bail money on Dr. Medoff?
13 │ A.   Yes.
14 │ Q.   So in other words, if the sentencing had been continued,
15 │ that $8,500 would not be available for your appellate fee
16 │ afterwards?
17 │ A.   No, it would have been paid to Dr. Medoff.
18 │ Q.   Now, in your sentencing memorandum, you were seeking a
19 │ sentence of the mandatory minimum; is that right, 128 months --
20 │ I'm sorry, 120 months?
21 │ A.   I believe so.  I don't remember the numbers.
22 │ Q.   Okay.  But considerably lower than what he got.  Is that
23 │ correct?
24 │ A.   I don't remember what he got, but I know it was a lot, as
25 │ far as the number.
```

**G.App.449**

```
 1   Q.   Okay.  I'm going to show you another document, if I could
 2   just --
 3           MR. GRANT:  Your Honor, this has not been marked, but
 4   it is Document 79 on the docket.  Can we designate it as such?
 5           THE COURT:  Yes.
 6           MR. GRANT:  Okay.
 7           THE COURT:  And are you moving for this to be an
 8   exhibit as well?
 9           MR. GRANT:  I am, Your Honor.
10           MR. BARRON:  No objection.
11           THE COURT:  All right, no objection.  This is also an
12   exhibit now.  It's document, as you said, 79.
13           MR. GRANT:  79, yes.
14           (Exhibit 79 received into evidence.)
15   BY MR. GRANT:
16   Q.   So Mr. Foley, I'm showing you document 79.  I'm just going
17   to scroll through it for a moment just so you can see it.  Can
18   you see it okay?
19   A.   I can, yes, sir.
20   Q.   Do you recognize this as the plea agreement between
21   Mr. Batchu and the government?
22   A.   I don't recognize it, but I believe it is or was.
23   Q.   And if we could go all the way to the end of the plea
24   agreement part, which is page -- we had longer plea agreements
25   back then.  Getting to page -- okay.  So page 14 of this
```

**G.App.450**

```
 1   document, do you see your signature at the end?

 2   A.    I do.

 3   Q.    Okay.  And then you see a place for Mr. Batchu's

 4   signature?

 5   A.    Yes.

 6   Q.    Is that something that you got from Mr. Batchu when you

 7   were meeting him face-to-face?

 8              MR. GRANT:  I think -- Mr. Foley -- I think he might

 9   have froze.

10              (Technical difficulties.)

11              THE COURT:  All right.  Who do we have on the line?

12              THE CLERK:  It looks like we've lost Attorney Foley.

13              MR. GRANT:  Actually, I see him now.  He's muted,

14   though.

15              THE COURT:  He's trying to talk.

16              THE WITNESS:  Okay.  Yes.  Can you hear me now?

17              THE CLERK:  Yes.

18              THE WITNESS:  I apologize.  Technology is what it is.

19              MR. GRANT:  Your Honor, may I proceed?

20              THE COURT:  Yes.  Go right ahead.

21              Mr. Batchu, are you still with us?

22              THE DEFENDANT:  I am still here.  Thank you very much.

23              THE COURT:  Okay.  Great.

24   BY MR. GRANT:

25   Q.    Attorney Foley, I have on the screen paragraph 7 or
```

**G.App.451**

```
 1   section 7 of the plea agreement.  Can you see it from your
 2   screen?
 3   A.    I can.
 4   Q.    And could you just take a moment to look this over and
 5   then I'm going to ask you a question.  If you could just tell
 6   us when you're ready.
 7   A.    Okay.  Yes, I read it.
 8   Q.    Okay.  I want to direct your attention to paragraph 7C.
 9   Do you see that part?
10   A.    Correct.
11   Q.    Okay.  And isn't it true that in this paragraph Mr. Batchu
12   was agreeing not to file an appeal of his sentence if the
13   sentence was 293 months or less?
14   A.    Yes.
15   Q.    So this was, you know, a sentence of well over 20 years?
16   A.    Yes.
17   Q.    Now, given that, did you think that there would be an
18   appeal before the sentencing hearing?
19   A.    I was hoping not, because that's a significant amount of
20   time.
21            (Court reporter interrupts.)
22   A.    I said no, I did not expect it to be appealed because it
23   was a significant amount of time, and I was hoping that he
24   would not get more than that, which was a trigger to permit an
25   appeal.
```

**G.App.452**

```
 1          MR. GRANT:  Your Honor, I think Mr. Barron may be --
 2   Mr. Barron, I'm sorry, you just looked frozen for a second.
 3   I'm sorry.  You're not.
 4   BY MR. GRANT:
 5   Q.   So given that, did you have any expectation that you would
 6   earn any appellate fees prior to the sentencing?
 7          THE COURT:  Did you hear the question?  He's frozen.
 8   Yeah, he's frozen.
 9          MR. GRANT:  Mr. Foley.
10          THE WITNESS:  Can you hear me now?
11          MR. GRANT:  Yes.
12          Your Honor, may I proceed?
13          THE COURT:  Yes.
14          MR. GRANT:  Okay.  Thank you.
15   BY MR. GRANT:
16   Q.   So given that you were hoping that Mr. Batchu would not
17   receive a very large sentence and that you would not have to
18   appeal, did you have any expectations that you would earn any
19   appellate fees prior to the sentencing?
20   A.   No.
21   Q.   Did you ever avoid hiring an expert in order to get
22   appellate attorney's fees?
23   A.   No.
24          MR. GRANT:  One moment, Your Honor.  I'm almost done.
25   BY MR. GRANT:
```

```
 1   Q.   I think you testified earlier about the $4,800 that were
 2   allocated to experts that you got from Imhoff Associates.  Is
 3   that correct?
 4   A.   Correct.
 5   Q.   And did that money go to Mr. Batchu's mother?
 6   A.   Yes.
 7   Q.   So you returned that; is that right?
 8   A.   Yes.
 9   Q.   Is the reason that you returned it is that you had not
10   actually earned that money?
11   A.   No.  Yes, I returned it because I had not earned it.
12   Q.   So would it be fair to say that your assessment of what
13   you had earned was the $9,500?
14   A.   Yes.
15   Q.   No more?  Is that correct?
16   A.   Yeah.  That was my expectation of what I earned.
17   Q.   Okay.
18           MR. GRANT:  No further questions, Your Honor.
19           THE COURT:  All right.  Anything on that, Attorney
20   Barron?
21           MR. BARRON:  Yes.
22                      REDIRECT-EXAMINATION
23   BY MR. BARRON:
24   Q.   Mr. Foley --
25           MR. BARRON:  First of all, Alex, could you take down
```

**G.App.454**

```
 1    your document.
 2          MR. GRANT:  Oh, yeah.  I'll stop sharing.
 3    BY MR. BARRON:
 4    Q.   Mr. Foley, have you ever done an appeal before in a case
 5    in which there's been a plea agreement?
 6    A.   I don't remember any.  I can't say one way or the other.
 7    I don't know.
 8    Q.   I mean, when somebody's facing a long sentence, he has to
 9    exhaust remedies, doesn't he?
10    A.   Yes.
11    Q.   So even if he's entered into an agreement with the
12    government for a waiver of appeal, he might still enter an
13    appeal in spite of having made that waiver?
14    A.   Well, of course he can enter it whenever he wishes or she
15    wishes.  Yes.
16    Q.   And courts of appeal don't always enforce these appellate
17    waivers either, do they?
18    A.   I don't have any knowledge of that one way or the other.
19    Q.   In fact, didn't you at one point write to Mr. Batchu
20    talking about an appeal before the sentencing?
21    A.   I don't remember.
22          MR. BARRON:  Thank you.
23          THE COURT:  All right.  Okay.  Give me, Attorney
24    Barron, and then Attorney Grant, a three-minute -- just your
25    three-minute summary of the issues that are identified in
```

1    just -- I'm not looking for you to persuade me or make any

2    arguments.  I just want to make sure that I am focused on what

3    you want me to focus on.

4          So go ahead, Attorney Barron.

5          MR. BARRON:  So claim 1 is the actual conflict of

6    interest claim.  And actual conflict of interest would mean

7    that Mr. Foley had delayed spending the money for the expert in

8    the hopes that he could have kept the money for pursuit of an

9    appeal.  He took a low amount of money -- according to the

10   papers, right, he took a low amount of money to pursue a case

11   at a great distance.  There is, what, $10,000 plus additional

12   money for making trips to Springfield, a great deal of driving,

13   low pay for that.  The money was there in the form of bail and

14   in the form of a $5,000 trust account.

15         So this kind of -- in many cases, the client's bail

16   money is used for an appeal, but in cases where there's an

17   expert, perhaps that's not an appropriate thing to do, to avoid

18   an expert.

19         This case was from the very beginning a case that

20   would go to sentencing.  I think it's very clear everybody --

21   any experienced attorney who have these cases know that there

22   would be a sentencing hearing.  Not only is there a great

23   percentage of cases that end up as convictions, it's clear,

24   particularly in a case like this one with all the wealth of

25   electronic evidence.

**G.App.456**

1          There's no reason to wait until June or September of

2     2011, well more than a year, to prepare a defense.  That should

3     have been something started long, long before.  So I'll leave

4     further argument on that because you said three minutes.

5          THE COURT:  Right.

6          MR. BARRON:  We have the *Cronic* and *Strickland* claims.

7     I mean, here we have a sentencing memorandum filed by facsimile

8     on the day of sentencing with no apparent sentencing argument.

9     There were still available means of making arguments about the

10    dangerousness and need for individual deterrence.  Individual

11    deterrence is a huge issue in a sentencing of sex offenders.  I

12    mean, it's the issue, how dangerous is the person.  And he

13    really didn't make any effort in this.

14         As far as the *Cronic* claim is concerned, the record

15    sort of speaks for itself.  Putting a defendant on the witness

16    stand regardless of what he says, you can object to it.  You

17    don't allow a defendant to do whatever he wants.  There are

18    certain strategic questions that the defendant has.  He can

19    make an allocution.  That's his right.  But he can't do

20    anything he wants.  Thank you.

21         THE COURT:  All right.  Attorney Grant.

22         MR. GRANT:  Yes, Your Honor.  If I just understand

23    what you're looking for is just kind of an identification of

24    what the issues are.

25         THE COURT:  Yeah, that's all.  So if you agree those

```
 1   are the issues, you can just give me in three minutes just your

 2   side of them, your version.

 3          MR. GRANT:  Sure.  So I think the main issue is the

 4   conflict of interest issue because in that case the defendant

 5   does not have to show prejudice, prejudice is presumed.  And as

 6   I think I've articulated in other filings, you would have to

 7   believe that Mr. Foley was not trying to do any of the things

 8   that he was actually doing, that he was not trying to get an

 9   expert, that he was faking it with his client when he was

10   sending him letters talking about it, getting an expert, that

11   he was filing motions to continue with the court that he was

12   hoping would be denied and that he wouldn't actually have to

13   spend money on the expert, because if he did, then there would

14   be no money for the appellate fees that Mr. Barron is

15   suggesting is the motive for, you know, subverting the

16   defendant's interests.  So I think that's completely

17   unpersuasive.

18          With respect to what happened at the sentencing, I

19   think that's the second issue, of whether, first of all, it

20   constituted deficient performance and, second of all, whether

21   it was prejudicial.  I think what you've heard is that

22   Mr. Foley was trying to make the best of a bad situation of

23   trying to deal with the fact that his client was very insistent

24   on pursuing what turned out to be a poor course, and that he

25   tried to do this question and answering session to try to exert
```

1    some control over it after having advised him specifically to

2    not do the things that Judge Ponsor found to be so troubling.

3           With respect to the third point, which has to do with

4    trying to line up a mitigation expert, I think, first of all,

5    we go into this in some depth, that there is no showing that

6    had such a report been produced, that it would actually have

7    been helpful to him.

8           They have produced an after-the-fact report by

9    Dr. Sorentino, who, as I indicated -- whose analysis would be

10   quite different had it been done at the time.

11          In any event, I don't think any of this rises to the

12   high level of deficient performance, and with respect to both

13   the pursuing of the expert and of what happened at the

14   sentencing hearing, both of those issues, you wouldn't be able

15   to show prejudice.

16          THE COURT:  All right.

17          MR. BARRON:  I don't agree with some of those things

18   in there.

19          THE COURT:  Go ahead, Attorney Barron, take a minute.

20   Go ahead.

21          MR. BARRON:  Yeah, two quick things.  First of all,

22   the question isn't whether we tried to get a sentencing expert

23   in just a month or two before sentencing but why we were in

24   that position to begin with.

25          THE COURT:  Of the month or two?

1          MR. BARRON:  Yeah.  Why are we waiting?  We should

2     have been doing this in May or June of 2010 because it was

3     obvious from day one that this was going to be an issue.  So I

4     mean, it may be we changed course and it was too late by then.

5     It's always foreseeable that you might be denied a continuance,

6     surprising as that might have been.

7          The other question about Dr. Sorentino's report was

8     that anybody who offered that report would have been able to

9     say what the defendant's risk level was years out, 10 years

10    out, 15 years out, 20 years out, so on.  So the government's

11    argument about age is well taken, but it's also not helpful to

12    the government, because we're talking about doing a ten-year

13    sentence or do we really need a 365-month sentence or 15, 20

14    years.

15         MR. GRANT:  Your Honor, could I just make one point in

16    response.  Then I'll be quiet.

17         I guess the -- with respect to the pursuit of the

18    expert, I think you have the same issue that you had at the

19    sentencing where the defendant's own actions are subverting the

20    pursuit where he was insisting upon Dr. Ablow for a certain

21    period of time.  And then that turned out to be a dead end.

22    And then he went ahead and looked for Mr. Medoff.

23         THE COURT:  All right.  Attorney Barron, let me ask

24    you, to support your claim that Attorney Foley could have

25    stopped the proceedings and not let Mr. Batchu undertake the

```
 1    way he wanted to give the statement to the court and what he
 2    said to the court, that Attorney Foley could have stopped him,
 3    if that's what the client wants, I mean the client doesn't have
 4    to accept the attorney's advice.  How would Attorney Foley have
 5    stopped that, or how could he have?
 6             MR. BARRON:  Well, first of all, I'd have told --
 7    giving an allocution does not mean a right to take the witness
 8    stand.  I would have objected to the judge.  Easy enough.  I
 9    think Judge Ponsor, looking at that record, would have been in
10    agreement.  In fact, he was admonishing Attorney Foley not to
11    do it.
12             I mean, clients have limited strategic rights, and
13    they're quite narrow, and it's often necessary to ignore the
14    client's requests.
15             THE COURT:  Well, if a client is -- not to debate this
16    case with you, but generally if a client is insisting on doing
17    something at sentencing, insisting on giving a statement and
18    the lawyer is telling him no and the lawyer tells the court,
19    look, the client is doing this against my advice, I don't want
20    the client to do this, and the judge has some type of colloquy
21    with the client and the client still wants to go ahead and say
22    whatever they want to say, you're telling me the judge should
23    just say to that client no, you can't say a word, I'm not going
24    to let you?
25             MR. BARRON:  Well, there are two portions to the
```

```
 1   response.  First of all, the sentencing memorandum filed the
 2   morning of the sentencing tells us why we're in that situation.
 3   I think it's circumstantial, a panicked client.
 4           And secondly, yes, I think -- I think there is a
 5   measure of control and a way to interrupt the sentencing.  I'm
 6   not a witness.  So I can't say what I'd do, but I think the
 7   court has seen lawyers interrupt their clients, correct them
 8   and get them to change course in an allocution that's going
 9   badly.
10           THE COURT:  Yes, I have seen that.  But I've also seen
11   defendants who are -- individuals charged are very focused,
12   perhaps stubborn, and there is no stopping them once they
13   decide they want to do something.
14           All right.  I just wanted to have that discussion with
15   you regarding the authority, the appropriateness of a court
16   stopping someone who, if they want to say something, from doing
17   so, even if it's against the advice of counsel.
18           MR. BARRON:  Yes, and take the witness stand.
19           THE COURT:  Right.
20           All right.  So very good.  Thank you, everyone.  All
21   right.  I will take the matter under advisement.  Thanks.
22           MR. GRANT:  Thank you.
23           MR. BARRON:  Thank you.
24           THE CLERK:  Thank you, everyone.
25   (Proceedings adjourned at 1:33 p.m.)
```

**G.App.462**

```
 1                    C E R T I F I C A T E

 2

 3

 4   UNITED STATES DISTRICT COURT )

 5   DISTRICT OF MASSACHUSETTS    )

 6

 7

 8            I certify that the foregoing is a correct transcript

 9   from the record of proceedings taken February 24, 2021 in the

10   above-entitled matter to the best of my skill and ability.

11

12

13

14

15   /s/ Kathleen Mullen Silva                    8/24/21

16

17   Kathleen Mullen Silva, RPR, CRR              Date
     Official Court Reporter
18

19

20

21

22

23

24

25
```

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES of AMERICA,

                          Case No. 3:10-cr-30008 MGM

        v.


MANI BATCHU,
        Defendant-Petitioner.

REQUEST FOR AMENDED OR ADDITIONAL FINDINGS
UNDER F.R.Civ.P. Rule 52

        Defendant-petitioner, Mani Batchu, by his counsel, Kevin L.
Barron, Esq., respectfully moves the Honorable Court for amended
or additional findings of fact and conclusions of law under
F.R.Civ.P. Rule 52 and Rule 11 of the Rules Governing Section
2255 Cases (as Amended February 1, 2010) concerning the Court's
March 1, 2021 Memorandum and Order (Doc. 283) ("Order"), as
follows:

        1.    Concerning petitioner's *Mickens* claim and trial
counsel's delay over 19 months of representation in obtaining an
expert evaluation, the Court finds that counsel waited an
"irresponsibly long time"  but that "[s]everal factors undercut
Defendant-Petitioner's argument" (Doc. 283, p. 6) that a
conflict of pecuniary interest affected the adequacy of
representation.  Petitioner has not argued that trial counsel
didn't attempt to obtain an evaluation at the last minute;
rather, petitioner maintains that the conflict of pecuniary

1

**G.App.465**

interest caused counsel to delay so long as to actually *affect the adequacy* of representation.

a.   Does the Court find that trial counsel's delay in obtaining funds was not motivated by a desire to keep the funds for an appellate retainer, regardless whether counsel may have later changed his mind?

b.   Can the Court take judicial notice that most defendants sentenced to long terms of imprisonment usually appeal their judgments sentences in violation of the terms of their plea agreements?  In other words, would any experienced counsel not have known that a defendant sentenced to less than the 293 months contemplated by the plea agreement - or even a 200 month sentence - have been likely to appeal?

c.   Does the fact that the November 1, 2011 motion to continue (Doc. 84) and November 8, 2011 motion for reconsideration (Doc. 86) were denied not show that representation was affected by the delay in obtaining an evaluation over the prior 17 months?

d.   Does the Court not find that an evaluation employing widely used standard indices such as those in Dr. Sorrentino's Psycho-Sexual Evaluation (Doc. 241-1, SEALED Ex. A to Hearing Brief) would have been helpful at sentencing to address the issue of petitioner's dangerousness, an issue that the sentencing Court found paramount?

e.   Does the Court find that Attorney O'Brien's statements
in his July 30, 2020 letter (Doc. 268-1, p. 2) show that the
earlier Connecticut bail money check for $9,500.00 (Doc. 271-1,
p. 10) was mailed to trial counsel?  If so, does not evidence of
mailing give rise to a presumption of receipt?

f.   What is the meaning of trial counsel's statements that
he had "no control" over funds in the Imhoff client trust
account?  Did the final hearing not make clear that Imhoff
disbursed these funds with reasonable promptness on trial
counsel's request?

g.   Does not trial counsel's failure over 19 months to
obtain the $4,800.00 in the Imhoff trust account and use that
money for an ordinary, inexpensive evaluation or the kind used
in Sex Offender Registry Board proceedings not support Ground
One of the petition?

h.   Does the Court find that trial counsel did *any*
substantive work on petitioner's appeal?  Does the apparent
improper collection of a $9,500.00 fee without a retainer
agreement or any statement of billable hours not corroborate
petitioner's statements in pleadings that trial counsel
complained about the fee he earned in petitioner's case?
Moreover, does the $10,000.00 flat fee earned not further
corroborate petitioner's claim by providing a motive to delay

expenditures in the hopes of recovering such money as an appellate fee?

2.   Petitioner raises a *Strickland* claim that trial counsel's performance was deficient when measured against that of an ordinary fallible attorney and that such deficient performance prejudiced petitioner.

a.   This Court reasons that the sentencing Court based its 365-month sentence on defendant's conduct and that an evaluation would not have mattered.  Doc. 283, p. 10.  Does the absence of a favorable evaluation on dangerousness, recidivism rates and management of sex offenders in the community not undermine confidence in the outcome of the sentencing proceeding?  Given that the persistence of petitioner's offense conduct was the principal reason to impose a 365-month sentence, could countervailing social sciences evidence not have a mitigating influence on the Court's decision?

b.   The Court makes no finding with respect to the portion of Dr. Sorrentino's evaluation that discusses the availability of medications to suppress sexual aggressiveness.

c.   Is the use of a sex offender evaluation, whether its outcome is ultimately favorable or unfavorable, not ordinary diligence on the part of an ordinary fallible defense attorney practicing in a federal criminal court?

d.   Does the Court not find that trial counsel would have been under an obligation to timely seek Criminal Justice Act funds had such counsel been unable to obtain private funds for an evaluation?

e.   The Court finds that the existence of a report would have done nothing to change the petitioner's conduct at sentencing.  Doc. 283, p. 10.  Petitioner argued at final hearing that the apparent lack of a sentencing strategy in the absence of an evaluation, the four-page sentencing memorandum filed the morning of sentencing (regardless when the government filed its memorandum), the failure to cite United States Sentencing Commission Recidivism studies and other favorable recidivism materials, the lack of any formal argument on record by counsel, all showed a failure to prepare for sentencing. Does the Court find that a trial counsel's lack of preparation precipitated a breakdown of attorney client communication at sentencing?

f.   Does the Court find that trial counsel was a professional obligation to allow petitioner to make a harmful allocution?  Conversely, was counsel not obliged under these circumstances to interrupt petitioner and seek and adjournment to regain control over or stop his allocution.

Dated:  March 27, 2021          Respectfully submitted,
                                MANI BATCHU, Petitioner
                                /s/Kevin L. Barron
                                Kevin L. Barron, Esq.
                                50 Congress St. - Ste. 600
                                Boston, MA 02129-4075
                                (617) 407-6837


                        CERTIFICATE OF SERVICE

     Counsel certifies that he has caused a true copy of this
document to be served today on counsel for all the parties
through the CM/ECF system of this District as set forth in the
Notice of Electronic Filing and that no party requires service
by other means.


                        /s/Kevin L. Barron

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES of AMERICA,

                              Case No. 3:10-cr-30008 MGM

      v.


MANI BATCHU,
         Defendant-Petitioner.

MOTION FOR CERTIFICATE OF APPEALABILITY

      Petitioner, Mani Batchu, by his attorney, Kevin L. Barron,

Esq., respectfully moves the Honorable Court for a Certificate

of Appealability ("COA") from the Court's March 1, 2021

Memorandum and Order (Doc. 283) denying the petition and an

Order under Rule 11[1] of Rules Governing Section 2255 Cases.

      The petitioner proposes the following issues for appeal, as

may further be liberally amended in light research on the

applicable law and as need fairly appears:

---

[1] Rule 11. Certificate of Appealability; Time to Appeal
(a) Certificate of Appealability. The district court must issue or deny a
certificate of appealability when it enters a final order adverse to the
applicant. Before entering the final order, the court may direct the parties
to submit arguments on whether a certificate should issue. If the court
issues a certificate, the court must state the specific issue or issues that
satisfy the showing required by 28 USC § 2253(c)(2). If the court denies a
certificate, the parties may not appeal the denial but may seek a certificate
from the court of appeals under Federal Rule of Appellate Procedure 22. A
motion to reconsider a denial does not extend the time to appeal.

(b) Time to Appeal. Federal Rule of Appellate Procedure 4(a) governs the time
to appeal an order entered under these rules. A timely notice of appeal must
be filed even if the district court issues a certificate of appealability.
These rules do not extend the time to appeal the original judgment of
conviction.  Rules Governing Section 2255 Cases in the United States District
Courts (as Amended February 1, 2010).

G.App.471

I.   Whether the record contains sufficient evidence that trial counsel delayed expenditure of bail monies and escrowed funds owing to a pecuniary conflict of interest in obtaining these funds for an appellate retainer and whether such delay actually affected the adequacy of representation?  Petitioner contends that the sentencing Court's surprising denial of trial counsel's motion to continue is immaterial.  The issue is not whether the grant of a motion to continue was likely but, rather, whether the counsel's conflict of interest *actually affected the adequacy of representation* - which it clearly did.  The government's argument that the plea agreement foreclosed an appeal and gave counsel no expectation of collecting an appellate retainer is a legally erroneous argument.  As Justice Sotomayor has written for the majority in *Garza*: "We hold that the presumption of prejudice recognized in *Flores-Ortega* applies regardless of whether the defendant has signed an appeal waiver."  *Garza v. Idaho*, 586 U.S. ___ (2019) (reversing high state court and holding presumption of prejudice from *Roe v. Flares-Ortega*, 528 US 470 (2000) applies regardless of whether a defendant has signed an appeal waiver.)  Moreover, nearly every defendant who pleads under agreement and receives a long sentence like petitioner's files a direct appeal.  Here it is uncontested that the bail money from Connecticut would have been available to fund an evaluation had the motion to continue been

granted.  It follows, therefore, had counsel not delayed in
obtaining bail money that had been made available 15 months
before sentencing by August 12, 2010 order of the Enfield
Superior Court (Doc. 271-1, p. 9), the evaluation could have
been timely completed and presented at sentencing.  Likewise,
the $4,800.00 in Trust at Imhoff were also available for a
cheaper evaluation, even though trial counsel claimed to have
"no control" but did in fact have control over an account from
which Imhoff made prompt disbursements at counsel's request.  No
other cogent explanation exists for the long delay except that
trial counsel delayed making expert expenditures until the last
possible moment in the hopes that the money would be available
for an appellate retainer.

    II.  Whether trial counsel's failure to obtain a sex
offender evaluation for sentencing "fell below an objective
standard of reasonableness" and that such deficiency was
"prejudicial to the defense"?  *Strickland v. Washington*, 466 US
668, 692 (1984).  Petitioner respectfully submits that, here,
the Court's reasoning shows some degree of circularity.  The
record of the sentencing hearing shows strongly that the Court
was troubled by the "persistence"[2] of petitioner's offense
conduct and that was the reason to sentence petitioner to 365

---

[2] The government argued four times that petitioner's offense conduct was
"persistent".  Doc. 99, pp. 27, 28, 32 & 46.

months on all counts (a sentence five months above statutory
maximum on two counts):  "I have not seen a more determined
course of criminal conduct in 28 years on the bench."  Doc. 99,
p. 92.  Concerns over "determined" offense conduct is an
individual deterrence consideration, protecting the victim and
the public from future similar offenses by a defendant.  If this
was the sentencing Court's main concern, then how could
counsel's failure to obtain an evaluation showing petitioner's
low risk of re offense and manageability on supervised release
not undermine confidence in the outcome?  In this case,
petitioner shows harm because counsel's omission implicates the
substantive reasonableness of the sentence.

                            ARGUMENT

     Petitioner has made a substantial showing of a denial of a
constitutional right such that a certificate of appealability
should issue.  See, 28 USC §2253(c)(2).  A petitioner makes a
"substantial showing of the denial of a constitutional right"
where he demonstrates "that reasonable jurists would find the
district court's assessment of the constitutional claims
debatable or wrong." *Miller-El v. Cockrell*, 537 US 322, 337
(2003) quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  As
described above, petitioner has made a substantial showing on
circumstantial evidence that trial counsel's pecuniary personal
conflict of interest *actually affected the adequacy of*

                               4
                          **G.App.474**

*representation* because counsel's long delay in making expert

expenditures left the defense without an expert sex offender

evaluation at sentencing, regardless whether denial of the

motion to continue was unexpected.  Petitioner has further

substantially shown that he was denied the effective assistance

of counsel where counsel failed over the course of 18 months of

representation to retain any expert at all to conduct an

evaluation and the absence of such evaluation undermines

confidence in petitioner's sentence because the evaluation would

have favorably addressed the issues on which the Court imposed

its heavy sentence.

CONCLUSION

For the reasons set forth above, a certificate of

appealability should issue.

Dated:  March 29, 2021          Respectfully submitted,
                                MANI BATCHU, Petitioner
                                /s/Kevin L. Barron
                                Kevin L. Barron, Esq.
                                50 Congress St. - Ste. 600
                                Boston, MA 02129-4075
                                (617) 407-6837


CERTIFICATE OF SERVICE

Counsel certifies that he has caused a true copy of this
document to be served today on counsel for all the parties
through the CM/ECF system of this District as set forth in the
Notice of Electronic Filing and that no party requires service
by other means.

/s/Kevin L. Barron

**G.App.475**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES of AMERICA,

Case No. 3:10-cr-30008 MGM

v.

MANI BATCHU,
Defendant-Petitioner.

MOTION FOR RECONSIDERATION

Petitioner, Mani Batchu, by his attorney, Kevin L. Barron, Esq., respectfully moves the Honorable Court for reconsideration of its March 1, 2021 Memorandum and Order (Doc. 283) in light of *Garza v. Idaho*, 586 US ___, 139 S. Ct. 738 (2019).

The government argued at final hearing with apparent success that the plea agreement foreclosed an appeal and, therefore, gave trial counsel no expectation of collecting an appellate retainer. This is a legally erroneous argument. The Court adopted this argument over objection. See, Memorandum and Order, Doc. 283, p. 6.[1]

---

[1] "Several factors undercut Defendant-Petitioner's argument. First, at the time Attorney Foley was allegedly scheming to make sure there would be funds available for an appeal, it was unclear whether Defendant-Petitioner would be able to file an appeal, let alone that he would retain Attorney Foley for such an appeal. The written plea agreement, negotiated by Attorney Foley, waived Defendant-Petitioner's right to challenge his conviction on direct appeal and his right to appeal a sentence of 293 months or less."

Although the Court accepted the government's argument, that argument is contrary to clearly established federal law as expressed in decisions of the Supreme Court.  The plea agreement posed no impediment to taking an appellate retainer.  Regardless of any waiver it contains, under the law of the United States, a plea agreement does not abrogate a defendant's right to appeal.  According to the Supreme Court, the failure of counsel to file a notice of appeal when defendant so instructs is presumptively ineffective assistance, even where the defendant has pled guilty under a plea agreement with an appellate waiver.  "We hold that the presumption of prejudice recognized in *Flores-Ortega* applies regardless of whether the defendant has signed an appeal waiver."  *Garza v. Idaho*, 586 U.S. ___ (2019) (Sotomayor for the majority) (reasoning that the presumption of prejudice from *Roe v. Flares-Ortega*, 528 US 470 (2000) applies regardless of whether a defendant has signed an appeal waiver).

Whether the waiver may later be enforced is a separate and different question, but the defendant's right of appeal and, therefore, counsel's ethical basis for accepting a retainer, are both secure.

In view of the foregoing, petitioner suggests that the Court may have sufficient grounds to reconsider its findings of fact.

Dated:  March 30, 2021          Respectfully submitted,
                                MANI BATCHU, Petitioner
                                /s/Kevin L. Barron
                                Kevin L. Barron, Esq.
                                50 Congress St. - Ste. 600
                                Boston, MA 02129-4075
                                (617) 407-6837


                       CERTIFICATE OF SERVICE

     Counsel certifies that he has caused a true copy of this
document to be served today on counsel for all the parties
through the CM/ECF system of this District as set forth in the
Notice of Electronic Filing and that no party requires service
by other means.


                          /s/Kevin L. Barron

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES of AMERICA,

　　　　　　　　　　　　　　　　Case No. 3:10-cr-30008-MGM

　　v.

MANI BATCHU,
　　　　Defendant-Petitioner.

NOTICE OF APPEAL

　　　　Defendant-Petitioner, Mani Batchu, hereby gives notice of
appeal from the District Court's March 1, 2021 Order (Doc. 283)
denying the petition and motion to vacate and from the Court's
April 1, 2021 Order (Doc. 288) denying petitioner's Motion for
Amended or Additional Findings of Fact Under F.R.Civ.P. Rule 52
(Doc. 285) and the denial of petitioner's Motion for
Reconsideration (Doc. 287).　By the same April 1, 2021 Order
(Doc. 288), the Court has granted petitioner's Motion for a
Certificate of Appealability (Doc. 286).

Dated:　April **8**, 2021　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　MANI BATCHU, Petitioner

CERTIFICATE OF SERVICE
BY PRISON MAIL

Defendant petitioner states that he has caused this notice
of appeal to be served on _April 8TH_ , 2021 by mailing the same
through prison mail, correct first-class postage paid, to the
Clerk of the Court, United States District Court, 1 Courthouse
Way – 2nd Fl., Boston, MA 02210.  See, *Morales-Rivera v. United
States*, 184 F.3d 109 (1st Cir. 1999).

MANI BATCHU

Please return a stamped copy of this document to my address of:

Mani Batchu 91057-038
Inmate Mail
FCI Beaumont Low
PO Box 26020
Beaumont, TX 77720

## <u>CERTIFICATE OF SERVICE</u>

I, Mark T. Quinlivan, AUSA, hereby certify that on July 15, 2022, I served a copy of the foregoing document by first-class mail, postage prepaid, on the petitioner-appellant: Mani Batchu, No. 91057-038, FCI Beaumont Low, PO Box 26020, Beaumont, TX 77720-6020.
.

 /s/ *Mark T. Quinlivan*
MARK T. QUINLIVAN